Richard G. Menaker
Rebecca Northey
Stephen D. Houck
MENAKER & HERRMANN LLP
10 East 40th Street
New York, NY 10016
Telephone:   (212) 545-1900
Facsimile:   (212) 545-1656

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>　　　　　LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　　　Debtor. | Case No. 08-01420 (JMP) SIPA |
| LEHMAN BROTHERS INC.,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　　-against-<br><br>CITIBANK, N.A., CITIGROUP, INC.,<br>CITIGROUP GLOBAL MARKETS, INC.,<br>CITIBANK JAPAN LTD., CITIBANK<br>EUROPE PLC, CITIBANK INTERNATIONAL<br>PLC, CITIGROUP PTY LIMITED, BANCO DE<br>CHILE, BANCO NACIONAL DE MEXICO<br>SA, CITIBANK DEL PERU SA, BANK<br>HANDLOWY, ZAO KB CITIBANK,<br>CITIBANK AS, CITIBANK MAGHREB and<br>CITIBANK AFFILIATES 1-5,<br><br>　　　　　　　　　Defendants. | Adv. Proc. No. 11-　　(JMP)<br><br>**<u>COMPLAINT</u>** |

Plaintiff, James W. Giddens (the "Trustee"), as Trustee for the liquidation of the business of Lehman Brothers Inc. ("Debtor" or "LBI") pursuant to the Securities Investor Protection Act ("SIPA"), by his undersigned attorneys Menaker & Herrmann LLP, for his complaint against Citibank, N.A. ("Citibank"), Citigroup, Inc. and their respective affiliates and subsidiaries as set forth in the caption, (collectively the "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1.       In furtherance of his duty to recover LBI's assets for the benefit of its former customers, the Trustee brings this adversary proceeding to recover more than $1.3 billion in cash and other assets of LBI now held by Citibank, N.A., and its affiliates. Unlike its parent Lehman Brothers Holdings, Inc. ("LBHI") which filed for protection under Chapter 11, LBI remained in business during the week of September 15, 2008, to ensure an orderly wind-down of the business in order to facilitate a seamless transfer of customer accounts and thereby to protect its customers. After LBHI's filing, Citibank conditioned continuation of certain foreign exchange settlement services to LBI on LBI's depositing $1 billion (the "$1 billion deposit") in an LBI account at Citibank. Also during the week of September 15, Citibank obtained a $700 million pledge from Barclays Bank PLC ("Barclays") as security for carrying on the same foreign exchange settlement services. On September 19, after the SIPC filing and after LBI requested the return of the $1 billon deposit, Citibank advised LBI that it had set the deposit off against "obligations owed to Citibank." In addition, Citibank and its various affiliates around the world froze over $300 million in additional LBI deposits and asserted a right to setoff against the

alleged remaining balance of the shortfall. In November 2008, Citibank returned the $700 million pledge to Barclays without notification to the Court or to the Trustee.

2.     The Trustee seeks to recover the $1 billion deposit, post-petition deposits in LBI's various accounts at Citibank which total approximately $190 million as of May 31, 2010, approximately $62 million in pre-petition deposits in LBI's accounts at Citibank, and approximately $90 million in deposits and net payables to LBI from Citibank and certain of its affiliates. The Trustee's right to recover these funds derives from simple and straightforward principles of applicable bankruptcy law and SIPA – e.g., the requirement of mutuality with respect to setoffs – together with the clear limitations on the scope of safe harbor insulation. These legal principles are reinforced by the purposes underlying SIPA and a balance of the equities that weighs heavily against Citibank and its affiliates and in favor of the Trustee and those he is charged to protect.

### THE PARTIES

3.     On September 19, 2008, the Honorable Gerard E. Lynch entered the LBI Liquidation Order pursuant to the provisions of SIPA in the case entitled *Securities Investor Protection Corporation v. Lehman Brothers Inc*., Case No. 08-CIV-8110 (GEL) (the "SIPA Proceeding"). The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of the business of LBI pursuant to section 78eee(b)(3) of SIPA; (ii) appointed counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (iii) removed the SIPA Proceeding to this Court pursuant to section 78eee(b)(4) of SIPA.

4.     The Trustee is charged with liquidation of the business of LBI pursuant to the provisions of 78eee(b)(3) of SIPA and the orders of this Court and the

District Court. The Trustee is vested by SIPA with the same powers and rights to avoid transfers as a trustee in a case under title 11, 15 U.S.C. § 78fff-1(a), and is also specifically authorized by SIPA to recover property transferred by the debtor that would have been customer property if the transfer were held voidable under the Bankruptcy Code.

5.      Defendant Citibank, N.A. ("Citibank") is a national banking association organized under the laws of the United States with its principal place of business at 388 Greenwich Street, 14th Floor, New York, New York 10013.

6.      Defendant Citigroup, Inc. ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 399 Park Avenue, New York, New York 10022.

7.      Defendant Citigroup Global Markets, Inc. ("CGMI") is a corporation organized under the laws of the State of Delaware and, upon information and belief, is a subsidiary of Citigroup.

8.      Upon information and belief, defendant Citibank Japan Ltd. is a Citibank subsidiary incorporated in Japan; defendant Citibank Europe PLC is a Citibank subsidiary incorporated in Ireland; Citibank International PLC is a Citibank subsidiary incorporated in the U.K.; defendant Citigroup Pty Limited is a Citibank subsidiary incorporated in Australia; defendant Banco de Chile is a Citibank subsidiary incorporated in Chile; defendant Banco Nacional De Mexico SA is a Citibank subsidiary incorporated in Mexico; defendant Citibank Del Peru SA is a Citibank subsidiary incorporated in Peru; defendant Bank Handlowy is a Citibank subsidiary incorporated in Poland; defendant

ZAO KB Citibank is a Citibank subsidiary incorporated in Russia; defendant Citibank AS is a Citibank subsidiary incorporated in Turkey; and defendant Citibank Maghreb is a Citibank subsidiary incorporated in Morocco.

9.     The unspecified defendants, referred to herein as Citibank Affiliates 1-5, are affiliated entities under the aegis of Citigroup that are or may be holding funds or other property that should be returned to LBI.

## VENUE AND JURISDICTION

10.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and (c). This is a core proceeding within the meaning of 28 U.S.C. §157(b). The claims asserted include proceedings to determine, avoid and recover preferences and fraudulent transfers, obligations and/or conveyances. In addition, resolution of the claims asserted herein will have an effect upon the administration of LBI's SIPA liquidation case, the value of its estate and any distribution to its creditors.

11.     Pursuant to 28 U.S.C. §§157(a) and 157(b)(1) and the District Court's reference of proceedings to the bankruptcy court, this Court has subject matter jurisdiction. Venue in this district is proper in accordance with 28 U.S.C. §1409(a).

12.     LBI brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seeks relief, *inter alia,* under Sections 105(a), 362, 541, 542, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, 28 U.S.C. §2201 and applicable provisions of state law.

<h1 style="text-align: center;">FACTUAL ALLEGATIONS</h1>

**A.     The Business of LBI**

13.     During the relevant period, LBI was a registered broker-dealer in the United States affiliated with LBHI as part of the latter's global financial services network ("Lehman"). The operations of Lehman were organized in three segments: a) Capital Markets, b) Investment Banking and c) Investment Management.

a.     Capital Markets encompassed, among other things, secondary trading, financing, mortgage origination and securitization, prime brokerage and research activities in fixed income and equity products, as well as principal investing and proprietary trading activities.

b.     Investment Banking included, among other things, providing advice to corporate, institutional and government clients on mergers and acquisitions and other financial matters, and raising capital by underwriting public and private offerings of debt and equity instruments.

c.     Investment Management consisted of two major businesses, Asset Management and Private Investment Management ("PIM"). Asset Management provided proprietary asset management products through a variety of distribution channels to individuals and institutions. Private Investment Management provided traditional brokerage services and comprehensive investment, wealth advisory, trust and capital markets execution services to both high-net-worth individuals and small and medium size institutional clients.

14.     LBI's activities were related to all three segments of the business. In the Capital Markets segment, LBI cleared securities transactions for virtually all of the Lehman affiliates, and offered prime brokerage services to hedge funds, pension funds, insurance companies, trading companies, university endowments and asset managers. Lehman Brothers International Europe ("LBIE"), the European broker-dealer counterpart to LBI in the Lehman group of companies, cleared certain transactions for LBI and its customers. As part of the Investment Banking segment of Lehman, LBI was involved in underwriting debt and equity instruments, and in traditional brokerage services and M&A advisory services.

15.     LBI also held securities in connection with transactions involving other Lehman entities and their counterparties and cleared proprietary trades for Lehman Brothers OTC Derivatives, Inc.

16.     LBI engaged in foreign exchange ("FX") trading mainly to facilitate its services to clients. A *de minimis* amount of proprietary FX trading was carried on by LBI's traders on behalf of LBI itself. (The settlement of FX trading is hereinafter referred to as "FX settlement.") While several Lehman affiliates were involved in FX trading, LBI was the affiliate in the United States that carried on the greatest volume of such transactions.

**B.     The Services Provided to LBI by Citibank and Affiliates**

17.     Citibank and its affiliates provided a number of services to LBI and its affiliates in connection with their various activities described above, including maintenance of cash deposits and custodial accounts, FX settlement, agency and trade

services and provision of credit facilities. Citibank and its affiliates also entered into ISDA (International Swap Dealers Association, Inc.) Multicurrency Agreements and securities lending agreements with LBI.

18.     Citibank assisted LBI in FX settlement using two methods: (a) traditional correspondent banking settlement and (b) settlement through the Continuous Linked Settlement system ("CLS") carried out via CLS Bank International ("CLS Bank"), an Edge Act corporation chartered by the Federal Reserve System.

19.     Currency exchange constituted an indispensable element of the worldwide business of LBI and its affiliates; accordingly, FX transactions were critical to serving Lehman customers. Under the traditional correspondent banking method of FX settlement, each counterparty to an FX trade transfers to the other counterparty the currency it is selling, typically using correspondent banks in the currencies concerned. Because the transfer of the sold currency takes place independently of the transfer of the bought currency, this method exposes the parties to principal and liquidity risks equal to the full value of the trade.

## C.     Overview of FX Settlement Services

20.     Under the CLS method of FX settlement, the counterparties settle their trades on the books of a specialized FX settlement institution, CLS Bank, which assures that the bought currency is paid out only if the sold currency is received. CLS Bank acts as a settlement institution but does not act as a counterparty for any FX trader. Each trade remains the obligation of the counterparties themselves. Thus, what is actually

settled are not the trades themselves but the payments arising from the trades as instructed by the parties.

21.     CLS Bank operates a global multi-currency cash settlement system on a payment-versus-payment basis, thereby effecting simultaneous exchange of the two legs of an FX transaction. The system is intended to eliminate the risk associated with FX settlement across time zones by protecting a party to an FX trade from paying away the currency being sold before receiving the currency being bought.

22.     There are three categories of participants who use the CLS settlement system. "Settlement Members" have direct access to the system, have their accounts with CLS Bank, and can submit information about FX trades and payments for such trades directly to CLS Bank. "User Members" have direct access to the settlement system and can submit information about their trades to the system; however, they do not have an account with CLS Bank and cannot make their own payments. Finally, third parties may use the CLS system, but they have neither direct access nor the ability to submit payments. They cannot carry out CLS settlement without using the services of a Settlement Member that they designate to act on their behalf ("Designated Settlement Member"). Thus, both User Members and third parties are totally dependent on Settlement Members for making payments within the CLS system.

23.     The CLS daily process involves matching and funding of FX trades. Direct participants in the system submit information about their own (or their customers') FX trades with other participants (or their customers) specifying their counterparty, currency exchanged, date of trade, settlement date and other relevant data necessary for

matching the two sides of the trades ("Instructions"). The Instructions are matched on the basis of the data included, and each matched Instruction to be settled is placed in a settlement queue maintained on the CLS System. On the settlement date, Settlement Members administer the matched Instructions by paying in one currency and receiving payment in the counterpart currency so that neither party to the match ends up being indebted to the other.

24. During the period relevant to this proceeding, Citibank was a Settlement Member of the CLS Bank. As such, it settled its own transactions through the CLS system and provided fee-based CLS settlement services to User Members and third parties that designated it to do so.

25. LBI was a User Member of CLS Bank and in that capacity could directly submit its FX trades for settlement to CLS Bank. However, because LBI did not have an account with CLS Bank, its payments were processed through the account of its Designated Settlement Member, Citibank. Accordingly, LBI had full access to the CLS system only by virtue of its special relationship with Citibank.

26. Pursuant to the CLS Settlement Services Amended and Restated Agreement for CLS User Members, dated October 28, 2004 (the "CLS Agreement"), Citibank served as the Designated Settlement Member in the CLS system for LBI, as well as LBI's affiliates LBIE, Lehman Brothers Special Financing and Lehman Brothers Commercial Corporation.

27. As an inducement to enter into the CLS Agreement, Citibank offered more favorable terms if LBI and the above-listed affiliates consolidated the majority of

their foreign currency accounts with Citibank. Accordingly, LBI and the listed affiliates maintained a number of accounts with various Citibank branches and affiliates in twenty-five different currencies. The main such affiliates are the defendants in this action named in paragraphs 7 and 8 above.

28.     As LBI's Designated Settlement Member, Citibank had discretion to authorize or reject LBI's settlement Instructions and, by the express terms of the CLS Agreement, had no obligation to extend credit to support LBI's trades. Citibank was authorized, in the ordinary course of business, to credit LBI's accounts with long balances and debit LBI's accounts for short balances to fund LBI's FX settlements through CLS. In addition, in order to fund CLS payments for LBI, Citibank was authorized under the CLS Agreement to debit accounts of LBI at branches and affiliates of Citibank and at certain other banks throughout the world insofar as those accounts were used by LBI for FX trading.

**D.     The $1 Billion Deposit**

29.     During the weekend of September 13-14, 2008, meetings were held at the Federal Reserve Bank of New York and at the offices of LBHI in connection with the then-current financial crisis, in particular to determine the future of LBHI and its subsidiaries, including LBI. Citibank representatives were active participants in the meetings at the Federal Reserve Bank and were in contact with LBI personnel during this period. Ultimately, it was determined that LBHI and most of its affiliates would file a petition for relief under Chapter 11 of the Bankruptcy Code, which occurred during the early morning hours of September 15, 2008 (the "Petition Date").

30.     It was further determined as of September 14, 2008, that LBI would not file for bankruptcy court relief but would remain in business for the protection of its customers while efforts were undertaken to wind down pending transactions in the ordinary course of business and facilitate a possible sale of the overall broker-dealer operations to an institutional purchaser, thereby minimizing the disruption to customers' securities accounts, while maximizing the assets available to satisfy LBI's obligations to all its creditors.

31.     Citibank knew that LBI could not remain viable as an ongoing concern without continued access to CLS FX settlement services. Citibank also knew that LBI would be unable to find a replacement in a timely manner were it to resign as LBI's Designated Settlement Member. Accordingly, Citibank had considerable leverage – and knew that it had considerable leverage – to extract concessions from LBI for its benefit and to the detriment of LBI's customers and other creditors.

32.     On the morning of September 15, 2008, aware of the events of the previous weekend and notwithstanding its knowledge of the consequences for LBI should LBI's access to CLS FX settlement services be cut off, Citibank notified LBI and CLS Bank that it was resigning as LBI's Designated Settlement Member and unilaterally terminated the CLS Agreement on the ground of LBHI's Chapter 11 filing. Citibank knew that the effect of its action would be to undermine efforts to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors. Citibank, thus, endeavored to use its leverage to gain an advantage over LBI's customers and other creditors.

### E. Citibank's Limited Restoration of LBI's CLS Access

33. After urgent requests by LBI's senior management, Citibank agreed later in the day on September 15 that it would, after all, continue providing CLS FX settlement services to LBI, but only under limited conditions that were materially different from those provided for in the CLS Agreement, including receipt of a deposit in the amount of $1 billion as a precondition to providing any CLS settlement services.

34. Given the indispensable importance of FX settlement through the CLS system for LBI's ability to continue in business, and having neither power nor time to negotiate, LBI had no alternative but to sign a Letter Agreement, dated September 15, 2008 (the "9/15/08 Letter Agreement") drafted by Citibank. The 9/15/08 Letter Agreement provided that Citibank would continue to serve as the Designated Settlement Member for LBI and its subsidiary Lehman Brothers Commercial Corporation in the CLS system for September 16, 2008, if LBI transferred $1 billion in US currency into a newly created deposit account at Citibank to be opened in LBI's name.

35. The 9/15/08 Letter Agreement further provided that Citibank would "effect payments on CLS only for the account of LBI and its subsidiary Lehman Brothers Commercial Corp, which companies are not in bankruptcy or other insolvency proceedings, and for no other company. The payments will be made by Citibank only in amounts at any time outstanding of up to the aggregate amount of deposits."

36. On September 16, 2008, Citibank again issued an ultimatum to LBI stating that it intended to terminate FX settlement services for LBI through the CLS system unless LBI signed another letter agreement (the "9/16/08 Letter Agreement"

together with the 9/15/08 Letter Agreement, the "<u>Letter Agreements</u>") extending by one more day Citibank's obligation to serve as LBI's Designated Settlement Member for CLS. The continuation of settlement services was conditioned on Citibank's continuing to hold the deposited amount with the right to setoff against it. LBI again had no alternative but to sign. The 9/16/08 Letter Agreement, like its predecessor, was drafted by Citibank and presented to LBI on a take-it-or-leave-it basis. Lehman Brothers Commercial Corp. was not a party to the 9/16/08 Letter Agreement.

37.     In forcing LBI to make the $1 billion deposit and sign the two Letter Agreements, Citibank was exercising palpable economic leverage created by the fact that continued access to the CLS FX Settlement System was vital to LBI's ability to maintain its ongoing business operations. LBI, at a time of increasing financial distress, found itself in the coerced position of facing a demand for funds that it could not refuse.

38.     The 9/16/08 Letter Agreement modified the language of the original CLS Services agreement by making it subject to six specific terms and conditions enumerated therein. Among other things, it provided, in paragraph 5, that Citibank would effect payments for the account of LBI on CLS "only in amounts at any time outstanding of up to the aggregate amount in effect from time to time of the LBI deposit placed with Citibank" -- i.e., up to a maximum of $1 billion. Moreover, the only setoff rights provided to Citibank under the CLS Agreement as modified by the 9/16/08 Letter Agreement are set forth in paragraph 6 and are limited to the $1 billion deposit.

**F.      Citibank's Mishandling of the $1 Billion Deposit**

39.      On the evening of September 15, LBI transferred $700 million from an account at Chase via the Fedwire into one of its Citibank accounts which already held in excess of $300 million. On information and belief, shortly thereafter, Citibank moved $1 billion to an off-shore account at Citibank Nassau in the Bahamas. One of Citibank's senior risk officers gave internal instructions that the funds were to be held in LBI's name.

40.      On information and belief, contrary to the instructions of one of its own senior risk officers, Citibank did not hold LBI's $1 billion deposit in LBI's own name. Instead, LBI's $1 billion deposit was deposited in a Citibank Treasury account, rather than in a separate time account in LBI's name as contemplated and required by both Letter Agreements.

41.      On September 18, 2008, Citibank transferred the $1 billion deposit to a newly opened Citibank Global Transaction Services demand deposit account at Citibank N.A., New York branch, denominated "Lehman," and commingled it with the balance remaining from a $2 billion deposit previously made by LBHI.

**G.      Citibank's Violation of the Aggregate Settlement Limit**

42.      In addition, in its capacity as LBI's Designated Settlement Member under the CLS Agreement, Citibank withheld and did not credit long positions accumulated from CLS settlements to the LBI accounts although it knew that this action would impair LBI's FX operations.

43.     On Wednesday, September 17, 2008, Citibank personnel observed that a large net shortfall had accumulated during the CLS settlement process, contrary to accepted procedures for carrying out settlements on the CLS system. Citibank's executives asserted that such a large shortfall resulted from internal management weaknesses that led to substantial negative balances being built up when Citibank settled the various FX payments it handled for LBI as LBI's Designated Settlement Member. Never in the prior history of the relationship had there been a failure to establish a net zero balance in the parties' relative positions as of the close of each business day.

44.     Citibank risk management personnel concluded that the additional, uncontemplated CLS shortfall put it at risk, especially given the stress on LBI's financial position. Once again endeavoring to use the leverage it held over LBI, Citibank demanded yet another large influx of cash from LBI to be used as collateral to secure its CLS obligations. LBI, however, could not meet Citibank's new demands.

## H.     The Barclays Pledge

45.     Citibank then turned to Barclays, which was in the final stages of negotiating with LBI for what turned out to be a purchase of LBI's assets. Accordingly, Barclays had a strong interest in maintaining LBI's viability until it could complete the acquisition. On September 17, 2008, Citibank obtained from Barclays a pledge of $700 million, to be held as security in a special cash collateral account, to permit Citibank's continued "CLS services, and daylight overdraft lines and temporary overdraft lines in connection with the provision of CLS Services to LBI." Citibank would not have

continued to provide CLS FX settlement services to LBI without the security provided by the Barclays pledge.

46.     The $700 million deposit arrangement between Barclays and Citibank was documented in a Pledge Agreement, dated September 17, 2008 (the "9/17/08 Barclays Agreement"). The 9/17/08 Barclays Agreement, unlike the Letter Agreements of the previous two days between Citibank and LBI, expressly granted Citibank a security interest in the special cash collateral account. It also granted Citibank a right of setoff against that account. Further, the 9/17/08 Barclays Agreement specifically secured "all obligations of [Barclays] and LBI now or hereafter existing" under the CLS Agreement.

## I.     The Further Build-Up of the CLS Shortfall

47.     Despite the clear commitment by Citibank in the 9/16/08 Letter Agreement that it would settle CLS transactions only up to the aggregate amount of the $1 billion LBI deposit, Citibank continued to further the build-up of LBI's foreign currency positions. Instead of reducing the short and long balances to zero at the end of each day, as was done in the ordinary course of business, Citibank allowed running balances to accumulate throughout the week of September 15, 2008. At the end of the week, there were substantial negative outstanding balances in various currencies, the largest of which was the net balance in US dollars (approximately $16 billion dollars). In an attempt to protect itself, Citibank withheld the long balances and did not pay them out to LBI, which in turn affected payments to third parties. Citibank built up its position for an eventual setoff by refusing to honor LBI's requests for payments to LBI brokerage

customers, including but not limited to LBI's requests to transfer funds in the aggregate amount of approximately $82 million owed to PIM customers prior to September 19, 2008.

48. Eventually, after commencement of the SIPA liquidation, Citibank netted LBI's short positions against its long positions, leaving what it has claimed to be a net shortfall in the amount of $1,260,326,894. Citibank would not have incurred such a large shortfall absent the security provided by the Barclays pledge.

49. Also as of September 19, 2008, in addition to the almost $16 billion deficit, LBI had short positions in CLS in the following currencies – Australian Dollar (AUD), Honk Kong Dollar (HKD), Mexican Peso (MXN), New Zealand Dollar (NZD), Swedish Krona (SEK) and Singapore Dollar (SGD). The long balances, i.e., amounts that Citibank was supposed to pay out to LBI but did not, were in the following currencies – Canadian Dollar (CAD), Swiss Franc (CHF), Danish Krona (DKK), Euro (EUR), British Pound Sterling (GBP), Israel Shekel (ILS), Japanese Yen (JPY), Norwegian Krona (NOK), South African Rand (ZAR).

**J. Citibank's $1 Billion Setoff and Return of the Barclays Pledge**

50. At 1:13 p.m. EST on September 19, 2008 Citibank moved the $1 billion deposit from the "Lehman" account to a Citibank administrative hold account used to hold funds on a temporary basis pending further instruction. Citibank's contemporaneous records describe the action as a "reversal" of the September 18 transfer. On information and belief, however, these funds were never returned to the Citibank Nassau account from which they had been taken.

51.     On September 19, 2008, settlement of payments on the CLS system for LBI ceased, and LBI's Treasurer requested that Citibank return the $1 billion deposit.

52.     On September 19, 2008, SIPC filed its petition for a protective decree under SIPA with the District Court with respect to LBI, and an Order Commencing Liquidation was entered at 1:23 p.m. EST.

53.     On information and belief, Citibank did not take the requisite action to effectuate a setoff of the $1 billion deposit against the LBI debt prior to the filing. At 2:07 p.m. -- *after* the SIPA liquidation petition had been filed -- Citibank's legal department addressed a notice to "Lehman Brothers International" (not LBI) advising that Citibank had exercised its right of setoff against the $1 billion deposit.  It was not until 3:22 p.m. on September 19, however, that Citibank finally transferred the $1 billion deposit from the administrative hold account to an account denominated "Citibank N.A. New York Branch for Branch and Citibank Affiliates," again describing the action as a "reversal" of the September 18 transfer.

54.     Citibank refused to return the deposit, stating in a second email at 2:28 p.m., this time addressed to Lehman Brothers Incorporated: "This is to notify you that Citibank has exercised its right to set off the $1 billion deposit that you placed with Citibank to satisfy obligations owed to Citibank."

55.     Citibank did not, in fact, effect the seizure of the $1 billion deposit or record a credit to LBI's net shortfall in the CLS system until after the filing of the SIPC petition. Accordingly, the purported setoff was not pre-petition as claimed by

Citibank, but constituted an improper post-petition setoff taken without approval of the Court.

56.     It was not until the end of September, 2008 that Citibank specified the amount of the alleged indebtedness owed to it by LBI for CLS services in the amount of $1,260,326,894. This amount was said to be based upon the net shortfall that Citibank allowed to be built up during the week of September 15 through September 19, together with approximately $25 million in fees based upon the alleged spread between bid and ask that Citibank's FX Desk charged and over $6 million for what Citibank alleges to be its "cost of carry." While there appeared to be a significant shortfall in connection with CLS settlements, Citibank has never alleged or claimed any shortfall arising out of traditional correspondent banking settlement, although it never ceased providing the traditional correspondent banking settlement service.

57.     On November 13, 2008, without notice to the Court or the Trustee, Citibank returned to Barclays the full $700 million deposit which it had received on September 17, 2008, as security to protect against any loss occasioned by Citibank's provision of settlement services to LBI in the CLS system. Thus, rather than using the Barclays pledge to reduce the amount of the CLS shortfall, Citibank unilaterally took it upon itself to return the funds *in toto* to Barclays. Upon information and belief, Citibank's decision to return the $700 million was made to foster its relationship with Barclays and with full knowledge of the adverse consequences it would have on the LBI estate and on LBI's former customers and other creditors. Citibank's return of the $700 million conferred an enormous benefit on Barclays, allowing it to complete its profitable

acquisition of LBI's assets without the necessity of honoring the pledge it had made specifically for the purpose of buying the time necessary to do so.

58. Citibank represented to the Court in various proofs of claim that it had properly credited the $1 billion deposit to its own account prior to the filing of the SIPA liquidation petition. At the time it made these representations, however, Citibank knew that the $1 billion was in an administrative hold account when the SIPA petition was filed and that it had not taken the legally required steps to effect a valid setoff.

**K.    Funds Held by Citibank and Its Affiliates**

59. Citibank continues wrongfully to retain LBI's $1 billion deposit based on its post-petition setoff in connection with the CLS settlement shortfall. Citibank claims that certain safe harbor provisions in the Bankruptcy Code concerning swap agreements and related credit enhancements insulate it from any recovery of that sum by the Trustee. But those safe harbor provisions do not in fact apply to CLS services of the kind provided by Citibank.

60. In addition, Citibank affiliates that do not have any claims against LBI are currently holding pre-petition cash deposits in various LBI accounts in the amount of approximately $70,000,000.

61. Citibank and its affiliates are also currently holding post-petition cash deposits in various LBI accounts in the amount of approximately $190,000,000 as of May 31, 2010.

62. Citigroup Global Markets, Inc. is currently holding an account payable to LBI in the amount of approximately $11,000,000.

63.     Citibank owes additional sums to LBI in the latter's representative capacity on behalf of customers or in its proprietary capacity, including but not limited to, approximately $11,000,000, by reason of an agreement relating to the acquisition of Salomon Smith Barney, which the Trustee is entitled to recover.

## COUNT I

### (Violation of the Automatic Stay)

64.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

65.     On information and belief, Citibank was on notice that the SIPA liquidation of LBI was being commenced on Friday, September 19, 2008. Citibank seized the $1 billion deposit and purported to set it off against the accumulated LBI shortfall after commencement of the SIPA liquidation knowing that the liquidation had been commenced. Citibank did not record the purported setoff on its books, i.e., it did not credit or reduce LBI's obligations, document or otherwise effect the "setoff," until after the commencement of the liquidation proceeding.

66.     Since the commencement of the SIPA liquidation, Citibank has wrongfully maintained that it effected a pre-petition setoff.

67.     Citibank willfully violated the automatic stay and Section 362(a)(7) of the Bankruptcy Code when it effected the seizure of the $1 billion deposit.

68.     The funds that were seized by Citibank are property of the LBI estate under Section 541 of the Bankruptcy Code.

69.     Citibank should be ordered to turn over to the Trustee the funds seized or their equivalent immediately.

## COUNT II

### (Avoidance of Fund Sweep as an Impermissible Post-Petition Transfer under Section 549 of the Bankruptcy Code)

70.     The allegations in paragraphs 1 through 69 are incorporated by reference as if fully set forth herein.

71.     Citibank's seizure of the $1 billion deposit constitutes an invalid setoff, because under Section 553(a)(3) of the Bankruptcy Code, the $1 billion deposit was a debt to LBI incurred by Citibank within ninety days of the commencement of the SIPA liquidation and for the purposes of obtaining a right of setoff against LBI and improperly getting ahead of other creditors.

72.     The seizure of the funds occurred after the commencement of the case without court permission, in violation of the Bankruptcy Code, and is avoidable under Section 549 of the Bankruptcy Code.

## COUNT III

### (Recovery of the Avoided Post-Petition Transfer under Section 550 of the Bankruptcy Code)

73.     The allegations in paragraphs 1 through 72 are incorporated by reference as if fully set forth herein.

74.     Citibank's seizure of the $1 billion deposit is avoidable as a post-petition transfer pursuant to Section 549 of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover

from Citibank the value of the transfer together with interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT IV

### (Avoidance of the $1 Billion Transfer as Preference under Section 547 of the Bankruptcy Code)

75.     The allegations in paragraphs 1 through are incorporated by reference as if fully set forth herein.

76.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, as of September 19, 2008, LBI owed to Citibank an amount in excess of $15 billion accumulated between September 15 and September 19, 2008, and Citibank seized the deposit to reduce LBI's pre-petition obligations. The seizure of the deposit on September 19, 2008 by Citibank constituted a transfer for the benefit of Citibank.

77.     The transfer occurred within ninety days prior to the Petition Date.

78.     As of the time of the transfer, Citibank was a creditor of LBI.

79.     The transfer was made for, or on account of, an antecedent debt (within the scope of Section 547(b) of the Bankruptcy Code) owed by LBI to Citibank.

80.     The transfer was made while LBI was presumed to be insolvent pursuant to Section 547(f) of the Bankruptcy Code.

81.     The transfer enabled Citibank to receive a larger share of LBI's estate than if such transfer had not been made and if Citibank had received payment of such debt in a liquidation of LBI's assets under chapter 7 of the Bankruptcy Code.

82.     The transfer is an avoidable preference under Section 547(b) of the Bankruptcy Code.

## COUNT V

### (Recovery of the Avoided Preferential Transfer under Section 550 of the Bankruptcy Code)

83.     The allegations in paragraphs 1 through 63 and 75 through 82 are incorporated by reference as if fully set forth herein.

84.     The transfer is avoidable as a preferential transfer pursuant to Section 547 of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT VI

### (Avoidance of the $1 Billion Setoff under Section 553(a)(3) of the Bankruptcy Code and State Law)

85.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

86.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, on September 15, 2008, LBI deposited $1 billion with Citibank under an agreement providing that Citibank "shall have the right at all times to set off the amount of the referenced deposit account against any obligations of Lehman Brothers, Inc. and/or Lehman Brothers Commercial Corporation under the CLS Agreement."

87.     LBI deposited $1 billion with Citibank within ninety days prior to the Petition Date.

88.     At the time of the transfer of the $1 billion deposit to Citibank, LBI was presumed to be insolvent for purposes of Section 553(c) of the Bankruptcy Code.

89.     Citibank caused LBI to make the $1 billion preferential deposit for the purpose of obtaining a right of setoff.

90.     The setoff is invalid under Section 553 of the Bankruptcy Code and under state law because through the preferential deposit, Citibank was positioned ahead of the other creditors of LBI.

## COUNT VII

### (Turnover under Section 542 of the Bankruptcy Code of Estate Property Held by Citibank)

91.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

92.     Citibank itself holds approximately $1.3 million in proprietary assets and $246 million in 19 LBI cash deposits, of which approximately $62 million constitute pre-petition deposits, which Citibank failed to distribute to LBI customers and other third parties in accordance with pre-petition instructions, and approximately $184 million post-petition deposits.

93.     Citibank is in possession, custody or control of the above-described assets, which are of substantial value or benefit to LBI's estate and are property belonging to LBI (that may be used by LBI), and may not be used to setoff against any

alleged claims Citi may have against LBI because of the limitations of Section 553 of the Bankruptcy Code.

94.     Citibank should be directed to turn over the above-described assets or the value thereof to LBI immediately.

## COUNT VIII

**(Avoidance of the $1 billion Transfer as Improvement in Position under Section 553(b) of the Bankruptcy Code)**

95.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

96.     In the alternative and only if the seizure of the $1 billion deposit were found to be pre-petition, on information and belief, in the ordinary course of business the balances from CLS settlements between LBI and Citibank were zeroed out as of the end of each business day. The first day on which LBI was indebted to Citibank in connection with CLS was Monday, September 15, 2008. Due to the failure of LBI's FX trade counterparties to make required payments, LBI's resulting inability to cover short balances and Citibank's paying out certain (but not all) long balances, LBI owed Citibank approximately $480 million at the end of the day on September 15. On September 19, 2008, after Citibank seized the $1 billion deposit, LBI's debt to Citibank was reduced to $260 million. As a result of the $1 billion deposit, Citibank improved its position by $220 million.

97.     As of ninety days prior to the Petition Date, and at all relevant times prior to and including the Petition Date, Citibank was a creditor of LBI. Citibank has

asserted that at certain times within ninety days of the Petition date it held claims against LBI.

98.     Within ninety days prior to the Petition Date, LBI transferred $1 billion to Citibank.

99.     At the time of the transfer of the $1 billion deposit to Citibank, LBI was insolvent for purposes of Section 553(c) of the Bankruptcy Code.

100.     Citibank improved its position through LBI's transfer because the amount of the insufficiency on the date of the setoff was less than the insufficiency on the later of ninety days prior to the Petition Date and the first date during the ninety days immediately preceding the Petition Date on which there was an insufficiency. For purposes of this Count, insufficiency means the amount by which any debt owed by LBI to Citibank exceeded any mutual debt owed by Citibank to LBI.

101.     Pursuant to Section 553(b) of the Bankruptcy Code, Citibank is liable for the amount by which the transfer enabled it to improve its credit position with respect to LBI in the ninety days preceding the Petition Date.

## COUNT IX

**(Recovery of an Avoided Transfer as an Impermissible Improvement in Position under Section 550 of the Bankruptcy Code)**

102.     The allegations in paragraphs 1 through 63 and 95 through 101 are incorporated by reference as if fully set forth herein.

103.     The transfer is avoidable as an impermissible improvement in position pursuant to Section 553(b) of the Bankruptcy Code, and accordingly, pursuant to

Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT X

**(Avoidance of Letter Agreements as Actually Fraudulent under
Section 548 of the Bankruptcy Code)**

104.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

105.    Within two years of the Petition Date, LBI entered into the September 15 Letter Agreement and the September 16 Letter Agreement.

106.    Entering into the Letter Agreements was an obligation incurred by LBI to or for the benefit of Citibank.

107.    Entry into the Letter Agreements was made with an actual intent to hinder, delay, and/or defraud LBI's creditors and customers. Such intent can be inferred from the traditional badges of fraud surrounding LBI's entry into the Letter Agreements. Among other things, on September 15, 2008, the global markets were experiencing an unprecedented meltdown/chaos and LBHI and some of its subsidiaries had filed petitions under Chapter 11 of the Bankruptcy Code. In exchange for the $1 billion deposit, LBI received only a reinstatement of an essential bank service previously provided by Citibank under a long-term contract; Citibank hastily terminated the long-term contract unilaterally and agreed to reinstate it within hours after termination only under terms

more favorable to Citibank. Finally, the Letter Agreements were executed on a rushed "take-it-or-leave-it" basis without any meaningful negotiation between LBI and Citibank.

108.    As a result of LBI's entering into the Letter Agreements, LBI and its customers and creditors have been harmed.

109.    The 9/15/08 and 9/16/08 Letter Agreements are avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT XI

### (Avoidance of Transfer as Actually Fraudulent under Section 548 of the Bankruptcy Code)

110.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

111.    Within two years of the Petition Date, LBI transferred $1 billion in cash to Citibank, and Citibank retained such funds after the close of business on September 19, 2008, in the absence of the existence of any further CLS settlement exposure.

112.    The $1 billion deposit was a transfer made by LBI to or for the benefit of Citibank.

113.    The transfer was made with an actual intent to hinder, delay and/or defraud LBI's creditors and customers. Such intent can be inferred from the traditional badges of fraud demonstrated by the circumstances surrounding the Letter Agreements. Among other things, on September 15, 2008, the global markets were experiencing an unprecedented disruption, LBHI and some of its subsidiaries had already filed petitions

under Chapter 11 of the Bankruptcy Code, LBI received disproportionately and unreasonably small consideration in exchange for the transfer of the $1 billion deposit, and the Letter Agreements were executed on a rushed basis, under coercion by Citibank and without any meaningful negotiation whatsoever.

114.    As a result of the transfer, LBI and its customers and creditors have been harmed.

115.    The transfer is avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT XII

### (Recovery of Section 548-Avoided Fraudulent Transfers under Section 550 of the Bankruptcy Code)

116.    The allegations in paragraphs 1 through 63 and 104 through 115 are incorporated by reference as if fully set forth herein.

117.    The transfer is avoidable as an actual fraudulent transfer pursuant to 548(a)(1)(A) of the Bankruptcy Code. Accordingly, pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Citibank the value of the transfer plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT XIII

### (Avoidance of the Obligation to Deposit $1 Billion as a Constructive Fraudulent Conveyance under Section 544 of the Bankruptcy Code and State Law)

118.    The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

119.    Pursuant to Section 544(b) of the Bankruptcy Code, the Trustee has the rights of an existing unsecured creditor of LBI. Section 544(b) permits the Trustee to assert claims and causes of action that such creditor could assert under applicable state law.

120.    Prior to the commencement of the SIPA liquidation, LBI entered into the Letter Agreements pursuant to which LBI had to deposit $1 billion with Citibank and give Citibank a setoff right against the deposit in exchange for resumption of CLS settlement services. By entering into the Letter Agreements, LBI incurred an obligation to or for the benefit of Citibank.

121.    LBI did not receive fair consideration, or fair equivalent, or reasonably equivalent value in exchange for entering into the Letter Agreements.

122.    When LBI entered into the Letter Agreements, it was already insolvent or became insolvent as a result of incurring the obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, as to which the property remaining was capital in an unreasonably small amount; and/or LBI intended to incur, or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

123.    The Letter Agreements are avoidable as a constructive fraudulent conveyance under Section 544 of the Bankruptcy Code and applicable state law.

## COUNT XIV

### (Recovery of an Avoided Constructive Fraudulent Transfer under Section 550 of the Bankruptcy Code)

124. The allegations in paragraphs 1 through 63 and 118 through 123 are incorporated by reference as if fully set forth herein.

125. The transfer is avoidable as a fraudulent conveyance pursuant to Section 544 of the Bankruptcy Code and applicable state law, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBI is entitled to recover from Citibank the value of the transfer plus interest from the transfer date, and costs and fees to the extent available, for the benefit of LBI's estate.

## COUNT XV

### (Turnover under Section 542 of the Bankruptcy Code of Estate Property Held by Affiliates)

126. The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

127. Prior to the commencement of LBI's SIPA liquidation, Citibank Affiliates, with corporate identities separate from Citibank and with no claims against LBI, held funds in LBI deposit accounts totaling approximately $64 million. Thereafter, as of May 31, 2010, Citibank Affiliates had also received and retained additional deposits of approximately $7 million.

128. Citibank Affiliates owe debts to LBI as a result of failed trades effected through customer accounts at LBI in the amount of approximately $1 million.

129. The above-described assets are property of the estate because LBI has a legal or equitable interest in them.

130. Citibank Affiliates are in possession, custody or control of the above-described assets, which are of substantial value or benefit to LBI's estate and are property belonging to LBI (that may be used by LBI), and may not be used to setoff against any alleged claims Citibank Affiliates may have against LBI because of the limitations of Section 553 of the Bankruptcy Code.

131. Citibank Affiliates should be directed to turn over the above-described assets or the value thereof to LBI immediately.

## COUNT XVI

### (Buyer's Note Related to Smith Barney Acquisition)

132. The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

133. In connection with a 1993 Asset Purchase Agreement between a Lehman Brothers Inc. predecessor and a predecessor to the entity subsequently known as Citibank Smith Barney, a promissory note was issued in favor of the LBI predecessor (now LBI) covering certain vested benefits that would be due in the future under certain deferred compensation plans (the "Buyer's Note"). As of the date of this complaint, Citibank retains the duty to pay out to LBI on the balance due under the Buyer's Note.

134. The Trustee now stands in the position of LBI with respect to the Buyer's Note in consequence of the present SIPA liquidation proceeding. Upon payment by the LBI estate on account of the relevant deferred compensation plans, there will be

due from Citibank to the LBI estate the sum of approximately $11 million under the Buyer's Note.

135. Citibank has disavowed its obligation under the Buyer's Note, contending that the conditions and circumstances of the SIPA liquidation create a Catch-22 that prevents the Trustee from enforcing the Buyer's Note. The Trustee disagrees with Citibank's position and submits that upon making the requisite payment the LBI estate will be entitled to receive payment from Citibank of the $11 million balance still due under the Buyer's Note.

136. Accordingly, the Trustee seeks (a) a declaratory judgment establishing his right to have the balance due under the Buyer's Note paid by Citibank when the requisite payment has been made by the LBI estate, or (b) if the LBI estate in fact makes such payment prior to this Count coming on for determination, a money judgment against Citibank for the amount due under the Buyer's Note.

## COUNT XVII

**(Equitable Subordination under Section 510(c) of the Bankruptcy Code)**

137. The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth herein.

138. Citibank engaged in and benefited from inequitable conduct that resulted in injury to LBI's customers and creditors and conferred an unfair advantage to Citibank. This inequitable conduct has resulted in harm to LBI and its customers and other creditors because customers and general unsecured creditors are less likely to recover the full amounts due to them.

139. Citibank's conduct has been inequitable and has harmed LBI, its customers, employees and creditors. In equity and good conscience, any claim or interest of Citibank in respect of LBI's estate should be equitably subordinated pursuant to Section 510(c) of the Bankruptcy Code and/or disallowed to the fullest extent permitted by law. Equitable subordination as requested herein is consistent with the provisions of the Bankruptcy Code.

## COUNT XVIII

### (Disallowance of Claims under Section 502(d) of the Bankruptcy Code and Avoidance of Liens Securing Such Claims under Section 506(d))

140. The allegations in paragraphs 1 through 131 are incorporated by reference as fully set herein.

141. Claims held by Citibank against LBI are subject to disallowance under Section 502(d) of the Bankruptcy Code unless and until Citibank has turned over all property transferred, or paid LBI the value of such property for which Citibank is liable under Sections 542, 550, or 553 of the Bankruptcy Code.

142. In the event that (a) the property is recoverable from Citibank under Sections 542, 550 or 553 of the Bankruptcy Code, or (b) any of the transfers made to Citibank are avoided under Sections 544, 547 or 548 of the Bankruptcy Code, then all of the claims of Citibank against LBI should be disallowed unless and until Citibank has turned over to LBI all property transferred or paid LBI the value of such property, for which it is liable under Sections 542, 550 and 553.

143. Based on the foregoing, to the extent a lien secures a claim that is disallowed such liens are void under Section 506(d) of the Bankruptcy Code.

## COUNT XIX

### (Breach of Contract)

144. The allegations in paragraphs 1 through 63 are incorporated by reference as fully set herein.

145. The CLS Agreement was amended and modified by the Letter Agreements, both of which were drafted by Citibank.

146. LBI's $1 billion deposit had no precedent in LBI's relationship with Citibank as its Designated Settlement Member under the CLS Agreement and constituted an extraordinary change in circumstances in that relationship. In return for LBI's $1 billion deposit, Citibank's rights of setoff against LBI's assets, including that deposit, are strictly limited as set forth by the terms of the Letter Agreements.

147. Citibank breached the terms of the Letter Agreements by exceeding the limitations contained therein with respect to the setoffs it purportedly has taken, and claims to be allowed to take, against LBI's assets, including the $1 billion deposit.

## PRAYER FOR RELIEF

WHEREFORE, LBI demands judgment against Defendants as follows: (i) declaring that Citibank willfully violated the automatic stay and ordering it to pay LBI an amount to be determined at trial for such violation of the automatic stay; (ii) declaring that Citibank has no right to retain LBI's $1 billion deposit; (iii) preserving for the benefit of LBI's estate under Section 551 of the Bankruptcy Code all transfers avoided herein;

(iv) ordering Citibank to return to the Trustee the $1 billion deposit; (v) ordering Citibank to return to the Trustee all LBI assets and customer property held by Citibank prior to commencement of LBI's SIPA liquidation; (vi) disallowing the claims and avoiding the liens of Citibank against LBI unless and until Citibank has turned over to LBI the value of such transferred property for which Citibank is liable under Sections 542, 550 and 553 of the Bankruptcy Code; (vii) equitably subordinating and/or disallowing Citibank's claims and interests in respect to LBI's estate; (viii) ordering Citibank and Citibank Affiliates to turn over all post-petition deposits; (ix) declaring the Trustee's right to payment of the balance due under the Buyer's Note; (x) awarding LBI all other damages in an amount commensurate with the value of all LBI assets held by Citibank and Citibank Affiliates as of September 19, 2008, in addition to statutory interest; (xi) awarding LBI damages as a result of Citibank's breach of the Letter Agreements; (xii) awarding LBI costs and disbursements of this action and attorneys' fees; and (xiii) granting such other and further relief as the Court may deem just and proper.

Dated:  March 18, 2011
     New York, New York

MENAKER & HERRMANN LLP


By:/s/ Richard G. Menaker
    Richard G. Menaker

MENAKER & HERRMANN LLP
10 East 40th Street
New York, New York 10016
Telephone:  (212) 545-1900
Facsimile:  (212) 545-1656

Special Counsel for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.