Brad S. Karp
Stephen J. Shimshak
Douglas R. Davis
Claudia L. Hammerman
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Attorneys for Citibank, N.A., Citigroup Inc., Citigroup
Global Markets, Inc., Citibank Japan Ltd., Citibank
Europe plc, Citibank International plc, Citigroup Pty
Limited, Banco Nacional de Mexico SA, Citibank del
Peru SA, Bank Handlowy W Warszawie SA, ZAO KB
Citibank, Citibank AS, and Citibank Maghreb

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>                           Debtor. | Case No. 08-01420 (JMP) SIPA |
| LEHMAN BROTHERS INC.,<br><br>                      Plaintiff,<br><br>           -against-<br><br>CITIBANK, N.A., CITIGROUP INC.,<br>CITIGROUP GLOBAL MARKETS, INC.,<br>CITIBANK JAPAN LTD., CITIBANK EUROPE<br>PLC, CITIBANK INTERNATIONAL PLC,<br>CITIGROUP PTY LIMITED, BANCO DE CHILE,<br>BANCO NACIONAL DE MEXICO SA, CITIBANK<br>DEL PERU SA, BANK HANDLOWY, ZAO KB<br>CITIBANK, CITIBANK AS, CITIBANK MAGHREB<br>and CITIBANK AFFILIATES 1-5,<br><br>                  Defendants. | Adv. Proc. No. 11-01681 (JMP) |

**MEMORANDUM OF LAW OF DEFENDANTS CITIBANK, N.A., CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., CITIBANK JAPAN LTD., CITIBANK EUROPE PLC, CITIBANK INTERNATIONAL PLC, CITIGROUP PTY LIMITED, BANCO NACIONAL DE MEXICO SA, CITIBANK DEL PERU SA, BANK HANDLOWY, ZAO KB CITIBANK, CITIBANK AS, AND CITIBANK MAGHREB IN <u>SUPPORT OF THEIR MOTION TO PARTIALLY DISMISS THE COMPLAINT</u>**

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 8

      A.      The Parties ................................................................................................. 8

      B.      Foreign Exchange Trading and the Continuous Linked Settlement System ........... 9

      C.      The CLS Agreement Between LBI and Citibank ................................................. 11

      D.      The $1 Billion Deposit ................................................................................. 14

      E.      Citibank Continues to Settle LBI's FX Trades Through CLS ........................... 16

      F.      Citibank Exercises Its Right of Setoff and LBI Enters Into a SIPA Proceeding ................................................................................................. 17

ARGUMENT ................................................................................................................. 19

I.      The Bankruptcy Code Safe Harbors Protect the $1 Billion Setoff ................................. 20

II.      The Doctrine of Equitable Recoupment Protects the $1 Billion Setoff ........................... 27

III.      The Trustee's Claims to Avoid and Recover the $1 Billion Setoff Fail on Multiple Independent Grounds ................................................................................................. 30

      A.      Citibank Did Not Violate the Automatic Stay ................................................. 30

      B.      Citibank Did Not Receive the Deposit to Obtain Setoff Rights For Purposes of 11 U.S.C. § 553(a)(3) ................................................................. 32

      C.      Citibank Did Not Improve Its Position For Purposes of 11 U.S.C. § 553(b) ........ 34

      D.      Citibank Gave More Than Fair Consideration for Purposes of 11 U.S.C. § 544 and New York State Law ........................................................................... 36

      E.      The Parties Intended a Contemporaneous Exchange of New Value Under 11 U.S.C. § 547(c)(1) ................................................................................. 39

IV.    The Complaint Fails to State a Claim For Actual Fraudulent Conveyance .....................42

V.    The Complaint Fails to State a Claim For Equitable Subordination................................45

VI.    Citibank Did Not Breach Any Contract With LBI.........................................................47

VII.    The Trustee Fails to State a Claim Based on the APA and Buyer Note ..........................48

    A.    Background ..........................................................................................................49

    B.    The Trustee's Claim Should Be Dismissed in Favor of Arbitration ...................51

    C.    The Trustee's Claim Fails on the Merits............................................................52

CONCLUSION...................................................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allbrand Appliance & Television Co. v. Merdav Trucking Co.*
*(In re Allbrand Appliance & Television Co.)*,
16 B.R. 10 (Bankr. S.D.N.Y. 1980) ...................................................................32, 34

*Ames Merch. Corp. v. Revere Mills, Inc. (In re Ames Dep't Stores, Inc.)*,
Bankr. No. 01-42217 (REG), Adv. Nos. 03-03951 (REG) & 03-08325 (REG),
2010 WL 2403104 (Bankr. S.D.N.Y. June 10, 2010) .....................................41

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.*
*(In re Andrew Velez Constr., Inc.)*,
373 B.R. 262 (Bankr. S.D.N.Y. 2007) ..........................................................43

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)..................................................................................19

*Aspen Indus. Inc. v. Marine Midland Bank*,
426 N.Y.S.2d 620 (App. Div. 1980), *rev'd on other grounds*,
421 N.E.2d 808 (N.Y. 1981).....................................................................30, 31

*Baker v. Nat'l City Bank of Cleveland*,
511 F.2d 1016 (6th Cir. 1975)...................................................................30, 31

*Belford v. Union Trust. Co. (In re Wild Bills, Inc.)*,
206 B.R. 8 (Bankr. D. Conn. 1997)................................................................40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................19

*Brooks Shoe Mfg. Co. v. United Tele. Co.*,
39 B.R. 980 (E.D. Pa. 1984) ....................................................................33, 41

*In re Centolella*,
142 B.R. 624 (Bankr. N.D.N.Y. 1992)............................................................40

*Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*,
270 B.R. 108 (S.D.N.Y. 2001).......................................................................51

*Citizens Bank of Md. v. Strumpf*,
516 U.S. 16 (1995) .........................................................................................31

*Clarkson Co. v. Shaheen*,
533 F. Supp. 905 (S.D.N.Y. 1982)..................................................................31

Doc#: US1:6887901v1

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ...............................................................................8

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983)............................................................................46

*Creative Waste Mgmt. v. Capitol Env't Servs., Inc.*,
    429 F. Supp. 2d 582 (S.D.N.Y. 2006) ...........................................................47

*Cuevas v. Hudson United Bank (In re M. Silverman Laces Inc.)*,
    No. 01 Civ. 6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)..........39

*Dunn v. First Nat'l Bank of Decatur (In re Jenkins Enters., Inc.)*,
    289 B.R. 702 (Bankr. C.D. Ill. 2003) ......................................................34, 35

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
    341 B.R. 451 (Bankr. S.D.N.Y. 2006) ...........................................................19

*Evergreen Solar, Inc. v. Barclays PLC (In re Lehman Bros. Holdings, Inc.)*,
    Bankr. No. 08-13555 (JMP), Adv. No. 08-01633 (JMP),
    2011 WL 722582 (Bankr. S.D.N.Y. Feb. 22, 2011) .......................................8

*Gala Enters., Inc. v. Hewlett Packard Co.*,
    989 F. Supp. 525 (S.D.N.Y. 1998) ...........................................................37, 39

*Gant v. Wallingford Bd. of Educ.*,
    69 F.3d 669 (2d Cir. 1995) .............................................................................8

*Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*,
    330 B.R. 362 (S.D.N.Y. 2005)........................................................................37

*Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*,
    323 B.R. 838 (Bankr. S.D.N.Y. 2005), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005) .................39

*Hecht v. Chemical Bank (In re Hecht)*,
    41 B.R. 701 (Bankr. S.D.N.Y. 1984) .............................................................34

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)............................................................................8

*Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home)*,
    273 B.R. 305 (Bankr. D. Mass. 2002) ...........................................................40

*Houbigant, Inc. v. IMG Fragrance Brands, LLC*,
    No. 09 Civ. 839(LAP), 2009 WL 5102791 (S.D.N.Y. Dec. 18, 2009)..............8

*Howell v. Bank of Newnan (In re Summit Fin. Servs., Inc.)*,
    240 B.R. 105 (Bankr. N.D. Ga. 1999)............................................................35

*In re HQ Global Holdings, Inc.,*
    290 B.R. 78 (Bankr. D. Del. 2003) ........................................................................29

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch),*
    413 B.R. 115 (Bankr. S.D.N.Y. 2008) (Peck, J.) ...............................................45

*Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship),*
    277 B.R. 181 (Bankr. S.D.N.Y. 2002) ...............................................................52

*Lee v. Schweiker,*
    739 F.2d 870 (3d Cir. 1984)...............................................................................41

*Liquidation Trust v. Daimler AG (In re Old CarCo LLC),*
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) ..............................................19, 39, 43

*Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),*
    156 F.3d 131 (2d Cir. 1998)...............................................................27, 28, 29

*MBNA Am. Bank, N.A., v. Hill,*
    436 F.3d 104 (2d Cir. 2006)...............................................................................51

*Mendelsohn v. Louis Frey Co. (In re Moran),*
    188 B.R. 492 (Bankr. E.D.N.Y. 1995) ..............................................................41

*Mercy Hosp. of Watertown v. N.Y.S. Dep't of Social Serv.,*
    171 B.R. 490 (N.D.N.Y. 1994) ........................................................................29

*In re Middendorf,*
    381 B.R. 774 (Bankr. D. Kan. 2008) ................................................................39

*Mt. McKinley Ins. Co. v. Corning Inc.,*
    399 F.3d 436 (2d Cir. 2005)...............................................................................51

*N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon),*
    129 F.3d 93 (2d Cir. 1997) ......................................................................27, 28

*Newton v. United States (In re Newton),*
    No. 5-05-BK-52728, Adv. No. 5-06-1p-50130, 2006 WL 5692759
    (Bankr. M.D. Pa. Oct. 6, 2006) ........................................................................40

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
    322 F.3d 147 (2d Cir. 2003)...............................................................................19

*Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen*
    *(In re Hydrogen, L.L.C.),*
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..............................................................38

*Official Comm. of Unsecured Creditors of Maxwell Newspapers, Inc. v. Travelers Indem. Co. (In re Maxwell Newspapers, Inc.)*,
192 B.R. 633 (Bankr. S.D.N.Y. 1996) ........................................................41

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*,
284 B.R. 355 (Bankr. S.D.N.Y. 2002) ........................................................45

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*,
146 F.3d 136 (2d Cir. 1998)........................................................................36

*Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*,
212 B.R. 206 (B.A.P. 2d Cir. 1997) ...........................................................32

*Pardo v. Akai Elec. Co. Ltd. (In re Singer Co., N.V.)*,
No. 00 Civ. 6793 LTS, 2001 WL 984678 (S.D.N.Y. Aug. 21, 2001)............52

*Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*,
991 F.2d 42 (2d Cir. 1993) .........................................................................47

*In re Refco, Inc. Sec. Litig.*,
No. 07 MDL 1902 GEL, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009).........43

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)..........................................................................8

*Schachter v. Tolassi (In re 105 E. Second St. Assocs.)*,
207 B.R. 64 (Bankr. S.D.N.Y. 1997) ..........................................................29

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005) .........................................................................37

*Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.)*,
698 F.2d 42 (1st Cir. 1983)..........................................................................31

*Stratton v. Equitable Bank, N.A.*,
104 B.R. 713 (D. Md. 1989) ........................................................................39

*Sure-Snap Corp. v. State Street Bank & Trust Co.*,
948 F.2d 869 (2d Cir. 1991)........................................................................45

*Tyler v. Swiss Am. Secs. (In re Llewellyn & Co.)*,
929 F.2d 424 (8th Cir. 1991) ......................................................................42

*Union Cartage Co. v. Dollar Sav. & Trust Co. (In re Union Cartage Co.)*,
38 B.R. 134 (Bankr. N.D. Ohio 1984).........................................................35

*United States v. Agnello*,
    344 F. Supp. 2d 360 (E.D.N.Y. 2004)................................................................47

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*
    *(In re U.S. Lines, Inc.)*,
    197 F.3d 631 (2d Cir. 1999)...........................................................................51

*V. I. Bureau of Internal Revenue v. Chase Manhattan Bank*,
    312 F.3d 131 (3d Cir. 2002)...........................................................................31

*Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C. (In re Vargas Realty Enters., Inc.)*,
    440 B.R. 224 (S.D.N.Y. 2010)...............................................................*passim*

*Wagner v. J & K Plumbing & Heating Co. (In re Rumsey Sheet Metal, Inc.)*,
    70 B.R. 84 (Bankr. W.D.N.Y. 1987)................................................................35

*Westinghouse Credit Corp. v. D'Urso*,
    278 F.3d 138 (2d Cir. 2002)....................................................................27, 28

*Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.)*,
    940 F.2d 1507 (11th Cir. 1991)................................................................32, 40

*In re Yonkers Hamilton Sanitarium Inc.*,
    22 B.R. 427 (Bankr. S.D.N.Y. 1982)........................................................28, 29

## STATUTES

11 U.S.C. § 101(22A) ...................................................................................20

11 U.S.C. § 101(37) .....................................................................................23

11 U.S.C. § 101(50) .....................................................................................23

11 U.S.C. § 101(51) .....................................................................................23

11 U.S.C. § 101(53B) ..................................................................20, 21, 22, 23

11 U.S.C. § 101(53C) ...................................................................................20

11 U.S.C. § 362(a)(7) ..............................................................................25, 30

11 U.S.C. § 362(b)(17) .................................................................................25

11 U.S.C. § 362(o) .......................................................................................25

11 U.S.C. § 506(a) .......................................................................................35

11 U.S.C. § 510(c) .......................................................................................45

11 U.S.C. § 544 ................................................................................. 5, 27, 36, 37

11 U.S.C. § 546(g) ..................................................................................... 26, 27

11 U.S.C. § 547 ........................................................................... 6, 26, 39, 40

11 U.S.C. § 547(a) .............................................................................................41

11 U.S.C. § 547(c) ...................................................................................... 40, 41

11 U.S.C. § 548(a) ...................................................................................... 26, 42

11 U.S.C. § 549 ........................................................................................... 25, 32

11 U.S.C. § 550 ........................................................................................ *passim*

11 U.S.C. § 553 ........................................................................................... 29, 40

11 U.S.C. § 553(a) ................................................................................. 5, 26, 32

11 U.S.C. § 553(b) ................................................................................. 5, 26, 34

11 U.S.C. § 560 ........................................................................................... 25, 27

15 U.S.C. § 78eee(b)(2)(C)(i) .......................................................................25

12 U.S.C.A. § 5390(c)(8) ...............................................................................25

N.Y. Debt. & Cred. Law §§ 273–75 ...........................................................37

## RULES

Fed. R. Bankr. P. 7012 .....................................................................................19

Fed. R. Civ. P. 9(b) .............................................................................. 1, 19, 43

Fed R. Civ. P. 12(b)(6) .............................................................................. 1, 19

Fed. R. Evid. 201(b)(2) .....................................................................................8

## OTHER AUTHORITIES

CLS Group, *About CLS*,
    http://www.cls-group.com/About/Pages/default.aspx (last visited May 25, 2011) ..........10

*Collier on Bankruptcy* (16th ed. 2009) ...................................................40

*The Concise Blackwell Encyclopedia of Management*
    (Cary L. Cooper & Chris Argyris eds., 1998).................................................9

*A Dictionary of Business & Management* (Oxford Univ. Press 4th ed. 2006)............................9

H.R. Rep. No. 109-31, 109th Cong. (2005) ............................................ 21, 22, 23, 24

International Monetary Fund, IMF Country Rep. No. 10/122, *Technical Note on Selected*
    *Issues on Liquidity Risk Management In Fedwire Funds and Private Sector*
    *Payment Systems* (May 2010) *available at*
    http://www.imf.org/external/pubs/ft/scr/2010/cr10122.pdf...............................................24

*The New Palgrave Dictionary of Money & Finance*
    (Peter Newman et al. eds., 1992) ..................................................................9

Philip R. Wood, *English & International Set-Off* (1989) ...................................................30, 36

Rory Derham, *Derham on the Law of Set-Off* (4th ed. 2010) ...................................................29

Stephen J. Lubben, *The Bankruptcy Code Without Safe Harbors*,
    84 Am. Bankr. L.J. 123 (2010) ..................................................................25

Defendants Citigroup Inc. ("Citigroup"), Citibank, N.A. ("Citibank"), Citigroup Global Markets, Inc. ("CGMI"), Citibank Japan Ltd., Citibank Europe plc, Citibank International plc, Citigroup Pty Limited, Banco Nacional de Mexico SA, Citibank del Peru SA, Bank Handlowy W Warszawie SA, ZAO KB Citibank, Citibank AS, and Citibank Maghreb (collectively, the "Citi Affiliates" and together with Citigroup, Citibank, and CGMI, "Citi") respectfully submit this memorandum of law in support of their motion for partial dismissal of the Complaint (the "Complaint") of James W. Giddens as trustee (the "Trustee") for the liquidation of Lehman Brothers Inc. ("LBI"), pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure (as incorporated by the Bankruptcy Rules) and the safe harbor provisions of the Bankruptcy Code and the Securities Investor Protection Act ("SIPA").

## PRELIMINARY STATEMENT

The morning that its parent filed for bankruptcy, LBI urgently requested Citibank to continue settling LBI's foreign exchange ("FX") trades through the Continuous Linked Settlement ("CLS") system to avoid catastrophic losses to LBI and its customers. Although Citibank had the absolute right unilaterally and immediately to cease settling FX trades for LBI through CLS, it agreed to continue settling those trades on the express condition that Lehman deposit $1 billion as security for any resulting exposure to LBI. Lehman deposited $1 billion in cash with Citibank, and in reliance on the $1 billion in security, Citibank extended billions of dollars of credit to LBI over that week, ultimately incurring losses of $1.26 billion. Shortly before LBI filed for liquidation, Citibank set off a portion of these losses against the $1 billion deposit. Two years later, having received the full benefit of these essential bank services, LBI now seeks to renege on its part of the bargain and claw back the $1 billion deposit.

On their face, the allegations of the Complaint show that the Trustee's claims to recover Citibank's $1 billion setoff are entirely without merit.

*First*, the Bankruptcy Code safe harbors for "swap agreements" protect the $1 billion setoff. The FX trades Citibank settled for LBI, the agreement under which Citibank settled those trades, and the letter agreements relating to the $1 billion cash deposit are all "swap agreements" within the plain language of the Bankruptcy Code safe harbor provisions.

As the Complaint acknowledges, LBI did not have an account with CLS and could only settle its FX trades in the CLS system if a Designated Settlement Member (one of a select group of financial institutions and central banks) authorized those trades. Under the CLS Rules, once a Designated Settlement Member authorized LBI's trades, that Settlement Member became fully liable as principal to pay CLS the full amounts due under those FX transactions.

Citibank acted as LBI's Designated Settlement Member pursuant to a written agreement between the parties, dated October 24, 2004 (the "CLS Agreement"). The CLS Agreement acknowledges that, in authorizing LBI's trades in CLS, "Citibank necessarily assumes a credit exposure to CLS Bank on [LBI's] behalf." The CLS Agreement also makes clear that Citibank's decision to extend credit to LBI for CLS settlement "is within Citibank's sole discretion and may be changed or discontinued at any time without prior notice . . . ." The CLS Agreement obligates LBI to reimburse Citibank daily for its payments to CLS Bank on LBI's behalf and, in the event LBI defaults on its reimbursement obligation, grants Citibank liens and broad setoff rights.

On September 15, 2008, in light of the precipitous meltdown of the financial markets, the bankruptcy filing of LBI's corporate parent and the resulting material adverse change to LBI's financial condition (each of which constitutes an independent ground for immediate termination of the CLS Agreement), Citibank elected to terminate the CLS Agreement. In response, LBI's senior management urgently requested Citibank to revoke its termination and continue settling LBI's trades through CLS. As acknowledged in the Complaint, continued access to CLS settlement services was

"vital" to LBI's ability to continue in business over that week and "to preserve as much of LBI's assets as possible for the benefit of LBI's customers and creditors."  To allay Citibank's concern about assuming additional LBI exposure, LBI established a $1 billion cash deposit at Citibank and confirmed in writing (the "September 15 Letter Agreement") that Citibank had the "right at all times to set off the amount of the referenced deposit account against any obligations of [LBI] under the CLS Agreement."  LBI again confirmed that setoff right in writing on September 16 (the "September 16 Letter Agreement").

Citibank continued to advance settlement payments to CLS on LBI's behalf throughout that week, incurring $1.26 billion in losses as a result.  On September 19, 2008 (*before* commencement of LBI's SIPA liquidation proceeding), Citibank exercised its contractual and common law rights of setoff, transferring the $1 billion deposit to a Citibank-controlled account, but still leaving Citibank with a net loss of over $260 million arising from its provision of CLS services to LBI.

The Complaint and its supporting documents conclusively establish that each of the transactions and agreements at issue constitutes a protected "swap agreement" under the Bankruptcy Code:  (i) the underlying FX trades are "swap agreements"; (ii) the CLS Agreement—which provides a "credit enhancement" or a "security arrangement" in connection with settling these FX trades on CLS—is a "swap agreement"; and (iii) the September 15 and September 16 Letter Agreements and $1 billion deposit—each of which provides a "security arrangement" in connection with settling these FX trades on CLS—also are "swap agreements."  There can be no dispute that Citibank qualifies as a "swap participant" and a "financial participant" under the Bankruptcy Code. Accordingly, when Citibank set off the $1 billion deposit against the losses it suffered from extending credit to LBI for CLS settlement, that setoff was safe-harbored under the plain language of

the Bankruptcy Code. The Trustee's conclusory assertion that the "safe harbor provisions do not apply to CLS services of the kind provided by Citibank" is contradicted by the express terms of the Bankruptcy Code and the specific allegations of his own Complaint.

Not only do the transactions at issue fall squarely within the plain language of the safe harbors, they also are precisely the kinds of transactions Congress meant to protect when it created and then broadened the scope of the safe harbors. As the legislative history makes clear, Congress intended to minimize systemic risk by assuring financial institutions, such as Citibank, that if they continued to conduct business with, and extend credit to, a failing institution, their transactions in protected markets would not be disturbed in bankruptcy. As the Complaint makes clear, Citibank's continued provision of CLS services to LBI over this tumultuous period was critically important to LBI's ability to continue in business, engage in an orderly wind-down, facilitate the transfer of customer accounts and preserve value for LBI's customers and creditors. Citibank was able to play this market-stabilizing role because of the security provided by LBI's $1 billion deposit and in reliance upon the protections expressly set forth in the Bankruptcy Code. Indeed, the Trustee's attempt to claw back these funds, transparently to increase recoveries in the LBI liquidation proceeding, is profoundly short-sighted. When the next financial crisis arrives, the Securities Investor Protection Corporation ("SIPC") undoubtedly will expect and count on financial institutions like Citibank to support a failing broker-dealer to avoid systemic risk and to preserve value for that broker-dealer's customers and creditors. Without the protection afforded by the Bankruptcy Code's safe harbors, no rational financial institution, acting with due regard for its own safety and soundness, will be willing to step forward. Yet, it is that very protection that SIPC and the Trustee seek to undermine.

*Second*, the equitable doctrine of recoupment bars the Trustee's claims. Recoupment applies where parties have obligations arising out of a "single integrated transaction" such that it would be inequitable for the debtor to enjoy the benefits of the transaction without satisfying its corresponding obligations. For purposes of recoupment, a "single integrated transaction" can include multiple components and agreements. Here, as the Complaint makes clear, Citibank was willing to assume the risks of continuing to provide LBI with CLS settlement services *only* if LBI deposited $1 billion as security for any losses Citibank might suffer as a result. Citibank's continued provision of CLS services and Citibank's receipt of the $1 billion in security thus comprise elements of a single, integrated transaction such that it would be inequitable for LBI to enjoy the benefits of the transaction (continued access to CLS settlement for the benefit of its creditors and customers) without meeting its corresponding obligations (Citibank's right to apply the $1 billion deposit to reduce its resulting losses). Recoupment bars the Trustee's effort to secure an unjust windfall and protects Citibank's use of the deposit to reduce its CLS losses.

*Third*, the facts alleged in the Complaint show that the Trustee cannot recover the $1 billion on multiple independent grounds, including:

- The Complaint fails to state a claim for violation of the automatic stay because Citibank set off the $1 billion deposit *before* commencement of LBI's liquidation proceeding.

- The Complaint fails to state a claim under 11 U.S.C. § 553(a) because Citibank did not receive the $1 billion deposit for the purpose of obtaining a right to set off existing debt, but instead to secure Citibank's *future* extensions of credit to LBI for CLS services.

- The Complaint fails to state a claim under 11 U.S.C. § 553(b) because Citibank did not "improve its position" as a creditor from September 15 to September 19, 2008, but instead *increased* its exposure to LBI.

- The Complaint fails to state a claim under 11 U.S.C. § 544 with respect to the September 15 and September 16 Letter Agreements (and an alleged "obligation" to deposit $1 billion and confer setoff rights) because LBI did not incur any such obligations under those Agreements and, even if it did, LBI received fair consideration in exchange for those Agreements.

- The Complaint fails to state a claim under 11 U.S.C. § 547 because, even assuming Citibank's $1 billion setoff was a "transfer," the parties intended a contemporaneous exchange of new value and a substantially contemporaneous exchange took place.

*Fourth*, the Trustee's claims of actual fraud fail as a matter of law because LBI did not enter into the September 15 and September 16 Letter Agreements or create the $1 billion deposit with "an intent to hinder, delay, and/or defraud LBI's creditors and customers." The Complaint's factual allegations show that LBI's intent was precisely the opposite: to obtain "continued access to the CLS FX Settlement System," which was "vital to LBI's ability to maintain its ongoing business operations" and to its effort "to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors."

*Fifth*, the Trustee's claim for equitable subordination fails as a matter of law because the Complaint does not remotely allege the type of conduct—"egregious and severely unfair to other creditors," "involving fraud, illegality or some other breach of a legally recognized duty"—required to support such a claim. There is nothing inequitable—much less egregious, illegal or fraudulent— in Citibank's decision to seek security before extending credit to an entity in severe financial distress. Nor does the Complaint even allege that LBI and its customers and creditors were harmed by Citibank's conduct. To the contrary, the Complaint expressly acknowledges that Citibank's provision of CLS services was necessary to permit LBI to stay in business, effect an orderly wind-down and maximize value for the benefit of its customers and creditors.

*Sixth*, the Trustee's claim that Citibank breached the September 15 and September 16 Letter Agreements "by exceeding the limitations contained therein with respect to setoffs" fails to state a claim because there is nothing in the Letter Agreements that purports to limit Citibank's broad setoff rights. The claim is particularly baffling with respect to Citibank's setoff of the $1 billion deposit, because each of the Letter Agreements explicitly confirms that "Citibank shall have

the right at all times to set off the amount of the referenced [$1 billion] deposit account against any obligations of [LBI] under the CLS Agreement."

*Finally*, the Trustee has inexplicably included a claim for $11 million with respect to the alleged "disavowal" of an entirely unrelated agreement arising out of a 1993 Asset Purchase Agreement ("APA") and related Buyer Note between predecessors of both LBI and Citibank. The Trustee's assertion of this claim, in this lawsuit, is frivolous. There has been no "disavowal" that could be the predicate for a claim; subordination provisions in the relevant deferred compensation plans mean that the conditions for payment by LBI (and for Citibank's reimbursement obligation) will never be met; and all claims arising out of the APA and Buyer Note, clearly non-core matters, are expressly subject to arbitration.

As set forth more fully below, Counts I, II, III, IV, V, VI, VIII, IX, X, XI, XII, XIII, XIV, XVI, XVII, and XIX should be dismissed in their entirety, with prejudice, as should Count XVIII insofar as it is directed at the $1 billion deposit and setoff. The remaining claims—Counts VII, XV, and the remainder of Count XVIII—relate to certain other deposits and payables which are addressed in the Motion of Citibank, N.A. and Certain Affiliates For the Entry of an Order Pursuant to 11 U.S.C. §§ 362(b)(6), 362(b)(7), 362(b)(17), 362(o), 555, 559, 560 and 15 U.S.C. §§ 78eee(b)(2)(C), 78fff(b) Authorizing Exercise of Certain Contractual, Common Law, and Statutory Rights In Respect of Amounts Claimed by LBI and Other Related Relief ("Citi's Lift Stay Motion"), filed contemporaneously with this motion.

## A. The Parties

The United States District Court for the Southern District of New York appointed the Trustee on September 19, 2008, to liquidate LBI's business pursuant to SIPA. Compl. ¶ 3.[2] Before its liquidation proceedings, LBI was the domestic broker-dealer subsidiary of Lehman Brothers Holdings Inc. ("LBHI"), and operated as part of LBHI's international financial network. *Id.* ¶ 13.

Citigroup is a holding company that, through its subsidiaries, provides a range of global diversified financial services. Citibank is the primary banking subsidiary of Citigroup, and, among other activities, provides banking and transaction services around the world to major financial institutions and other large corporations. CGMI is the U.S.-based broker-dealer subsidiary

---

[1] Solely for purposes of this motion, Citi accepts as true the non-conclusory factual allegations of the Complaint. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). Citi also refers to, and the Court may consider, documents referenced in the Complaint, documents upon which the Trustee must have relied in framing the Complaint, and matters of public record such as prior pleadings and orders in these proceedings. *See, e.g., Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991); *Evergreen Solar, Inc. v. Barclays PLC (In re Lehman Bros. Holdings, Inc.)*, Bankr. No. 08-13555 (JMP), Adv. No. 08-01633 (JMP), 2011 WL 722582, at *3 nn.6 & 9 (Bankr. S.D.N.Y. Feb. 22, 2011). The Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Moreover, "the 'court need not accept as true an allegation that is contradicted by documents on which the complaint relies.'" *Houbigant, Inc. v. IMG Fragrance Brands, LLC*, No. 09 Civ. 839(LAP), 2009 WL 5102791, at *2 (S.D.N.Y. Dec. 18, 2009) (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004)). Nor must the Court credit "attenuated allegations . . . contradicted both by more specific allegations in the Complaint and by facts of which [the Court] may take judicial notice." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995).

[2] Citations in the form of "Compl. ¶ __" refer to paragraphs in the Complaint attached as Exhibit 1 to the accompanying Declaration of Claudia Hammerman, dated May 26, 2011 (the "Hammerman Declaration"). Citations in the form of "Trustee's Prelim. Report ¶ __" refer to paragraphs in the Trustee's Preliminary Investigation Report and Recommendations, dated August 25, 2010 [Docket No. 3604] and attached as Exhibit 2 to the Hammerman Declaration. Citations in the form of "Ex. __" refer to other exhibits attached to the Hammerman Declaration.

of Citigroup.  The Citi Affiliates are various international banking entities either fully or partially owned by Citigroup or one of its subsidiaries or affiliates.

### B.     Foreign Exchange Trading and the Continuous Linked Settlement System

Citibank and its affiliates provided LBI with a full range of financial services, including FX settlement services.  *Id.* ¶¶ 17–18.  FX trading was "an indispensable element" of LBI's business and "critical to serving Lehman customers."  *Id.* ¶ 19.  Citibank "assisted LBI in FX settlement using two methods: (a) traditional correspondent bank settlement and (b) settlement through the Continuous Linked Settlement System ("CLS")."  *Id.* ¶ 18.

Under the traditional method, each counterparty to an FX trade transfers to the other counterparty the currency it has sold, typically relying on correspondent banks in the relevant localities to make or receive payment.  *Id.* ¶ 19.  Under this settlement method, the two transfers take place independent of one another, and each counterparty is exposed to the risk of paying out funds while receiving nothing in return.  *Id.* ¶ 19.  This risk, known as "settlement risk" or "Herstatt Risk,"[3] is heightened where the currencies being exchanged belong to countries in different time zones, increasing the timing difference between the two transfers.  *Id.* ¶ 21.

The CLS method of FX settlement was developed as an industry response to "increased and continuing regulatory concern about settlement and systemic risk associated with the

---

[3]     "Herstatt Risk" refers to the well-known failure of the German bank, Bankhaus Herstatt, which German regulators closed on June 26, 1974 at 3:30 PM Central European Time, after counterparties had made Deutschemark payments to Herstatt on FX trades but before Herstatt made corresponding dollar payments in the U.S. markets.  The failure of Bankhaus Herstatt left counterparties with substantial losses and caused disruptions of payment and settlement systems in the U.S. and abroad.  *See The New Palgrave Dictionary of Money & Finance*, 303–04 (Peter Newman et al. eds., 1992); *A Dictionary of Business & Management* 476 (Oxford Univ. Press 4th ed. 2006); *The Concise Blackwell Encyclopedia of Management* 237 (Cary L. Cooper & Chris Argyris eds., 1998).

growth in FX trading."[4]   Banks from the largest economies in the world established CLS Bank International ("CLS Bank"), a special-purpose bank chartered by the Federal Reserve, to operate "a global multi-currency cash settlement system on a payment-versus-payment basis" for FX trades in the most common currencies. *Id.* ¶¶ 18, 21. CLS Bank eliminates settlement risk in such trades by effecting a *simultaneous* exchange of the two legs of an FX transaction, thereby eliminating the risk that one payment could be made and the corresponding payment not received. *Id.* ¶ 21.

Customers may join CLS Bank as either a Settlement Member or a User Member. Settlement Members, such as Citibank, have full access to CLS services.  They can submit identifying data about FX trades (the "Instructions") to be settled in CLS, and they have a multi-currency account with CLS Bank through which they make (and receive) payments due on these trades. *Id.* ¶¶ 22, 24.  A User Member, such as LBI, does not have an account with CLS Bank and must instead be sponsored by at least one Settlement Member that agrees to act as a Designated Settlement Member. *Id.* ¶ 22.  While a User Member may submit Instructions about its FX trades directly to the CLS System, these Instructions will not be processed for settlement unless they have been authorized by its Designated Settlement Member. *Id.* ¶¶ 22, 25, 28; Ex. 3 § 4.3.9.[5]   By authorizing the Instructions of a User Member, the Designated Settlement Member becomes fully responsible to CLS Bank to make all payments necessary to settle those Instructions.  Ex. 3 § 2.1.7(b) ("A Designated Settlement Member that authorizes any Instruction submitted by a User

---

[4]   CLS Group, *About CLS*, http://www.cls-group.com/About/Pages/default.aspx (last visited May 25, 2011).

[5]   The CLS Bank International Rules ("CLS Bank Rules") are expressly incorporated into the CLS Agreement between LBI and Citibank. *See, e.g.*, Ex. 4 at 2–3.

Member shall be fully responsible as principal for all obligations arising with respect to such Instruction.").[6]

Once Instructions have been submitted and authorized, CLS Bank matches the Instructions (ensuring that there are Instructions for both sides of each trade) and places each matched Instruction into a settlement queue. Compl. ¶ 23; Ex. 3 §§ 4.3, 5.1. On the settlement date, CLS Bank simultaneously debits and credits the accounts of each Settlement Member in the currencies and amounts provided in the Instructions it submitted or authorized. Compl. ¶ 23; Ex. 3 § 5.2.2. Settlement risk is eliminated because CLS Bank will not effect settlement for either leg of a trade unless it can successfully debit the appropriate amounts from both Settlement Members' accounts. Ex. 3 § 5.2.1.

The CLS system effectively shifts the settlement risk of User Member trades away from the User Member's counterparties and onto its Designated Settlement Member. The User Member's FX counterparties can rely on the functioning of the CLS system to ensure that they will not pay out on one leg of a trade but receive nothing in return. In contrast, the Designated Settlement Member, which takes principal responsibility for and fronts payments with respect to a User Member's trades, alone assumes the risk that the User Member will not repay the outlays made on its behalf. *Id.* § 2.1.7(b).

## C. The CLS Agreement Between LBI and Citibank

During the relevant period, Citibank acted as LBI's Designated Settlement Member pursuant to the CLS Settlement Services Amended and Restated Agreement for CLS User Members, dated October 28, 2004 (the "CLS Agreement"). Compl. ¶¶ 25–26; Ex. 4. In the CLS Agreement,

---

[6] *See also id.* § 1.1 ("'*Designated Settlement Member*' means, in respect of a User Member, a Settlement Member. . . that has agreed to assume, as a principal, the obligation to make payments necessary to Settle the Instructions submitted by such User Member that have been authorized by such Settlement Member . . .").

which is governed by English law, Citibank agreed to act as LBI's Designated Settlement Member with respect to trade Instructions submitted by LBI and authorized by Citibank. Ex. 4 at 2, 9.[7] The agreement makes clear, however, that "such authorization shall be made in Citibank's sole discretion." *Id.* at 2. The parties acknowledged that Citibank extended credit to LBI when it settled LBI's FX transactions in the CLS system: "By authorizing a transaction in the CLS system . . . Citibank necessarily assumes a credit exposure to CLS Bank on [LBI's] behalf." *Id.* at 3. Again, however, the Agreement makes clear that "any extension of credit on behalf of [LBI] is within Citibank's sole discretion and may be changed or discontinued at any time without prior notice . . . provided, however, that Citibank may not without [LBI's] consent, cancel or rescind any instruction that Citibank has previously authorized." *Id.* The Agreement further provides that "no custom or course of dealing shall be interpreted by [LBI] . . . as any type of commitment on behalf of Citibank or any of its affiliates to extend credit to [LBI]." *Id.*

LBI was obligated to reimburse Citibank the same day (at specified cut-off times applicable to the various currencies) for all payments Citibank made to CLS Bank on LBI's behalf; until it repaid these "short balances," LBI was not entitled to receive from Citibank a corresponding amount of the "long balances" CLS Bank had paid to Citibank with respect to LBI's FX trades:

> [LBI] agrees . . . that it will fund all net short balances in respect of transactions to which it is the Transaction Party by the cut-off times notified to [LBI] from time to time with respect to the relevant currency. At any time that [LBI] has an outstanding short balance in one or more currencies ("short balance owing"), [LBI] acknowledges that it shall have no right to the portion of its long balance it may

---

[7] LBI could also submit Instructions on behalf of certain "Permitted Affiliates," namely Lehman Brothers Special Financing, Inc., Lehman Brothers Commercial Corp. and Lehman Brothers International (Europe), who were also parties to the CLS Agreement. Compl. ¶ 26; Ex. 4 at 2. Because the FX trades and obligations of Permitted Affiliates are not relevant to this dispute, we refer solely to LBI and Citibank as the relevant parties to the CLS Agreement.

have in any other currency(ies) up to the value of such short balance owing.

*Id.*; *see also* Compl. ¶ 28.

Citibank had the right to terminate the CLS Agreement immediately and without notice to LBI if an Event of Default occurred and was continuing, including LBI's failure "to make any payment to Citibank to fund a short balance of [LBI] in any currency by the applicable cut-off time." Ex. 4 at 6. Citibank also had the right to terminate the CLS Agreement "immediately, without notice" if, among other things, (i) "a bankruptcy, reorganization, receivership, insolvency or other similar proceeding" was instituted against LBI, its parent or any material subsidiary; (ii) LBI "is unable to pay its debts as they become due or admits in writing its inability to pay its debts generally;" or (iii) "upon the occurrence of a material adverse change in the financial or other condition of [LBI], as Citibank may determine in its sole discretion." *Id.*

Upon an Event of Default, including LBI's failure to repay "short balances" by the applicable cut-off times, the CLS Agreement gave Citibank the right to reduce any amounts that Citibank or its affiliates owed to LBI by any amounts that LBI owed to Citibank:

> Upon an occurrence of an Event of Default . . . with respect to [LBI], Citibank may (in respect of any account of [LBI] and whether by combination or unification of accounts, set-off or otherwise) reduce without notice the amount of any payment obligation whether matured or unmatured owed by it or any of Citibank's branches, affiliates, or subsidiaries to [LBI] . . . by the amount of any payment obligation owed to it by [LBI]. . . regardless of the place of payment or currency of either obligation.

*Id.* at 3–4. If the CLS Agreement was terminated for any reason, the obligations of Citibank and LBI incurred before the termination continued to be governed by the terms of the CLS Agreement. *Id.* at 7.

### D. The $1 Billion Deposit

On September 14, 2008, it was determined that LBHI and most of its affiliates would file a petition for relief under Chapter 11 of the Bankruptcy Code; that petition was filed in the early morning hours of September 15. Compl. ¶ 29. LBI, by contrast, was to "remain in business for the protection of its customers while efforts were undertaken to wind down pending transactions in the ordinary course of business and facilitate a possible sale of the overall broker-dealer operations to an institutional purchaser, thereby minimizing the disruption to customers securities accounts, while maximizing the assets available to satisfy LBI's obligations to all its creditors." *Id.* at ¶ 30.

But LBI's resources became increasingly strained as third parties continued backing away from LBI. Trustee's Prelim. Report ¶ 51. For example, LBI's financing through tri-party repurchase transactions decreased precipitously. *See id.* ¶ 55. FX counterparties, unwilling to accept settlement risk facing LBI, simply failed to perform on their legs of FX transactions, further constraining LBI's liquidity; indeed, there were non-receipts on 2,350 such trades as of September 19, 2008. *Id.* ¶ 56. During the week of September 15, LBI was "unable to obtain adequate financing on an unsecured or even a secured basis." *Id.* ¶ 49. By September 16, 2008, "the FRBNY had to finance the operations of LBI, as counterparties were unwilling to undertake the risk of financing LBI during the wind down of its activities." *Id.* ¶ 52.

Citibank was no exception. On September 15, 2008, faced with the prospect of extending substantial unsecured intraday credit to LBI in these ever-worsening conditions, Citibank terminated the CLS Agreement and resigned as LBI's Designated Settlement Member. Compl. ¶ 32. However, after notifying LBI and CLS of its decision, Citibank received "urgent requests by LBI's senior management" to rescind the termination of the CLS Agreement so that LBI could continue to settle its FX trades in CLS. *Id.* ¶¶ 32–33. CLS settlement—which eliminated settlement risk for LBI's FX counterparties—was particularly valuable to LBI at this time because counterparties were

refusing to take on LBI risk.  As a "precondition" to assuming that risk, Citibank required LBI to maintain a $1 billion cash deposit at Citibank as security for its provision of CLS services to LBI. *Id.* ¶ 33.  "Given the indispensable importance of FX settlement through the CLS system for LBI's ability to continue in business," LBI agreed to this condition.  *Id.* ¶ 34.

During the late afternoon of September 15, LBI transferred $700 million to an LBI account at Citibank.  That $700 million was added to $300 million already in LBI's Citibank account to form the $1 billion deposit. *Id.* ¶ 39.[8]  The parties memorialized LBI's $1 billion cash deposit in a letter agreement dated September 15, 2008 (the "September 15 Letter Agreement"). *Id.* ¶ 34.  In the September 15 Letter Agreement, Citibank agreed to continue CLS settlement for LBI through September 16, 2008, "in accordance with the [CLS Agreement]" and subject to certain additional terms and conditions. *Id.* ¶ 34; Ex. 5.  Specifically, LBI represented that it had previously instructed the transfer of the $700 million to Citibank (Ex. 5 ¶ 1); LBI instructed Citibank to combine this $700 million with the $300 million already at Citibank to form the $1 billion deposit (*id.* ¶ 2); LBI represented that the $1 billion cash deposit was LBI's property only and did not belong to any other Lehman entity (*id.* ¶ 4); the parties confirmed Citibank's "right at all times to set off the amount of the referenced deposit account against any obligations of [LBI] under the CLS Agreement" (*id.* ¶ 7); and the parties acknowledged that CLS payments "will be made by Citibank only in amounts at any time outstanding of up to the aggregate amount of deposits" (*id.* ¶ 6).

On September 16, in response to LBI's renewed request, Citibank agreed to continue CLS settlement for LBI through September 17, 2008.  The parties executed another letter agreement, substantially the same as that of the day before (the "September 16 Letter Agreement," and together

---

[8]  The Trustee makes several allegations about the location of the $1 billion deposit and Citibank's management of the funds.  Compl. ¶¶ 39–41.  Although the Trustee plainly misunderstands the facts, because the allegations are irrelevant to his claims for relief, we do not address them here.

with the September 15 Letter Agreement, the "Letter Agreements"), which again confirmed that "Citibank shall have the right at all times to set off the amount of the referenced [$1 billion] deposit account against any obligations of LBI under the CLS Agreement." Ex. 6 ¶ 6; Compl. ¶ 36.

### E. Citibank Continues to Settle LBI's FX Trades Through CLS

From September 15 through September 19, 2008, Citibank advanced billions of dollars of credit on LBI's behalf to ensure that LBI's FX transactions could settle in the CLS system. Compl. ¶ 47. However, for the first time ever, LBI failed to make substantial payments to Citibank to fund its short positions in CLS on a timely basis, and thus did not zero out its CLS position with Citibank at the end of each business day. *Id.* ¶¶ 43, 47–49, 96; Trustee's Prelim. Report ¶ 72. The short balances that LBI accrued were massive: "LBI owed Citibank approximately $480 million at the end of the day on September 15." Compl. ¶ 96. In light of LBI's continuing failure to pay the short balances owing, Citibank exercised its right to withhold a portion of the long balances that it had received from CLS Bank for LBI's trades. *Id.* ¶¶ 42, 47, 96; *see* Ex. 4 at 3.

On September 17, due to LBI's continuing failure to pay short balances owing, Citibank requested additional cash collateral from LBI before Citibank would continue settling LBI's trades in CLS the following day. Compl. ¶ 44. LBI was unable to deposit any additional funds. *Id.* ¶ 44. Instead, Barclays Bank PLC ("Barclays"), which was then negotiating a purchase of LBI's assets, agreed to pledge $700 million to Citibank to induce Citibank to continue providing LBI with CLS Services. Compl. ¶ 45. Citibank and Barclays executed the pledge agreement on September 17, 2008 (the "Barclays Pledge Agreement"). Ex. 7.

The Barclays Pledge Agreement provided that Citibank could set off LBI's CLS obligations against the $700 million pledged, and further granted Citibank a continuing security interest in the funds. *Id.* §§ 2, 13, 17; Compl. ¶ 46. The Barclays Pledge Agreement explicitly stated that the rights granted to Citibank were non-exclusive, and cumulative of Citibank's rights and

remeties under the CLS Agreement, other agreements, and common law.  Ex. 7 § 24.[9]

After entering into the Barclays Pledge Agreement on September 17, Citibank sent LBI written notification that Citibank would continue providing CLS services.  Ex. 9.  In that letter, Citibank confirmed that the reinstatement of CLS services was made "at the request of Lehman Brothers Inc.," and undertaken "[i]n consideration of the pledge over an *additional* cash deposit granted in [Citibank's] favour by Barclays Bank PLC."  *Id.* (emphasis added).  Citibank conditioned its reinstatement "on the basis that the provision of CLS settlement services remains subject to all rights contained in the CLS Agreement and its terms remain in full force and effect."  *Id.*

### F. Citibank Exercises Its Right of Setoff and LBI Enters Into a SIPA Proceeding

Citibank continued to provide CLS services to LBI—and therefore continued to extend intraday credit to LBI—until September 19, 2008.  Compl. ¶ 47.  Because "LBI did not make certain payments to Citi  . . . for CLS activity," LBI continued to accrue short positions with Citibank for CLS, and Citibank continued to hold onto a portion of the long positions due to LBI, as it was entitled to do under the CLS Agreement.  Trustee's Prelim. Report ¶ 72; Compl. ¶¶ 42, 47–49; Ex. 4 at 3.  In light of LBI's continuing failure to cover its short positions, Citibank sold off LBI's long positions, netting them against LBI's short positions and leaving a shortfall of $1.26 billion. Compl. ¶ 48.

On September 19, 2008, Citibank set off the $1 billion LBI deposit against its CLS losses.  *Id.* ¶¶ 50, 65, 76.  The Trustee alleges "on information and belief" that "Citibank was on notice that the SIPA liquidation of LBI" would commence that day, and that Citibank did not

---

[9]    On November 13, 2008, Barclays and Citibank entered into a Supplement to Pledge Agreement, under which Citibank returned the $700 million in pledged cash to Barclays in consideration of Barclays's agreement to indemnify Citibank, in an amount up to $700 million, for losses that Citibank suffered from its provision of CLS services to LBI.  Ex. 8; Compl. ¶ 57.

complete its setoff before the commencement of LBI's SIPA liquidation. *Id.* ¶¶ 53, 65. More than that, the Trustee accuses Citibank of making knowing misrepresentations to the Court about the timing of the setoff. *Id.* ¶¶ 58, 65, 66.

As of the morning of September 19, 2008, the entire world (including Citibank) was on notice that LBI would enter into a SIPA proceeding that day. At 8:02 a.m., SIPC issued a statement that it would "file a proceeding placing LBI in liquidation under the Securities Investor Protection Act (SIPA)." Trustee's Prelim. Report Ex. C at 16.

Since September 18, 2008, LBI's $1 billion deposit had resided in an account, denominated "Lehman," at the New York branch of Citibank. Compl. ¶ 41. At 1:13 p.m. on September 19, Citibank seized the $1 billion from the "Lehman" account and transferred it to an administrative holding account owned and controlled by Citibank. *Id.* ¶¶ 50, 65. Contemporaneous records reflect the time of transfer, and the funds were never returned to any Lehman-owned account. *Id.* ¶¶ 50, 53. According to the Complaint, LBI's Treasurer requested that Citibank return the $1 billion, a request that Citibank did not honor. *Id.* ¶¶ 51, 54.

SIPC did not file its liquidation complaint against LBI until 1:23 p.m., and the District Court did not enter an Order Commencing Liquidation until 2:59 p.m. *Id.* ¶ 52; Ex. 10. At 2:07 p.m., Citibank sent a formal notice to LBI advising that Citibank had set off the $1 billion deposit against LBI's obligations. Compl. ¶ 53. This notice inadvertently referred to LBI as "Lehman Brothers International," so Citibank sent a second, corrected notice—addressed to Lehman Brothers Incorporated—at 2:28 p.m. *Id.* ¶ 54. At 3:22 p.m., Citibank transferred the $1 billion deposit from the Citibank administrative account to another Citibank-owned account, denominated "Citibank NA New York Branch for Branch and Citibank Affiliates." *Id.* ¶ 53.

# **ARGUMENT**

To survive a Rule 12(b)(6) motion to dismiss, as incorporated in Bankruptcy Rule 7012, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It is not enough for the Trustee to plead facts that are "merely consistent with" a right to relief; instead, a plaintiff is required to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949–50. Clearly, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C. (In re Vargas Realty Enters., Inc.)*, 440 B.R. 224, 233 (S.D.N.Y. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949).

The pleading standard for the Trustee's fraud-based claims is even higher. To avoid dismissal, the Complaint must state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Moreover, a plaintiff is required to "allege facts that give rise to a strong inference of fraudulent intent." *Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 191 (Bankr. S.D.N.Y. 2010).

On a motion to dismiss that raises an affirmative defense, dismissal is appropriate where "the defense appears on the face of the complaint." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)). Thus, dismissal is proper where, as here, the factual allegations of the Complaint (together with other material the court may consider on this motion) show that the Bankruptcy Code safe harbors apply. *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 455 n.3 (Bankr. S.D.N.Y. 2006).

As set forth below, sixteen of the nineteen Counts in the Complaint fail to state any valid cause of action against Citi and should be dismissed, with prejudice. An additional count should be dismissed insofar as it is directed at the $1 billion deposit and setoff.[10]

## I. The Bankruptcy Code Safe Harbors Protect the $1 Billion Setoff

The factual allegations of the Complaint and documents referenced therein conclusively establish that LBI's deposit of $1 billion with Citibank and Citibank's setoff against that $1 billion deposit are safe-harbored transactions under the Bankruptcy Code. Accordingly, the counts of the Complaint seeking avoidance and recovery of the $1 billion (other than on the basis of actual fraud)—Counts I, II, III, IV, V, VI, VIII, IX, XIII, and XIV—fail to state a claim upon which relief can be granted.

Each of the transactions and agreements relating to Citibank's receipt and setoff of the $1 billion deposit qualifies as a "swap agreement" under the Code.[11] *First*, the underlying "FX transactions" that LBI asked Citibank to settle through CLS are plainly "swap agreements." *See* 11 U.S.C. § 101(53B)(A)(i)(I)–(III) (2006) (defining "swap agreement" to include a "spot, same day-tomorrow, tomorrow-next, forward or other foreign exchange . . . agreement."); Compl. ¶¶ 16, 18, 21, 23; Ex. 3 § 1.1 (defining "FX transaction").[12]

---

[10] The Trustee's claim for disallowance of Citibank's claims and liens under 11 U.S.C. §§ 502(d) and 506(d)—Count XVIII—should be dismissed insofar as it concerns the $1 billion deposit and Citibank's setoff, because there is no basis for the Trustee to avoid these transactions and recover all or any part of the $1 billion.

[11] There can be no dispute that Citibank is both a "financial participant" and a "swap participant" under the Bankruptcy Code. 11 U.S.C. § 101(22A), (53C) (2006). Indeed, because the CLS Agreement and Letter Agreements are "swap agreements" under the Code, Citibank, by definition, qualifies as a "swap participant."

[12] The Trustee alleges that "what is actually settled" through CLS "are not the [FX] trades themselves but the payments arising from the trades as instructed by the parties." Compl. ¶ 20. The Trustee's proposed distinction is meaningless. An FX trade is settled by making the payments called for under that FX trade.

*Second*, each of the CLS Agreement, September 15 Letter Agreement, and September 16 Letter Agreement qualifies as a "swap agreement" under the Bankruptcy Code because each is a "security agreement or arrangement or other credit enhancement related to [a swap agreement], including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with [a swap agreement]." 11 U.S.C. § 101(53B)(A)(vi). As the text of the statute makes clear, Congress did not intend to restrict safe harbor protection to some narrow list of prescribed types of credit support provided in connection with swap agreements. Instead, Congress chose flexible, functional, and adaptive terms—"arrangement," "other credit enhancement"—that could reach all manner of credit support and "ensure[] that any such agreement, arrangement or enhancement is itself deemed to be a swap agreement." H.R. Rep. No. 109-31, at 122, 109th Cong. (2005). The terms of the statute clearly comprehend the credit support provided in the CLS Agreement and the September 15 and 16 Letter Agreements.

The CLS Agreement is a "credit enhancement" and "security arrangement" related to a swap agreement under 11 U.S.C. § 101(53B)(A)(vi). In the CLS Agreement, Citibank agreed to act as LBI's Designated Settlement Member in the CLS system. Ex. 4 at 2. Under the CLS Rules, LBI could not clear its FX trades through CLS unless Citibank, as LBI's Designated Settlement Member, agreed to "be fully responsible as principal" to fund all payments due in connection with those trades. Ex. 3 §§ 1.1 (defining "Designated Settlement Member") & 2.1.7(b). Thus, as the CLS Agreement and Trustee acknowledge, "[i]n the process of settling trades for LBI on the CLS system, Citi extended intraday credit to LBI." Trustee's Prelim. Report ¶ 109; Ex. 4 at 3 (by authorizing trades in CLS, Citibank "necessarily assumes a credit exposure to CLS Bank on [LBI's] behalf"). LBI, in turn, was obligated to reimburse Citibank for the settlement payments made on LBI's behalf. Ex. 4 at 3 (LBI agrees to "fund all net short balances in respect of transactions to which it is the

Transaction Party" at the times specified by Citibank). Citibank's credit extension with respect to CLS settlement and LBI's consequent "reimbursement obligation" to Citibank were the core operative provisions of the CLS Agreement. Compl. ¶¶ 19, 21, 23.[13] The CLS Agreement thus constitutes a "credit enhancement" under the Bankruptcy Code and, specifically, a "reimbursement obligation" from LBI to Citibank (a swap participant and financial participant), relating to LBI's FX trades. 11 U.S.C. § 101(53B)(A)(vi). [14]

The CLS Agreement also constitutes a "security arrangement" in favor of Citibank. While "security arrangement" is not defined in the Bankruptcy Code, the House Report provides some guidance, stating, significantly, that "[a]n example of a security arrangement is a right of setoff." H.R. Rep. No. 109-31, at 129. The CLS Agreement grants Citibank a right of setoff where, among other things, LBI does not satisfy its reimbursement obligations:

> Upon an occurrence of an Event of Default . . . with respect to [LBI], Citibank may (in respect of any account of [LBI] and whether by combination or unification of accounts, set-off or otherwise) reduce without notice the amount of any payment obligations whether matured or unmatured owed by it or any of Citibank's branches, affiliates, or subsidiaries to [LBI] . . . by the amount of any payment obligation owed to it by [LBI]. . . regardless of the place of payment or currency of either obligation.

Ex. 4 at 3–4. Thus, whether regarded as a "credit enhancement" or "security arrangement" relating to the FX transactions Citibank settled for LBI, the CLS Agreement plainly qualifies as a "swap

---

[13] Indeed, the whole purpose of the CLS Agreement—and Citibank's role as LBI's Designated Settlement Member—was for Citibank to "guaranty" to CLS Bank LBI's obligations on its FX trades. *See* Ex. 3 §§ 1.1 & 2.1.7(b).

[14] The CLS Agreement can also be viewed as a "master agreement" providing for FX transactions between LBI and Citibank. *See* 11 U.S.C. § 101(53B)(A)(v). Every time Citibank settled an FX transaction for LBI through CLS, LBI was obligated to deliver to Citibank the currency LBI was selling, and Citibank was required to deliver to LBI the currency LBI was buying. Thus, a duplicate FX transaction between Citibank and LBI was created under the CLS Agreement. Viewed as a "master agreement," the CLS Agreement, again, plainly qualifies as a "swap agreement" under the Bankruptcy Code. *Id.*

agreement" under the Code.  11 U.S.C. § 101(53B)(A)(vi).[15]

Likewise, each of the September 15 and 16 Letter Agreements provides for a right of setoff:  "Citibank shall have the right at all times to set off the amount of the referenced [$1 billion] deposit account against any obligations of [LBI] under the CLS Agreement."  Ex. 5 ¶ 7; Ex. 6 ¶ 6. Thus, each constitutes a "security arrangement" relating to the FX transactions Citibank settled for LBI in CLS and therefore qualifies as a "swap agreement" under the Bankruptcy Code.  11 U.S.C. § 101(53B)(A)(vi).

As shown above, all of the transactions at issue fall squarely within the plain language of the safe harbors.  Moreover, these are precisely the kinds of transactions Congress sought to protect when it created and then broadened the safe harbors.  As the legislative history makes clear, Congress hoped to minimize systemic risk and assure financial institutions, such as Citibank, that if they continued to conduct business with, and extend credit to, a failing institution, their transactions in protected markets would not be disturbed in bankruptcy.  As the House Report on the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 notes, the safe harbors "are intended to reduce 'systemic risk' in the banking system and financial marketplace."  H.R. Rep. No. 109-31, at 20.  Congress defined "systemic risk" as follows:

> The risk that the failure of a firm or disruption of a market or settlement system will cause widespread difficulties at other firms, in

---

[15]  The CLS Agreement may also constitute a "security agreement" in favor of Citibank, because it is an "agreement that creates or provides for a security interest."  11 U.S.C. § 101(50).  A "security interest" is a "lien created by an agreement," *id.* § 101(51), and a "lien" is, in turn, a "charge against or interest in property to secure payment of a debt or performance of an obligation," *id.* § 101(37).  The CLS Agreement gives Citibank a security interest by providing that "any time LBI has an outstanding short balance in one or more currencies"—that is, a debt to Citibank—LBI has "no right to the portion of its long balance it may have in any other currency(ies) up to the value of such short balance owing."  Ex. 4 at 3.  Thus, Citibank's interest in LBI's long positions secured LBI's obligation to reimburse Citibank for payments made on LBI's behalf, and the CLS Agreement likely constitutes a "security agreement" relating to LBI's FX trades.  11 U.S.C. § 101(53B)(A)(vi).

other market segments or in the financial system as a whole. If participants in certain financial activities are unable to enforce their rights to terminate financial contracts with an insolvent entity in a timely manner, or to offset or net their various contractual obligations, the resulting uncertainty and potential lack of liquidity could increase the risk of an inter-market disruption.

*Id.* at 20 n.78. In amending the safe harbors, Congress was also specifically concerned with "promoting the clearing of derivatives and other transactions as a way to reduce systemic risk." *Id.* at 131.

Citibank's actions in continuing to settle LBI's transactions through CLS reduced systemic risk and limited the market disruption suffered as a result of LBHI's bankruptcy filing. The CLS method of FX settlement, developed in response to concerns over systemic risk in FX trading, eliminated settlement risk for LBI's FX counterparties. As the Trustee acknowledges, settling transactions in CLS "avoid[ed] a major cause of defaults." Trustee's Prelim. Report Ex. C at 12; *see also* International Monetary Fund, IMF Country Rep. No. 10/122, *Technical Note on Selected Issues on Liquidity Risk Management In Fedwire Funds and Private Sector Payment Systems* ¶ 32 (May 2010), *available at* http://www.imf.org/external/pubs/ft/scr/2010/cr10122.pdf ("CLS Bank performed well during the crisis. Major dislocations were avoided since the settlement member that represented Lehman Brothers did not exercise its right to rescind the transactions entered on behalf of Lehman Brothers and completed its settlement obligations on Lehman's behalf."). By contrast, LBI suffered substantial failures in connection with FX transactions settled outside of CLS. LBI's counterparties—presumably unwilling to assume settlement risk opposite LBI—failed to perform on thousands of these FX trades, further constraining LBI's liquidity. Trustee's Prelim. Report ¶ 56. Citibank, however, would not have been able to play this vital market-stabilizing role if it had been

uncertain about its rights to offset its CLS losses against the $1 billion deposit.[16]

*     *     *

Because the CLS Agreement, the September 15 Letter Agreement, and the September 16 Letter Agreement are "swap agreements," and because Citibank is a "swap participant" or "financial participant" within the meaning of the Bankruptcy Code, the Bankruptcy Code safe harbors bar virtually all of the Trustee's claims to avoid and recover the $1 billion setoff. The barred claims include:

*Count I*: The Complaint alleges that Citibank's seizure of the $1 billion deposit, if post-petition, was a violation of the automatic stay in 11 U.S.C. § 362(a)(7). Compl. ¶¶ 64–69. This claim for relief is barred under 11 U.S.C. § 362(b)(17), which provides that the stay shall not bar "the exercise by a swap participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement."[17]

*Counts II & III*: The Complaint alleges that Citibank's seizure of the $1 billion deposit, if post-petition, constitutes an impermissible post-petition transfer under 11 U.S.C. § 549, which the Trustee seeks to recover under 11 U.S.C. § 550. Compl. ¶¶ 70–74. These claims for relief are barred under 11 U.S.C. § 560, which states that "[t]he exercise of any contractual right of any

---

[16] Citi recognizes that there has been significant debate in the academic literature as to whether the safe harbors serve to reduce systemic risk. Indeed, some have argued that the safe harbors may actually increase systemic risk. *See, e.g.*, Stephen J. Lubben, *The Bankruptcy Code Without Safe Harbors*, 84 Am. Bankr. L.J. 123 (2010). Citi submits that, in this case, the safe harbors clearly operated to reduce systemic risk. Citi also notes that, notwithstanding the lively academic debate, Congress expressly adopted similar safe harbor protection in the recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act. 12 U.S.C.A. § 5390(c)(8) (West 2011).

[17] *See also* 15 U.S.C. § 78eee(b)(2)(C)(i) (2006), which protects the setoff rights of parties to swap agreements in SIPA proceedings, and 11 U.S.C. § 362(o), which provides that setoff rights not subject to the automatic stay "shall not be stayed by any order of a court or administrative agency in any proceeding under this title."

swap participant or financial participant . . . to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title."

*Counts IV & V*:  The Complaint alleges that Citibank's seizure of the $1 billion deposit, if pre-petition, constitutes an avoidable preference under 11 U.S.C. § 547, which, upon avoidance, the Trustee seeks to recover under 11 U.S.C. § 550.  Compl. ¶¶ 75–84.  Even if viewed as a "transfer," these claims for relief are barred under 11 U.S.C. § 546(g), which provides that the Trustee "may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A)."

*Count VI*:  The Complaint alleges that the setoff, if pre-petition, is avoidable under 11 U.S.C. § 553(a)(3) because the $1 billion deposit was created for the purpose of obtaining a setoff.  Compl. ¶¶ 85–90.  This claim for relief is barred by the terms of the very Bankruptcy Code section relied on by the Trustee.  On its face, 11 U.S.C. § 553(a)(3) does not apply to "a setoff of a kind described in section . . . 362(b)(17) . . . [or] 560."

*Counts VIII & IX*:    The Complaint alleges that the setoff, if pre-petition, allowed Citibank to improve its position by $220 million in violation of 11 U.S.C. § 553(b), and the Trustee seeks to recover that amount under 11 U.S.C. § 550.  Compl. ¶¶ 95–101.  These claims for relief are barred by the terms of the very Bankruptcy Code section relied on by the Trustee.  On its face, 11 U.S.C. § 553(b)(1) does not apply to "a setoff of a kind described in section . . . 362(b)(17) . . . [or] 560."

*Counts XIII & XIV*:  The Complaint alleges that LBI's entry into the September 15 and 16 Letter Agreements is avoidable as a constructive fraudulent conveyance under 11 U.S.C. § 544 and state law.  Compl. ¶¶ 118–125.  Whether or not the Trustee can avoid LBI's alleged "obligation" under the Letter Agreements to place a $1 billion deposit with Citibank, the $1 billion transfer itself is protected by the safe harbors because it was made under or in connection with one or more swap agreements, namely, the CLS Agreement, the Letter Agreements, and LBI's FX trades.  Under 11 U.S.C. §§ 546(g) and 560, the transfers therefore may not be avoided.

## II.     The Doctrine of Equitable Recoupment Protects the $1 Billion Setoff

In addition to the safe harbors, the doctrine of equitable recoupment bars the Trustee's attempts to avoid and recover the $1 billion deposit.

Recoupment applies when parties have obligations that "arise out of a *single integrated transaction* so that it would be *inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations."  *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 147 (2d Cir. 2002) (citations omitted) (emphases in original).  Recoupment is "in the nature of a defense, the purpose of which is to do justice viewing one transaction as a whole."  *Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998) (internal quotations omitted) (citing *Constantino v. State*, 415 N.Y.S.2d 966, 968–69 (Ct. Cl. 1979) ("Recoupment permits a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole.")).

For purposes of recoupment, a "single, integrated transaction" can include multiple components and agreements.  *In re Malinowski*, 156 F.3d at 133 ("In recoupment . . . the claim and counterclaim must arise out of the same transaction or set of transactions."); *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997) ("Recoupment in bankruptcy may occur only within a single contract or transaction or a single set of transactions.").  The focus is

on whether the claim and counterclaim result from a set of reciprocal obligations or from the same set of facts. *In re Malinowski*, 156 F.3d at 134.

While "the recoupment doctrine is a limited one and should be narrowly construed," *id.* at 133, the facts here clearly warrant its application. As the Complaint makes clear, Citibank was willing to continue to provide LBI with services under the CLS Agreement *only* if LBI deposited $1 billion as security for any losses Citibank might suffer as a result (as memorialized in the September 15 and 16 Letter Agreements). Compl. ¶¶ 33–38. Thus, Citibank's continued provision of CLS services and Citibank's receipt of the $1 billion deposit to cover any losses are components of a "single, integrated transaction," such that it would be inequitable for LBI to enjoy the benefits of the transaction (continued access to CLS settlement) without also meeting its obligations (Citibank's right to apply the $1 billion deposit to reduce its resulting losses).[18] The Trustee may not use the automatic stay or his avoidance powers "as a weapon to obtain the gross benefits under a contract with the defendants and prevent the defendants from netting out against that contract the recoupment called for under the same agreement." *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 435 (Bankr. S.D.N.Y. 1982).

Because Citibank's use of the $1 billion deposit to reduce its CLS-related LBI exposure qualifies as a recoupment, all of the Trustee's claims seeking return of the $1 billion deposit must be dismissed. *First*, it is well-established that a party may exercise a right of recoupment free of the limitations imposed by the automatic stay. *In re McMahon*, 129 F.3d at 96;

---

[18] Here, unlike *In re Malinowski*, the obligations arise out of the same set of facts and, unlike *Westinghouse*, the parties expressly intended the $1 billion to be applied in just this way. *Cf. In re Malinowski*, 156 F.3d at 134–35 (rejecting state's effort to recoup overpayment on one unemployment claim against payments arising under a separate unemployment claim for a later period of unemployment); *Westinghouse*, 278 F.3d at 147–48 (rejecting recoupment claim where "parties had knowingly assigned different forms of security to discrete parts of the transaction" such that it would be inequitable to permit recoupment of one obligation against security specifically intended to secure a different obligation).

*In re Malinowski*, 156 F.3d at 133 ("The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property.").

       *Second*, Citibank's recoupment right is exempt from any limitation on setoffs prescribed by 11 U.S.C. § 553. *In re HQ Global Holdings, Inc.*, 290 B.R. 78, 81 (Bankr. D. Del. 2003) ("Recoupment 'allows the creditor to assert that certain mutual claims extinguish one another in bankruptcy, in spite of the fact that they could not be 'setoff' under 11 U.S.C. Section 553.'") (citations omitted); *see also Schachter v. Tolassi (In re 105 E. Second St. Assocs.)*, 207 B.R. 64, 68–69 (Bankr. S.D.N.Y. 1997) (holding that "the recoupment claim is therefore independent of setoff rights under 11 U.S.C. § 553 and not restricted thereby") (internal quotations and citations omitted); *In re Yonkers*, 22 B.R. at 432 (holding pre-petition payments to a creditor were recoupments and therefore "not governed by Code § 553(b).").

       *Finally*, because "recoupment is an adjustment of the debtor's liability and is not a transfer," an act of recoupment does not constitute an avoidable preference or a fraudulent transfer. *In re Yonkers*, 22 B.R. at 433; *Mercy Hosp. of Watertown v. N.Y.S. Dep't of Social Serv.*, 171 B.R. 490, 495 n.4 (N.D.N.Y. 1994) ("A party exercising the right of recoupment is not subject to . . . the prohibitions against preferences or fraudulent transfers under §§ . . . 547, 548 and 549 of the Code.").

       Because Citibank used the $1 billion deposit to recoup its losses from the provision of CLS services to LBI, the Trustee's claims for relief in Counts I–VI and VIII–XIV must be dismissed.[19]

---

[19]   English law, too, would protect Citibank's application of the $1 billion against its losses as a recoupment, or "equitable setoff." *See* Rory Derham, *Derham on the Law of Set-Off* § 4.11 (4th ed. 2010) (stating that "in order for an equitable set-off to apply: first, the cross-claim must arise out of the same transaction as the claim or be closely connected with it; and, second, the relationship between the respective claims must be such that it would be manifestly unjust to allow one claim to be enforced without regard to the

## III. The Trustee's Claims to Avoid and Recover the $1 Billion Setoff Fail on Multiple Independent Grounds

In addition to the safe harbors and recoupment, the Trustee's efforts to avoid and recover the $1 billion setoff fail for a multiplicity of additional reasons.

### A. Citibank Did Not Violate the Automatic Stay

The Complaint alleges that Citibank "willfully violated the automatic stay" under 11 U.S.C. § 362(a)(7) when Citibank set off against LBI's $1 billion deposit. Compl. ¶¶ 64–69. Further, the Trustee accuses Citi of making knowing misrepresentations to this Court that the setoff was pre-petition. *Id.* ¶ 58. The claim of stay violation—and the Trustee's accusations of willful misconduct on Citi's part—are utterly baseless and refuted by the very facts set forth in his Complaint.

As the Complaint establishes, Citibank seized the $1 billion deposit from the "Lehman" account and transferred those funds to a Citibank-owned administrative account at 1:13 p.m. on September 19, 2008. *Id.* ¶ 50. Citibank's contemporaneous records reflect the fact and timing of this transfer. *Id.* ¶ 50. These actions effected the setoff, which was therefore complete before SIPC filed its application for a protective decree with the District Court at 1:23 p.m.

Under New York law, some "overt act" is required to accomplish a setoff. *Aspen Indus. Inc. v. Marine Midland Bank*, 426 N.Y.S.2d 620, 622 (App. Div. 1980) (stating that the requirement of an "overt act" is meant to "assure[] those who deal with banks that their rights will not be defeated by unsupported internal declarations of a self-serving nature"), *rev'd on other grounds*, 421 N.E.2d 808 (N.Y. 1981). Like most courts, those in New York follow the rule announced in *Baker v. National City Bank of Cleveland*, 511 F.2d 1016 (6th Cir. 1975), which held

---

other") (*citing Fed. Commerce & Navigation Co. v. Molena Alpha Inc.*, [1978] 1 Q.B. 927, 974–75). *See generally* Philip R. Wood, *English & International Set-Off* §§ 4-1 *et seq.* (1989) (discussing equitable setoff and related doctrines).

that three steps are necessary to complete a setoff: "(1) the decision to exercise the right, (2) some action which accomplishes the setoff and (3) some record which evidences that the right of setoff has been exercised." *Id.* at 1018; *see Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995) (noting majority of jurisdictions follow the *Baker* test in determining whether a setoff has occurred); *V. I. Bureau of Internal Revenue v. Chase Manhattan Bank*, 312 F.3d 131, 140 (3d Cir. 2002) (applying New York law); *Clarkson Co. v. Shaheen*, 533 F. Supp. 905, 925 (S.D.N.Y. 1982); *Aspen Indus.*, 426 N.Y.S.2d at 622.

        Citibank's actions in debiting LBI's account and crediting the $1 billion to a Citibank-owned account (together with the contemporaneous record of these actions) clearly suffice to complete the setoff. *See Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.)*, 698 F.2d 42, 47 (1st Cir. 1983) ("The Bank's actions in debiting the [debtor's] account and crediting its treasurer's account were sufficient to satisfy *Baker*'s three requirements"); *see also V. I. Bureau*, 312 F.3d at 140 (stating that setoff is complete upon withdrawal of funds from debtor's account and transfer to the creditor bank).

        While the Complaint contends that Citibank "did not take the requisite action to effectuate a setoff . . . prior to the filing," Compl. ¶ 53, the only deficiency specifically alleged is that Citibank did not record a credit to LBI's CLS debt before the filing of the liquidation proceeding. *See id.* ¶ 55 (Citibank did not "record a credit to LBI's net shortfall in the CLS system until after the filing of the SIPC petition"); *id.* ¶ 65 (Citibank "did not credit or reduce LBI's obligations"). But *Baker* and the cases applying *Baker* make clear Citibank was not required to make this additional bookkeeping entry in order to exercise its setoff. *See Baker*, 511 F.2d at 1018 ("[T]here is no requirement that the actual cross entries to reflect off setting debits and credits be made before the right of setoff is exercised."); *In re Saugus*, 698 F.2d at 48 (rejecting argument that "the Bank should

be required to take the final step of crediting the [debtor's] mortgage loan" and finding that such additional "bookkeeping entry" is not required to complete a setoff under *Baker*).

The Complaint establishes that Citibank setoff the $1 billion deposit *before* SIPC filed its petition for a protective decree with respect to LBI, and thus Count I of the Complaint, alleging violation of the automatic stay, should be dismissed with prejudice.[20]

## B. Citibank Did Not Receive the Deposit to Obtain Setoff Rights For Purposes of 11 U.S.C. § 553(a)(3)

The Complaint alleges that Citibank's setoff of the $1 billion deposit is avoidable under 11 U.S.C. § 553(a)(3) because "Citibank caused LBI to make the $1 billion preferential deposit for the purpose of obtaining a right of setoff." Compl. ¶ 89. This claim fails for the independent reason that Citibank did not receive the deposit for the purpose of obtaining a right to set off existing debt, but instead to secure Citibank's *future* extension of credit to LBI for CLS services.

The phrase "for the purpose of obtaining a right of setoff against the debtor" has been "authoritatively noted [to] 'involve[] a deliberate manipulation by the creditor' to incur a prepetition debt to his debtor for the sole purpose of triggering a setoff." *Allbrand Appliance & Television Co. v. Merdav Trucking Co. (In re Allbrand Appliance & Television Co.)*, 16 B.R. 10, 14 (Bankr. S.D.N.Y. 1980) (citing Weintraub & Resnick, *Bankruptcy Law Manual* 5.10(1) at 5–34 (1980)), *cited approvingly in Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*, 212 B.R. 206, 216 (B.A.P. 2d Cir. 1997). Thus, the "archetypal situation" in which 11 U.S.C. § 553(a)(3) applies "is the case where a debtor has a preexisting obligation to the creditor" and "pays back the creditor by 'loaning' him money." *Woodrum v. Ford*

---

[20] Because the Complaint establishes that Citibank effected the $1 billion setoff pre-petition, Counts II and III, which seek to avoid and recover the setoff as an "impermissible post-petition transfer" in violation of 11 U.S.C. §§ 549 and 550, must also be dismissed. *See* Compl. ¶¶ 70–74.

*Motor Credit Co. (In re Dillard Ford, Inc.)*, 940 F.2d 1507, 1512–13 (11th Cir. 1991) (holding that "disfavored" setoffs are those where "the creditor obtains the debt only to engage in setoff"); *see also Brooks Shoe Mfg. Co. v. United Tele. Co.*, 39 B.R. 980, 983 (E.D. Pa. 1984) (holding that "[s]ection 553 of the Bankruptcy Code, read in conjunction with § 547 and in light of the legislative history, proscribes only preferential setoffs" where creditor "attempt[s] to gain an advantage over other unsecured creditors with respect to existing debts").

Here, the only "build-up" the Trustee alleges involves LBI's transfer of $700 million to Citibank on September 15. LBI transferred the $700 million "into one of its Citibank accounts which already held in excess of $300 million," to form the $1 billion deposit. Compl. ¶ 39; Ex. 5. That "build-up," though, was clearly intended to secure Citibank's *future* extensions of credit in providing CLS services on the following date. Ex. 5; *see also* Compl. ¶ 34. As the Complaint makes clear, Citibank extended at least $780 million in additional net credit after receiving this incremental $700 million, Compl. ¶ 96,[21] and advanced gross funds exceeding $15 billion on LBI's behalf over that week, *id.* ¶ 76.[22] *Cf. Brooks Shoe Mfg.*, 39 B.R. at 981–83 (holding that 11 U.S.C. § 553 did not disturb setoff rights of creditor who received $15,000 security deposit from debtor and thereafter extended pre-petition "new value" to debtor in the form of telephone services worth $15,343.64). Because Citibank's receipt of this incremental $700 million secured future extension of credit and did not "involve[] a deliberate manipulation by [Citibank] to incur a prepetition debt to

---

[21]     According to the Complaint, LBI owed Citibank $480 million before the $700 million was deposited at Citibank and LBI owed Citibank $1.26 billion on September 19, 2008 (reduced to $260 million after Citibank's $1 billion setoff). Compl. ¶ 96. As a mathematical fact, then, Citibank extended at least $780 million in additional net credit over that period.

[22]     The Trustee also purports to bring this count under "state law," without identifying the state law at issue. Compl. ¶ 90 ("The setoff is invalid under Section 553 of the Bankruptcy Code and *under state law* because through the preferential deposit, Citibank was positioned ahead of the other creditors of LBI.") (emphasis added). The Trustee has not identified any provision or principle of New York law—or any other state—that provides him with a basis to avoid Citibank's setoff as preferential.

[LBI] for the sole purpose of triggering a setoff" against existing debt, *In re Allbrand*, 16 B.R. at 14, Count VI fails as a matter of law and should be dismissed with prejudice.

### C. Citibank Did Not Improve Its Position For Purposes of 11 U.S.C. § 553(b)

The Complaint alleges that Citibank's setoff of the $1 billion allowed Citibank to improve its position by $220 million in violation of 11 U.S.C. § 553(b); the Trustee then seeks to recover that amount under 11 U.S.C. § 550. These claims fail for the independent reason that Citibank did *not* improve its position as a creditor at all. As the Trustee's own allegations demonstrate, Citibank *increased* its exposure to LBI during the relevant period.

Section 553(b) of the Bankruptcy Code permits a trustee to avoid a pre-petition setoff to the extent a creditor's exposure to the debtor improved during the 90 days before the Filing Date, up to and including the moment of setoff—the so-called "improvement in position" test. Courts have described the application of the test as follows:

> Compare the amount owed to the creditor with the mutual debt owed by the creditor to the debtor on the 90th day before the bankruptcy filing . . . . If the amount owed to the creditor exceeds the amount owed to the debtor, there is an insufficiency and the 90th day before bankruptcy is the hypothetical setoff date. If no insufficiency exists on the 90th day, then a comparison of the balances of the mutual debts must be made on each subsequent day until an insufficiency does exist . . . .

*Dunn v. First Nat'l Bank of Decatur (In re Jenkins Enters., Inc.)*, 289 B.R. 702, 705 (Bankr. C.D. Ill. 2003); *see also Hecht v. Chemical Bank (In re Hecht)*, 41 B.R. 701, 704 (Bankr. S.D.N.Y. 1984) (generally explaining operation of 11 U.S.C. § 553(b)). After determining that an insufficiency exists on the 90th or some later day, the court measures that insufficiency against the insufficiency that exists at the time of the challenged setoff. *In re Hecht*, 41 B.R. at 704–05 (citing, *e.g.*, 4 *Collier on Bankruptcy* ¶ 553.02 at 553–59 (1979)). If the earlier insufficiency exceeds the insufficiency on the date of setoff, a trustee may recover that difference, up to the amount of the setoff. If the

insufficiency on the setoff date equals or exceeds the insufficiency on the earlier date, then a trustee cannot recover. *In re Jenkins Enters.*, 289 B.R. at 705; *Wagner v. J & K Plumbing & Heating Co. (In re Rumsey Sheet Metal, Inc.)*, 70 B.R. 84, 87 (Bankr. W.D.N.Y. 1987).

The Trustee attempts to apply the "improvement in position" test at paragraph 96 of his Complaint. According to the Complaint, "[t]he first day on which LBI was indebted to Citibank in connection with CLS was Monday, September 15, 2008." Compl. ¶ 96. On that day "LBI owed Citibank approximately $480 million." *Id.* ¶ 96. The Complaint alleges that, after Citibank's setoff of the $1 billion deposit on September 19, "LBI's debt to Citibank was reduced to $260 million." Comparing these two numbers, the Trustee contends that "Citibank improved its position by $220 million" as a result of the $1 billion setoff. *Id.* ¶ 96.

But the Trustee has misapplied the "improvement in position" test to the facts alleged in the Complaint. His calculation ignores the fact that "[a] creditor cannot improve its position with respect to a secured claim." *Union Cartage Co. v. Dollar Sav. & Trust Co. (In re Union Cartage Co.)*, 38 B.R. 134, 138 (Bankr. N.D. Ohio 1984) (stating that "only an unsecured claim can be subject to an insufficiency"); *see also, e.g.*, *Howell v. Bank of Newnan (In re Summit Fin. Servs., Inc.)*, 240 B.R. 105, 121 (Bankr. N.D. Ga. 1999) (Section 553(b) looks at the extent "the creditor's unsecured position improves during the ninety (90) days prior to filing"). Under the Bankruptcy Code, a claim subject to setoff qualifies as "a secured claim . . . to the extent of the amount subject to setoff." 11 U.S.C. § 506(a)(1).

As the Trustee's own allegations demonstrate, only a portion of LBI's $480 million debt on September 15 was unsecured at the time LBI created the $1 billion deposit. According to the Complaint, LBI already had "in excess of $300 million" in a deposit account at Citibank. Compl. ¶ 39. LBI then transferred an additional $700 million to that account to form the $1 billion deposit.

*Id.* ¶ 39. Under the CLS agreement and common law, Citibank had the right to set off its CLS exposure against any LBI deposit, including the $300 million.[23]

Thus, on the date of the first insufficiency (September 15), Citibank had the preexisting right to set off the $300 million it already held against LBI's $480 million CLS shortfall, leaving Citibank with an insufficiency of, at most, $180 million. When Citibank set off the $1 billion deposit on September 19, it was left with an insufficiency of $260 million. *Id.* ¶ 96. Citibank therefore had a greater insufficiency on September 19 than it did on September 15.[24]

Because Citibank did not improve its position as a creditor of LBI as a result of the $1 billion setoff, but actually *increased* its exposure to LBI between September 15 and September 19, Counts VIII and IX of the Complaint fail as a matter of law and should be dismissed with prejudice.

### D. Citibank Gave More Than Fair Consideration for Purposes of 11 U.S.C. § 544 and New York State Law

The Complaint seeks to avoid the September 15 and 16 Letter Agreements (and their alleged "obligations" to deposit $1 billion and confer setoff rights) as constructive fraudulent conveyances under 11 U.S.C. § 544, and the Trustee seeks to recover the $1 billion deposit under 11 U.S.C. § 550. Compl. ¶¶ 118–23. These claims fail because (i) the Letter Agreements contained no such avoidable obligations and, even if they did, (ii) the facts alleged in the Complaint demonstrate LBI received fair consideration in exchange for those Agreements.

---

[23] *See* Ex. 4 at 3, 6; Wood, *English & International Set-Off* §§ 5-12 ("The law encourages contractual set-off in order to prevent multiplicity of suits and circuity of action.") (citing *Jeffs v. Wood* [1723] 2 P.Wms. 128) & 5-25 ("A contract to set off is to be construed like any other contract."); *Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*, 146 F.3d 136, 139 (2d Cir. 1998) ("There is [] no question that New York has long recognized a common law right of setoff." (citing *Straus v. Tradesmen's Nat'l Bank*, 25 N.E. 372, 372 (N.Y. 1890)).

[24] The Complaint alleges that Citibank holds an additional $62 million in deposits that were in LBI's accounts as of September 19. Compl. ¶ 92. Even though the Trustee claims these deposits are not available for offset, if they are factored into the "improvement in position" test, Citibank is still left with an insufficiency of at least $198 million—that is, $260 million less $62 million—following the setoff against the $1 billion deposit. *Id.* ¶¶ 56, 92, 96.

As a threshold matter, the September 15 and 16 Letter Agreements do not constitute avoidable "obligations" of LBI with respect to the $1 billion deposit for the simple reason that, as the Complaint shows, the Agreements did not "obligate" LBI to do anything that LBI had not already done, and did not grant Citibank any new rights that Citibank did not already have as a matter of contract and common law. In the September 15 Letter Agreement, LBI "represent[ed] and warrant[ed]" that it had previously issued irrevocable instructions to transfer $700 million to Citibank; the other $300 million used to fund the $1 billion deposit was already in LBI's Citibank account. Ex. 5 ¶ 1; Compl. ¶ 39. Thus LBI's deposit of the funds pre-dated the parties' entry into the Letter Agreement. Similarly, Citibank had setoff rights in these funds—under the CLS Agreement, English law, and New York law—before the parties entered into the Letter Agreements. *See supra* p. 36 n.23.

In any case, even if the Letter Agreements obligated LBI to make the $1 billion deposit and to confer setoff rights on Citibank, the Complaint's allegations fail to state a claim under 11 U.S.C. § 544. To state a claim for avoidance of a constructively fraudulent transfer, the Trustee must plausibly allege that LBI received less than "fair consideration" for the Letter Agreements. *See* N.Y. Debt. & Cred. Law §§ 273–75 (McKinney 2011); *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53–54 (2d Cir. 2005); *see also Gala Enters., Inc. v. Hewlett Packard Co.*, 989 F. Supp. 525, 529 (S.D.N.Y. 1998) (same).[25] Here, the Complaint contains no such factual allegations but simply sets forth "a formulaic recitation of the elements" of the claim, which does not suffice under Rule 8. *Official Comm. of Unsecured Creditors of*

---

[25] The Trustee seeks to avoid the Letter Agreements based on "applicable state law," but does not specify the state law on which he bases his claim. Citi assumes it is New York law. "Fair consideration" under the N.Y.D.C.L. has virtually the same meaning as "reasonably equivalent value" under the analogous federal provision. *Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330 B.R. 362, 363 n.3 (S.D.N.Y. 2005).

*Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010) (dismissing constructive fraudulent transfer claim where no facts pled to support allegation that debtor "received less than reasonably equivalent value"); *In re Vargas*, 440 B.R. at 239–40 (S.D.N.Y. 2010) (dismissing claim where facts alleged demonstrated "fair consideration").

Not only does the Complaint fail to allege facts supporting the assertion that LBI received less than fair consideration in exchange for the Letter Agreements (and their putative "obligation" to deposit $1 billion), it expressly acknowledges that LBI (and its customers and creditors) benefited enormously from Citibank's resumption of CLS services. Citibank had "no obligation to extend credit to support LBI's trades," Compl. ¶ 28, and, following LBHI's Chapter 11 filing and the material change in LBI's financial condition, Citibank had the unilateral right to terminate the CLS Agreement entirely. Ex. 4 at 6. In exchange for the $1 billion deposit (only $700 million of which constituted new money), LBI received continued access to the CLS system—an "essential bank service" of "indispensable importance" to LBI. Compl. ¶¶ 33, 34, 107. LBI also received substantial credit from Citibank in connection with these CLS services: by the close of business on September 15, "LBI owed Citibank approximately $480 million," *id.* ¶ 96, and by September 19 LBI had a gross *$16 billion* U.S. dollar deficit to Citibank and net deficit of $1.26 billion, *id.* ¶¶ 47, 96.

Thus, the factual allegations of the Complaint confirm that, in connection with the September 15 and 16 Letter Agreements, LBI received more than "fair consideration" in the form of (i) Citibank's forbearance from exercising its right to terminate the CLS Agreement, (ii) Citibank's continued extension of credit to LBI under the CLS Agreement, and (iii) LBI's access to an "indispensable" service that was "vital" for its ability to maintain its business operations and LBI's efforts to preserve as much value as possible for the benefit of its customers and creditors. *Id.* ¶¶

33–37; *see In re Old CarCo*, 435 B.R. at 187 (holding that trustee's complaint failed to allege lack of "fair consideration" where it did not "account for all of the elements of value that [the estate] received" from transfers, including "direct and indirect value"); *Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 839–41 (Bankr. S.D.N.Y. 2005), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005) (holding that debtor's grant of security interest for antecedent debt and extensions of new credit was "reasonably equivalent value"); *Cuevas v. Hudson United Bank (In re M. Silverman Laces Inc.)*, No. 01 Civ. 6209 (DC), 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (same).[26]

The Complaint fails to state a claim for constructive fraudulent conveyance with respect to the September 15 and 16 Letter Agreements, and Counts XIII and XIV should be dismissed with prejudice.

### E.    The Parties Intended a Contemporaneous Exchange of New Value Under 11 U.S.C. § 547(c)(1)

The Complaint seeks to avoid the $1 billion transfer as a preference under 11 U.S.C. § 547, which the Trustee seeks to recover under 11 U.S.C. § 550.  Compl. ¶¶ 75–84.  These claims fail because (i) 11 U.S.C. § 547 does not apply to setoffs, and (ii) the allegations of the Complaint establish that LBI intended any transfer to Citibank as a contemporaneous exchange of value,

---

[26] *See also In re Vargas*, 440 B.R. at 236–37, 240 (holding that forbearance from exercising a contractual right and agreement to engage in settlement negotiations constituted "fair consideration"); *Gala Enters.*, 989 F. Supp. at 529–30 (holding that $500,000 pre-payment for legal services constituted "fair consideration" where retainer "was a reasonable amount for what could reasonably be expected to be required in legal services"); *In re Middendorf*, 381 B.R. 774, 778 (Bankr. D. Kan. 2008) (holding that "debtors receive reasonably equivalent value for tax pre-payments where they face significant tax liability and obtain dollar for dollar credit against that potential liability and the right to a refund if the tax debt is ultimately less"); *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 726–27 (D. Md. 1989) (holding that extension of credit by the debtor's lender of last resort gave "reasonably equivalent value" that benefited "both present and future creditors").

protected under 11 U.S.C. § 547(c)(1), and that Citibank extended subsequent new value to LBI, protected under 11 U.S.C. § 547(c)(4).[27]

The Trustee apparently attempts to apply 11 U.S.C. § 547 to Citibank's setoff of the $1 billion on September 19, 2008. Compl. ¶¶ 76, 82 ("The seizure of the deposit on September 19, 2008 by Citibank constituted a transfer for the benefit of Citibank . . . . The transfer is an avoidable preference under Section 547(b) of the Bankruptcy Code.") But Section 553 is the exclusive Bankruptcy Code provision governing avoidance and recovery of setoffs.[28] Indeed, the legislative history confirms that setoffs do not amount to "transfers" within the meaning of 11 U.S.C. § 547.[29] Because 11 U.S.C. § 547 does not apply to setoffs, Counts IV and V of the Complaint fail as a matter of law.

The only relevant "transfer" for purposes of 11 U.S.C. § 547 was LBI's transfer of $700 million to Citibank on September 15, 2008. But whether we consider the September 15 "transfer" or the September 19 setoff, it is clear that the parties "intended . . . a contemporaneous exchange for new value" and that there was, in fact, "a substantially contemporaneous exchange."

---

[27] *See Newton v. United States (In re Newton)*, No. 5-05-BK-52728, Adv. No. 5-06-ap-50130, 2006 WL 5692759, at *1 (Bankr. M.D. Pa. Oct. 6, 2006) (dismissing claim where facts alleged in complaint established availability of affirmative defense under 11 U.S.C. § 547(c)).

[28] *See In re Dillard Ford*, 940 F.2d at 1512 ("The Bankruptcy Code is explicit that questions of setoff are governed exclusively by section 553 of the Bankruptcy Code."); *Lee v. Schweiker*, 739 F.2d 870, 873 n.4 (3d Cir. 1984) ("Although setoffs might otherwise be treated as preferential transfers, section 547 is not applicable . . . where a setoff right is being asserted . . . ."); *In re Centolella*, 142 B.R. 624, 627 (Bankr. N.D.N.Y. 1992) ("[Q]uestions of setoff under the Code are governed exclusively by Code § 553, and a setoff is thus not avoidable as a preference under Code § 547.").

[29] *See, e.g.*, *Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home)*, 273 B.R. 305, 309–10 (Bankr. D. Mass. 2002); *Belford v. Union Trust. Co. (In re Wild Bills, Inc.)*, 206 B.R. 8, 12–13 (Bankr. D. Conn. 1997); 5 *Collier on Bankruptcy* ¶ 553.09[1][a] (16th ed. 2009) ("The term 'transfer' is defined in Code section 101 . . . and the definition intentionally omits 'setoffs.' The legislative history to section 101 explains the omission in clear terms: 'Inclusion of 'setoff' is deleted. The effect is that a 'setoff' is not subject to being set aside as a preferential 'transfer' but will be subject to special rules.'").

11 U.S.C. § 547(c)(1). According to the Complaint, LBI transferred the $700 million, and conferred

setoff rights on Citibank, in order to obtain CLS services from Citibank. *See* Compl. ¶¶ 33–35, 39.

For its part, Citibank conditioned its continuation of CLS services on LBI's $1 billion deposit as

security. *Id.* ¶ 33. Citibank, in fact, advanced substantial credit to LBI over that week and then

seized the deposit on September 19 to set off its CLS losses. *Id.* ¶¶ 47, 50, 96; *see also* 11 U.S.C.

§ 547(a)(2) (defining "new value" as "money or money's worth in goods, services, or new credit").

On the facts alleged, the parties indisputably intended a contemporaneous exchange for new value

and a substantially contemporaneous exchange took place.[30] *See Ames Merch. Corp. v. Revere*

*Mills, Inc. (In re Ames Dep't Stores, Inc.)*, Bankr. No. 01-42217 (REG), Adv. Nos. 03-03951 (REG)

& 03-08325 (REG), 2010 WL 2403104, at *6–8 (Bankr. S.D.N.Y. June 10, 2010) (holding that

parties intended and in fact made a "paradigmatic" contemporaneous exchange when creditor did not

deliver goods until seven days after receipt of debtor's payment); *Mendelsohn v. Louis Frey Co. (In*

*re Moran)*, 188 B.R. 492, 497 (Bankr. E.D.N.Y. 1995) (upholding validity of creditor's lien as

contemporaneous exchange for new value where creditor advanced funds to debtor pursuant to

---

[30] If only the September 15 transfer of $700 million is considered, the facts alleged in the Complaint also demonstrate Citibank's entitlement to the "subsequent new value" defense, which exempts from avoidance any transfer "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor – (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4). Like the contemporaneous exchange exception, the "subsequent new value exception[] seek[s] to encourage creditors to continue dealing with troubled businesses." *Official Comm. of Unsecured Creditors of Maxwell Newspapers, Inc. v. Travelers Indem. Co. (In re Maxwell Newspapers, Inc.)*, 192 B.R. 633, 637 (Bankr. S.D.N.Y. 1996); *see also Brooks Shoe Mfg.*, 39 B.R. at 983 (explaining that to allow avoidance of a pre-petition security deposit as a preferential transfer would "leave the utility little choice but to terminate service instead" of extending new value to debtors when they need it most). Following the $700 million deposit on September 15, Citibank extended $780 million in new credit to LBI which was not secured by another security interest granted by LBI. *See supra* Part III.B; Compl. ¶¶ 47, 50, 96. It is evident from the Complaint that Citibank "[has] not diminished" LBI's "estate to the detriment of other creditors." *Maxwell Newspapers*, 192 B.R. at 637.

perfected mortgage note); *Tyler v. Swiss Am. Secs. (In re Llewellyn & Co.)*, 929 F.2d 424, 428–29 (8th Cir. 1991) (affirming finding of contemporaneous exchange of new value where debtor transferred collateral securities to defendant within seven days of defendant's extension of credit). Thus, Counts IV and V fail as a matter of law and should be dismissed with prejudice.

## IV.     The Complaint Fails to State a Claim For Actual Fraudulent Conveyance

The Complaint seeks to avoid the September 15 and 16 Letter Agreements as well as the $1 billion transfer as actually fraudulent under 11 U.S.C. § 548(a)(1)(A), and recover the $1 billion under 11 U.S.C. § 550, on the ground that LBI entered into the agreements and made the transfer "with an actual intent to hinder, delay, and/or defraud LBI's creditors and customers." Compl. ¶¶ 107, 113.  Because the Trustee's allegations of fraudulent intent are flatly contradicted by the specific allegations of his Complaint and otherwise fall woefully short of the heavy pleading burden applicable to fraud-based claims, Counts X, XI, and XII should be dismissed with prejudice.

To state a claim for actual fraudulent conveyance, the Complaint must plead facts establishing that *the transferor*, LBI, intended to "hinder, delay or defraud" its creditors.  *See* 11 U.S.C. § 548(a)(1)(A) (requiring a showing by the trustee that "the *debtor* . . . made such transfer . . . with actual intent to hinder, delay, or defraud.") (emphasis added); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) ("As is clear from the statutory language . . . the claim of actual fraud looks only to the intent of the transferor/debtor") (internal citation and emphasis removed).  But the Complaint's allegations establish precisely the opposite.

According to the Complaint, LBI entered into the Letter Agreements and made the $1 billion deposit expressly to obtain "continued access to the CLS FX Settlement System," which was "vital to LBI's ability to maintain its ongoing business operations" and to its efforts "to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors."  Compl.

¶¶ 31, 32, 37. Notwithstanding its formulaic recitation of an "intent to hinder, delay or defraud," the Trustee's Complaint specifically alleges that LBI intended to *help* its customers and creditors when it entered into the Letter Agreements and created the $1 billion deposit. *See id.* ¶ 30 (LBI would "remain in business for the protection of its customers"); *id.* ¶ 31 ("LBI would not remain viable as an ongoing concern without continued access to CLS FX settlement services"); *id.* ¶ 32 (the cancellation of CLS services would "undermine efforts to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors"); *id.* ¶ 34 (LBI entered into the September 15 Agreement, "[g]iven the indispensable importance of FX settlement through the CLS FX Settlement System for LBI's ability to continue in business") *id.* ¶ 37 ("continued access to the CLS system was vital to LBI's ability to maintain its ongoing business operations"); *id.* ¶ 107 (LBI received the "reinstatement of an essential bank service" in exchange for the $1 billion deposit); *In re Old CarCo*, 435 B.R. at 192–95 (dismissing claims for actual fraudulent transfer where trustee did not dispute evidence of transferor's non-fraudulent intent).[31]

In its counts for actual fraud, the Trustee ignores the specific allegations of LBI's motives and instead invokes certain "badges of fraud" as circumstantial evidence that LBI's intent was to "hinder, delay or defraud." Compl. ¶¶ 107, 113. The Trustee alleges the following as purported "badges of fraud":

> Among other things, on September 15, 2008, the global markets were experiencing an unprecedented disruption, LBHI and some of its subsidiaries had already filed petitions under Chapter 11 of the Bankruptcy Code, LBI received disproportionately and unreasonably small consideration in exchange for the transfer of the $1 billion deposit, and the Letter Agreements were executed on a rushed basis,

---

[31] While the particularity requirements of Rule 9(b) "are relaxed somewhat for fraud claims brought by trustees," *In re Refco, Inc. Sec. Litig.*, No. 07 MDL 1902 GEL, 2009 WL 7242548, at *9 (S.D.N.Y. Nov. 13, 2009), any such liberality would not encompass fraud allegations flatly contradicted by the *particularized* allegations in the rest of a trustee's complaint.

> under coercion by Citibank and without any meaningful negotiation whatsoever.

*Id.* ¶ 113; *see also id.* ¶ 107. But there is no conceivable reason to consider circumstantial evidence when the Complaint directly establishes LBI's good faith motive for entering into the Letter Agreements and making the $1 billion deposit. *See id.* ¶¶ 1, 29–38.

Even if considered, the purported "badges of fraud" alleged by the Trustee fail on their own terms. Alone or in combination, they do not support any inference, much less a plausible or strong inference, of LBI's fraudulent intent. The "unprecedented disruption" in the financial markets and the fact that LBHI and some of its subsidiaries had filed for bankruptcy does not support the inference that LBI had fraudulent intent. *Id.* ¶¶ 107, 113. If it did, every transfer LBI made in the week before its SIPA liquidation proceeding—including the thousands of transfers LBI made to its customers, counterparties, and other stakeholders—would be similarly suspect.

Likewise, the Trustee's allegation that LBI entered into the Letter Agreements and created the $1 billion deposit under "coercion by Citibank," "on a rushed basis" and "without any meaningful negotiation," even if true, does not suggest fraudulent intent by LBI. *See id.* ¶ 113. As the Complaint makes clear, whatever "leverage" Citibank had in the situation was a product of LBI's good faith desire and urgent request for CLS services so LBI could "remain in business" for the "benefit of LBI's customers and its creditors." *Id.* ¶¶ 30–32.

Finally, the Complaint's allegation that LBI received "disproportionately and unreasonably small consideration in exchange for the transfer of the $1 billion deposit" is flatly contradicted by the Trustee's own allegations and public statements. *See id.* ¶ 113. As the Trustee acknowledges, Citibank provided LBI with an "essential bank service," *id.* ¶ 107, in which "Citibank extended intraday credit to LBI," Trustee's Prelim. Report ¶ 109. Because "LBI did not make certain payments to Citi that week for CLS activity," Trustee's Prelim. Report ¶ 72, substantial short

balances built up, such that, by September 19, 2008 (before the $1 billion setoff), LBI owed Citibank $1.26 billion in connection with CLS, Compl. ¶ 96. Thus, LBI plainly received adequate consideration for the $1 billion deposit.

The Complaint's allegations of fraudulent intent do not satisfy even the most liberal "plausibility" standard, much less the heightened pleading standard applicable to fraud claims. Counts X, XI, and XII of the Complaint should be dismissed with prejudice.

## V. The Complaint Fails to State a Claim For Equitable Subordination

The Trustee seeks to equitably subordinate Citibank's claims under 11 U.S.C. § 510(c)(1). Compl. ¶¶ 137–39. To support a claim for equitable subordination, the Trustee must allege that: (1) Citibank engaged in some sort of inequitable conduct; (2) the misconduct resulted in injury or harm to other creditors or conferred an unfair advantage on Citibank; and (3) the equitable subordination of Citibank's claim is consistent with other provisions of the Bankruptcy Code. *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977) (establishing the three-part test)); *see also Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991) (reciting the 3-part test for equitable subordination). Further, a heightened standard applies where, as here, equitable subordination is sought against a non-insider and non-fiduciary. The complained-of conduct must be "egregious and severely unfair to other creditors," *In re Sunbeam Corp.*, 284 B.R. at 364, or "wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty." *In re Vargas*, 440 B.R. at 241 ("Because an ordinary creditor . . . does not owe a fiduciary duty to the debtor, it is rare for a court to subordinate claims arising out of such arms-length dealings."); *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) (Peck, J.) ("In cases of non-insider equitable subordination . . . the proponent of subordination has the burden of proving, among other

things, that the claimant engaged in egregious, improper or wrongful conduct that damages creditors.").

The Trustee's Complaint does not remotely allege the type of egregious conduct by Citibank required to support an equitable subordination claim. While the Trustee labels Citibank's actions "inequitable," he "fail[s] to ground this conclusion in fact or law." *In re Vargas*, 440 B.R. at 241. At best, the Complaint alleges that Citibank exercised its contractual right not to extend credit to LBI unless LBI deposited $1 billion as security against any losses Citibank might sustain as a result. There is nothing inequitable—much less egregious, illegal or fraudulent—in Citibank's decision to demand security before extending credit to an entity in severe financial distress. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 610 (2d Cir. 1983) ("The permissible parameters of a creditors' efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make future loans needed by the debtor, to improve the status of his existing claims."). This count should be dismissed with prejudice on this basis alone.

But beyond these deficiencies, the Complaint does not allege any harm to LBI's customers and creditors or any unfair advantage to Citibank. The Complaint expressly acknowledges that Citibank's provision of CLS services was "vital to LBI's ability to maintain its ongoing business operations," effect an orderly wind-down, and maximize value "for the benefit of LBI's customers and its creditors." Compl. ¶¶ 30–32, 37. The Complaint thus establishes that Citibank's continued extension of credit under the CLS Agreement and Letter Agreements *benefited*, rather than harmed, LBI's customers and creditors. What is more, as discussed in Part III.B above, Citibank's continued extension of credit under the CLS Agreement and Letter Agreements increased

Citibank's exposure to LBI. So, far from receiving an unfair advantage, the Complaint establishes that Citibank's position worsened as a result of Citibank's continuation of CLS clearing for LBI.

The allegations of the Complaint utterly fail to state a claim for equitable subordination, and Count XVII should be dismissed with prejudice.

## VI.    Citibank Did Not Breach Any Contract With LBI

In the last Count of the Complaint, the Trustee alleges a bewildering claim for breach of the September 15 and 16 Letter Agreements. The Complaint alleges that the Letter Agreements "strictly limited" Citibank's rights of setoff and that Citibank's $1 billion setoff—and Citibank's prospective setoffs against other LBI assets—"exceed[] the limitations contained" in the Letter Agreements. Compl. ¶¶ 144–47. This count fails to state a claim for relief because nothing in the Letter Agreements purports to limit Citibank's setoff rights and, in all events, Citibank's $1 billion setoff is specifically contemplated by the very terms of the Letter Agreements.

In the Letter Agreements, Citibank agreed to "maintain CLS clearing facilities for Lehman Brothers Inc. . . . in accordance with the [CLS Agreement]" and subject to certain additional terms and conditions. Ex. 5; Ex. 6. According to the Complaint, "[t]he CLS Agreement was amended and modified by the Letter Agreements." Compl. ¶ 145. As amendments to the CLS Agreement, the September 15 and 16 Letter Agreements "leave[] intact those provisions of the original agreement that are not directly inconsistent." *United States v. Agnello*, 344 F. Supp. 2d 360, 368 (E.D.N.Y. 2004) (citing *Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir. 1989)).[32] The CLS Agreement, of course, provides Citibank with broad setoff

---

[32]    Alternatively, the September 15 and 16 Letter Agreements could be seen to incorporate the terms of the CLS Agreement by reference. *See, e.g.*, *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993); *Creative Waste Mgmt. v. Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006) (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)).

rights to reduce any obligation of LBI by any obligation owed to LBI by Citibank and its affiliates. Ex. 4 at 4 (CLS Agreement). The terms of the September 15 and 16 Letter Agreements are not inconsistent. Both merely confirm that "Citibank shall have the right at all times to set off the amount of the referenced [$1 billion] deposit account against any obligations of [LBI] . . . under the CLS Agreement." Ex. 5 ¶ 7; Ex. 6 ¶ 6. Nothing in the Letter Agreements derogates in any way from Citibank's setoff rights under the CLS Agreement, New York statutory law, or common law. *See Agnello*, 344 F. Supp. 2d at 368–69 (enforcing security interest provided in agreement that was subsequently amended). To the extent this claim challenges Citibank's setoff against the $1 billion deposit as somehow "exceeding the limitations contained" in the Letter Agreements—which expressly provide that Citibank *has* the right to set off *any* CLS obligations against the $1 billion deposit—it is particularly baffling.[33]

Count XIX of the Complaint should be dismissed with prejudice.

## VII. The Trustee Fails to State a Claim Based on the APA and Buyer Note

Finally, in Count XVI, the Trustee has thrown in a claim for $11 million with respect to an agreement entirely unrelated to Citibank's provision of CLS services. This *non sequitur* of a claim arises out of a 1993 Asset Purchase Agreement (the "APA") and related July 31, 1993 Buyer Note (the "Buyer Note") between predecessors of both LBI and Citibank. According to the Complaint, CGMI allegedly has "disavowed its obligation" to reimburse LBI under the Buyer Note for any payments LBI might make in the future with respect to certain deferred compensation plans. Compl. ¶¶ 132–36. This claim makes no sense. First, CGMI's supposed "disavowal" of its

---

[33] The claim is equally unfounded as applied to prospective setoffs Citibank seeks to take against LBI assets to cover Citibank's remaining CLS losses. The Trustee would appear to be suggesting that Citibank agreed to limit its otherwise broad setoff rights and restrict itself to setoff rights in a $1 billion deposit while simultaneously agreeing to extend credit to settle billions of dollars worth of FX trades for an entity in severe financial distress. The argument strains credulity. Citibank addresses its rights to effect additional setoffs against other LBI assets in its Motion to Lift Stay, filed contemporaneously herewith.

obligation (the sole basis for jurisdiction as there is otherwise no case or controversy) can only be based on statements made in the context of privileged settlement negotiations that the Trustee should never have raised with this Court. As a contractual matter, CGMI has not anticipatorily repudiated or otherwise "disavowed" any obligations under the Buyer Note whatsoever, and the Complaint alleges no facts showing otherwise. Second, the conditions for payment by LBI that would trigger CGMI's reimbursement obligation will never be met because the relevant deferred compensation plans all have subordination provisions such that participants have no right to payment unless and until all senior LBI creditors have been paid in full. Third, all claims arising out of the APA and Buyer Note, clearly non-core matters, are expressly subject to arbitration.

A.      **Background**

Pursuant to the APA, Smith Barney, Harris Upham & Co. Incorporated ("Smith Barney," which now operates as CGMI) and Smith Barney's then-parent, Primerica Corporation, agreed to purchase the Asset Management Divisions of Shearson Lehman Brothers Inc., the predecessor-in-interest to LBI. *See* Ex. 11 at 1. Smith Barney agreed to employ all of the LBI employees working in the acquired divisions (as defined in the APA, the "Transferred Business Employees"). *Id.* § 10.1. While LBI agreed "to remain liable for the Vested Benefits under certain unfunded deferred compensation plans" for these transferred employees, Smith Barney agreed to issue the Buyer Note to LBI in "a principal amount equal to the sum of the Vested Benefits." *Id.* § 3.5; *see also id.* § 10.9 (defining "Vested Benefits"); Compl. ¶ 133. The Buyer Note is "payable on demand of the Seller [LBI] *only at such times and in such amounts as the Vested Benefits and other accrued liabilities are paid by the Seller [LBI] and the Buyer has received documentation reasonably satisfactory to it evidencing such payment.*" Ex. 11 § 3.5 (emphasis added). Like the APA, the Buyer Note obligates Smith Barney and its successor, CGMI, to reimburse LBI only for payments that LBI actually makes with respect to the Vested Benefits. *See* Ex. 12 at 1-2 (providing

for reimbursement only of "an amount paid by or on behalf of Lehman in respect of Accrued Liabilities," and defining "Accrued Liabilities" as the "Vested Benefits . . . retained by Lehman pursuant to Section 10.9 of the [APA]"). Section 10.9 of the APA, in turn, provides that "Vested Benefits shall be paid by the Seller [LBI] to the Transferred Business Employees entitled thereto *at the time such benefits become payable under the applicable Seller's Vested Deferred Compensation Plan.*" *Id.* § 10.9 (emphasis added).[34]

Each Vested Deferred Compensation Plan contains a substantially identical Article VIII, entitled "Subordination Provisions," providing that:

> *the right of a Participant to receive any payment* in respect of amounts credited to his Deferred Compensation Account *shall be subordinated to claims of the holders of Senior Subordinated Debt*[35] *so that, in the case of any distribution of assets of the Company in complete or partial liquidation . . . no such distribution or payment will be made* with respect to amounts credited to a Participant's Deferred Compensation Account *unless and until the principal of and interest on the Senior Subordinated Debt are paid in full.*

Ex. 13 § 8.5(b) (emphasis added); *see also* Ex. 14 § 8.5(b); Ex. 15 § 8.5(b); Ex. 16 § 8.5(b).

Finally, the APA provides that "any dispute" between the parties, with exceptions not relevant here, will be "resolved by an equitable rather than a strictly legal interpretation" and will be

---

[34] The "Vested Deferred Compensation Plans" at issue include: (i) the Shearson Lehman Brothers Inc. Voluntary Deferred Compensation Plan (for Shearson Vested Amounts as of July 30, 1993 and Lehman Brothers); (ii) the Shearson Lehman Brothers Inc. E.F. Hutton Partnership Award Plan (for Shearson Vested Amounts as of July 30, 1993 and Lehman Brothers); (iii) the Shearson Lehman Brothers Inc. Deferred Compensation Plan for Financial Consultants (for Shearson Vested Amounts as of July 30, 1993 and Lehman Brothers); (iv) the Shearson Lehman Brothers Inc. Deferred Compensation Plan for Branch Managers (for Shearson Vested Amounts as of July 30, 1993 and Lehman Brothers), copies of which are attached as Exhibits 13–16.

[35] "Senior Subordinated Debt," is defined, in pertinent part, as "all indebtedness of the Company [other than certain identified exclusions not relevant here] constituting part of its Net Capital . . . ." *See, e.g.*, Ex. 13 § 8.6.

submitted to binding arbitration. Ex. 11 § 16.2(c)(1).[36] The Trustee now stands in the shoes of LBI, and is bound by all of the provisions in the APA, the Buyer Note, and related agreements. Compl. ¶ 134.

### B. The Trustee's Claim Should Be Dismissed in Favor of Arbitration

Under the APA, this dispute is subject to binding arbitration. Ex. 11 § 16.2(c)(i); *see also id.* § 3.5. Under the law of the Second Circuit, Bankruptcy Courts should enforce an arbitration clause unless compelling arbitration would "inherently conflict" with or "necessarily jeopardize" the objectives of the Bankruptcy Code. *MBNA Am. Bank, N.A., v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (internal quotations and citations omitted). Thus, "[b]ankruptcy courts generally do not have discretion to refuse to compel arbitration of 'non-core' bankruptcy matters, or matters that are simply 'related to' bankruptcy cases." *Id.* (citation omitted). The Trustee's claim under the Buyer Note is clearly non-core: it is a simple contract claim based on state law, arising from a pre-petition agreement, and neither invokes rights created under the Bankruptcy Code nor affects the disposition of the LBI estate. It is not "the type of proceeding [] unique to or uniquely affected by the bankruptcy proceedings," nor does it "directly affect a core bankruptcy function." *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 448 (2d Cir. 2005).[37] Count XIX of the Complaint should be dismissed in favor of arbitration.

---

[36] Pursuant to the APA, the Buyer Note and the Vested Deferred Compensation Plans are incorporated into the APA. *See* Ex. 11 § 16.9 ("All schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.").

[37] Even if this dispute could be considered a "core" proceeding, the Court should still enforce the arbitration provision of the APA because there is no basis to find that "any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing the arbitration clause." *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999). Courts frequently enforce arbitration clauses in core proceedings where, as here, the Trustee's claim is rooted in a pre-petition contract and the Trustee merely sues in his capacity as the debtor's successor. *Cibro*

### C. The Trustee's Claim Fails on the Merits

Even if this Court does not dismiss this claim in favor of arbitration, it should be dismissed on the merits. Not only has the Trustee failed to satisfy the conditions precedent for enforcing the Buyer Note against CGMI, the inescapable conclusion is that he will never be able to do so. Under the APA and Buyer Note, CGMI is obligated to reimburse LBI only for Vested Benefits amounts that it actually pays under the Vested Deferred Compensation Plans, which in turn provide that, upon entering into a SIPA proceeding, LBI cannot pay any Vested Benefits "unless and until the principal of and interest on the Senior Subordinated Debt are paid in full." *See, e.g.*, Ex. 13 § 8.5(b); *see* Ex. 11 §§ 3.5, 10.9; Ex. 12 at 2. More than 18 months ago the Trustee filed an extensive motion calling for the allocation of estate property to protect against known shortfalls in the fund available for the claims of *customers*—the creditors who are given first priority under SIPA.[38] Any suggestion that the LBI estate will pay its general creditors in full thus borders on the frivolous.

CGMI is not, as the Trustee alleges, "contending that the conditions and circumstances of the SIPA liquidation create a Catch-22 that prevents the Trustee from enforcing the Buyer's Note." Compl. ¶ 135. Rather, CGMI is contending that the Trustee's claim has no merit on its face. Because the Trustee will never incur the obligation to pay Vested Benefits to the Transferred Business Employees, CGMI's reimbursement obligation will never arise. Count XVI of the Complaint should be dismissed, with prejudice.

---

*Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*, 270 B.R. 108 (S.D.N.Y. 2001); *Pardo v. Akai Elec. Co. Ltd. (In re Singer Co., N.V.)*, No. 00 Civ. 6793 LTS, 2001 WL 984678 (S.D.N.Y. Aug. 21, 2001); *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181 (Bankr. S.D.N.Y. 2002).

[38] *See* Motion for Order Approving Trustee's Allocation of Property of the Estate, filed October 5, 2009 [Docket No. 1866].

## CONCLUSION

For the reasons set forth above, Citi respectfully submits that the Court should dismiss Counts I-VI, VIII-XIV, XVI, XVII, and XIX of the Complaint, together with Count XVIII to the extent it is directed to the $1 billion deposit and setoff, with prejudice.

Dated: New York, New York
      May 26, 2011

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   */s/ Claudia Hammerman*
      Brad S. Karp
      Stephen J. Shimshak
      Douglas R. Davis
      Claudia L. Hammerman
      1285 Avenue of the Americas
      New York, New York  10019-6064
      Telephone:  (212) 373-3000
      Facsimile:  (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Inc., Citigroup Global Markets, Inc., Citibank Japan Ltd., Citibank Europe plc, Citibank International plc, Citigroup Pty Limited, Banco Nacional de Mexico SA, Citibank del Peru SA, Bank Handlowy W Warszawie SA, ZAO KB Citibank, Citibank AS, and Citibank Maghreb*