Richard G. Menaker
Rebecca Northey
Stephen D. Houck
MENAKER & HERRMANN LLP
10 East 40th Street
New York, NY 10016
Telephone: 212-545-1900
Facsimile: 212-545-1656

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation
Of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>      LEHMAN BROTHERS INC.,<br><br>                           Debtor. | Case No. 08-01420<br>SIPA |
| LEHMAN BROTHERS INC.,<br><br>                     Plaintiff,<br><br>        -against-<br><br>CITIBANK, N.A., CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CITIBANK JAPAN LTD., CITIBANK EUROPE PLC, CITIBANK INTERNATIONAL PLC, CITIGROUP PTY LIMITED, BANCO DE CHILE, BANCO NACIONAL DE MEXICO SA, CITIBANK DEL PERU SA, BANK HANDLOWY, ZAO KB CITIBANK, CITIBANK AS, CITIBANK MAGHREB, and CITIBANK AFFILIATES 1-5,<br><br>                  Defendants. | Adv. Proc. No. 11-01681    (JMP) |

**TRUSTEE'S MEMORANDUM IN OPPOSITION TO MOTIONS OF**
**CITIBANK, N.A., AND AFFILIATES (i) TO PARTIALLY DISMISS COMPLAINT**
**IN ADVERSARY PROCEEDING AND (ii) TO LIFT AUTOMATIC STAY**
**TO PERMIT EXERCISE OF POST-PETITION SETOFF AND RELATED RELIEF**

## Table of Contents

Table of Authorities ............................................................................................... iv

Introduction ........................................................................................................... 1

Summary of Argument ........................................................................................... 3

Background ............................................................................................................. 5

    A.    The SIPA Proceeding ................................................................ 5

    B.    The Adversary Proceeding ....................................................... 7

Counter-Statement of Facts ................................................................................... 8

    A.    The Business Relationship of the Parties .................................. 9

    B.    The CLS System ....................................................................... 10

    C.    How CLS Works ....................................................................... 12

    D.    Citibank's CLS Settlement Services Agreement with LBI ......... 17

    E.    The Events of September 15-19, 2008 ...................................... 19

        1.    The $1 billion deposit ..................................................... 19

        2.    The Barclays Pledge ...................................................... 20

        3.    LBI's shortfall on CLS ..................................................... 21

        4.    Citibank's treatment of the $1 billion deposit ................. 23

        5.    Citibank's subsequent conduct ...................................... 24

Argument ............................................................................................................... 25

I.    The Complaint Meets the *Iqbal/Twombly* Standard ................................. 25

II.   The Safe Harbors Do Not Insulate Citibank from Turnover of Funds
      Obtained While Providing CLS Services for LBI ................................. 29

      A.    Citibank's Resort to the Safe Harbors Ignores Their Purpose
            And Legislative History; CLS Itself Curbs Systemic Risk ........................ 30

      B.    The CLS-Related Agreements Are Not Covered by the Safe Harbor
            for "Swap Agreements" .................................................................. 35

            1.    The $1 Billion Setoff Is Not Safe-Harbored Based on
                  "Underlying FX Transactions" ........................................ 36

            2.    The CLS-Related Agreements Are Neither a "Credit
                  Enhancement" nor a "Security Arrangement" ................................ 37

            3.    Citibank Was Not a "Financial Participant" or "Swap
                  Participant" to Which LBI Owed Any "Reimbursement
                  Obligation" under the Code ............................................. 46

            4.    The CLS Agreement and Letter Agreements Are Not
                  "Related to" Any Actual Swap Transaction .................................... 50

III.  The Doctrine of Equitable Recoupment Does Not Apply in the
      Factual Circumstances Alleged in the Complaint .................................. 54

IV.   Citibank's Alternative Arguments to Preserve Its $1 Billion Setoff
      and Escape Return of LBI Funds Are without Merit ............................. 59

      A.    The $1 Billion Setoff Was a Post-Petition Violation of the
            § 362(a) Stay ............................................................................... 59

      B.    The $1 Billion Was Improperly Applied against Existing Debt ................ 61

      C.    Citibank's Setoff Is Avoidable to the Extent It Improved Its Position ....... 63

D.  Citibank's Setoff Is Avoidable as a Constructive Fraudulent Conveyance ................................................................................ 66

E.  Citibank's $1 Billion Setoff Is Avoidable under Section 547.................... 71

F.  The Complaint States a Valid Claim for Equitable Subordination ............. 75

    1.  The Elements of Equitable Subordination ....................................... 76

    2.  Applying Equitable Subordination Here .......................................... 78

G.  The Complaint States a Claim for Breach of Contract .............................. 80

H.  The Trustee Should Be Granted Leave to Re-plead Actual Fraud.............. 83

I.  The Claim Relating to the Smith Barney Note Should Be Sustained ........ 85

V.  Citibank's Motion to Lift the Stay Should Be Denied ........................................... 89

A.  Citibank May Not Seize Existing Deposits Based on the Safe Harbors ............................................................................................... 90

B.  Citibank and Its Affiliates May Not Engage in Triangular Setoff ............. 91

C.  Unresolved Questions of Fact Exist as to the Claimed Right To Seize LBI Accounts ................................................................................ 93

VI.  Citibank and Its Affiliates Should Turn Over Post-Petition Deposits ................... 95

Conclusion ...................................................................................................................... 97

# Table of Authorities

## <u>Cases</u>

*Adelphia Commc'n Corp. v. Bank of Am., N.A. (In re Adelphia Commc'n)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd*, 390 B.R. 64 (S.D.N.Y. 2008) ........... 77

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005) ................................................................. 85

*Affiliated of Fla., Inc., v. Mount Olive Pickle Co., Inc. (In re Affiliated of Fla., Inc.)*,
    258 B.R. 495, 499 (Bankr. M.D. Fla. 2000)...................................... 54, 55

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    351 F. Supp. 2d 79 (S.D.N.Y. 2008) ...................................................... 69

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S. Ct. 1937 (2009) ....................................................... 26

*Baker v. Nat'l City Bank*,
    511 F.2d 1016 (6th Cir. 1975) ............................................................... 60

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th Cir. 1977) ................................................................. 77

*Bernstein v. Alpha Assoc., Inc. (In re Frigitemp Corp.)*,
    34 B.R. 1000 (S.D.N.Y. 1983), aff'd, 753 F.2d 230 (2d Cir. 1985)...................... 58

*CarCo Group, Inc. v. Maconachy*,
    644 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd in part*; *vacated in part*, 383 Fed.
    Appx. 73 (2d Ci. 2010)......................................................................... 82

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .................................................................. 26

*Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*,
    346 B.R. 621 (Bankr. E.D.N.Y. 2006) ................................................... 38

*Chrysler LLC v. Daimler AG (In re Old Carco LLC)*,
    2011 WL 1833244 (Bankr. S.D.N.Y. May 12, 2011) ............................ 25

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995) .......................................................................... 59, 60

*Cuevas v. Hudson United Bank (In re Silverman Laces, Inc.)*,
  2002 WL 31412465 (S.D.N.Y.) .............................................................. 69

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*,
  773 F.2d 452 (2d Cir. 1985) ................................................................. 92

*CVI GVF Master S.A.R.L. v. Lehman Bros. Holdings, Inc.*
*(In re Lehman Bros. Holding)*,
  445 B.R 137 ........................................................................................ 50

*Davis v. Ind. State Police*,
  541 F.3d 760 (7th Cir. 2008) ............................................................... 27

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ................................................................ 26

*Dimuzio v. Resolution Trust Corp.*,
  68 F.3d 777 (3d Cir. 1995) .................................................................. 38

*Dixon & Graiber, Jr. v. Am. Cmty. Bank & Trust. (In re Gluth Bros. Const., Inc.)*,
  424 B.R. 379 (Bankr. N.D. Ill. 2009) .................................................. 73

*Dole v. United Steel Workers of America*,
  494 U.S. 26 (1990) .............................................................................. 49

*Durham v. SMI Indus. Corp.*,
  882 F.2d 881 (4th Cir. 1989) ............................................................... 72

*Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., Ltd.*,
  375 F. Supp. 2d 257 (S.D.N.Y. 2005) ................................................. 69

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*,
  2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ........................... 68

*Faulkner v. Beer*,
  463 F.3d 130 (2d Cir. 2006) ................................................................ 26

*Ferris, Baker Watts, Inc. v. Stephenson (In re MJ K Clearing, Inc.)*,
  286 B.R. 109 (Bankr. D. Minn. 2002), *aff'd*, 2003 WL 1824937 (D. Minn.) *aff'd*,
  371 F.3d 397 (8th Cir. Minn.) 2004 ..................................................... 58

*First Ambulance Ctr. of Tenn., Inc. v. Nationsbank*
*(In re First Ambulance Ctr. of Tenn., Inc.)*,
    182 B.R. 198 (Bankr. M.D. Tenn. 1995)................................................................ 65

*Gala Enter., Inc. v. Hewlett Packard Co.*,
    989 F. Supp. 525 (S.D.N.Y. 1998) ........................................................................ 69

*Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*,
    437 B.R. 798 (Bankr. D.S.C. 2010) ...................................................................... 27

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
    547 U.S. 651 (2006) .............................................................................................. 34

*Howell v. Bank of Newnan (In re Summit Fin. Serv., Inc.)*,
    240 B.R. 105 (Bankr. N.D. Ga. 1999).................................................................. 66

*In re ARN LTD. Ltd. P'ship*,
    140 B.R. 5 (Bankr. D.C. 1992).............................................................................. 38

*In re Berger Steel Co.*,
    327 F.2d 401 (7th Cir. 1964) ................................................................................ 92

*In re CCT Comm'n, Inc.*,
    2008 WL 2705471 (Bankr. S.D.N.Y. 2008) ........................................................ 82

*In re Fasano/Harriss Pie Co.*,
    43 B.R. 864 (Bankr. W.D. Mich. 1984), *aff'd* 70 B.R. 285
    (W.D. Mich. 1987) ................................................................................................ 92

*In re Hagerstown Fiber L.P.*,
    277 B.R. 181 (Bankr. S.D.N.Y. 1998) ................................................................ 88

*In re Hydrogen, L.L.C.*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) .......................................................... 70, 76

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143......................................................................................................... 78

*In re Middendorf*,
    381 B.R. 774 (Bankr. D. Kan. 2008)..................................................................... 70

*In re Motors Liquidation Co.*,
    447 B.R. 142 (Bankr. S.D.N.Y. 2011) ................................................................ 49

*In re Nat'l Century Fin Enter., Inc.*,
   310 B.R. 580 (Bankr. S.D. Ohio 2004), aff'd, 2008 WL 3890764
   (S.D. Ohio), *aff'd in part, rev'd in part*, 377 Fed. Appx. 531
   (6th Cir. (Ohio) 2010) ............................................................................ 38

*In re Norstan Apparel Shops, Inc.*,
   367 B.R. 68 (Bankr. E.D.N.Y. 2007) ........................................................ 67

*In re Old CarCo LLC*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010) ................................................. 69, 84

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005), cert denied, 547 U.S. 1123 (U.S. 2006) ................. 38

*In re SemCrude, L.P.*,
   399 B.R. 388 (Bankr. D. Del. 2009), *aff'd,* 428 B.R. 590 (D. Del. 2010)........ 92, 93

*In re Spiegel, Inc. Sec. Litig.*,
   382 F. Supp. 2d 989 (N.D. Ill. 2004) ........................................................ 38

*Lain v. ZC Specialty Ins. Co. (In re Senior Living Properties, L.L.C.)*,
   309 B.R. 223 (Bankr. N.D. Tex. 2004) ...................................................... 38

*In re Tampa Chain Co.*,
   53 B.R. 772 (Bankr. S.D.N.Y. 1985) ........................................................ 76

*In re Tucker Freight Lines, Inc.*,
   133 B.R. 76 (W.D. Mich. 1991), *aff'd*, 1992 WL 713902 (N.D. Mich.), *aff'd*, 991
   F.2d 796 (6th Cir.(Mich.) 1993), *cert. denied*, 114 S. Ct. 306 (U.S. Mich. 1993)  82

*In re Vehm Eng'g Corp.*,
   521 F.2d 186 (9th Cir. 1975) .................................................................. 92

*In re Westchester Structures, Inc.*,
   181 B.R. 730 (Bankr. S.D.N.Y. 1995) ...................................................... 92

*In re Winn-Dixie Stores, Inc.*,
   356 B.R. 239 (Bankr. M.D. Fla. 2006)...................................................... 38

*In re Yonkers Hamilton Sanitarium Inc.*,
   22 B.R. 427 (Bankr. S.D.N.Y. 1982), aff'd, 34 B.R. 385 (S.D.N.Y. 1983) ........... 57

*J.B.I. Industries, Inc. v. Suchde*,
  2000 WL 1174997 (S.D.N.Y.) ............................................................... 92

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
  No. 06-B-10706 (JMP), 2007 WL 1580049 (Bankr. S.D.N.Y.) ........................... 28

*Katz v. First Nat'l Bank of Glen Head*,
  568 F.2d 964 (2d Cir. 1977), *cert. denied*, 98 S. Ct. 1250 (U.S.N.Y. 1978) ......... 74

*King v. Fulbright & Jaworski, LLP (In re Koch)*,
  224 B.R. 572 (Bankr. E.D. Va. 1998) .................................................. 72

*Lee v. Schweiker*,
  739 F.2d 870 (3d Cir. 1984) ........................................................... 66

*Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Serv. Ltd.*
*(In re Lehman Bros. Holding, Inc.)*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010) ........................................... 36, 71

*Liberty Mut. Ins. Co. v. Leroy Holding Co. Inc.*,
  226 B.R. 746 (N.D.N.Y. 1998) ......................................................... 77

*M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank*
*(In re M. Fabrikant & Sons, Inc.)*,
  394 B.R. 721 (Bankr. S.D.N.Y. 2008) .................................................. 84

*Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*,
  156 F.3d 131 (2d Cir. 1998) ........................................................... 54

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) ........................................................... 26

*Menkes Feuer, Inc. v. Peoples Bank of Johnstown*,
  43 N.Y.S.2d 32 (N.Y. Sup. Ct. Co. 1943), *aff'd*, 268 A.D. 809,
  48 N.Y.S.2d 593 (N.Y. 1944)........................................................... 58

*Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*,
  936 F.2d 640, 648 (2d Cir. 1991) ..................................................... 92

*N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*,
  576 F.2d 952 (2d Cir. 1978) ........................................................... 62

*N.Y. Cnty. Nat'l Bank v. Massey,*
    192 U.S. 138 (1904) ........................................................................ 74

*Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.),*
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) .................................... 76

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),*
    361 B.R. 369 (Bankr. S.D.N.Y. 2007) .................................... 84

*Official Comm. of Unsec. Creditors v. Mfrs. and Traders Trust Co.*
*(In re Bennett Funding Group, Inc.),*
    146 F.3d 136 (2d Cir. 1998) ...................................................... 61

*Ohio-Erie Corp. v B Geron v. Palladin Overseas Fund Ltd.,*
*(In re AppliedTheory Corp.),*
    323 B.R. 838, 839, (Bankr. S.D.N.Y. 2005), *aff'd,* 330 B.R. 362
    (S.D.N.Y. 2005)............................................................................ 65

*Pan Am Corp. v. Delta Air Lines, Inc.,*
    175 B.R. 438 (S.D.N.Y. 1994) ............................................... 78

*Panther Partners Inc. v. Ikanos Commc'n, Inc.,*
    347 Fed. Appx. 617 (2d Cir. 2009) ........................................ 85

*Pension Comm. of the Univ. of Montréal Pension Plan v. Banc of Am. Sec. LLC,*
    568 F.3d 374 (2d Cir. 2009) ..................................................... 26

*Pepper v. Litton,*
    308 U.S. 295 (1939) ..................................................................... 77

*Petersen v. State Emp. Credit Union (In re Kittrell),*
    115 B.R. 873 (Bankr. M.D.N.C. 1990) .................................. 72

*Pfau v. First Nat'l Bank, Pipestone, Minn. (In re Schmidt),*
    26 B.R. 89 (Bankr. D. Minn. 1982)........................................ 65

*Pryor v. Fisher & Donnelly ( In re Dimino),*
    429 B.R. 408 (Bankr. E.D.N.Y. 2010) ................................... 69

*Schachter v. Tolassi (In re 105 E. Second St. Assoc.),*
    207 B.R. 64 (Bankr. S.D.N.Y. 1997) ..................................... 55

*Sec. Investor Prot. Corp. v. Lehman Bros. Inc.*,
    No. 08-CIV-8119 (S.D.N.Y. Sept. 19, 2008) ........................................... 5

*Sharp Int'l Corp. v. State St. Bank & Trust Co.) (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ................................................................ 71

*SIPC v. Barbour*,
    421 U.S. 412 (1975) .......................................................................... 80

*SKBC Serv. Corp. v. 1111 Prospect Partners, L.P.*,
    153 F.3d 728 (10th Cir. 1998) ........................................................... 38

*Stafford v. Giddens (In re New Times Secs. Servs. Inc.)*,
    463 F.3d 125 (2d Cir. 2006) .............................................................. 80

*Stratosphere Litig., L.L.C. v. Grand Casinos, Inc.*,
    298 F.3d 1137 (9th Cir. 2002) ........................................................... 38

*Stratton v. Equitable Bank, N.A.*,
    104 B.R. 713 (D. Md. 1989) .............................................................. 69

*Swedbank v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*,
    445 B.R. 130 (S.D.N.Y. 2011) ........................................................... 32

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ........................................................... 73

*Togut v. Chemical Bank (In re Hecht)*,
    41 B.R. 701 (Bankr. S.D.N.Y. 1984) .................................................. 65

*Trade Fin. Corp. (In re Kalisch)*,
    413 B.R. 115 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900 247
    (S.D.N.Y.) ........................................................................................ 78

*Tronox Inc. v. Anadarko Petroleum Corp. & Kerr-McGee Corp.)*
*(In re Tronox Inc.)*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) .................................................. 69

*Tyler v. Swiss Am. Secs., Inc. (In re Lewellyn & Co. Inc.)*,
    929 F.2d 424 (8th Cir. 1991) ............................................................. 74

*Union Cartage Co. v. Dollar Sav. & Trust Co. (In re Union Cartage Co.)*,
    38 B.R. 134 (Bankr. N.D. Ohio 1984) ........................................... 62, 65

*Union Switch & Signal, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    226 F.R.D. 485 (S.D.N.Y. 2005)................................................................. 49

*Vargas Realty Enter., Inc. v. CFA W. 111 St., L.L.C.*
*(In re Vargas Realty Enters., Inc.)*,
    440 B.R. 224 (S.D.N.Y. 2010) .............................................................. 70

*Viacom Int'l v. Tandem Prod., Inc.*,
    368 F. Supp. 1264 (S.D.N.Y. 1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975)............... 69

*Walker v. Pasteur (In re Aphton Corp.)*,
    423 B.R. 76 (Bankr. D. Del. 2010) ........................................................ 27

*WestLB AG NY Branch v. TPS McAdams (In re Enron Corp.)*,
    370 B.R. 583 (Bankr. S.D.N.Y. 2007) .................................................. 38

*Westinghouse Credit Corp. v. D'Urso*,
    278 F.3d 138 (2d Cir. 2002) ................................................................ 55

*Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.)*,
    940 F.2d 1507 (11th Cir. 1991) ........................................................... 63

## Statutes and Regulations

11 U.S.C. § 101(22A)................................................................................. 29, 47

11 U.S.C. §101(31)..................................................................................... 77, 78

11 U.S.C. §101(53B)(A)..................................................... 29, 35, 37, 39, 40, 47, 51

11 U.S.C. §161(53C)................................................................................. 29, 47

11 U.S.C. § 362(a) ................................................................................ 6, 9, 10, 12

11 U.S.C. § 362(b)(17) ................................................................................... 29

11 U.S.C. § 365(a) ......................................................................................... 51

11 U.S.C. § 506(a)(1) .......................................................................... 63, 64, 65

11 U.S.C. § 546(g).......................................................................................... 71

11 U.S.C. § 547 ........................................................................... 73, 74

11 U.S.C. §547(c)(1) ........................................................................ 71

11 U.S.C. § 548(a)(1)(A) .................................................................. 83

11 U.S.C. § 553(a) .............................................................. 53, 61, 91, 93

11 U.S.C. § 553(b) .................................................................. 58, 65, 73

11 U.S.C. § 555 .......................................................................... 31, 32

11 U.S.C. § 556 .......................................................................... 31, 32

11 U.S.C. § 559 .......................................................................... 31, 32

11 U.S.C. § 560 .............................................................. 29, 31, 51, 93

11 U.S.C. § 561 .............................................................. 31, 47, 93

11 U.S.C. § 562 .......................................................................... 51, 52

11 U.S.C. § 741(A)(7)(vi) ............................................................ 42, 51

15 U.S.C. § 78*eee*(b)(2)(C)(i) .......................................................... 29

15 U.S.C. § 78*lll*(4)(E) ...................................................................... 7

17 C.F.R. §§ 240.15c3-1 .................................................................... 7

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
      Pub. L. No. 109-8, § 1 *et seq.* (2005) ................................... 30

Bankruptcy Rule 7012 ........................................................................ 2

Fed. R. Civ. P. 12(b)(6) ........................................................ 2, 25, 26, 86

Fed. R. Civ. P. 9(b) ......................................................................... 85

Fed. R. Evid. 408 ............................................................................ 86

GA. CODE ANN. §11-4-210 .............................................................. 65

N.Y. Debt. & Cred. Law §§ 272-275 ................................................................. 67

**Legislative Reports**

H.R. REP. NO. 95–595 (1977),
    *reprinted in 1978 U.S.C.C.A.N.* at 5787, 6145 ...................................... 66

H.R. Rep. No. 97-420 (1982),
    *reprinted in* 1982 U.S.C.C.A.N. 583, 584 ............................................ 32

H.R. Rep. No. 101-484 (1990),
    *reprinted in* 1990 U.S.C.C.A.N. 223 ................................................... 32

H.R. Rep. No. 109-31, Pt. 1 (2005),
    *reprinted in 2005* U.S.C.C.A.N. at 88, 189 ................................... 37, 41

H.R. Rep. No. 109-648 (2006),
    *reprinted in* 2006 U.S.C.C.A.N. 1585, 1592 ....................................... 42

**Other Authorities**

R. Aicher, D. Cotton and T. Khan, "Credit Enhancement:
Letters of Credit, Guaranties, Insurance and Swaps,"
    59 Bus. Law 897 (2004) ......................................................................... 38

J. Bethel, A. Ferrell and G. Hu, "Legal and Economic Issues in Litigation
Arising from the 2007-2008 Credit Crisis,"
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1096582 ............................. 38

E. Gilbane, "Testing the Bankruptcy Code Safe Harbors
in the Current Financial Crisis,"
    18 Am. Bankr. Inst. L. Rev. 241 (2010)................................................. 30

4 COLLIER ON BANKRUPTCY ¶ 553.15[3] (15th ed. 1982) ............................. 62

4 COLLIER ON BANKRUPTCY ¶ 553.03 (15th ed. 1995)................................... 49

5 COLLIER ON BANKRUPTCY ¶ 553.09[1][c][ii] (16th ed. 2010) ..................... 72

5 COLLIER ON BANKRUPTCY ¶ 562.01 (16th ed. 2011)................................... 52

C. Johnson, "At the Intersection of Bank Finance and Derivatives:
Who Has the Right of Way,"
    66 Tenn. L. Rev. 1, 52 (1998) ................................................................ 41

Report of the Committee on the Judiciary to Accompany H.R. 8200 ............................. 64

RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 21 (1996) ................................ 49

U.S. Dep't of the Treasury, Notice of Proposed Determination on
Foreign Exchange Swaps and Forwards
    www.treasury.gov/press-center-press-releases/Pages/tag1152.aspx ............... 16, 33

On March 18, 2011, the Trustee filed the captioned adversary proceeding to recover more than $1.3 billion in cash and other assets of LBI held by Citibank, N.A., and its affiliates. The filing occurred after lengthy, but unsuccessful, efforts to reach settlement. The parties continue to disagree about such key issues as whether Citibank's purported setoff of a $1 billion deposit on September 19, 2008, occurred pre- or post-petition. The parties also disagree over the implications of an alleged $1.26 billion shortfall in connection with CLS services during September 15-19, 2008, which is by far the largest component of Citibank's claims against LBI. The Trustee believes it is a conventional lender's claim for which self-help was improper. Citibank believes it is a safe-harbored claim exempting it from avoidance under SIPA.

The limited evidence available pre-discovery raises serious questions about Citibank's conduct in seizing LBI's $1 billion deposit via a purported setoff and in freezing other LBI deposits, which include over $200 million in post-petition deposits and customer funds. Once the complaint was filed, the Trustee promptly initiated the discovery process, serving document requests on the Citibank defendants and subpoenas on, among others, CLS Bank International ("CLS Bank") and Barclays Bank PLC ("Barclays"), although responsive documents have not yet been produced.

Barclays plays a crucial role in the events at issue. During the week of September 15, 2008, after it had already reached agreement to purchase LBI assets, Barclays provided a $700 million cash pledge to Citibank as security for Citibank's continued provision of CLS settlement services to LBI pending this Court's approval of

the purchase. After the SIPC filing, however, Citibank elected not to draw upon Barclays' $700 million pledge. Instead, in November 2008, Citibank returned the $700 million to Barclays rather than using it to reduce the CLS shortfall from a supposed $1.26 billion to $560 million. Absent discovery, the only apparent reason for Citibank's otherwise inexplicable conduct was to further its relations with Barclays, to the detriment of LBI's former customers and creditors.

The Citibank defendants have responded to the Trustee's adversary complaint with two motions – a pre-answer motion to dismiss most of the adversary proceeding under Bankruptcy Rule 7012 and Fed. R. Civ. P. 12(b)(6), and a motion in the SIPA case for a declaration that the automatic stay does not prevent their seizure of LBI and customer funds still frozen in accounts at Citibank and its affiliates around the world. The overarching premise of both motions is that the Court should dismiss the Trustee's adversary proceeding on the basis of safe harbor provisions, without any factual inquiry into the bona fides of Citibank's claim or the validity of Citibank's conduct.

As demonstrated below, both of Citibank's motions are misconceived. Although purportedly based upon the allegations in the complaint and extrinsic facts subject to "judicial notice," the motions instead mischaracterize those allegations, make inaccurate assertions as to the extrinsic facts, and misconstrue the workings of the CLS system that underlies the central factual and legal issues. The motions ignore critical detail, much of which must still be developed through discovery, but enough of which is sufficiently available to demonstrate that Citibank's key contentions are wrong.

### SUMMARY OF ARGUMENT

Citibank's motions should be denied for many reasons. The individual counts in the adversary complaint are more than sufficiently pleaded and satisfy the *Iqbal/Twombly* standard.[1] Moreover, both motions are premature; they seek relief before an adequate record has been developed. The arguments Citibank advances for dismissal, to the extent they are not legally defective on their face, are fact intensive and cannot be ruled upon without proper development of the evidence.

For example, Citibank's claim that it extended credit to LBI to the extent of $1,260,326,894 in the course of providing CLS settlement services, which made it a creditor of LBI, is not supported by any evidentiary showing beyond Citibank's proof of claim. And it is flatly contrary to the condition the parties agreed to in writing on September 16, 2008, stipulating that Citibank would limit payments on LBI's behalf in the CLS system to $1 billion. Another example is Citibank's exercise of self-help in purporting to set off a $1 billion LBI deposit on September 19, 2008. The complaint alleges numerous facts that indicate it was a post-petition setoff that violated the automatic stay. Citibank's insistence that the setoff occurred pre-petition creates an important disputed issue of fact.

Both of Citibank's alternative legal theories asserted to justify its claim to preferential treatment – safe harbor insulation for swap agreements and equitable recoupment – are without merit. The safe harbor argument mistakenly equates Citibank's role in providing CLS settlement services for settling foreign exchange trades with the

---

[1] An exception may be actual fraud, as to which discovery is needed to permit particularized pleading.

role of an actual counterparty to a foreign exchange agreement. Citibank's argument ignores both the purpose of the safe harbor for swap agreements and the actual language of the Bankruptcy Code. Citibank's CLS Settlement Services Agreement with LBI was exactly what its title states: an agreement to provide services, *not* to make FX trades. The fact that Citibank extended intraday credit, in addition to CLS settlement services, did not convert the CLS Agreement into a swap agreement. Instead, Citibank acted as a conventional lender, providing overdraft privileges for which the Bankruptcy Code provides no special protection.

The doctrine of equitable recoupment, which has apparently never been applied in a SIPA proceeding, requires a showing of both a single integrated transaction and a windfall to the debtor that would be inequitable to the creditor claiming the recoupment. Neither element exists here. Citibank's attempt to create a single transaction out of the $1 billion deposit is unavailing because roughly $480 million of the debt was pre-existing, while the remainder of the debt arose over the course of five business days in connection with four separate agreements. Citibank's conduct was inequitable for a number of reasons detailed below, and the only windfall went to Barclays, not the LBI estate.

Citibank and its affiliates appear to have filed their separate lift-stay motion to assure that none of their rights are deemed waived. The motion repeats much of what is argued in the dismissal motion because the Citibank defendants need safe harbor insulation to justify their continued freeze on LBI assets. They further seek leave to seize those assets, including cash deposits and held securities, claiming both safe harbor

protection and, as to the affiliates, the ability to engage in triangular setoff. Neither

ground is available here, and other issues exist that bar the relief sought. For example,

certain of the accounts contain LBI customer funds. There are also sums admittedly

owed by certain Citibank affiliates to LBI which cannot be reduced by offsetting

Citibank's claims against LBI.

Finally, Citibank and its affiliates admit that they hold roughly $200 million

in post-petition deposits that belong to LBI. They also admit that the law requires

disgorgement of those funds to the Trustee. Their only ground for continued withholding

is that they disagree with the law. The Court should direct that this property of the LBI

estate be turned over to the Trustee.

## BACKGROUND

### A.     The SIPA Proceeding

On September 19, 2008 (the "Filing Date"), by order of the United States

District Court for the Southern District of New York (the "LBI Liquidation Order"), the

Securities Investor Protection Corporation ("SIPC") commenced this SIPA proceeding to

liquidate LBI and recover funds for LBI's customers (the "SIPA Proceeding"). Order

Commencing Liquidation, *Sec. Investor Prot. Corp. v. Lehman Bros. Inc.*, No. 08-CIV-

8119 (S.D.N.Y. Sept. 19, 2008), ECF No. 3.

The LBI Liquidation Order, among other things: (i) determined that LBI's

customers were in need of the protections afforded by SIPA; (ii) appointed James W.

Giddens Trustee for the liquidation of the business of LBI pursuant to Section

78eee(b)(3) of SIPA; (iii) removed the case to this Court pursuant to Section78eee(b)(4)

of SIPA; (iv) authorized the Trustee to take immediate possession of the property of LBI, wherever located; and (v) notified all persons and entities that the automatic stay provisions of Bankruptcy Code section 362(a) operate as a stay of, among other things, "any act to obtain possession of property of the estate or property from the estate" (*id.* ¶¶ I, II, III.C, XIII and XIV). The LBI Liquidation Order also ordered that all entities are stayed and enjoined from directly or indirectly retaining or setting off or interfering with any assets or property owned by LBI (*id.* ¶ IV).

In the course of the Trustee's ongoing efforts to effect the liquidation of LBI and administer the LBI estate, and in furtherance of the Trustee's duty of returning customer property to customers, as defined under SIPA, while at the same time maximizing the general estate for all creditors, the Trustee and his counsel have acted diligently to recover LBI funds deposited at financial institutions but retained by such institutions without justification under the Bankruptcy Code**.** The present proceeding concerns such circumstances.

The Trustee's ability to marshal assets recovered from financial institutions that have previously engaged in improvident setoff or other unjustified retention has a direct impact on the Trustee's ability to fulfill his duty to LBI's public customers to return customer property, because amounts recovered from such institutions will, in part, be allocated to customers.[2]

---

[2] Where a broker-dealer has not fully complied with the Securities and Exchange Commission's ("SEC") customer protection rules, which require a broker-dealer to segregate property and to maintain reserves for the exclusive benefit of customers, *see* 17 C.F.R. §§ 240.15c3-1, 240.15c3-3(e), SIPA mandates that the trustee treat as customer property "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers." 15 U.S.C. § 78*lll*(4)(E). In this SIPA Proceeding, for

## B.    *The Adversary Proceeding*

On March 18, 2011, after discussions failed to yield a mutually acceptable resolution of issues arising from Citibank's self-help, the Trustee commenced an adversary proceeding (No. 11-01681) (the "Adversary Proceeding") against Citibank, N.A., Citigroup Inc., and eleven of their affiliates (hereinafter individually and jointly, "Citibank," or where context requires, "Citibank and its affiliates" or the "Citi parties") to recover more than $1.3 billion in cash and other assets held by those entities.  The assets include a $1 billion deposit that Citibank purported to set off on September 19, 2008, post-petition deposits in LBI's various accounts at Citibank which totaled approximately $190 million as of May 31, 2010 (now $200 million), approximately $62 million in pre-petition deposits in LBI's accounts at Citibank, and approximately $90 million in deposits and net payables to LBI from Citibank and affiliates.

Shortly after the Adversary Proceeding was filed, the parties reached agreement on a Scheduling Order and Discovery Plan that set dates for document discovery and Citibank's initial motions.  The Court approved the schedule on April 14, 2011 (Docket No. 7), and it has been amended twice, as of June 22, 2011 (Docket Nos. 13, 23).  The motions now before the Court were filed on May 26, 2011.  As of the date of this submission, document production is about to occur.  In the absence of documents, there have been no depositions, and in any event Citibank has objected to allowing

---

example, the Court granted the Trustee authority to reallocate property from other sources to the fund of customer property as necessary to cure shortfalls created by compliance failures. In this way, the Trustee's ability to marshal assets from the unwinding of derivative transactions has a direct impact on the Trustee's ability to fulfill his duty to LBI's public customers to return customer property, because amounts recovered from improvidently seized or retained LBI deposits will, in part, be allocated to customers.

depositions prior to the determination of its motions. As discussed below, the absence of an opportunity to review documents and examine knowledgeable witnesses, including former LBI employees unavailable to the Trustee, and Citibank and Barclays employees, has thus far delayed the Trustee in developing a full factual record.

## COUNTER-STATEMENT OF FACTS

Citibank presents a "Statement of Facts" supposedly based upon "the non-conclusory factual allegations of the Complaint" and upon "documents referenced in the Complaint, documents upon which the Trustee must have relied in framing the Complaint, and matters of public record such as prior pleadings and orders in these proceedings."[3] In reality, Citibank repeatedly distorts the complaint's allegations, its assumptions about what the Trustee relied upon are incomplete and inaccurate, its references to the "public record" are selective and misleading, and it impermissibly injects its own view of the facts, contrary to the requirements of Rule 12(b)(6). The following account summarizes the Trustee's actual allegations, as supplemented by publicly available information about the CLS system.

### A. The Business Relationship of the Parties

LBI served as the registered broker-dealer in the United States for the global financial services network of the overall Lehman Brothers group of companies

---

[3] *See* Memorandum of Law of Defendants Citibank, N.A. [et al.] … In Support of Their Motion to Partially Dismiss the Complaint, dated May 16, 2011 ("Defs' Mem.") at 8 n.1. The related motion of Citibank and affiliates in the main case for relief from the automatic stay, also dated May 16, 2011, is hereinafter referred to as "Citi Stay Mot."

(collectively, "Lehman"). In addition to traditional securities brokerage activities, LBI engaged in foreign exchange ("FX") trading as part of its efforts to facilitate Lehman services to clients (Compl. ¶¶ 14-16). Citibank and its affiliates provided a number of services to LBI and its affiliates in connection with their business, including maintenance of cash deposits and custodial accounts, services related to FX settlement, agency and trade services, and provision of credit facilities (*id.* ¶ 17). Citibank and its affiliates also entered into International Swap Dealers Association, Inc. ("ISDA") Multicurrency Agreements and securities lending agreements with LBI (*id.*). Importantly, FX trading between Citibank and LBI as counterparties is *not* at issue in the Adversary Proceeding.

Citibank assisted LBI in FX settlement using two methods: (a) traditional correspondent banking settlement and (b) settlement through the Continuous Linked Settlement system ("CLS") carried out via CLS Bank, an Edge Act corporation chartered by the Board of Governors of the Federal Reserve System. Under the traditional correspondent banking method of FX settlement, each counterparty to an FX trade transfers to the other counterparty the currency it is selling, typically using correspondent banks in the currencies concerned. Because the transfer of the sold currency takes place independently of the transfer of the bought currency, this method exposes the parties to principal and liquidity risks equal to the full value of the trade (*id.* ¶¶ 18-19).

In contrast, CLS allows the counterparties to settle their trades on the books of a specialized FX settlement institution, CLS Bank, which assures that the bought currency is paid out only if the sold currency is received *(id.* ¶ 20). As discussed in greater detail below, the CLS settlement process has reduced systemic risk for FX

settlements that occur within its jurisdiction. Citibank, as a "Settlement Member" of CLS Bank provided LBI (which was a "User Member" but not a Settlement Member) access to the CLS settlement function (*id.* ¶¶ 24-25).

## B. The CLS System

The greater part of Citibank's claims against the LBI estate arise from its relationship with LBI in providing CLS settlement services. Accordingly, the complaint contains a detailed description of how the CLS system functions. Citibank's motions do not accurately characterize the complaint's allegations in this regard. Nor do those motions contain a fair account of the role that Citibank, as a Settlement Member, plays in CLS. A more accurate description appears in nonpartisan, publicly available literature (upon which the complaint's allegations are largely based) explaining the workings of CLS. That material is submitted herewith in support of the Trustee's presentation. [4]

An FX trade consists of the exchange of one currency for another based on an agreement between a selling and a buying party.[5] Such transactions (whether "spot" or "forward") always involve both a trade date and a settlement date, the latter being when the actual exchange is carried out and thus when both parties expect they will receive the currency they traded for. Because FX trading regularly occurs across time

---

[4] *See* accompanying declaration of Richard G. Menaker, dated August 5, 2011 ("Menaker Decl.") in opposition to Citibank's motions, Exhibits 1, 2, 3.

[5] Useful summaries of the FX process appear in CLS Bank International, Assessment of Compliance with the Core Principles for Systematically Important Payment Systems (Dec. 2009) ("CLS Core Principles"); J. McPartland, "Foreign Exchange Trading and Settlement: Past and Present," 223 Chi. Fed Letter (February 2006) ("McPartland"); and R. Levich, "Why foreign exchange transactions did not freeze up during the global financial crisis: The role of the CLS Bank," VOX (July 10, 2009), *available at* www.voxeu.org/index.php?q=node/3754 ("Levich"), from which much of the discussion in the following paragraphs is drawn.

zones, there are instances where one counterparty to a transaction will have provided its committed currency for the trade on the settlement date before the other counterparty (in a later time zone) has done so. Sequential presentation for settlement exposes the earlier paying party to the risk that the later paying party will have received the benefit of its trade but then will fail to reciprocate. Exposure to that risk, known as "settlement risk," is ordinarily "addressed by the trading and settlement limits that banks set for each other." McPartland at 2; CLS Core Principles at 3; Menaker Decl. Ex. 2, 3.

The problems inherent in settling FX trades across time zones led to the creation of CLS. On June 26, 1974, the German banking authorities shut down Bankhaus Herstatt at the close of the German business day, six hours before business was scheduled to close in New York where most US dollar FX transactions were settled. Chase Manhattan Bank, Herstatt's USD correspondent bank, stopped sending dollar payments on behalf of Herstatt through the interbank payments system ("CHIPS") as of the close of business German time. But other banks that held FX contracts to sell German marks versus the dollar found that they had already paid the marks to Herstatt and now stood to receive no US dollars in return. The resulting financial losses, and loss of trust, arising from so-called "Herstatt risk" permanently altered perceptions of the reliability of the existing international FX system. McPartland at 2; *see also* Levich, Menaker Decl. Ex. 2, 3.

Over the next two decades, efforts to address the issue of systemic risk in FX settlements resulted in development of a simultaneous payment versus payment ("PVP") methodology that in effect eliminated the Herstatt problem. That methodology

became known as Continuous Linked Settlement, or CLS. Thereafter, CLS Bank and its affiliate, CLS Services Ltd. (jointly, "CLS Bank"), with offices in London and New York, commenced CLS service operations on September 9, 2002. McPartland at 3. CLS Bank describes itself as a "response to regulatory concerns regarding the potential for FX settlement to be a major source of systemic risk," which it has substantially reduced through its PVP mechanism. *See* Public Letter of Alan Bozian, President and CEO of CLS Bank, to U.S. Department of the Treasury (Nov. 23, 2010), commenting on proposed regulations under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("11/23/10 CLS Letter") at 2, Menaker Decl. Ex. 4.

## C.    *How CLS Works*

Citibank's motions present a truncated, misleading description of the CLS settlement process (*see* Defs' Mem. 9-11, 20-21). The complaint alleges, and publicly available information shows, that contrary to Citibank's assertion (*id.* at 11), CLS Bank itself (rather than institutions like Citibank) performs the settlement function for the counterparties (most of whom are unknown to it) who have previously engaged in the FX trades. In contrast, Citibank in its capacity as a Settlement Member in CLS simply transmits the designated amounts of currency each day on behalf of its customers (such as LBI), while *CLS Bank performs the matching function*. The process works as follows.

CLS Bank operates a global multi-currency cash settlement system on a PVP basis, thereby effecting simultaneous exchange of the two legs of an FX transaction. The system is intended to eliminate the risk associated with FX settlement across time zones by protecting a party to an FX trade from paying away the currency being sold

before receiving the currency being bought (Compl. ¶ 21; 11/23/10 CLS Letter at 4). CLS Settlement Members, such as Citibank, have direct access to the system by establishing an account with CLS Bank and can submit information about FX trades and payments for such trades directly to CLS Bank. CLS User Members, such as LBI, may directly submit information about their trades to the CLS settlement system; however, they do not have an account with CLS Bank and cannot make their own payments. Third parties may also have their FX trades settled through the CLS system but can neither submit information to CLS Bank nor make direct payment. They must use the services of a Settlement Member designated to act on their behalf, referred to as a "Designated Settlement Member." Both User Members and third parties are completely dependent on Designated Settlement Members for authorizing the transaction for CLS settlement and making and receiving payments (Compl. ¶ 22).

The CLS daily process involves matching and funding of FX trades. Acting on their own behalf or on behalf of customers, direct participants in the system submit "Instructions" concerning the FX trades with other participants (or those participants' customers). The Instructions are then matched *by CLS Bank* on the basis of the data provided, and each matched Instruction to be settled is placed in a settlement queue maintained by CLS Bank. On the settlement date, Settlement Members pay in one currency and receive payment in the counterpart currency so that neither party to the match ends up being indebted to the other (Compl. ¶ 23). If one side fails to deliver the requisite funds or certain other criteria are not satisfied, CLS Bank will not complete the settlement and will return the paid-in funds, thereby eliminating settlement risk (CLS

Core Principles ¶ 0.3.1 at 5). The following diagram illustrates the CLS process. "Trader A" stands in the position of an entity like LBI. "DSM" refers to "Designated Settlement Member." In the timeline columns, "T" stands for Trade Date, "S-1" stands for day before Settlement Date, and "S" stands for Settlement Date:

**Figure 1**



*1   Simplified to show single transaction. Settlements actually occur on net basis.

*2   Counterparty (i.e., "Trader") may act for own account or on behalf of customer.

*3   DSM is designated settlement member, which may be identical to counterparty.

*4   If counterparty is user member, it will also directly advise CLS bank of trade.

*5   Or the DSM may grant intraday credit to counterparty.

*6   Counterparty may be obligated to zero out intraday credit liability by day's end.

Reproduced from Menaker Decl. Ex. 13.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ It is

up to the DSM and its customer (and of no moment to CLS Bank) whether those funds

are prepaid to the DSM by the customer or covered by an intraday credit; in the case of

Citibank and LBI, extension of credit was entirely at Citibank's discretion (CLS Agmt.

¶ 1 at 3, Hammerman Decl. Ex. 4).

      Citibank's motions assert that the "CLS system effectively shifts the

settlement risk of User Member trades away from the User Member's counterparties and

onto its Designated Settlement Member" (Defs' Mem. 11). This is absolutely untrue.

CLS actually insulates Settlement Members such as Citibank (as well as User Members)

from settlement risk through its PVP design, a point recently emphasized both by the

U.S. Treasury and by CLS Bank itself. *See* U.S. Dep't of the Treasury, Notice of

Proposed Determination on Foreign Exchange Swaps and Forwards (April 29, 2011),

*available at* www.treasury.gov/press-center-press-releases/Pages/tag1152.aspx ("The

strong, internationally coordinated oversight of this [FX] market led to the establishment

of a well-functioning settlement process that effectively addresses [settlement] risk.");

11/23/10 CLS Letter at 4-5 ("CLS was created out of a cooperative effort to limit

---

[6] The CLS International Rules, which have been filed under seal, are annexed as Ex. 3 to the
declaration of Claudia L. Hammerman, dated May 26, 2011, ("Hammerman Decl.") in support of
Citibank's Motion to Dismiss.

systemic risk and has had this as its principal purpose from inception."); Menaker Decl. Ex. 4, 5.

## D.    *Citibank's CLS Settlement Services Agreement with LBI*

Because LBI did not have an account with CLS Bank, it required the services of a Designated Settlement Member to obtain access to the CLS system. Citibank served that function for LBI.  Under a CLS Settlement Services Amended and Restated Agreement for CLS User Members, dated October 28, 2004 (the "CLS Agmt."), Citibank undertook to provide services in CLS for LBI and four other Lehman affiliates (Compl. ¶¶ 25-26). As an inducement, Citibank offered more favorable terms if LBI and the affiliates consolidated the majority of their foreign currency accounts with Citibank. This resulted in the opening of Lehman deposit accounts with various branches of Citibank and its affiliates throughout the world in twenty-five different currencies. (Such affiliates include the defendants listed in the caption to this action) (*id*. ¶ 27).

The CLS Agreement appointed Citibank as LBI's "'Designated Settlement Member' with respect to 'Instructions' (i) submitted directly to CLS Bank by Customer in its capacity as 'User Member', for itself or on behalf of a Permitted Affiliate, and (ii) authorized by Citibank, in accordance with CLS Bank Rules" (CLS Agmt. at 2) (Hammerman Decl. Ex. 4). Pursuant to this appointment, Citibank would effect payments to and from LBI's accounts, a conventional banking function. To do so, Citibank would credit LBI's accounts with long balances and debit LBI's accounts for short balances resulting from CLS settlements. To make these payments, Citibank was authorized under

- 17 -

the CLS Agreement to debit accounts of LBI at branches and affiliates of Citibank and at certain other banks used by LBI for FX trading (Compl. ¶ 28).

The parties' CLS relationship was also governed by a CLS Service Level Agreement (Menaker Decl. Ex. 7), the purpose of which was "to foster open communication and clear standards" in the relationship (*id*. §1). The Service Level Agreement contained provisions relating to "liquidity management," including a "short position" (i.e., an intraday credit, referred to as a "daylight overdraft line") that Citibank "grant[ed] to the customer in order to facilitate the settlement process" (*id*. §§ 4.1, 4.2.3). LBI was required under the agreement to pay Citibank for any "daylight overdraft" in accordance with specified time deadlines on the same day credit was granted (*id.* §§ 4.2.2, 4.2.3). The parties thus were required to reduce to zero the short and long balances at the end of each day, and in fact did so throughout the history of the relationship, at least until the week of September 15, 2008 (Compl. ¶ 47). Citibank's extension of intraday credit, however, was not mandatory. Both the CLS Agreement and the Service Level Agreement made it clear that Citibank had unilateral discretion to authorize or reject LBI's settlement Instructions and no obligation to extend credit to support LBI's trades (CLS Agmt. § 1; Service Level Agmt. § 4.2.3). It had the right instead to require LBI to prefund all trades submitted for settlement. Citibank was thus a discretionary gatekeeper with regard to LBI's access to CLS and chose to be a short-term lender to LBI to facilitate cash flow for FX payments settled in the CLS system.

### E.     The Events of September 15-19, 2008

The relationship between LBI and Citibank as to CLS changed dramatically in the days leading up to the SIPC filing on September 19, 2008. Decisions reached during the weekend of September 13-14 resulted in the filing by LBHI and a number of its affiliates for relief under Chapter 11 of the Bankruptcy Code on Monday, September 15, 2008 (Compl. ¶ 29). A different fate was decreed for LBI: it would remain in business while efforts were undertaken to wind down pending transactions and facilitate a possible sale (*id*. ¶ 30). To achieve this goal, LBI would have to complete outstanding FX transactions during that week, including transactions being settled in the CLS system. This would require the assistance of Citibank in its capacity as LBI's Designated Settlement Member (*id*. ¶ 31).

#### 1.     The $1 billion deposit

On September 15, 2008, while Citibank provided settlement services for LBI in the CLS system based upon authorization it had granted the previous Friday, it notified LBI that it was terminating the CLS Agreement going forward, citing the Chapter 11 filing by LBHI as an event of default (*id*. ¶ 32). Later that day, based on requests by LBI's senior management, Citibank agreed that it would, after all, continue providing CLS settlement services, but only on the condition that LBI deposit $1 billion in an account to be established in its name at Citibank and subject to potential setoff (*id*. ¶ 33). The new conditions were set out in a Letter Agreement, dated September 15, 2008 (the "9/15/08 Letter Agreement") drafted by Citibank (Hammerman Decl. Ex. 5). LBI

provided the $1 billion, which Citibank thereafter moved to an off-shore account at Citibank Nassau in the Bahamas (Comp. ¶ 39).

Citibank sent LBI a similar termination notice the next day, which it likewise withdrew when LBI agreed to sign a second Letter Agreement, dated September 16, 2008 (the "9/16/08 Letter Agreement") (*id*. Ex. 6). Again the continuation of settlement services was conditioned on Citibank's continuing to hold the deposited $1 billion with the right to set off against it. The 9/16/08 Letter Agreement, like its predecessor, was drafted by Citibank and presented to LBI on a take-it-or-leave-it basis (Compl. ¶ 36). It made the provision of further CLS settlement services subject to six terms and conditions. Among other things, it provided (¶ 5) that Citibank would effect payments for the account of LBI on CLS "only in amounts at any time outstanding of up to the aggregate amount in effect from time to time of the LBI deposit placed with Citibank" – i.e., up to a maximum of $1 billion (Compl. ¶ 38; Hammerman Decl. Ex. 6).

### 2. *The Barclays pledge*

Meanwhile, efforts were underway to sell LBI's assets to an institutional purchaser to facilitate a transition of the brokerage business with a minimum of disruption to customers. On September 16, 2008, it was announced that Barclays had entered into an agreement to purchase certain LBI assets. On the following day, Citibank demanded an additional deposit from LBI as a condition of continuing to provide CLS settlement services. LBI referred the request to Barclays, leading to the issuance of a pledge agreement, dated as of September 17, 2008, between Barclays and Citibank (the

"Barclays Pledge Agreement") (Hammerman Decl. Ex. 7). [7] Pursuant to that agreement,

Barclays deposited $700 million in a special cash collateral account at Citibank (the

"Barclays Pledge") to induce Citibank to continue "CLS Services, and daylight overdraft

lines and temporary overdraft lines in connection with the provision of CLS Services to

LBI" (Compl. ¶¶ 45-46).

      The Barclays Pledge Agreement granted Citibank far more extensive rights

to the $700 million Barclays Pledge than existed as to LBI's $1 billion deposit. Unlike

the Letter Agreements between Citibank and LBI the previous two days, the Barclays

Pledge Agreement expressly granted Citibank a security interest in the special cash

collateral account. It also specifically secured "all obligations of [Barclays] and LBI now

or hereafter existing" under the CLS Agreement (Compl. ¶ 46). Upon receipt of the

Barclays Pledge, Citibank continued to provide CLS settlement services to LBI on

September 18 and 19, 2011, until the SIPA liquidation proceeding was filed.

### 3. *LBI's shortfall on CLS*

      As noted above, a material component of the parties' relationship under the

CLS Agreement and the Service Level Agreement was the requirement that the short and

long balances be reduced to zero at the end of each day (Compl. ¶ 47). But beginning on

September 15, 2008, Citibank departed from that practice (*id.* ¶ 43). As a result of

insufficient funds in a number of LBI's foreign currency accounts, substantial negative

balances built up that prevented day-end payment of Citibank's daylight overdraft credit

---

[7] The Trustee has received very little information concerning the dealings between Citibank and Barclays, which resulted in a $700 million pledge securing LBI's unprecedented buildup of a shortfall to Citibank for CLS settlement services during September 15-19.

(*id*.). Adding to the problem was Citibank's decision to withhold LBI's long balances accumulated from CLS settlements and refusal to credit them to LBI's accounts at the various Citibank branches (*id.* ¶¶ 42, 47-49).

LBI's failure to pay Citibank for the intraday credits resulted in the build-up of a large shortfall in connection with CLS activity. At the end of the day on Monday, September 15, LBI already owed Citibank approximately $480 million for transactions that had settled before the $1 billion deposit was provided (*id.* ¶ 96). Further shortfalls were added on each of the following days of that week, resulting in what Citibank now claims to be a net shortfall in the amount of $1,260,326,894 (*id.* ¶¶ 48, 56). Citibank personnel were aware of the growing imbalance at least as early as Wednesday, September 17, 2008, which senior personnel attributed to internal risk management weaknesses (*id.* ¶ 43).[8] But the provision of CLS services, including further daylight overdrafts, continued once Barclays had committed itself to providing the $700 million Pledge. At no time was LBI's $1 billion deposit used to pre-fund settlements in CLS, nor were the transactions settled in CLS limited to the amount of that deposit, as Citibank committed in the 9/16/08 Letter Agreement (*id.* ¶ 47). Finally, the Barclays Pledge was never drawn upon (*id.* ¶ 57).

---

[8]  The Federal Reserve Bank of New York downgraded Citibank's risk management procedures from "satisfactory" to "fair" in a Summary of Supervisory Activity and Findings delivered April 15, 2008 (Menaker Decl. Ex. 8). Those procedures were further downgraded to "marginal" in a follow-up Summary delivered January 14, 2009, covering the period at issue here (*id.* Ex. 9). The Trustee has requested from Citibank, but not yet obtained, documentation concerning the build-up of the CLS shortfall and its relationship to deficiencies in Citibank's risk management procedures.

### 4.    *Citibank's treatment of the $1 billion deposit*

The $1 billion deposit followed a twisted path before Citibank finally took the steps that could even arguably be termed a "setoff" (*see* Compl. ¶¶ 39-40). Eventually, on September 18, 2008, Citibank transferred the $1 billion deposit to a newly opened Citibank Global Transaction Services demand deposit account at Citibank, N.A., New York branch, denominated "Lehman," and commingled it with the balance remaining from a $2 billion deposit previously made by LBHI (*id.* ¶ 41). On September 19, at 1:13 p.m. EST, Citibank moved the $1 billion deposit from the "Lehman" account to a Citibank administrative hold account used to hold funds on a temporary basis pending further instructions. Citibank's contemporaneous records describe the action as a "reversal" of the September 18 transfer. Nevertheless, it appears that these funds were never returned to the Citibank Nassau account from which they were taken (*id.* ¶ 50).

At 1:23 p.m. EST on September 19, 2008, SIPC filed its petition in the District Court for a protective decree under SIPA with respect to LBI, and an Order Commencing Liquidation was entered. Shortly prior to filing, settlement of payments on the CLS system for LBI had ceased, and LBI's Treasurer had requested that Citibank return the $1 billion deposit (*id.* ¶¶ 51-52). The funds were not returned. At 2:07 p.m. EST – *after* the SIPA liquidation petition had been filed – Citibank's legal department addressed a notice to "Lehman Brothers International" (not LBI) advising that Citibank had exercised its right of setoff against the $1 billion deposit. This was corrected in an e-mail 21 minutes later, this time addressed to LBI. At 3:22 p.m. EST, Citibank finally transferred the $1 billion deposit from the administrative hold account to an account

denominated "Citibank N.A. New York Branch for Branch and Citibank Affiliates," again describing the action as a "reversal" of the September 18 transfer (*id.* ¶¶ 53-54).

### 5. Citibank's subsequent conduct

Citibank has never provided evidence that, prior to the SIPA filing, it reduced the LBI indebtedness on its books by the amount of its $1 billion setoff. It was not until the end of September 2008 that Citibank claimed that debt amounted to $1,260,326,894. This figure was said to be derived from the net LBI shortfall that Citibank had allowed to build up in connection with CLS services during September 15-19, together with approximately $25 million in fees based upon the alleged spread between bid and ask that Citibank's FX Desk charged, and over $6 million for what Citibank alleged to be its "cost of carry" (Compl. ¶ 56).

The complaint's allegations concerning the events of September 15-19, 2008, while based upon the best information available to the Trustee when the complaint was filed, are necessarily incomplete. This is particularly so with respect to the conduct of Citibank. The Trustee has pleaded the amount LBI owed to Citibank in connection with CLS settlement services based on Citibank's proofs of claim, without having been able to reconcile discrepancies between Citibank's numbers and LBI's records.

As to one key fact, however, there is no dispute. On November 13, 2008, without notice to the Court or the Trustee, Citibank returned to Barclays the full $700 million Barclays Pledge, which had been expressly intended as security to protect against any loss occasioned by Citibank's provision of CLS settlement services. Rather than using the Barclays Pledge to reduce the amount of the shortfall, Citibank elected instead

to seize and freeze LBI assets that otherwise would have been available to make customer losses whole (Compl. ¶ 57). Significantly, Citibank chose to freeze LBI accounts in excess of $350 million rather than apply $260 million of the Barclays Pledge to eliminate the alleged LBI indebtedness above the $1 billion deposit.

## ARGUMENT

Citibank's two substantive motions – to dismiss sixteen counts in the Adversary Proceeding and to lift the stay in the SIPA Proceeding – repeat many of the same arguments and should be denied for the same reasons. Both motions center on Citibank's effort to set off its admitted debts to LBI against the purported $1.26 billion LBI shortfall resulting from CLS settlements. In both motions Citibank seeks, by resort to safe harbors, to insulate itself and its affiliates from the Trustee's claims under the Bankruptcy Code, and both seek definitive rulings from this Court on the parties' respective positions without discovery and development of an evidentiary record.

In the following discussion, the Trustee addresses, first, the applicable pleading standard, second, Citibank's safe harbor arguments, third, its equitable recoupment claim, and fourth, its objections to specific counts in the complaint. The next point considers the lift-stay motion, and the final point requests immediate return of post-petition deposits.

## I. The Complaint Meets the Iqbal/Twombly Standard.

A motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), and Fed. R. Bankr. P. 7012 tests the sufficiency of the pleading rather than the merits of the case. *Chrysler LLC v. Daimler AG* (*In re Old Carco LLC*), 2011 WL 1833244 at *3 (Bankr.

S.D.N.Y., May 12, 2011). At this stage, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in Plaintiffs' favor." *Pension Comm. of the Univ. of Montréal Pension Plan v. Banc of Am. Sec. LLC*, 568 F.3d 374, 381 (2d Cir. 2009); *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.* (*In re Lehman Bros. Holdings Inc.*), 2011 WL 1831779 (Bankr. S.D.N.Y., May 12, 2011), (hereinafter "*Ballyrock*"). The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In ruling on a motion under Fed. R. Civ. P. 12(b)(6), the court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The court may also consider a document where the complaint "relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), as further quoted by *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). But "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and "that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, the Trustee has satisfied the pleading standard of Rule 12(b)(6). Indeed, Citibank (with limited exceptions)[9] does not in fact challenge the complaint as either insufficiently stated or "implausible." Rather than attack the adequacy of pleading, Citibank in both its motions challenges the Trustee's claims based on its own characterization of events, assertions of fact, and affirmative defenses. Such an approach disregards the limits of a motion to dismiss.

With respect to Citibank's invocation of the safe harbors and its other various affirmative defenses, the Trustee "need not anticipate, and attempt to plead around, potential affirmative defenses" in his complaint. *Davis v. Ind. State Police*, 541 F.3d 760, 763 (7th Cir. 2008); *see also Walker v. Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 95 (Bankr. D. Del. 2010) (rejecting motion to dismiss based on Section 546(e) bankruptcy safe harbor); *accord Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*, 437 B.R. 798, 812 (Bankr. D.S.C. 2010) ("Defendants bear the burden of proving" applicability of bankruptcy safe harbors in order to bar plaintiff's avoidance claims).

Similarly, Citibank's motions rely upon various arguments which assume a version of the facts that the Trustee disputes. For example, in both motions Citibank insists that its setoff was timely rather than, as the complaint alleges, effected after the SIPA filing at 1:23 p.m. on September 19, 2008 (Defs' Mem. 3; Citi Stay Mo. ¶¶ 67-68).

---

[9] Only with respect to Counts X, XI and XII (the "fraud-based claims"), does Citibank claim a failure to plead with adequate particularity, a contention addressed below (*see* pp. 83-84 *infra*).

This is a clear issue of fact that cannot be resolved on motions to dismiss or motions to lift the §362(b) stay in the absence of discovery.

      Likewise, Citibank claims that the LBI shortfall in funding for CLS settlements amounts to $1.26 billion and that it is entitled to a setoff of the full amount against LBI deposits. But that factual assertion, a critical element of both the dismissal motion and the lift-stay motion, will not withstand scrutiny. The 9/16/08 Letter Agreement states on its face that Citibank would only "effect payments on CLS" for the benefit of LBI limited to "the aggregate amount in effect from time to time of the LBI deposit" of $1 billion (Hammerman Decl. Ex. 6). Despite this limitation, Citibank "advanced billions of dollars of credit on LBI's behalf to ensure that LBI's FX transactions could settle in the CLS system" (Defs' Mem. 16, citing Compl. ¶ 47) and now argues that "its total damages claim" from this activity amounts to $1,260,326,894 (Citi Stay Mo. ¶ 69). This, of course, exceeds the limitation in the 9/16/08 Letter Agreement and on its face amounts to a breach of contract. The circumstances of the claim and its computation are fact-intensive and cannot be resolved without a proper evidentiary record. *See Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*), No. 06-B-10706 (JMP), 2007 WL 1580049 at *4 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss because issues raised therein required development of material facts before court could decide merits).

## II.    The Safe Harbors Do Not Insulate Citibank from Turnover of Funds Obtained While Providing CLS Services for LBI.

The Citibank motions are flawed in relying on the Bankruptcy Code's safe harbor language (a) to justify the setoff of the $1 billion deposit on September 19, 2008, and (b) to seek a further $260 million in setoffs against frozen LBI funds admittedly belonging to the LBI estate (*see* Defs' Mem. 20-27; Citi Stay Mot. ¶¶ 1-2 and *passim*). Safe harbor insulation is unavailable to Citibank because its rendering of services and extension of credit to LBI under the CLS agreement are not the kinds of activity Congress exempted from usual SIPA and bankruptcy principles.

Citibank predicates its safe harbor argument on 11 U.S.C. §§ 362(b)(17), 546(g) and 560 (Bankruptcy Code), and 15 U.S.C. § 78eee(b)(2)(C)(i) (SIPA), which provide an exemption from avoidance of an otherwise preferential transfer by the debtor in connection with "one or more swap agreements" as defined respectively in Code §§ 101(22A), 101(53C) and  101(53B)(A)(i)(I)-(III) (Defs' Mem. 20, 25-26).  Specifically, Citibank contends that the CLS Agreement and the Letter Agreements that amended it are each exempt as a "swap agreements" because they meet the definition of that term and also constitute a "credit enhancement" and "security arrangement" related to a "swap agreement" under Section 101(53B)(A)(vi) (*id*. 21). Citibank applies each of these characterizations to its function as LBI's Designated Settlement Member in the CLS system and its extension of intraday credit in support of its claim to entitlement to the benefit of safe harbor insulation.

Citibank's arguments are an attempt to fit a square peg into a round hole. Each of its contentions distorts the scope of the safe harbor provisions, misconstrues how the CLS system works and misrepresents the CLS-related agreements and Citibank's services thereunder. Citibank provided access to the FX settlement function performed by CLS Bank and served as an ordinary lender to facilitate settlements through the CLS system. The provision of those services did not itself constitute a "swap agreement" or transform Citibank into a "swap participant" or a "financial participant" under any Bankruptcy Code safe harbor.

**A.      *Citibank's Resort to the Safe Harbors Ignores Their Purpose and Legislative History; CLS Itself Curbs Systemic Risk.***

Citibank's safe harbor arguments are mistaken because they misconstrue the underlying purpose served by those exemptions – to reduce systemic risk in financial markets. The conduct by Citibank at issue here did not reduce systemic risk – it was the actions of CLS Bank that did so.

The initial safe harbor provisions were enacted between 1982 and 1990 as exceptions to general bankruptcy principles to enable certain contract parties to conclude their relationships with a debtor without obtaining relief from the automatic stay and despite the general prohibition on *ipso facto* clauses.  In 2005, Congress expanded the scope of the safe harbors through certain amendments in the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 109th Congress §§ 1, *et seq*. (2005) ("BAPCPA Amendments").[10]

Among other things, the expanded safe harbors added further categories of financial contracts, such as master netting agreements, to the range of exemptions. The definition of the term "swap agreement" was broadened, and a new provision, §562, was added relating to damages in cases where the trustee has rejected an executory contract or the counterparty has terminated, liquidated, or accelerated a contract with the debtor. *See* Gilbane, at 244-45. In 2006, with the passage of the Financial Netting Improvements Act ("FNIA"), Congress made additional "technical changes" to the safe harbor provisions "by strengthening and clarifying the enforceability of early termination and close-out netting provisions and related collateral arrangements in US insolvency proceedings." *Id*. The safe harbors are only available to certain classes of *protected counterparties* exercising certain *protected rights* in connection with certain categories of *protected transactions*:

- Protected counterparties: stockbroker, financial institution, financial participant, securities clearing agency, commodity broker, forward contract merchant, repo participant, swap participant, and master netting agreement participant. *See* 11 U.S.C. §§ 555, 556, 559, 560 and 561.

- Protected rights: contractual rights to cause liquidation, termination or acceleration of a protected transaction because of a condition of the kind specified in section 365(e)(1) [§§ 362(b)(6), (b)(7), (b)(17)] and to offset or net out any termination values or payment amounts. *See* §§ 555, 556, 559, 560 and 561.

---

[10] A compilation of references to legislative material and scholarly commentary appear in E. Gilbane, "Testing the Bankruptcy Code Safe Harbors in the Current Financial Crisis," 18 Am. Bankr. Inst. L. Rev. 241, 242-45 (2010) (hereinafter "Gilbane").

- Protected transactions: securities contract, commodity contract, forward contract, repurchase agreement, and master netting agreement. *See* 11 U.S.C. 555, 556, 559, 560 and 561.

Congress justified these carve-outs for swap agreements, securities contracts and other covered financial transactions as protecting against market-wide disruptions. As stated in the House Committee Report in 1982: "The prompt closing out or liquidation … minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction." H.R. Rep. No. 97-420, at 2 (1982). And as the District Court observed in its *Swedbank* affirmance, "the legislative history reflects a concern for the stability of the often-volatile swap market. Consequently, Congress emphasized that the Safe Harbor Provisions permit immediate termination of swap transactions in order to minimize the non-bankrupt counterparty's exposure to such unpredictability." *Swedbank v. Lehman Bros. Holdings Inc.* (*In re Lehman Bros. Holdings Inc.*), 445 B.R. 130, 135 (S.D.N.Y. 2011) (hereinafter "*Swedbank*"), citing H.R. Rep. No. 101-484, at 2 (1990). Congress concluded that an exemption from the automatic stay and bankruptcy avoidance principles was necessary "to ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rep. No 101-484, at 1 (1990).

Citibank's relationship with LBI under the CLS Agreement and the Service Level Agreement does not implicate the concerns underlying the amended safe harbor provisions. The CLS-related contracts at issue are not protected contracts. Citibank is not seeking to exercise protected rights. And it does not qualify as a protected counterparty.

The CLS system provides a vehicle for the settlement of FX transactions that virtually eliminates the systemic risk posed by a bankruptcy. CLS Core Principles § 0.3.1, Menaker Decl. Ex. 1. This is because CLS involves the simultaneous exchange of currencies and thereby limits exposure to possible loss from the sequential timing that can occur in traditional bilateral settlement. As Designated Settlement Member for LBI and its other customers, Citibank participated in a system whose function is to minimize exposure to settlement risk, but it did so only as an access provider and lender (*id.* § 0.3.2). Any risk to Citibank is the risk it assumed as a lender and is unrelated to systemic risk.

In consequence, a major purpose of the safe harbors – to assure that the demise of a counterparty to a protected transaction does not prevent closing out the transaction or disrupt the market as a whole – is redundant to CLS. The simultaneous exchange mechanism, together with the fact that it does not guarantee settlement, allows CLS Bank to refuse settlement in the event of an intervening bankruptcy filing or to carry it out if all criteria for settlement are satisfied. Accordingly, neither side of the transaction can gain at the expense of the other as a result of an automatic stay. This protection against loss of principal in the event of a bankruptcy is what the *system* is designed to do. CLS Bank itself insulates the market from systemic risk, allowing the market to operate smoothly despite the failure of users of the system.

This explains why the U.S. Treasury recently supported the exclusion of FX swaps and forwards from the Dodd-Frank Act's central clearing and exchange trading requirements, noting that there is already "a well-functioning settlement process [*i.e.,*

CLS] … that permit[s] the transfer of one currency to take place only if the final transfer of the other currency also takes place." U.S. Department of the Treasury, Notice of Proposed Determination on Foreign Exchange Swaps and Forwards (April 29, 2011), *available at* www.treasury.gov/press-center/press-releases/Pages/tg1152.aspx (Menaker Decl. Ex. 5). And it is why observers ranging from the International Monetary Fund to the LBI Trustee have commented on how well CLS Bank performed during the financial crisis of 2008-09 (*see* Defs' Mem. 24).[11]

Citibank misstates the intent and scope of the Bankruptcy safe harbors, erroneously asserting that Congress sought to "assur[e] financial institutions, such as Citibank, that if they continued to conduct business with, and extend credit to, a failing institution, their transactions in protected markets would not be disturbed in bankruptcy" (*id.* at 4). The assertion is overbroad and does not apply to CLS. The Supreme Court in 2006 rejected a similar self-interested mischaracterization of Congressional intent in a related bankruptcy context. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 666-67 (2006) (holding creditor not entitled to priority status under Section 507(a)(5), and rejecting argument that Congress intended to encourage continued dealings with "a failing enterprise" as inconsistent with "the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed.").

---

[11]  Citibank wrongly takes credit for its supposed "vital market-stabilizing role" in providing CLS services to LBI (Defs' Mem. 24). To the contrary, it was the existence of the CLS process, with its limitation on systemic risk, that performed that function, not Citibank.

**B.     The CLS-Related Agreements Are Not Covered by the
Safe Harbor for "Swap Agreements."**

Citibank argues that the CLS Settlement Services Agreement and both Letter Agreements should be treated as safe-harbored "swap agreements" because "each is a 'security agreement or arrangement or other credit enhancement related to [a swap agreement], including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with [a swap agreement]'" (Defs' Mem. 21) (citing 11 U.S.C. §101(53B)(A)(vi)).

The term "swap agreement" has a special meaning in the Bankruptcy Code covering several species of transaction. While the definition is broad, it is not as broad as Citibank's partial quotation in its motion misleadingly suggests. The definitional subsection relied upon by Citibank, clause (vi) of Section 101(53B)(A), contains limiting language that Citibank drops. That clause defines a "swap agreement" as

> any security agreement or arrangement or other credit enhancement related to *any agreements or transactions referred to in clauses (i) through (v)*, including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with *any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562*

11 U.S.C. §101(53B)(A)(vi) (emphasis added).

Citibank's quotation thus omits the definition's statement that the "security agreement or arrangement" must be related to "agreements or transactions referred to in clauses (i) through (v)."  It also omits the reference to Section 562 at the end of the definition.  As shown below, those omissions are among the several reasons why neither

the CLS Agreement nor the Letter Agreements qualify as a "swap agreement" under the safe harbor provisions of the Code.

**1.    *The $1 Billion Setoff is Not Safe-Harbored Based on "Underlying FX Transactions."***

Citibank begins its argument by asserting that "the underlying 'FX transactions' that LBI asked Citibank to settle through CLS are plainly 'swap agreements'" (Defs' Mem. 20).[12] What conclusion it derives from this is ambiguous.

On the one hand, if Citibank is claiming that the $1 billion is safe-harbored just because the underlying FX transactions are "swap agreements" under the Bankruptcy Code, regardless of the work Citibank actually performs, it is wrong. Citibank's CLS settlement services under the CLS Agreement and the subsequent Letter Agreements did not comprise any part of the underlying FX transactions. *See Lehman Bros. Special Fin. Inc. v. BNY Corp. Trustee Serv. Ltd.* (*In re Lehman Bros. Holding, Inc.*), 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010). Citibank was not a counterparty to the underlying FX transactions; it was a service provider and a lender. If serving those roles could create safe harbor insulation, every courier who delivered swap agreement documentation and every lender that provided working capital to an FX dealer would be safe-harbored. Citibank points to no language in the Code that would allow it to conflate the rights and duties provided for by the CLS Agreement with the underlying FX agreements to which it is not a party, and no such language exists. *See Ballyrock*, 2011 WL 1831779.

---

[12]  As shown above, contrary to its assertion, Citibank was not asked "to settle" FX transactions for LBI in the CLS system but rather to provide access to that system as a Designated Settlement Member. Actual settlement in CLS is accomplished by CLS Bank (*see* pp. 12-17 *supra*).

On the other hand, if Citibank instead is claiming simply that because the underlying FX transactions may qualify as "swap agreements" is relevant to an argument it will subsequently make, *i.e.*, that the CLS Agreement and Letter Agreements were "related to" those "swap agreements," it is also wrong. As shown below, no conclusion as to safe harbor qualification can be reached without consideration of additional mistaken contentions advanced later in its memorandum.

      **2.**      ***The CLS-Related Agreements Are Neither a "Credit Enhancement" Nor a "Security Arrangement."***

Citibank next argues that the CLS Agreement and both Letter Agreements should be considered "swap agreements" because each supposedly satisfies the definition in clause (vi) of Code Section 101(53B)(A). Citibank claims its CLS-related agreements with LBI are "credit enhancements" or "security arrangements" because Citibank extended intraday "credit support" to LBI in the course of providing CLS settlement services (Defs' Mem. 21). The argument should be rejected – the activity relied upon by Citibank does not qualify as either a "credit enhancement" or a "security arrangement" for a number of reasons.

The term "credit enhancement" is not defined under the Bankruptcy Code. It was introduced with the 2005 amendments, the legislative history of which states that the term "credit enhancement" encompasses "letters of credit and other similar agreements." H.R. Rep. No. 109-31, Pt. 1, at 129 (2005). There was an identical 2005 amendment to the Federal Deposit Insurance Act, as to which the House Report gives additional examples of credit enhancements, specifically "letters of credit, guarantees,

reimbursement obligations and other similar agreements." *Id.* at 122. What these devices all have in common is precisely what distinguishes them from the CLS-related agreements – they all provide additional assets or recourse for a creditor beyond the debtor's principal unsecured obligation.

This distinguishing feature emerges even more forcefully from the reported bankruptcy court decisions that use the term "credit enhancement." The devices so designated in those rulings include specifically the following:

- Letters of credit - *SKBC Serv. Corp. v. 1111 Prospect Partners, L.P.*, 153 F.3d 728 (Table) (10th Cir. 1998), *In re ARN LTD. Ltd. P'ship*, 140 B.R. 5 (Bankr. D.C. 1992);

- Third party guarantees - *In re Owens Corning*, 419 F.3d 195, 201 (3d Cir. 2005), cert denied, 547 U.S. 1123 (U.S. 2006),*WestLB AG NY Branch v. TPS McAdams* (*In re Enron Corp.*), 370 B.R. 583 (Bankr. S.D.N.Y. 2007), *Chartwell Litig. Trust v. Addus Healthcare, Inc.* (*In re Med Diversified, Inc.*), 346 B.R. 621 (Bankr. E.D.N.Y.2006), *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006);

- Reserve accounts and cash collateral deposits - *In re Nat'l Century Fin Enter.*, *Inc.*, 310 B.R. 580 (Bankr. S.D. Ohio 2004), *aff'd*, 2008 WL 3890764 (S.D. Ohio 2008), *aff'd in part, rev'd in part*, 377 Fed. Appx. 531 (6th Cir. (Ohio) 2010), *Dimuzio v. Resolution Trust Corp.*, 68 F.3d 777 (3d Cir. 1995);

- Surety bonds and insurance policies - *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989 (N.D. Ill. 2004), *Lain v. ZC Specialty Ins. Co.* (*In re Senior Living Prop., L.L.C.*), 309 B.R. 223 (Bankr. N.D. Tex. 2004);

- Obligations to put money in an escrow account under certain circumstances - *Stratosphere Litig., L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137 (9th Cir. 2002).[13]

---

[13] For published commentary to the same effect, *see* J. Bethel, A. Ferrell, and G. Hu, Legal and Economic Issues in Litigation Arising from the 2007-2008 Credit Crisis (2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1096582; R. Aicher, D. Cotton and T. Khan, Credit Enhancement: Letters of Credit, Guaranties, Insurance and Swaps, 59 Bus. Law 897 (2004).

Citibank also argues that the CLS Services Agreement is a "security arrangement" under Section 101(53B)(A)(vi). (Defs' Mem. 21-22). Specifically, Citibank claims that because the CLS Agreement gives it a right of setoff in connection with its extension of credit to LBI in CLS, it qualifies for safe harbor treatment (*id*. at 22). Citibank notes, for example, that the House Report on the 2005 amendments to the safe harbors referred to "a right of setoff" as an example of a "security arrangement" (*id*.).

However, not just any security agreement or arrangement qualifies for safe harbor treatment under the definition in the Code. Rather, the security must be given *in connection with* the kinds of transactions referred to in clauses (i) through (v) of Section 101(53B)(A).[14] Neither the rendering of settlement services nor the providing of credit is included among the transactions listed in those clauses. This is not an accident. As explained above, settlement on the CLS system has effectively eliminated the kind of systemic risk that bilateral swap transactions face; protection of CLS Settlement Members was accordingly not included in the legislation. Thus, Citibank does not, in its role as a Designated Settlement Member in CLS, satisfy the criteria for being a party to a

---

[14] Clause (i) refers to interest rate swaps; foreign exchange, precious metals, or other commodity agreements; currency swaps; equity index or equity swaps; debt index or debt swaps; total return, credit spread or credit swaps; commodity indexes or commodity swaps; weather swaps; emissions swaps; inflation swaps; and option, future, or forward agreements as to each; clause (ii) refers to any similar agreement or transaction to the foregoing that becomes the subject of recurrent dealings in the swap or other derivatives markets; clause (iii) refers to any combination of agreements or transactions of these kinds; clause (iv) refers to any option to enter into agreements or transactions of these kinds; and clause (v) refers to any master agreement and supplements thereto related to agreements or transactions of these kinds.

"security agreement or arrangement" as a component of that CLS activity (*see also* Section II.B.4., *infra*).[15]

Significantly, the amendments to the Bankruptcy Code "were careful to exclude commercial loans from the definition of swap transactions" because the proponents of the legislation did "not want to create a situation where what is actually a loan received special treatment just because the documentation calls the transaction a swap." Gilbane at 5 (quoting U.S. Dep't of the Treasury: Press Release, Treasury Deputy Assistant Sec'y for Fed. Fin. Roger L. Anderson Delivers Testimony to the Senate Judiciary Subcomm. on Admin. Oversight and the Courts (May 19, 1998), *available at* http:/r/www.treas.gov/press/releases/rr2458. html)). Here the services Citibank provided to LBI were like those it would provide to a checking account customer with overdraft privileges. Citibank made, reviewed and accounted for payments as previously arranged by the customer and extended credit, up to a credit-line limit, as necessary to cover the customer's overdrafts.

The House Report provides additional grounds for rejecting Citibank's interpretation in its description of the function of the devices encompassed by the terms "credit enhancement" and "security arrangement." The report makes clear that those terms were intended to apply to collateral or third party guarantees that are governed by

---

[15] The same limitations defeat Citibank's argument that the CLS Agreement somehow constituted a "master agreement" (Defs' Mem. 22 n.14). Code Section 101(53B)(A)(v) covers only master agreements that provide for "an agreement or transaction referred to in clause (i), (ii), (iii), or (iv)" as well as "all supplements to any such master agreement . . . ." As shown in the immediately preceding footnote, *supra*, the CLS Agreement does not satisfy those criteria.

an agreement or instrument not incorporated in the main contract governing the swap transaction. H.R. Rep. No. 109-31, Pt. 1, at 129 (2005).

This clarification was prompted by ISDA and was designed to expand safe harbor protections to the kinds of security arrangements and credit enhancements typically used in the swap industry, as reflected in standardized contracts developed by ISDA. C. Johnson, At the Intersection of Bank Finance and Derivatives: Who Has the Right of Way, 66 Tenn. L. Rev. 1, 52-53 (1998). In an ISDA transaction, when parties are uncertain about each other's credit-worthiness and want to collateralize or guarantee the transaction, they employ credit support documents, which typically include a security agreement, guarantee or both. The Credit Support Annex is a standardized document that reveals the credit enhancement/security arrangement in a particular swap transaction governed by an ISDA master agreement. *Id.* at 53. Unsurprisingly, since the rendering of CLS services is not ISDA contract-governed activity, the CLS Agreement here bears no resemblance to a Credit Support Annex.

The 2006 amendments to the safe harbors further reinforce the point that neither Citibank's extension of credit in CLS nor its right of setoff upon a customer's default with respect to such credit constitutes a credit enhancement or a security arrangement as contemplated by the Bankruptcy Code. The FNIA of 2006 amended the safe harbor in Section 561 (exempting from stay or avoidance the termination, liquidation, acceleration or setoff under master netting agreements and across contracts) to include a broader definition of "securities contracts," which are covered by the provision. The term "securities contract" is defined in Section 741(A)(7). To that

definition, the 2006 amendments added the words "any extension of credit for the clearance or settlement of securities transactions," thereby making it clear that granting credit in the context of securities clearing became safe harbored. 11 U.S.C. § 741(A)(7)(vi).

In contrast, the term "swap agreement," which is also included among the protected contracts in Section 561, was not amended to include the term "extension of credit." In view of the purpose of the safe harbors, it is clear why the term "securities contract" was expanded in this way while the term "swap agreements" was not. Congress concluded that the bankruptcy of a financial entity had significant potential to create systemic risk in the securities clearance process, including the credit extension aspect of that process, because financial intermediaries finance and guarantee completion of clearance and settlement.[16] No similar view was reached as to swap agreements. The assumption of credit risk is an integral element of securities clearing but not of CLS, as shown by the following comparison of the U.S. equities clearing system with the CLS settlement system:

---

[16] The House committee report points out that "stockbrokers, financial institutions, financial participants or securities clearing agencies . . . often hedge their risk on these transactions through other market transactions, repledge securities collateral received under these transactions, or both. As such these transactions implicate the systemic risk concerns that are addressed by the safe harbors." H.R. Rep. No. 109-648, at 7 (2006).

**Figure 2**



Reproduced from Menaker Decl. Ex. 16.

**Figure 3**



*1    Simplified to show single transaction. Settlements actually occur on net basis.

*2    A's bankruptcy does not affect completion of settlement. CLS Bank, however, may cancel settlement if either DSM does not satisfy system criteria.

Reproduced from Menaker Decl. Ex. 15.

Three key distinctions between the systems highlight why securities contracts need safe harbor protection to reduce systemic risk in the context of bankruptcy while CLS settlement does not.  First, extension of credit is integral to the equities clearance process and is actively undertaken both by the brokers and banks in the clearance process and by the National Securities Clearing Corporation (NSCC) itself.  In contrast, extension of credit in CLS is a private matter between the Designated Settlement Member and its customer and takes place outside the system; CLS Bank does not extend credit. Second, in equities clearing, NSCC becomes the "central counterparty" on the day after the stock trade and for the duration of the clearance process. In contrast, CLS Bank is never a counterparty; it simply performs a matching and simultaneous currency exchange function as a neutral player.

Third, the management of risk is completely different in the two systems. In the equities clearing system, the transaction is "locked-in" on the first business day following the Trade Date (T+1).  NSCC then assures that the trade is funded through the broker on the buy side of the trade, and if that fails NSCC must (like a guarantor) fund the trade itself and then obtain reimbursement from the defaulting broker.  In CLS, however, the trade is not "locked in" until after CLS Bank has completed its match, funding has been provided, and the currencies have been exchanged on the Settlement Date (S). Settlement risk is minimized in a way that does not occur with equities clearing.

These differences have obvious implications in the event of bankruptcy. As shown in Figure 2, the bankruptcy of a participant in the equities clearing process that occurs after the lock-in point could potentially cause financial harm to any participant

who has extended credit unless the automatic stay is lifted and clearance can be completed. Congress, therefore, expanded the scope of the term "securities contracts" to encompass an "extension of credit" in connection with a securities transaction. In contrast, the bankruptcy of a counterparty to an FX transaction being settled in CLS will not result in a loss to the other counterparty because simultaneous exchange is the last step in the process, and CLS Bank may cancel prior to that point, or complete settlement if all criteria are satisfied. Thus, it is not surprising that Congress was not pressed to add "extension of credit" for purposes of CLS settlement to the definition of "swap agreement."

### 3. Citibank Was Not a "Financial Participant" or "Swap Participant" to Which LBI Owed Any "Reimbursement Obligation" Under the Code.

Citibank argues in the alternative (Defs' Mem. 21-22) that the CLS Agreement and Letter Agreements are "swap agreements" because LBI's duty each day to zero out the intraday credits extended by Citibank in CLS somehow constituted a "reimbursement obligation," which LBI supposedly owed to Citibank in the latter's capacity as a supposed "financial participant" or "swap participant," as referred to in Section 101(53B)(A)(vi). This attempt to turn overdraft privileges into a safe-harbored activity is unfounded. In the context of CLS, Citibank was neither a "financial participant" nor a "swap participant," and LBI did not owe Citibank any "reimbursement obligation."

Citibank asserts "[t]here can be no dispute that Citibank is both a 'financial participant' and a 'swap participant' under the Bankruptcy Code," citing Sections

101(22A) and (53C). (Defs' Mem. 20 n. 11). Citibank is wrong on both counts. The

term "financial participant" as defined in Section 101(22A) refers to

> an entity that, at the time it enters into a securities contract,
> commodity contract, swap agreement, repurchase agreement,
> or forward contract, or at the time of the date of the filing of
> the petition, has one or more agreements or transactions
> described in paragraph (1), (2), (3), (4), (5), or (6) of section
> 561(a) with the debtor or any other entity (other than an
> affiliate) of a total gross dollar value of not less than
> $1,000,000,000 in notional or actual principal amount
> outstanding (aggregated across counterparties) at such time or
> on any day during the 15-month period preceding the date of
> the filing of the petition, or has gross mark-to-market
> positions of not less than $100,000,000 (aggregated across
> counterparties) in one or more such agreements or
> transactions with the debtor or any other entity (other than an
> affiliate) at such time or on any day during the 15-month
> period preceding the date of the filing of the petition.

The term also covers "a clearing organization" as defined in the Federal Deposit

Insurance Corporation Improvement Act of 1991. 11 U.S.C. §101(22A)(A) and (B).

Citibank satisfies none of those criteria in connection with its role as LBI's Designated

Settlement Member in CLS. In that role it was certainly not a counterparty of "the debtor

or any other entity," as provided for in Section 101(22A), much less under the six

enumerated categories of contracts listed in Section 561(a).[17]

Nor was Citibank a "swap participant." That term is defined in Section

101(53C) as follows:

---

[17] The six enumerated categories of contract referred to in Section 561(a) are "securities contracts," "commodity contracts," "forward contracts," "repurchase agreements," "swap agreements," and "master netting agreements." Citibank does not argue that it had any such contracts with LBI in connection with its provision of CLS services.

The term 'swap participant' means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor.

To be a "swap participant," therefore, Citibank had to have a "swap agreement" with LBI as that term is defined in the Code. Citibank wrongly asserts in a footnote that "the CLS Agreement and Letter Agreements are 'swap agreements' under the Code" (Defs' Mem. 20 n.11). As already shown, those CLS-related agreements are not "credit enhancements" or "security arrangements." The mere assertion that Citibank was a "financial participant" or a "swap participant" cannot turn those agreements into "swap agreements." The argument is circular, erroneously assuming the proposition Citibank is required to prove.

In truth, Citibank did not have any "swap agreement" with LBI in its role as LBI's Designated Settlement Member in the CLS system. Citibank's only agreements with LBI were those that established the CLS settlement services and the intraday lending facility Citibank maintained in connection with these services. Citibank and LBI were not counterparties to any "swap agreement" by virtue of their CLS relationship. Accordingly, Citibank was not a "swap participant" in connection with the CLS services it undertook as LBI's Designated Settlement Member.

Lastly, Citibank wrongly claims the CLS Agreement and the Letter Agreements created a "reimbursement obligation" that qualifies those agreements as "swap agreements" (Defs' Mem. 21). To the contrary, LBI did not have a "reimbursement obligation" in CLS as that expression is used in the safe harbors. While the term "reimbursement obligation" is not defined in the Bankruptcy Code, its proximity

to the term "guarantee" in clause (vi) makes it clear that it refers to the duty of a principal

obligor to pay back (*i.e.*, reimburse) a guarantor or surety who has previously made good

on the principal obligor*'s* debt. *See Union Switch & Signal, Inc. v. St. Paul Fire &*

*Marine Ins. Co.*, 226 F.R.D. 485, 488 (S.D.N.Y. 2005); RESTATEMENT (THIRD) OF

SURETYSHIP & GUARANTY § 21 (1996) ("the principal obligor has the duty to the

secondary obligor (a) to perform the underlying obligation to the extent that failure to do

so would leave the secondary obligor liable for performance that would entitle the

secondary obligor to *reimbursement* by the principal obligor.") (emphasis added).

Under the principle of *noscitur a sociis*, words listed together in a statute

should be "given related meaning." *Dole v. United Steel Workers of America*, 494 U.S.

26, 36 (1990); *In re Motors Liquidation Co.*, 447 B.R. 142, 148 (Bankr. S.D.N.Y. 2011)

(applying *noscitur a sociis* and interpreting the phrase "accidents or incidents" as having

meanings that are "separate" but "conceptually related").  As used in the safe harbor

definition here, "reimbursement obligation" is conceptually related to "guarantee" and

thus to the duty of the principal obligor to the guarantor or surety.

Significantly, the CLS Agreement between Citibank and LBI does not

contain or mention a "reimbursement obligation." Neither party acts as a guarantor or has

a secondary obligation to pay some third party. Rather, the agreement provides that LBI

is liable to Citibank "as Principal" and LBI has an obligation to "fund" its trades

(Hammerman Decl. Ex. 4, ¶¶ 1, 2). Citibank, in turn, is "fully responsible as principal [to

CLS Bank] for all obligations arising from" the settlement services Citibank provides in

the CLS system for its various customers such as LBI (CLS Bank Int'l Rules § 2.17(b) at

38, Hammerman Decl. Ex. 3; *see also* Defs' Mem. 21 (acknowledging Citibank to be "fully responsible as principal" for payments due to CLS Bank)).

### 4. The CLS Agreement and Letter Agreements Are Not "Related To" Any Actual Swap Transaction.

In considering its argument regarding the applicability of the safe harbor for "swap agreements," it is important to distinguish Citibank's very different role when acting as a counterparty to LBI in FX transactions carried out under an ISDA master agreement. Counterparties to FX swaps and forwards may claim the benefits of the safe harbors in appropriate circumstances. However, when acting in its capacity as LBI's Designated Settlement Member in the CLS system, Citibank was *not* a counterparty but a provider of settlement services and a lender granting intraday credit. The safe harbor provisions insulate a creditor from the normal incidents of bankruptcy only to the extent the creditor qualifies for safe harbor treatment because of its role in the transaction(s) at issue. *CVI GVF Master S.A.R.L. v. Lehman Bros. Holdings, Inc.* (*In re Lehman Bros. Holding*) 445 B.R 137 (safe harbor status applies only to commercial transactions with debtor where creditor is a swap participant).

Citibank nevertheless asserts, as noted in Point II.B.1 above, that the "underlying FX transactions . . . are plainly 'swap agreements'" (Defs' Mem. 20). If by this assertion Citibank intends to argue that the CLS Agreement and the Letter Agreements are themselves "swap agreements" simply because they are "related to" underlying FX transactions, its argument has no more weight than the others already addressed. <u>First</u>, there is nothing in the statutory language that turns an agreement into a

"swap agreement" simply because it is "related to" a "swap agreement." <u>Second</u>, Section

101(53B)(A)vi) on which Citibank relies includes a quantitative limitation which further

shows that this subsection is inapplicable to the CLS Agreement and the Letter

Agreements. Specifically, the definition of "swap agreement" in clause (vi) expressly

states that such damages are "not to exceed the damages in connection with any such

agreement or transaction, measured in accordance with section 562" of the Code.

Section 562, entitled "Timing of damage measurement in connection with

swap agreements, securities contracts, forward contracts, commodity contracts,

repurchase agreements, and master netting agreements," provides as follows:

> (a) If the trustee rejects a swap agreement, securities contract (as defined in section 741), forward contract, commodity contract (as defined in section 761), repurchase agreement, or master netting agreement pursuant to section 365(a), or if a forward contract merchant, stockbroker, financial institution, securities clearing agency, repo participant, financial participant, master netting agreement participant, or swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –
>
> (1) the date of such rejection; or
>
> (2) the date or dates of such liquidation, termination, or acceleration.

This language demonstrates that neither the CLS Agreement nor the Letter

Agreements is a "swap agreement" safe-harbored by Section 560 because none of those

CLS-related agreements can give rise to damages measurable under Section 562. Indeed,

the "losses that Citibank suffered from its provision of CLS services to LBI" (Defs'

Mem. 17 n.9), *i.e.*, the shortfall resulting from unpaid intraday credits in CLS, cannot

even be analyzed in terms of the methodology for calculating damages referred to in Section 562. As Collier explains, "termination and exercise of contractual remedies" in accordance with Section 562 "typically entails an acceleration of the outstanding obligations of the parties to the [swap transaction] and fixing damages by reference to the prevailing market price and values at the time of termination." 5 COLLIER ON BANKRUPTCY ¶ 562.01, at 562-3 (16th ed. 2011).

Thus, for example, damages for rejection or termination of an FX spot or forward trade under an ISDA master agreement must, under Section 562, be measured by reference to market price as of the earlier of the date of rejection or the date of termination. In such cases, the transaction would be safe-harbored up to the amount of the damages thus computed. Similarly, and in contrast to Citibank's CLS-related agreements, a guarantee or credit enhancement, such as a Credit Support Annex commonly used in connection with ISDA master agreements covering FX transactions, may indeed give rise to damages consistent with the methods set forth in Section 562 and thus would be safe-harbored. In other words, with respect to secondary level agreements such as "credit enhancements" and "security agreements or arrangements," only those that are integral to underlying swap transactions will give rise to damages that can be measured pursuant to Section 562.

The claim asserted by Citibank against LBI here in connection with CLS is different. The concept of a "prevailing market price" under Section 562 makes no sense at all with regard to the CLS Agreement and the Letter Agreements, which is not surprising – those agreements relate solely to Citibank's provision of settlement services,

not to participation in a trade as a counterparty. They do not reflect the kind of transactional conduct, such as bilateral FX trades, that could be interrupted by a bankruptcy filing and then repudiated by a debtor or trustee prior to settlement, giving rise to damages.

This reading of the statute finds further support in the legislative history. As Judge Buchwald recently explained, in enacting the safe harbor for swap transactions, "Congress intended to prevent a swap counterparty from remaining tied up in existing positions and from being exposed to risk associated with short-term market movements." *Swedbank* at 136. Moreover, "Congress was further motivated by the fairness considerations that support the even-handed netting of favorable transactions against unfavorable ones to determine a single net termination value." *Id.* These purposes have no application to Citibank's situation here. Unlike, for example, a guarantor in connection with an ISDA master agreement, there is no underlying swap agreement to which Citibank would have had any settlement risk exposure (such that it could be said to be at risk of being "tied up in existing positions" if it did not have a right to terminate). Nor for the same reason would Citibank ever be subject to a Trustee's "cherry-picking" of transactions such that "fairness" would dictate that Citibank engage in netting of transactions. *Id.* at 135-36.

In sum, the damages limitation in the definition of "swap agreement" underscores a basic difference between, on the one hand, the kinds of agreement contemplated by Congress in creating the safe harbor for such relationships and, on the other hand, the settlement services arrangement provided for in the CLS Agreement and

Letter Agreements.  The latter are *service* agreements – not FX or derivatives transaction agreements, or guarantees backing up such agreements.  Consequently, Citibank's purported setoff of the $1 billion deposit in connection with the shortfall that built up in relation to the CLS-related agreements is not entitled to safe harbor insulation.

**III.     The Doctrine of Equitable Recoupment Does Not Apply**
**in the Factual Circumstances Alleged in the Complaint.**

Citibank argues in the alternative that, even if Bankruptcy Code safe harbor protection does not apply, it can nevertheless invoke the doctrine of equitable recoupment to preserve its setoff of LBI's $1 billion deposit (Defs' Mem. 27-29) and implicitly to lift the stay as to the $260 million balance of Citibank's CLS-based claim (Citi Stay Mot. ¶ 90).  Citibank ties its argument to a single assertion – that LBI's $1 billion deposit and Citibank's provision of CLS settlement services were components of a single integrated transaction (Defs' Mem. 28).  In making this argument, Citibank relies on an incomplete and inaccurate statement of the law and ignores factual allegations in the complaint that make it clear the doctrine is inapplicable.

The recoupment doctrine originates in the law of equity and has been imported into bankruptcy through state case law. *Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),* 156 F.3d 131, 133 (2d Cir. 1998). The doctrine consists of "the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Affiliated of Fla., Inc., v. Mount Olive Pickle Co., Inc.* (*In re Affiliated of Fla., Inc.*), 258 B.R. 495,

499 (Bankr. M.D. Fla. 2000) (quoting 4 COLLIER ON BANKRUPTCY ¶ 553.03, at 553–15

(15th ed. 1995)) (emphasis in original). In the words of the Second Circuit:

> [r]ecoupment means a deduction from a money claim through a
> process whereby cross demands arising out of the same transaction
> are allowed to compensate one another and the balance only to be
> recovered. Of course, such a process does not allow one transaction
> to be offset against another, but only permits a transaction which is
> made the subject of suit by a plaintiff to be examined in all its
> aspects, and judgment to be rendered that does justice in view of the
> one transaction as a whole.

*Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002) (quoting

*Malinowski* at 133). While similar to setoff, recoupment is not subject to the setoff

limitations imposed by the Bankruptcy Code, such as the mutuality requirement of 11

U.S.C. § 553(a). *Malinowski* at 133. In the absence of such limitations, the equitable

recoupment doctrine is narrowly construed "[i]n light of the Bankruptcy Code's strong

policy favoring equal treatment of creditors and bankruptcy court supervision over even

secured creditors . . . ." *Westinghouse* at 147.

A creditor seeking the benefits of equitable recoupment must show (a) that

the recoupment claim arises out of a "single integrated transaction," and (b) that

recoupment would be equitable under the circumstances. *Id.* (denying recoupment

because the claims did not arise out of the same transaction and recoupment would be

inequitable); *Schachter v. Tolassi* (*In re 105 E. Second St. Assoc.*)*,* 207 B.R. 64, 69

(Bankr. S.D.N.Y. 1997) (allowing recoupment where debtor would otherwise obtain an

inequitable windfall). The Second Circuit takes a restrictive view of the "single integrated

transaction" requirement – the acts must be so closely related "that it would be

*inequitable* for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Westinghouse*, 278 F.3d at 147 (quoting *Malinowski* at 133) (emphasis in original). The existence of a single contract, for instance, does not compel the conclusion that there has been a single integrated transaction. "Where the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment." *Westinghouse*, 278 F.3d at 147.

Citibank's effort to bring itself within the equitable recoupment doctrine should be rejected because the two required elements described above are missing. <u>First</u>, there was no single integrated transaction. The complaint makes clear that the net shortfall of $1,260,326,894 in LBI's CLS payments consisted of separate parts that accumulated under separate circumstances over the five-day period from September 15-19, 2008 (Compl. ¶¶ 42-44, 47-49, 96). Indeed, a shortfall of approximately $480 million arose on September 15 even *before* the $1 billion deposit was demanded (*id*. ¶ 96). Citibank therefore, is wrong in asserting that "in reliance on the $1 billion in security, Citibank extended billions of dollars of credit to LBI over that week, ultimately incurring losses of $1.26 billion" (Defs' Mem. 1). To the contrary, nearly a half billion dollars of its purported "losses" arose *before* LBI made the demanded $1 billion deposit. And when Citibank seized that deposit after the SIPC filing on September 19, nearly half of the funds were applied to a pre-existing debt. The fundamental premise of Citibank's factual basis for asserting equitable recoupment is thus mistaken.

Moreover, each of the subsequent incremental additions to the shortfall on September 16, 17 and 18 was preceded by a new agreement and new signed documentation. The shortfall on September 15 arose under the basic CLS Agreement in place since 2004 (Compl. ¶ 96). The shortfall on September 16 arose under the 9/15/08 Letter Agreement signed the previous afternoon, which modified the terms of the CLS Agreement in several respects, including provisions related to the $1 billion deposit (*id.* ¶¶ 33-35, 42-43, 47). The shortfall that arose on September 17, was governed by the 9/16/08 Letter Agreement, which further modified the CLS Agreement by, *inter alia*, limiting Citibank's settlement-related services to a maximum of $1 billion, i.e., "to the aggregate amount in effect from time to time of the LBI deposit placed with Citibank" (*id.* ¶¶ 36-38, 43, 47). Thereafter, LBI was unable to provide additional cash and Citibank instead entered into a separate transaction with Barclays under which a $700 million pledge was provided as a condition for continued provision of CLS settlement services (*id.* ¶¶ 44-46). The shortfall on September 18 and 19 would not have arisen absent the Barclays Pledge. Citibank's description of this sequence of events as a "single, integrated transaction" conflates a series of separate events that occurred over time and are reflected in separate agreements.[18]

Second, the equities do not favor Citibank. Most obviously, Citibank's demand for the $1 billion dollar deposit, with a gun to LBI's head (Compl. ¶¶ 31-37),

---

[18] Citibank places mistaken reliance on *In re Yonkers Hamilton Sanitarium Inc.,* 22 B.R. 427 (Bankr. S.D.N.Y. 1982) , *aff'd, 34 B.R. 385 (S.D.N.Y. 1983)*, which involved overpayments by the government under a single provider agreement for Medicare services, a typical equitable recoupment scenario. Those facts are far removed from the allegations here.

does not satisfy the test for equitable conduct. In addition, the demand was made *after* a $480 million shortfall had already arisen, so that the deposit was effectively an improvement in position (*id*. ¶ 96). Neither the Bankruptcy Code nor state law favors such tactics. *See* 11 U.S.C. § 553(b) (authorizing avoidance based on improper improvement in position); *Menkes Feuer, Inc. v. Peoples Bank of Johnstown,* 43 N.Y.S.2d 32, 35-36 (N.Y. Sup. Ct. 1943), *aff'd*, 268 A.D. 809, 48 N.Y.S.2d 593 (N.Y. 1944) (build-up of deposits for setoff against depositor's prior indebtedness to bank created illegal preference); *Bernstein v. Alpha Assoc., Inc.* (*In re Frigitemp Corp.*), 34 B.R. 1000, 1018 (S.D.N.Y. 1983)*, aff'd*, 753 F.2d 230 (2d Cir. 1985) (applying New York law).

Further, Citibank's build up of an increasingly large CLS shortfall, contrary to the express terms of the parties' Service Level Agreement and past practice, together with the bank's insistence upon the $1 billion deposit, allowed Citibank to drain critical assets from LBI at the expense of customers in the event of a SIPC filing (*id*. ¶¶ 42-44, 47-49, 81, 90). Even if Citibank assumed Barclays would cover the shortfall when it acquired LBI (a key factual question that requires discovery), the assumption proved misplaced. It cannot justify Citibank's unilateral attempt to reallocate LBI assets to itself and away from LBI's customers, who are entitled to paramount protection under SIPA. *See Ferris, Baker Watts, Inc. v. Stephenson* (*In re MJ K Clearing, Inc.*), 286 B.R. 109,

129 (Bankr. D. Minn. 2002), *aff'd*, 2003 WL 1824937 (D. Minn.) *aff'd*, 371 F.3d 397 (8th

Cir. Minn.) 2004).[19]

Finally, as explained in greater detail in Point IV.A, below, Citibank placed

the $1 billion deposit in an administrative hold account on September 19 and did not get

around to transfering the funds to its own proprietary account until *after* the SIPA filing

(Compl. ¶¶ 50-55). The deposit of funds in a bank's administrative hold account does not

constitute the bank's "taking of possession of [the depositor's] property nor an exercising

of control over it" as a matter of law. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16,

21 (1995). Accordingly, Citibank did not accomplish its purported setoff until after the

automatic stay had taken effect. Such post-petition conduct was inequitable, and it further

bars Citibank's resort to the doctrine of equitable recoupment.

## IV. *Citibank's Alternative Arguments to Preserve its $1 Billion Setoff and Escape Return of LBI Funds Are Without Merit.*

Besides its safe harbor and equitable recoupment theories, Citibank asserts

various "independent" grounds for upholding its setoff of the $1 billion deposit and claim

to funds still frozen in LBI bank accounts at offices of Citibank and affiliates around the

world. These arguments require resolution of disputed facts or are simply wrong as a

matter of law. None supports dismissal of the Trustee's claims on a Rule 12 (b)(6)

motion.

---

[19]  The fact that a SIPA trustee is charged with the protection of customers and is granted asset reallocation rights that are qualitatively different from those of a bankruptcy trustee undermines any claim of a "windfall" to the debtor here and may explain why there has never been a reported case under SIPA in which a non-customer creditor has been allowed a right of equitable recoupment.

***A.***         ***The $1 Billion Setoff Was a Post-Petition Violation of the § 362(a) Stay.***

Citibank argues that its purported setoff of the $1 billion deposit was made before SIPC filed its proceeding for liquidation (Defs' Mem. 30-32). The facts alleged in the complaint, however, indicate otherwise. The complaint avers that on September 19, 2008, at 1:13 p.m. EST, Citibank moved the $1 billion deposit from an account denominated "Lehman" to a "Citibank administrative hold account used to hold funds on a temporary basis pending further instruction" (Compl. ¶ 50). The law is clear that a bank's placement of its customer's funds in an administrative hold account is "neither a taking of possession of [the customer's] property nor an exercising of control over it," both of which are required to achieve a setoff. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. at 21.

Citibank evidently recognized that the movement of LBI's deposit to an administrative hold account was insufficient. As alleged in the complaint, it was not until after the 1:23 p.m. SIPA filing that Citibank notified LBI of its purported setoff, and almost two hours passed after the filing before the money was finally placed in a proprietary account (*id*. ¶¶ 52-54). Accordingly, the critical conduct was post-petition, as alleged in the complaint.

Citibank never squarely addresses the fact that LBI's $1 billion deposit was in an administrative hold account at the time of the SIPA filing (the term is not even mentioned in its argument), but instead focuses on various indicia of an intent to set off discussed in such decisions as *Baker v. Nat'l City Bank*, 511 F.2d 1016, 1018 (6th Cir. 1975). None of the cases cited by Citibank, however, deals with the timing question at

issue here.  All make it clear that whether and when a setoff has occurred is an intensively factual issue. The Trustee's complaint, at a minimum, raises substantial issues of fact regarding Citibank's claim that its setoff was pre-petition, which compels denial of the motion to dismiss.

**B.     *The $1 Billion Was Improperly Applied Against Existing Debt.***

It is elementary that a setoff will be disallowed to the extent the deposited funds were demanded in order to be set off against already existing debt. 11 U.S.C. §553(a)(3); *Official Comm. of Unsec. Creditors  v. Mfrs. and Traders Trust Co.* (*In re Bennett Funding Group, Inc.*), 146 F.3d 136, 140 (2d Cir. 1998). This is the gravamen of Count VI of the complaint (¶¶ 85-90). Citibank objects that it "did not receive the deposit for the purpose of obtaining a right to set off existing debt, but instead to secure Citibank's *future* extension of credit to LBI for CLS services" (Defs' Mem. 32) (emphasis in original). But the complaint alleges precisely the contrary.

The $1 billion deposit was demanded on the afternoon of September 15, 2008, as a precondition to Citibank's continuing with CLS services the next day. As of that point, LBI had already incurred a shortfall of $480 million based on settlements during September 15 (Compl. ¶¶ 33, 39, 96). Positioning oneself to eliminate nearly a half billion dollars in indebtedness already incurred is not the same thing as arranging protection for anticipated future extensions of credit.

Citibank argues that because LBI brought in the sum of $700 million on September 15 and because another $300 million was already in the bank (albeit in another account), the $1 billion total somehow must have been "clearly intended to

secure Citibank's *future* extensions of credit" (Defs' Mem. 33) (emphasis in original).

The argument is both incoherent and wrong as a matter of law. It is incoherent because it

ignores the pre-existing shortfall, and assumes without foundation that the parties

expected future shortfalls to arise despite the ordinary course of business practice that

required zeroing out of CLS balances at the end of each business day (Compl. ¶ 96). A

setoff may be avoided where "'the deposits are not accepted in the ordinary course of

business, or are procured, accepted or built-up for the real purpose of permitting the bank

to obtain a setoff,'" *Union Cartage Co. v. Dollar Sav. & Trust Co.* (*In re Union Cartage

Co.*), 38 B.R. 134, 139 (Bankr. N.D. Ohio 1984); quoting 4 COLLIER ON BANKRUPTCY ¶

553.15[3] (15th ed. 1982); *see also N.J. Nat'l Bank v. Gutterman* (*In re Applied Logic

Corp.*), 576 F.2d 952 (2d Cir. 1978).

   Citibank's argument also must be rejected because it completely lacks

evidentiary support based on the current state of the record – i.e., the complaint.

Citibank's memorandum cites to the 9/15/11 Letter Agreement and paragraph 34 of the

complaint as supposed grounds for claiming the deposit was solely to cover "future

extensions of credit" (Defs' Mem. 33). But they say nothing other than that the $1 billion

deposit was required so that "Citibank would continue to serve as the Designated

Settlement Member," not that it would provide further intraday loans (*see* Hammerman

Decl. Ex. 5, ¶ 6; Compl. ¶ 34).

   In fact, the CLS Agreement remained in effect (to the extent not amended

by the Letter Agreements) and the granting of credit continued to be at Citibank's

discretion, as its motion emphasizes (Defs' Mem. 12, 15). Nothing in the record supports

its assertion that the $1 billion deposit was "intended" solely to back up future credit and not be applied against the existing $480 million shortfall. Citibank also fails to take into consideration that LBI's instructions for payment to customers out of the funds on deposit were not honored on September 15 and 16, 2008, so that the $300 million likely included money that should have been used for those other payments, rather than being made part of the $1 billion deposit (Compl. ¶ 96).[20] Bankruptcy Code Section 553(a)(3) "prevents the courts from rewarding creditors who persuade a debtor to engage in conduct which has the effect of impermissibly improving the creditor's position among other creditors." *Woodrum v. Ford Motor Credit Co.* (*In re Dillard Ford, Inc.*), 940 F.2d 1507, 1513 (11th Cir. 1991). In short, Citibank's purported defense to the Trustee's 553(a)(3) claim has not been, and cannot be, established on its Rule 12(b)(6) motion.

**C.      Citibank's Setoff Is Avoidable to the Extent It Improved Its Position.**

The Trustee has pleaded in the alternative claims for recovery of a portion of the $1 billion deposit to the extent it allowed Citibank to improve its position over the positions of LBI customers and other creditors during the 90 days preceding the SIPA filing (Compl. Counts VIII, IX). Citibank seeks to dismiss those counts on the ground that it supposedly "did *not* improve its position as a creditor at all" (Defs' Mem. 34) (emphasis in original). The crux of its argument is that the $480 million debt incurred through CLS settlements prior to the $1 billion deposit on September 15 was "secured" to

---

[20] The $300 million component of the $1 billion deposit undoubtedly contained funds belonging to LBI customers and affiliates whom LBI acted for in FX transactions. The complaint alleges that LBI engaged in such trading "mainly to facilitate its services to clients" (Compl. ¶¶ 16, 19), and the 9/15/08 Letter Agreement requires the $1 billion deposit not just for CLS services to LBI but also to an affiliate, Lehman Brothers Commercial Corporation (Hammerman Decl. Ex. 5).

the extent of the $300 million already in the bank on that date (*id.* 35-36). Citibank cites

Code Section 506(a)(1) as the authority for that assertion (*id.* 35). Thus, according to

Citibank, when the additional $700 million was added at the end of the day to form the $1

billion deposit, "Citibank had the right to set off its CLS exposure against any LBI

deposit, including the $300 million" (*id.* 35-36). Citibank's argument should be rejected

because it makes unsupported fact assumptions, and misconstrues the applicable law.

As to the facts, the argument wrongly extrapolates from the allegation in

the complaint that $300 million was already on deposit at Citibank on September 15

(citing Compl. ¶ 39) and on that basis alone concludes it was automatically subject to a

Citibank security interest. But the actual status of that deposit – including its sources and

purposes, whether customer funds were included and whether Citibank was aware they

were customer funds – has not been proven and requires further fact-finding. The

argument further improperly assumes Citibank had the right to set off against the $300

million. The complaint alleges, to the contrary, that Citibank failed to make payments

despite LBI's instructions and instead built up its position for setoff (Compl. ¶¶ 42, 86-

90, 96, 120). As discussed above, the build-up of deposits to set off against existing debt

vitiates a claim to setoff rights (*see* pp. 59-60 *supra*).

As to the law, Citibank's reliance on Section 506(a)(1) is misplaced. That

provision states in pertinent part:

> An *allowed claim* of a creditor secured by a lien on property in
> which the estate has an interest, or that is subject to setoff under
> section 553 of this title, is a secured claim to the extent of the value
> of such creditor's interest . . . or to the extent of the amount subject
> to setoff . . . [emphasis added].

The operative phrase in the text is "an allowed claim." Here, Citibank argues that the $300 million on deposit on September 15 was available to set off against the $480 million shortfall that arose in CLS on the same date (Defs' Mem. 36). That claim, however, has not yet been allowed since the Trustee has objected to it, and under Section 502 a claim is not deemed allowed if a party in interest objects. Indeed, the purpose of the current proceedings is to address Citibank's demand for allowance of claims and the Trustee's objections. So there is no allowed claim of $480 million upon which to base a Section 506(a)(1) argument.

The courts have consistently applied the improvement in position test to setoffs against bank deposits. *Togut v. Chemical Bank* (*In re Hecht*), 41 B.R. 701 (Bankr. S.D.N.Y. 1984) (holding that a bank improved its position by offsetting debtor's loan obligations against the debtor's bank account). *See also First Ambulance Ctr. of Tenn., Inc. v. Nationsbank* (*In re First Ambulance Ctr. of Tenn., Inc.*), 182 B.R. 198, 200 (Bankr. M.D. Tenn. 1995), *Pfau v. First Nat'l Bank, Pipestone, Minn.* (*In re Schmidt*), 26 B.R. 89 (Bankr. D. Minn. 1982), *Ohio-Erie Corp. v Bancohio Nat'l Bank*, (*In re Ohio-Erie Corp.*)*,* 22 B.R. 340 (Bankr. N.D. Ohio 1982), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005), *Duncan v. First Heritage Bank*, *(In re Duncan)* 10 B.R. 13 (Bankr. E.D. Tenn. 1980). None of these opinions even considers the possibility that Section 506(a) elevates the status of a setoff right to a secured claim before a petition has been filed. The cases cited by Citibank are distinguishable as involving genuine liens. *Union Cartage Co. v. Dollar Sav. & Trust Co.* (*In re Union Cartage Co.*)*,* 38 B.R. 134 (Bankr. N.D. Ohio 1984)

(pledge of collateral), *Howell v. Bank of Newnan* (*In re Summit Fin. Serv., Inc.*), 240 B.R. 105 (Bankr. N.D. Ga. 1999)(statutory lien under GA.CODE ANN. §11-4-210).

Finally, Citibank's interpretation of 553(b) and 506(a) contravenes the purpose of the "improvement in position" test – *i.e.* to discourage prepetition setoffs that would likely precipitate a bankruptcy filing and to encourage workouts. As stated in the legislative history:

> The concern of Congress in enacting the improvement in position test was that creditors, primarily banks, that had mutual accounts with the debtor would foresee the approach of bankruptcy and scramble to secure a better position for themselves by decreasing the "insufficiency," to the detriment of the other creditors. Such a circumstance would not be improbable if banks were allowed to take advantage of any improvement in their position in the ninety days before bankruptcy. A bank with a continuing relationship with the debtor could not only anticipate the bankruptcy filing, but also pressure the debtor to increase its deposits, or reduce its short-term loans to the debtor.

Report of the Committee on the Judiciary to Accompany H.R. 8200, H.R. NO. 95–595, 95th Cong., 1st Sess. at 186 (1977), reprinted in 1978 U.S.C.C.A.N. at 5787, 6145; s*ee Lee v. Schweiker,* 739 F.2d 870, 877 (3d Cir. 1984). Congress was aware that bank deposits could facilitate an improvement in position and that banks would be the creditors most likely to improve their positions by setoffs. The Committee noted specifically that "any increase during the three months before bankruptcy in the amount of the debt owing by the creditor to the debtor would not be permitted to be offset. In the bank context, for example, if a debtor had on deposit $5,000 three months before the filing of the petition and $8,000 on the date of filing, then only $5,000 could be offset." H.R. Rep. No. 95–

595, *supra*, 185. Accordingly, Citibank's request for dismissal of the improvement in position counts should be denied.

**D.      Citibank's Setoff Is Avoidable as a Constructive Fraudulent Conveyance.**

Counts XIII and XIV of the complaint seek avoidance of Citibank's setoff under the Letter Agreements as constructive fraudulent conveyances pursuant to Section 544(b) of the Bankruptcy Code and state law because they were entered into without fair consideration. Citibank seeks dismissal of these counts because it claims (i) the Letter Agreements did not contain avoidable obligations, and even if they did (ii) the complaint alleges facts that supposedly "demonstrate LBI received fair consideration in exchange for those Agreements" (Defs' Mem. 36). Neither argument has merit.

Section 544(b) permits avoidance of any transfer that may be avoided under applicable state law, such as the New York Uniform Fraudulent Conveyance Act, N.Y. DEBT. & CRED. LAW ("N.Y.D.C.L.") §§ 272-275.  Under the N.Y.D.C.L., "[a] transfer is constructively fraudulent if it was made without fair consideration and (1) the debtor is insolvent or will be insolvent; (2) the debtor is engaged in business and will be left with unreasonably small capital; or (3) the debtor intended or believed that it would incur debts beyond its ability to pay them as they mature."  *In re Norstan Apparel Shops, Inc.*, 367 B.R. 68, 77 (Bankr. E.D.N.Y. 2007) (upholding allegations of constructive fraudulent conveyance on motion to dismiss).

Here, the complaint alleges that Citibank exploited its superior bargaining position to "extract concessions from LBI" for its own benefit and to LBI's detriment (Compl. ¶¶ 31-32).  The concessions imposed on LBI were "conditions that were

materially different" from those previously in place, and were extracted from LBI on a "take-it-or-leave-it basis," thus "forcing LBI to make the $1 billion deposit" (*id.* ¶¶ 33, 36-37). The Trustee has thereby adequately alleged a lack of fair consideration sufficient to survive a motion to dismiss. *See also Enron Corp. v. Granite Constr. Co.* (*In re Enron Corp.*), 2006 WL 2400369 at *8 (Bankr. S.D.N.Y. May 11, 2006) (sustaining constructive fraudulent conveyance claim).

Against this Citibank argues, first, that the Letter Agreements and the setoff permitted thereunder cannot be avoided under Section 544(b) because those agreements "did not 'obligate' LBI to do anything that LBI had not already done, and did not grant Citibank any new rights that Citibank did not already have as a matter of contract and common law" (Defs' Mem. 37). Citibank cites no authority for that proposition, and it should be rejected. The basis for the argument seems to be that the $1 billion deposit "pre-dated the parties' entry into the Letter Agreement[s]" which supposedly means the Letter Agreements did not "obligate" LBI to make the deposit (*id.*). At most this argument simply raises an issue of fact as to the relative timing of the various acts in question, which cannot be resolved on a motion to dismiss.

But the argument is also nonsensical. It is undisputed that the parties agreed that $1 billion would be deposited as a condition precedent to Citibank's continuing to provide settlement services in CLS on September 16 and 17, 2008 (*see* Hammerman Decl. Ex. 5, ¶ 1; Ex. 6, ¶ 2). Indeed, the 9/16/08 Letter Agreement expressly refers to LBI's "obligations hereunder" (*id.* Ex. 6, ¶ 2). Moreover, even if the deposit were made before the 9/15/08 Letter Agreement had been signed, LBI's *performance* evidences an

agreement, not the lack of one, with undeniable obligations. *See Viacom Int'l v. Tandem Prod., Inc.*, 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) (performance without a writing "is strong circumstantial proof that the minds of the parties had met on the essential elements"), *aff'd*, 526 F.2d 593 (2d Cir. 1975).

Citi's second contention, that the Complaint does not "plausibly allege that LBI received less than 'fair consideration' for the [9/15 and 9/16/08] Letter Agreements" (Defs' Mem. 37) is likewise without merit. In case after case the courts have consistently held that whether "fair consideration" was received is a question of fact, the resolution of which "cannot be determined on a motion to dismiss." *Tronox Inc. v. Anadarko Petroleum Corp. & Kerr-McGee Corp.* (*In re Tronox Inc.*), 429 B.R. 73, 97 (Bankr. S.D.N.Y. 2010); *see, e.g., Pryor v. Fisher & Donnelly* (*In re Dimino*), 429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010) ("Whether a transfer is for 'reasonably equivalent value' is largely a question of fact, the determination of which 'depends on all the circumstances surrounding the transaction.'"); *accord Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., Ltd.*, 375 F. Supp. 2d 257, 269 n.5 (S.D.N.Y. 2005); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F.Supp.2d 79 (S.D.N.Y. 2008)

The cases relied upon by Citibank are readily distinguishable. Several were decided on a motion for summary judgment, not on a motion to dismiss *Geron v. Palladin Overseas Fund Ltd.*, (*In re AppliedTheory Corp.*), 323 B.R. 838, 839, (Bankr. S.D.N.Y. 2005), *Stratton v. Equitable Bank*, *N.A.*, 104 B.R. 713 (D. Md. 1989), *aff'd*, 912 F. 2d 464 (4th Cir. 1990), and *Cuevas v. Hudson United Bank* (*In re Silverman Laces, Inc.*), 2002 WL 31412465 (S.D.N.Y.). Another, *Gala Enter., Inc. v. Hewlett Packard*

*Co.*, 989 F. Supp. 525 (S.D.N.Y. 1998), was rendered after an evidentiary hearing, and *In re Middendorf*, 381 B.R. 774 (Bankr. D. Kan. 2008) concerned stipulated facts. Although *In re Old CarCo LLC*, 435 B.R. 169, 186 (Bankr. S.D.N.Y. 2010) was decided on a motion to dismiss, it was only *after* the parties had substantial pre-complaint discovery pursuant to Bankruptcy Rule 2004. In any event, the case is not on point because there the court concluded that "significant value received by [debtor] pursuant to the overall transaction" was admitted elsewhere in the complaint. *Id.* at 178, 187.

The remaining cases are similarly inapposite. In *Sharp Int'l Corp. v. State St. Bank & Trust Co.) (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005), plaintiff "acknowledge[d] that the payment at issue discharged an antecedent debt and was made for a 'fair equivalent,'" leaving only plaintiff's argument that fair consideration was lacking because the transferee did not receive the payment in good faith, which the court rejected as a matter of law. In *Vargas Realty Enter., Inc. v. CFA W. 111 St., L.L.C. (In re Vargas Realty Enters., Inc.*, 440 B.R. 224 (S.D.N.Y. 2010) the fraudulent conveyance claim was rejected as a matter of law because the relevant contract was misinterpreted. *Id.* at 240. And the court in *In re Hydrogen, L.L.C.*, 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010), held that there was "a complete absence of facts" to support a fraudulent conveyance claim concerning bonuses and other compensation paid to defendants during the two-year period prior to bankruptcy.

Finally, Citibank challenges the absence of fair consideration by purporting to identify three distinct "forms" of such consideration (Defs' Mem. 38). Upon inspection all three amount to the same item – Citibank's "agreement" to continue to provide

services under the CLS Agreement.[21] In Citibank's view, this constituted valuable consideration because it otherwise "had the unilateral right to terminate the CLS Agreement entirely" following LBHI's Chapter 11 filing and agreed not to do so (*id.*). The argument is specious. As this Court has held, a contractual provision that provides for termination of an agreement with a Lehman entity based on its parent company's bankruptcy filing is void as an impermissible *ipso facto* clause. *Lehman Bros. Spec. Fin. Inc. v. BNY Corp. Trustee Serv. Ltd.*, (*In re Lehman Bros. Holdings Inc.*) 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010). Because Citibank was not entitled to terminate the CLS Agreement with LBI based merely on LBHI's bankruptcy filing, its "agreement" to continue to provide such services pursuant to that agreement, did not, and could not, provide "fair consideration" to LBI as a matter of law.

**E.     *Citibank's $1 Billion Setoff Is Avoidable Under Section 547.***

The complaint alleges in Counts IV and V that the setoff should be avoided and the funds recovered under Sections 547 and 550 of the Bankruptcy Code as a preference. Citibank does not deny that the complaint adequately alleges each of the requisite elements of a claim for preference, as well as for recovery under Section 550, but argues that the claim is nevertheless deficient because supposedly (i) §547 does not apply in setoff situations, and (ii) the parties intended "a contemporaneous exchange of

---

[21]  Citibank contends the complaint "acknowledges that LBI (and its customers and creditors) benefited enormously from Citibank's resumption of CLS services" (Defs' Mem. 38). In reality, the complaint alleges the contrary (Compl. ¶¶ 32, 37). As it turned out, Citibank's acts led to a shortfall of at least $1.26 billion, and its demand for, and purported setoff of, the $1 billion deposit stripped the LBI estate of funds that should have been available to pay back customers (*id.* ¶ 59).

value protected under 11 U.S.C. §547(c)(1) (Defs' Mem. 39-40). The first argument is incorrect in view of the complaint's allegations, and the second raises issues of fact that cannot be resolved on a motion to dismiss.

Citibank argues first that it effected a *pre petition* setoff, which is governed by Section 553 of the Bankruptcy Code and therefore cannot be challenged under Section 547 (Defs' Mem. 40). That misstates the rule. The courts first examine whether the requirements of Section 553 have been satisfied and, if not, then Section 547 applies. "In circumstances where a prepetition setoff is asserted in defense to an adversary proceeding brought by a trustee seeking to avoid a preferential transfer, the court must first determine whether the setoff is valid under Section 553." *King v. Fulbright & Jaworski, LLP* (*In re Koch*), 224 B.R. 572, 575 (Bankr. E.D. Va. 1998) (citing *Durham v. SMI Indus. Corp.*, 882 F.2d 881, 882 (4th Cir. 1989); *see also Petersen v. State Emp. Credit Union* (*In re Kittrell*), 115 B.R. 873 (Bankr. M.D.N.C. 1990).

A setoff is invalid and no setoff right exists in bankruptcy if the limitations of Section 553 of the Bankruptcy Code apply. If a setoff of the kind prohibited by §553(a)(2) and §553(a)(3) has been attempted prepetition, it may be subject to attack as preference. 5 COLLIER ON BANKRUPTCY ¶ 553.09[1][c][ii] (16th ed. 2010).

The $1 billion deposit in this case is a classic example of conduct prohibited by Section 553(a)(3). It (i) constitutes debt owed to LBI by its creditor, Citibank, (ii) incurred "after 90 days before the date of the filing of the petition," (iii) "while the debtor was insolvent," and (iv) "for the purpose of obtaining a right of setoff against the debtor" (Compl. ¶¶ 33-35, 71, 80). Since Citibank's purported setoff falls

within those criteria, it is not exclusively governed by Section 553 and becomes subject to challenge under Section 547.

Here, the seizure of the funds on September 19 constituted an involuntary transfer of LBI's property to Citibank, under the terms of 547(b)(1) (Compl. ¶ 50-53). The transfer was on account of the shortfall that had accumulated from September 15 through September 19, 2008, and it was made on the date of the filing of the petition, as required by 547(b)(2) and (4) (Compl. ¶ 43-44, 47-49). Since there were insufficient funds to satisfy all the creditors' claims, the transfer enabled Citibank to receive more than it would receive in a hypothetical chapter 7 liquidation (Compl. ¶ 75-82). Hence, all facts pertinent to the preference claim have been sufficiently stated.

Citibank's second argument is that two of the exceptions under Section 547 apply – the "contemporaneous exchange" exception in §547(c)(1) and the subsequent "new value" exception in §547(c)(4). But these exceptions are affirmative defenses that must be proven as matters of fact. They cannot support dismissal of a preference claim for failure to state a claim. *Dixon & Graiber, Jr. v. Am. Cmty. Bank & Trust.* (*In re Gluth Bros. Const., Inc.*), 424 B.R. 379, 398 (Bankr. N.D. Ill. 2009) (argument based on §547(c) is irrelevant for purposes of a motion to dismiss, since preference exceptions are affirmative defenses), (citing *Tamayo v. Blagojevich,* 526 F.3d 1074, 1090 (7th Cir. 2008)).

In addition, Citibank bases its argument on assertions of fact that conflict with the allegations of the complaint, alleging, for example, that the only relevant "transfer" for purposes of Section 547 was LBI's deposit of $700 million on September

15 (Defs' Mem. 40). The complaint does not so allege and indeed emphasizes that a total of $1 billion was deposited, including $300 million that was specifically moved with the $700 million out of an existing account into a newly-established off-shore account at Citibank Nassau in the Bahamas (Compl. ¶ 39). Moreover, Citibank claims the parties "*intended* . . . a contemporaneous exchange for new value" and a "substantially contemporaneous exchange" (Defs' Mem. 40) (emphasis added). Again, that is contrary to the allegations in the complaint, which point out that the deposit was made after a $480 million debt arose in CLS settlements on September 15 and that Citibank obtained the deposit for setoff in respect of that pre-existing debt (Compl. ¶¶ 54-56, 96).

Citibank has no basis in the record to claim that the requisite kind of "transfer" occurred or that a contemporaneous exchange or giving of subsequent new value was "intended." A bank deposit differs from other payments or transfers of money or property as contemplated by Section 547, since it creates a debt owed to the depositor by the bank and does not constitute parting with property by the depositor. *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964 (2d Cir. 1977), *cert. denied*, 98 S. Ct. 1250 (U.S.N.Y. 1978). "[A] deposit of money to one's credit in a bank . . . is not a transfer of property as a payment, pledge, mortgage, gift or security." *N.Y. Cnty. Nat'l Bank v. Massey*, 192 U.S. 138, 147 (1904). Moreover, the complaint avers that LBI expected to be able to receive the funds back, and that its Treasurer in fact requested the return of the funds on September 19 (Compl. ¶ 51). These allegations raise questions of fact both as to what the parties intended and whether the deposit constituted an actual parting with LBI's property. *Tyler v. Swiss Am. Secs., Inc.* (*In re Lewellyn & Co. Inc.*), 929 F.2d 424, 427

(8th Cir. 1991) ("The existence of intent, contemporaneousness, and new value are questions of fact."). The Section 547 counts should be sustained.

## F.     *The Complaint States a Valid Claim for Equitable Subordination.*

Count XVII of the complaint alleges equitable subordination in general terms, incorporating by reference paragraphs that allege at least four categories of inequitable conduct – (i) the compulsion under duress of the $1 billion deposit to be used in part against an existing indebtedness (Compl. ¶¶ 31-32); (ii) engagement in CLS settlements far in excess of the $1 billion LBI deposit despite the commitment in the 9/16/08 Letter Agreements to cap LBI's exposure in CLS at that aggregate amount (*id.* ¶47); (iii) the build-up of an unprecedented shortfall in connection with Citibank's granting of intraday credits that should have been zeroed out at the end of each business day (*id.* ¶¶ 43-44, 47-49); and (iv) the post-petition setoff of the $1 billion deposit and freezing of bank accounts coupled with returning the $700 million Barclays Pledge to Barclays (*id.* ¶¶ 45-46, 50-57).

Citibank's return of the Barclays Pledge is of special concern. Citibank had an unequivocal legal right, memorialized in a detailed written agreement (Hammerman Decl. Ex. 8) to use Barclays' $700 million in cash collateral to cover the debt incurred in connection with CLS. That was, after all, the purpose of the deposit. But instead of using that security to reduce its claim against the LBI estate from $1.26 billion to $526 million, Citibank acceded to Barclays' request to return the money on November 13, 2008, less than two months after the LBI petition was filed and without any notice to the Trustee or

to the Court.[22] The conduct is so manifestly unfair to LBI's customers (who are specially

protected under SIPA) and other creditors, in addition to providing unjust enrichment to

Barclays (a uniquely positioned insider), as to be unconscionable, and it alone warrants

equitable subordination of Citibank's claims.  *See 80 Nassau Assoc. v. Crossland Fed.*

*Sav. Bank* (*In re 80 Nassau Assoc.*)*,* 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting

*In re Tampa Chain Co.,* 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985); *In re Hydrogen,*

*L.L.C.,* 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010).

Citibank attacks the equitable subordination claim on the ground that the

complaint does not allege conduct that is sufficiently "egregious" or that shows "any

harm to LBI's customers and creditors or any unfair advantage to Citibank" (Defs' Mem.

46-47).  That is not so.  As this Court has stated:

> Inequitable conduct is that conduct which may be lawful, yet
> shocks one's good conscience. It means, *inter alia*, a secret or
> open fraud, lack of faith or guardianship by a fiduciary; an
> unjust enrichment, not enrichment by bon chance, astuteness
> or business acumen, but enrichment through another's loss
> brought about by one's own unconscionable, unjust, unfair,
> close or double dealing or foul conduct.

(citations omitted). *In re 80 Nassau Assoc.*, 169 B.R. at 837.  The conduct alleged in the

complaint satisfies these criteria.

### 1.      *The Elements of Equitable Subordination*

The doctrine of equitable subordination exists precisely to address

circumstances such as those presented here. Bankruptcy courts have available the full

---

[22] The return of the Pledge is subject to an indemnification agreement, but Citibank has shown no
inclination to exercise whatever rights it has thereunder.

panoply of equitable remedies, including subordination. *Pepper v. Litton*, 308 U.S. 295, 304 (1939). The courts "regularly apply" the three-part standard set forth in *Benjamin v. Diamond* (*In re Mobile Steel Co.*)*,* 563 F.2d 692, 700-701 (5th Cir. 1977), to determine whether equitable subordination is appropriate. *Adelphia Commc'n Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'n*), 365 B.R. 24, 68 (Bankr. S.D. N.Y. 2007), *aff'd*, 390 B.R. 64 (S.D.N.Y. 2008). The three prongs of the standard are whether (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with bankruptcy law. *In re Mobile Steel Co.,* 563 F.2d at 692. Where the creditor is an "insider," courts have applied the doctrine upon a lesser showing of misconduct. *Id.*

Determining whether someone is an insider – like evaluating the fairness of conduct – is a "highly fact intensive question." *Liberty Mut. Ins. Co. v. Leroy Holding Co. Inc.,* 226 B.R. 746, 755 (N.D.N.Y. 1998). The "courts have uniformly held that the Bankruptcy Code's definition [of an insider in §101(31)] is merely illustrative and that the term insider must be flexibly applied on a case-by-case basis [utilizing] a wide variety of factors, including whether the creditor:  (i) received information from the debtor that was not available to other creditors, shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) selected new management for the debtor; (iv) had special access to the debtor's premises and personnel; (v) was the debtor's sole source of financial support; and (vi) generally acted as a joint venturer or prospective

partner with the debtor rather than an arms-length creditor." *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 499-500 (S.D.N.Y. 1994) (internal citations omitted).

A motion to dismiss – prior to discovery and without the development of any factual record – is not the vehicle for making a determination as to insider status. Still, there can be no question that Barclays was a quintessential insider in relation to LBI. Its impending acquisition of LBI assets, for example, not only gave it access to information not available to other creditors, shareholders and the general public, but also gave it enormous influence on LBI's decisions. *See Liberty Mut. Ins. Co.,* 226 B.R. at 755; 11 U.S.C. §101(31). This Court is sufficiently familiar with the circumstances of Barclays' dealings with LBI to appreciate that these and many of the other factors enumerated above apply. *See In re Lehman Bros. Holdings Inc.,* 445 B.R. 143, *et seq.*

The complaint contains allegations sufficient to support a finding upon a fully-developed factual record that Citibank acted in concert with Barclays and should be deemed an insider for purposes of equitable subordination. Indeed, Citibank had an explicit agreement with Barclays and did Barclays' bidding, enabling Barclays to acquire LBI's assets at a deep discount without having to honor its pledge. In any event, while the appropriate standard here is likely to be that applicable to an insider, Citibank's actions also meet a standard of "egregious, improper or wrongful conduct that damages creditors," which is a proper basis upon which to apply the doctrine of equitable subordination. *Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*)*,* 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd,* 2009 WL 2900 247 (S.D.N.Y.).

## 2.    *Applying Equitable Subordination Here*

Each of the three *Mobile Steel* elements for establishing a basis for equitable subordination is present here. The conduct by Citibank was inequitable, it harmed LBI's creditors (particularly its customers), and subordination of Citibank's claims would fully accord with bankruptcy law. Indeed, Citibank's return of the Barclays Pledge was the final chapter in a pattern of conduct that exalted its own interests and its anticipated relationship with Barclays over the rights of LBI's customers in a manner flatly contrary to the mandate of SIPA.

The pattern begins with Citibank's permitting the shortfall at the outset, commencing on September 15, which violated the parties' Service Level Agreement and apparently departed from the ordinary course of business in CLS. Citibank had, as it acknowledges, complete discretion whether to advance intraday credit in the CLS settlement process (Defs' Mem. 12). Both Letter Agreements include as material terms the proviso that Citibank would limit the extent of its assistance in settlements only "up to the aggregate amount of deposits" (Hammerman Decl. Ex. 5, ¶ 6, Ex. 6, ¶ 5). But instead of controlling the settlement process to prevent further daily shortfalls and drawing on the Barclays Pledge to cover whatever shortfall arose, Citibank allowed the aggregate shortfall to continue to build, ultimately to over $1.26 billion (Compl. ¶¶ 47-48).

The next chapter was Citibank's coercive demand for the $1 billion deposit. This was expressly stated to be available for setoff, including against a pre-existing $480 million debt that had already been incurred on the first day of the week, a clear violation

of bankruptcy principles and state debtor-creditor law (*see* pp. 57-58, 61-62, 63-66 *supra*). Then came the SIPA filing, followed by Citibank's purported setoff of the $1 billion deposit and its freeze on over $300 million in LBI bank accounts around the world. These were funds that should have remained potentially available for return to customers.

Finally and most egregiously, Citibank decided to return the $700 million deposit to Barclays and forgo the exercise of legal rights that would have reduced its claim against the LBI estate to under $600 million (Compl. ¶ 57).

Seen as a whole, the conduct is unconscionable. Citibank, in connection with an indebtedness that it facilitated and that never should have occurred, compelled the redeployment of LBI assets for its own benefit and turned its back on protection provided by an insider that benefited financially from Citibank's collaboration. Unless checked by the Court, Citibank will literally have shifted the loss from Barclays and itself to LBI's customers. Citibank's conduct is fundamentally at odds with "the broad principles underlying SIPA [which are] its objective of giving priority treatment to customers of a liquidating broker." *In re Lehman Bros. Holdings Inc.*, 445 B.R. at 195. *See also SIPC v. Barbour,* 421 U.S. 412, 413 (1975) ("[SIPC] was established by Congress . . . for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit."); *Stafford v. Giddens* (*In re New Times Secs. Servs. Inc.*)*,* 463 F.3d 125, 127 (2d Cir. 2006). In sum, the equitable subordination claim should be sustained.

*G.*     *The Complaint States a Claim for Breach of Contract.*

Count XIX of the complaint alleges that the Letter Agreements, which were both drafted by Citibank, amended and placed limitations upon the scope of CLS settlement services provided for in the CLS Agreement (Compl. ¶¶ 145-47). These were strict contractual limitations on the scope of payments Citibank would make on behalf of LBI in CLS, thereby controlling the extent to which LBI would be subject to setoff for exposure to a shortfall in repayment of intraday credits (Hammerman Decl. Ex. 5, 6). As discussed above, Citibank violated those limitations when it engaged in settlement services for LBI in amounts greater than the aggregate of $1 billion and enabled the build-up of a shortfall of at least $1.26 billion during the week of September 15, 2008.[23]

In moving to dismiss this count, Citibank professes to find the breach of contract claim "bewildering" and "baffling," and then proceeds to ignore its substance completely (Defs' Mem. 47-48). Citibank asserts that nothing in the Letter Agreements "purports to limit Citibank's setoff rights" (*id*. 47). This sidesteps the gravamen of the claim, which is that LBI's exposure to CLS-related activity conducted by Citibank on its behalf would be *limited to the $1 billion sum* on deposit. In view of this restriction, Citibank's conduct is an obvious breach of contract – the allowance of a shortfall that *exceeded* the deposit by a quarter of a billion dollars.

---

[23] The Letter Agreements are ambiguous as to whether the limitation is upon overall settlement volume or net settlement volume. In either case, Citibank permitted activity that vastly exceeded "the aggregate amount in effect from time to time of the LBI deposit placed with Citibank" pursuant to the Letter Agreements (Hammerman Decl. Ex. 6, ¶ 5).

It is an elementary principle of New York law that a party that has committed a material breach of a contract is not entitled to enforce the contract or to exercise any rights otherwise provided in it to the detriment of the non-breaching party. *See, e.g., CarCo Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218, 246-47 (E.D.N.Y. 2009), *aff'd in part*; *vacated in* part, 383 Fed. Appx. 73 (2d Ci. 2010); *Global Crossing Telecomm., Inc. v. CCT Commc'n, Inc.* (*In re CCT Comm'n, Inc.*) 2008 WL 2705471 at *17 (Bankr. S.D.N.Y. July 2, 2008); *Walhout v. TFL, Inc. & Cent. Transp. Inc. (In re Tucker Freight Lines, Inc.)* 133 B.R. 76, 83 (Bankr. W.D. Mich. 1991), *aff'd*, 1992 WL 713902 (N.D. Mich.), *aff'd*, 991 F.2d 796 (6th Cir.(Mich.) 1993), *cert. denied*, 114 S. Ct. 306 (U.S. Mich. 1993) . Thus, as a result of its breach of the Letter Agreements, Citibank was not entitled to set off at all and, *a fortiori*, Citibank has no right to any "prospective setoff" (Defs' Mem. 47) above the $1 billion that was deposited with Citibank during the week of September 15.

The Letter Agreements also underscore a basic defect at the heart of Citibank's motion to dismiss. Citibank cannot invoke safe harbors as a magic bullet to terminate the Trustee's adversary proceeding *ab initio*. On the contrary, before any consideration is given to safe harbors, Citibank first must establish (i) that its claim is valid and (ii) that its setoff is otherwise permissible. In fact, the very Letter Agreements from which Citibank's purported setoff rights derive underscore this fatal flaw in Citibank's motion.

The 9/16/08 Letter Agreement states in Paragraph 6: "Citibank shall have the right at all times to set off the amount of the referenced deposit account against any

obligations of LBI under the CLS Agreement." In other words, the agreements at issue makes clear what should be obvious: that Citibank must establish *both the fact and the amount* of "any obligations of LBI under the CLS Agreement" before there can be a resolution of any issues relating to setoffs and safe harbors purportedly based on those obligations. Absent a showing of the substantive content of LBI's obligations as a matter of fact, Citibank can assert no contract rights.[24] And that fact issue cannot be finally determined on the present motion.

## H.  *The Trustee Should Be Granted Leave to Re-plead Actual Fraud.*

Counts XI and XII seek avoidance and turnover of the $1 billion seized by Citibank on the ground that it constituted a transfer made "with an actual intent to hinder, delay and/or defraud LBI's creditors and customers" under Code Section 548 (Compl. ¶¶ 111-117). Against these allegations, Citibank advances three main arguments for dismissal – (i) that the complaint "specifically alleges that LBI intended to *help* its customers and creditors" when it agreed to the $1 billion deposit; (ii) that the allegations of coercive conduct by Citibank do not amount to hindrance or fraud; and (iii) that the complaint does not adequately show that "*the transferor*, LBI, intended to 'hinder, delay or defraud' its creditors" (Defs' Mem. 42-44) (emphasis in original).

The first two arguments are without merit because they mischaracterize the allegations in the complaint and the requirements for pleading a Section 548 claim for

---

[24] In addition to Citibank's breach of the $1 billion limitation in the Letter Agreements, the Trustee has made other allegations which, if established, will materially reduce Citibank's claim, including the impact of its own risk management failures (Complaint ¶ 43) and its return of Barclays' $700 million pledge (Complaint ¶¶ 45-46 and 57).

relief, which requires allegations of "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted" 11 U.S.C. § 548(a)(1)(A). Fed. R. Civ. P. 9(b). *M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007).

Citibank argues that the complaint on its face alleges that it engaged in helpful and valuable conduct that contradicts any badges of "intent to hinder, delay or defraud" (Defs' Mem. 42-43). But the complaint emphasizes that the parties departed from agreed-upon practices during the week of September 15, 2008, knowing "that the effect of [Citibank's] action would be to undermine efforts to preserve as much of LBI's assets as possible for the benefit of LBI's customers and its creditors" (Compl. ¶ 32).[25] The complaint extensively pleads badges of fraud evidencing an intent to hinder, delay, or defraud creditors. *See* Compl. ¶ 33 (Citibank agreed [to] continue providing CLS FX settlement services to LBI, but only under limited conditions that were materially different from those provided for in the CLS agreement, including receipt of a deposit in the amount of $1 billion); Compl. ¶ 107 ("the Letter Agreements were executed on a rushed 'take-it-or-leave-it' basis without any meaningful negotiation between LBI and Citibank); Compl. ¶ 113, 121 ("LBI did not receive fair consideration, or fair equivalent, or reasonably equivalent value in exchange for entering into the Letter Agreements");

---

[25] Since the Trustee has asserted evidence of LBI's fraudulent intent, Citibank is wrong to analogize the pleadings here to those (*In re Old Carco LLC*) 435 B.R. 169, 192-95 (Bankr. S.D.N.Y. 2010), where the court dismissed claims for actual fraudulent conveyance where the trustee did not dispute evidence of transferor's non-fraudulent intent.

Compl. ¶ 146 ("LBI's $1 billion deposit had no precedent in LBI's relationship with Citibank as its Designated Settlement member under the CLS Agreement and constituted an extraordinary change in circumstances in that relationship").

As to Citibank's third argument, the Trustee acknowledges an absence in the complaint of a detailed pleading of acts by LBI demonstrating actual collusion in Citibank's improper conduct. If the Court concludes the claim lacks sufficient particularity, the Trustee respectfully requests leave to amend after a reasonable opportunity to take discovery. The Second Circuit has made it clear that such leave should be routinely granted unless the amendment would be futile. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 581 (2d Cir. 2005) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)) ("in cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity"); *Panther Partners Inc. v. Ikanos Commc'n, Inc.*, 347 Fed. Appx. 617, 620 (2d Cir. 2009) (stating Rule 9(b) complaints are "routinely allowed at least one opportunity to plead fraud with greater specificity"). The Trustee should be permitted discovery, and if he finds insufficient grounds to pursue a claim for actual fraud, he will not replead that count. Citibank's demand that the count be dismissed with prejudice should be denied.

I.    *The Claim Relating to the Smith Barney Note Should Be Sustained.*

Count XVI of the complaint seeks a declaratory judgment on a legal dispute arising out of Citibank's acquisition of the brokerage firm eventually known as Citibank Smith Barney. The complaint alleges the existence of a 1993 transaction between a

predecessor of LBI and Smith Barney that resulted in the issuance of a promissory note ("Buyer's Note") now held by the LBI estate (Compl. ¶ 133-34). The Buyer's Note covered certain vested benefits that would be due to various Smith Barney executives in the future under deferred compensation plans. As of the date of the complaint, Citibank retained the duty to pay out to LBI on the balance due under the Buyer's note but disclaimed having any such duty (*id.* ¶ 135). Accordingly, the Trustee seeks a declaratory judgment establishing his right to payment (*id.* ¶ 136).

Citibank asserts three arguments for dismissal. First, it argues that the communication of its refusal to pay came during settlement discussions, so it was improper for the Trustee to make the claim (Defs' Mem. 48-49). The objection is without merit. Citibank's refusal is not confidential information conveyed exclusively in settlement negotiations protected under Fed. R. Evid. 408. The same information was provided to a number of third parties and was not treated as confidential. Nor did Citibank object to the Trustee's reference to the refusal when the complaint was served or ask that it be removed from the pleading.

Second, Citibank argues that the Court should rule in its favor on the merits, relying upon copies of various agreements annexed to its motion papers (Defs' Mem. 52, referring to Hammerman Decl. Ex. 11, 12, 13). Citibank contends that these documents show that "the Trustee's claim has no merit on its face" (*id.* 52). The assertion is incorrect. Count XVI states a valid claim for relief on its face, but Citibank is, in effect, attempting by the submission of extrinsic evidence to obtain partial summary judgment resolving the count in its favor. That is improper on a Rule 12(b)(6) motion.

Moreover, Citibank's own fact-laden submission underscores the existence of clearly unresolved factual issues. For example, Citibank refers throughout its argument to "CGMI" (i.e., defendant Citigroup Global Markets, Inc.) as the responsible party (Defs' Mem. 40-49, 52), although the complaint makes no such allegation, and the documents it refers to do not mention CGMI. No ruling can be issued on a pre-answer motion to dismiss that brings such a key extrinsic fact into play.

In any event, Citibank is wrong on the merits. It argues that CGMI need not pay LBI unless LBI has already made payment to the former Smith Barney executives. Because the Trustee's first duty is to pay LBI customers, not general creditors such as the former executives, Citibank insists the required payment will not occur, and CGMI need not pay (*id*. 52). This is the Catch-22 referred to in the complaint (¶ 135). It reflects a misreading of the relevant document.

Specifically, the Buyer's Note sets forth straightforward "Demand Conditions" that do not require payment to the former Smith Barney executives as a triggering condition. Rather those conditions simply state that the appropriate "Demand Amount" (as defined) "shall have been paid" and that documentation of the payment and a written demand for reimbursement shall have been provided to the obligor (Smith Barney, Harris Upham & Co. Incorporated Buyer Note, dated July 31, 1993, p. 2, Hammerman Ex. 11). Thus, all the Trustee need do is make a payment from the LBI estate assets into an account for the benefit of creditors, including the former Smith Barney executives, and the payment requirement of the Demand Conditions will have been fully satisfied.

The Trustee requests in Count XVI that the Court declare that this interpretation of the relevant language is correct (Compl. ¶ 136). Not only is it consistent with the plain meaning of the Buyer's Note, but accepting Citibank's interpretation would be inequitable. Reading the words "Smith Barney executives" into the Buyer's Note, as Citibank suggests, would grant a windfall to the obligor. Should Citibank (or CGMI, as now contended) decide to pay those former employees directly instead of the Trustee, it would amount to a privately granted priority to a class of general creditors of LBI in circumvention of the authority of this Court.

Third, Citibank argues that under a 1993 Asset Purchase Agreement related to the Buyer's Note, the dispute over the payment terms is subject to binding arbitration (Defs' Mem. 51). But the sole basis for the Trustee's claim is the Buyer's Note itself, not the Asset Purchase Agreement. The Buyer's Note does not contain an arbitration clause, there is no incorporation by reference of such a clause, and Citibank does not state any basis for compelling the Trustee to accept such a remedy in connection with the note. Moreover, the arbitration clause in the Asset Purchase Agreement is what is known as a "narrow clause," excluding from arbitration a number of disputes including "disputes involving third-party claims which have not been settled" (Hammerman Decl. Ex. 11, §16.2 (c)(i)). Insofar as the Trustee is mandated under SIPA to give priority to customer (i.e., certain third-party) claims, it is arguable that this ambiguous narrow clause would not apply even if it explicitly appeared in the Buyer's Note. Where an arbitration clause is limited so that the scope of arbitration is unclear, the presumption of arbitrability does not

apply. *Kittay v. Landegger* (*In re Hagerstown Fiber L..P*), 277 B.R. 181, 198 (Bankr.

S.D.N.Y. 1998). For all these reasons, Count XVI should be sustained.

### V.     Citibank's Motion to Lift the Stay Should Be Denied.

The separate motion filed by Citibank in the SIPA case is substantially

duplicative in legal substance to its motion to dismiss in  the Adversary Proceeding.  It

differs in that it seeks affirmative relief that would enable it to unfreeze and seize LBI

deposits at Citibank branches and affiliates throughout the world. Three categories of

claims are covered by the motion –

> (i)     claims to set off LBI funds held at Citibank branches against
> the CLS shortfall that exceeds the $1 billion deposit Citibank has
> already purported to set off (Citi Stay Mot. 22-40, Items A.1-7);

> (ii)     claims to set off LBI funds held at Citibank affiliates' offices
> against debts owed by LBI to Citibank (*id*. 19-22, 30-31);

> (iii)     claims to net out cross obligations between LBI on the one
> hand and Citibank or its affiliates on the other hand (*id*. 8-22, Items
> I.A.1-7, II.1-5, III.A.1-3).

The motion should be rejected. The largest claims are predicated on the

same safe harbor arguments Citibank has advanced to justify its purported $1 billion

setoff. Such arguments are equally invalid with respect to the $260 million balance that

Citibank seeks to apply against funds still on deposit at its own branches and at the

offices of its affiliates. Moreover, Citibank has no right of setoff insofar as it is based on

claims against LBI by its affiliates. And even where safe harbor and triangular setoff are

not at issue, the motion ignores both fact issues relating to (i) the identity of funds on

deposit or constituting the substance of transactions and (ii) questions as to the

computation of the amounts asserted. Those issues cannot be resolved in the absence of discovery. Once that has occurred, there is a substantial likelihood that most if not all of the resulting amounts will become the subject of a consent order.

**A.      *Citibank May Not Seize Existing Deposits Based on the Safe Harbors.***

The lift-stay motion includes a lengthy section (Citi Stay Mot. 22-40) that essentially repeats the various arguments in Citibank's dismissal motion as to why its claims based on LBI's shortfall in relation to CLS should be considered subject to the safe harbor for "swap agreements." Citibank asserts that it is entitled to seize $260,326,894 out of funds in frozen bank accounts around the world to satisfy the balance of the unpaid debt left over after the $1 billion setoff on September 19, 2008. Such seizure, Citibank adds, should result in the reduction of sums it admits are owed to LBI by Citibank and certain of its affiliates in connection with certain specified relationships and transactions – namely,

- bilateral FX transactions, *i.e.*, not settled through CLS, in the amount of $60,015,440 (Citi Stay Mot. ¶¶ 13, 70),

- failed trades under an ISDA master agreement with defendant CGMI in the amount of $19,069,781 (*id.* ¶¶ 27-28, 71),

- securities lending involving both CGMI and Citibank in the amount of $8,358,995 (*id.* ¶¶ 31, 72),

- custody securities in the amount of $5,570,559 (*id.* ¶¶ 18, 73),

- pre-filing date deposits at both Citibank and certain affiliates in the amount of $139,946,592 (*id.* ¶ 74), and

- post-filing date deposits at both Citibank and certain affiliates in the amount of $200,698,072 (*id.* ¶ 75).

Insofar as Citibank and its affiliates claim the right to unfreeze the deposits and other property at issue and set off against the balance of the CLS-related shortfall based on a safe harbor argument, the claim is without merit for all the reasons stated above. Citibank's provision of services and lending in connection with CLS settlements does not give rise to safe harbor protection.

**B.     *Citibank and Its Affiliates May Not Engage in Triangular Setoff.***

Citibank and its affiliates also claim the right to unfreeze the deposits and other property described in the preceding section and set off against the balance of the CLS-related shortfall because the CLS Agreement purports to grant a right of cross-affiliate, or so-called "triangular," setoff (Citi Stay Mot. 35-36). Insofar as the Citibank affiliates are attempting to piggyback on Citibank's shortfall claim, the attempt should be denied because it is barred by the Bankruptcy Code. Section 553 only permits setoff of "mutual" debts, declaring in relevant part:

> Except as otherwise provided in this section and in section 362 and 363 of this title, this title does not affect any right of a creditor to offset a *mutual* debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

11 U.S.C. § 553(a) (emphasis added). Unless the debts are "mutual," a creditor will not be permitted to engage in setoff of countervailing debts. As this Court recognized in *Swedbank*, "[f]or purposes of any right to setoff permitted under Section 553, mutuality is baked into the very definition of setoff." *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 109 (Bankr. S.D.N.Y. 2010).

Courts have consistently found debts to be "mutual" only when they are "between the same parties, standing in the same capacity." *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 107; *Scherling v. Hellman Elec. Corp.* (*In re Westchester Structures, Inc.*), 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995); *Gray v. Rollo*, 85 U.S. 629, 632 (1873) (setoff of debts accruing in different rights is not allowed). Mutuality requires that the debts are owed between the same persons, in the same right, and acting in the same legal capacity. *J.B.I. Indus., Inc. v. Suchde*, 2000 WL 1174997 (S.D.N.Y. Aug. 17, 2000); *see also Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*, 936 F.2d 640, 648 (2d Cir. 1991) . Here, there is no "mutuality" with respect to Citibank's affiliates. The law is clear that, under the Bankruptcy Code and SIPA, a creditor cannot effect a setoff of an amount owed to an affiliate of the creditor by the debtor against an amount owed by the creditor to the debtor. *See Inland Steel Co. v. Berger Steel Co.* (*In re Berger Steel Co.*), 327 F.2d 401, 403-04 (7th Cir. 1964); *Heller & Co. v. Food Mktg. Assoc., Ltd.* (*In re Fasano/Harriss Pie Co.*), 43 B.R. 864, 870 (Bankr. W.D. Mich. 1984), *aff'd* 70 B.R. 285 (W.D. Mich. 1987); *Baruch Inv. Co.* (*In re Vehm Eng'g Corp.*), 521 F.2d 186, 190-91 (9th Cir. 1975).

Allowing Citibank to set off amounts owed by LBI to certain of Citibank's affiliates against amounts payable to the LBI estate by Citibank would hinder the "guiding premise" of the Bankruptcy Code of "the equality of distribution of assets among creditors." *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459 (2d Cir. 1985); *see also In re SemCrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 590 (D. Del. 2010) ("One of the primary goals – if not the primary goal –

of the Code is to ensure that similarly-situated creditors are treated fairly and enjoy an equality of distribution from a debtor absent a compelling reason to depart from this principle.").

Contrary to Citibank's stated position (Citi Stay Mot. 38), it is settled law that parties may not contract out of the mutuality requirement of Bankruptcy Code § 553. Thus, for example, in the *SemCrude* case*,* the Delaware Bankruptcy Court held that the mutuality requirement of Bankruptcy Code Section 553(a) precludes triangular (or cross-affiliate) setoff in bankruptcy even where the parties have a pre-petition agreement that explicitly provides for it. *In re SemCrude, L.P.*, 399 B.R. 388. This proposition was reinforced by this Court in its *Swedbank* decision, which added that the so called "safe harbor[26] provisions do not alter the axiomatic principle of bankruptcy law, codified in section 553, requiring mutuality in order to exercise a right of setoff." *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 109.

## C.   *Unresolved Questions of Fact Exist as to the Claimed Right to Seize LBI Accounts.*

Certain of the LBI claims and deposits Citibank seeks to set off against the alleged $260 million CLS shortfall are unrelated to CLS activity, for example, securities lending and custody securities claims (*see* Citi Stay Mot., Sched. C). As to other LBI assets, like pre-filing date deposits, there is no evidence one way or the other of their relationship to CLS activity. In several instances, Citibank and certain affiliates acknowledge LBI claims against them but claim a right to net out alleged counterclaims

---

[26] The court specifically analyzed Sections 560 (concerning swap agreements) and 561 (concerning master netting agreements) of the Bankruptcy Code.

(*e.g.* as to Citibank, Citi Stay Mot. ¶¶ 13-19; as to CGMI, *id.* ¶¶ 27-32; as to Citibank Japan, *id.* ¶¶ 43-46).  All of these claims raise issues of fact.

In addition, there are significant issues as to the capacity in which LBI held deposited funds.  Numerous former Lehman clients, now claimants in the SIPA litigation, have alleged that their property is being held in LBI deposit accounts that Citibank is seeking to set off and that LBI was holding those funds, not in its proprietary capacity, but as custodian or agent for them or for another Lehman affiliate with which they were dealing.  One such claimant has commenced an adversary proceeding against LBI to recover its funds. (PT Bank Negara complaint, Menaker Decl. Ex. 17).  Others have filed proofs of claim.  Nomura Global Financial Products, Inc., for example, has filed a claim seeking the return of approximately $83 million allegedly deposited on September 15, 2008, in one of LBI's foreign currency accounts at Citibank in connection with FX trades being handled for it by LBSF. (Nomura Claim Form, Menaker Decl. Ex. 18).  Because Citibank provided CLS settlement services to LBSF and other Lehman affiliates in addition to LBI (*see*, *e.g.*, 9/15/09 Letter Agreement, Hammerman Decl. Ex. 5), it must have known that LBI's foreign currency accounts included client funds.  But the full extent of Citibank's knowledge of LBI's use of its accounts to hold funds in its capacity as agent and the extent to which the deposits remaining in these LBI accounts are traceable to agent funds are not yet established and must be explored in discovery.

In addition, during the week of September 15, 2008, certain LBI accounts at Citibank contained funds being held by LBI as custodian for brokerage customers.  These customer funds were primarily foreign currency proceeds of sales of securities,

which were intended to pass through LBI's foreign currency accounts en route to the customers (*See* Trustee's Allocation Motion dated October 5, 2009, Docket No. 1866, ¶¶ 101-104). During its last week in operation, LBI instructed Citibank to transfer at least some of these funds to customers, but Citibank failed to do so. Why Citibank failed to honor LBI's transfer instructions and whether it understood that LBI's accounts held customer funds are unresolved questions at this point. In September 2009, the Trustee advanced for the benefit of brokerage customers approximately $70 million to cover funds held in Citibank accounts; he seeks to recover those funds from Citibank (*See* Trustee's Account Transfer Motion, dated November 20, 2009, Docket No. 2097, ¶ 37, Ex. G-3).

Lastly, Citibank's request for relief is premature because there are fact issues with respect to its various calculations concerning net amounts owed by and to LBI and Citibank and its various affiliates. Although Citibank has purported to net all amounts owed between the respective parties, the Trustee's own review indicates discrepancies in excess of $18 million in the calculations that require further investigation and consultation with Citibank's representatives (Menaker Decl. Ex. 21). Consensus on many of the computations may be possible. A motion for judgment on the net amount is premature.

## VI.     *Citibank and Its Affiliates Should Turn Over Post-Petition Deposits.*

In their lift-stay motion, Citibank and its affiliates propose, *inter alia*, to set off against certain funds that Citibank concedes were deposited in Citibank accounts post-petition (Citi Stay Mot. 31, referring to these as "LBI-Citibank post-filing date

deposits").  This Court in *Swedbank* squarely held that there is no right of setoff with respect to such post-petition deposits because of a lack of mutuality and further held that the safe harbors do not apply, a ruling that was affirmed in full on appeal.  *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 113.

Movants acknowledge that they have no established basis for continuing to withhold such funds, much less for seeking a setoff with respect to them.  Instead, they argue that this Court is simply wrong (Citi Stay Mot. 39, n.33).  On July 8, 2011, the Trustee's counsel requested that Citibank withdraw that position and return the funds (*see* Menaker Decl. Ex. 19).  Citibank's counsel declined (*id.* Ex. 20).  Accordingly, the Trustee requests that Citibank's motion be denied with respect to the LBI-Citibank post-petition deposits and that Citibank be directed to turn over those funds immediately to the Trustee after a proper accounting has occurred to determine the precise amount in question.

*Conclusion*

For the reasons stated above, the motion by Citibank and its affiliates for partial dismissal of the complaint and to lift the automatic stay to permit seizure of LBI estate property should be denied. If any counts of the complaint are found to be deficiently pleaded, leave is respectfully requested to replead following discovery. Citibank and its affiliates should be directed to turn over to the Trustee all post-petition deposits in LBI accounts, with interest.

Dated:  New York, New York
         August 5, 2011

                                     Respectfully submitted,

                                     MENAKER & HERRMANN LLP

                                     By: /s/ Richard G. Menaker
                                        Richard G. Menaker

                                     10 East 40th Street
                                     New York, NY  10016
                                     Telephone:  (212) 545-1900
                                     Facsimile:   (212) 545-1656

                                     Special Counsel for James W. Giddens
                                     Trustee for the SIPA Liquidation of
                                     Lehman Brothers Inc.

Rebecca Northey,
Stephen D. Houck,
Steven J. Purcell,
Albena Petrakov,
Erika S. Krystian,
Jennie L. Sacks,
      Of Counsel.