Brad S. Karp
Stephen J. Shimshak
Douglas R. Davis
Claudia L. Hammerman
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Attorneys for Citibank, N.A., Citigroup Inc., Citigroup
Global Markets, Inc., Citibank Japan Ltd., Citibank
Europe plc, Citibank International plc, Citigroup Pty
Limited, Banco Nacional de Mexico SA, Citibank del
Peru SA, Bank Handlowy W Warszawie SA, ZAO KB
Citibank, Citibank AS, and Citibank Maghreb

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>                      Debtor. | Case No. 08-01420 (JMP) SIPA |
| LEHMAN BROTHERS INC.,<br><br>               Plaintiff,<br><br>        -against-<br><br>CITIBANK, N.A., CITIGROUP INC.,<br>CITIGROUP GLOBAL MARKETS, INC.,<br>CITIBANK JAPAN LTD., CITIBANK EUROPE<br>PLC, CITIBANK INTERNATIONAL PLC,<br>CITIGROUP PTY LIMITED, BANCO DE CHILE,<br>BANCO NACIONAL DE MEXICO SA, CITIBANK<br>DEL PERU SA, BANK HANDLOWY, ZAO KB<br>CITIBANK, CITIBANK AS, CITIBANK MAGHREB<br>and CITIBANK AFFILIATES 1-5,<br><br>               Defendants. | Adv. Proc. No. 11-01681 (JMP) |

**REPLY MEMORANDUM OF LAW OF DEFENDANTS CITIBANK, N.A., CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., CITIBANK JAPAN LTD., CITIBANK EUROPE PLC, CITIBANK INTERNATIONAL PLC, CITIGROUP PTY LIMITED, BANCO NACIONAL DE MEXICO SA, CITIBANK DEL PERU SA, BANK HANDLOWY, ZAO KB CITIBANK, CITIBANK AS, AND CITIBANK MAGHREB IN <u>SUPPORT OF THEIR MOTION TO PARTIALLY DISMISS THE COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.     The Safe Harbors Bar the Trustee's Claims ........................................................ 4

     A.    The CLS Agreement and Letter Agreements Are Swap Agreements under the Plain Language of the Safe Harbors ................................................... 4

          1.    The CLS Agreement and Letter Agreements Are "Credit Enhancements" or "Security Arrangements" ................................. 6

          2.    Citibank Is a "Swap Participant" and a "Financial Participant" ................. 10

          3.    The Credit Enhancements and Security Arrangements in the CLS Agreement and Letter Agreements Are "Related To" Swap Agreements .... 12

     B.    Citibank's Actions Reduced Systemic Risk, A Clear Objective of the Safe Harbors ............................................................................................... 15

II.    The Doctrine of Equitable Recoupment Bars the Trustee's Claims .................. 18

III.   The Trustee's Claims to Avoid and Recover the $1 Billion Setoff Fail on Multiple Independent Grounds ................................................................................. 20

     A.    Citibank Did Not Violate the Automatic Stay ...................................... 20

     B.    Citibank Did Not Receive the Deposit to Obtain Setoff Rights Against Existing Debt ......................................................................................... 22

     C.    Citibank Did Not Improve Its Position ................................................. 23

     D.    LBI Received "Fair Consideration" in Exchange for the Letter Agreements ............................................................................................. 25

     E.    There Was a Contemporaneous Exchange for New Value ................... 27

IV.   The Trustee Admits He Has Not Stated a Claim for Actual Fraudulent Conveyance .............................................................................................................. 28

V.      There Is No Basis to Equitably Subordinate Citibank's Claims ........................................29

VI.     There Was No Actionable Breach of Contract ..................................................................33

VII.    The Buyer Note Claim Should Be Dismissed ..................................................................36

**Page(s)**

CASES

*80 Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.)*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994) .............................................................. 30

*Aetna Cas. & Sur. Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
94 F.3d 772 (2d Cir. 1996) ............................................................................... 32

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
351 F. Supp. 2d 79 (S.D.N.Y. 2004) ................................................................ 25

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ....................................................................................... 3

*Bank Brussels Lambert, S.A. v. Intermetals Corp.*,
779 F. Supp. 741 (S.D.N.Y. 1991) ................................................................... 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 29

*Brooks Shoe Mfg. Co., Inc. v. United Telephone Co.*,
39 B.R. 980 (E.D. Pa. 1984) ............................................................................ 19

*Cablevision Sys. Corp. v. Town of East Hampton*,
862 F. Supp. 875 (E.D.N.Y. 1994) .................................................................. 35

*Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*,
390 B.R. 595 (Bankr. N.D. Ill. 2008) ............................................................... 12

*Chem. Bank v. Meltzer*,
712 N.E.2d 656 (N.Y. 1999) ............................................................................ 32

*Chittenden Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*,
135 B.R. 762 (D. Vt. 1991) .............................................................................. 32

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995) ............................................................................................ 21

*Clark Motor Co., Inc. v. Mfrs. & Traders Trust*,
360 F. App'x 340 (3d Cir. Jan. 7, 2010) ................................................... 33, 34

*Cosoff v. Rodman (In re W.T. Grant Co.),*
    699 F.2d 599 (2d Cir. 1983)............................................................................................. 30

*Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., Ltd.,*
    375 F. Supp. 2d 257 (S.D.N.Y. 2005)............................................................................. 26

*In re Emergency Beacon Corp.,*
    48 B.R. 341 (S.D.N.Y. 1985)........................................................................................... 31

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.),*
    341 B.R. 451 (Bankr. S.D.N.Y. 2006).............................................................................. 4

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
    -- F.3d --, 2011 WL 2536101 (2d Cir. June 28, 2011).......................................... 4, 7, 15

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,*
    111 F.3d 284 (2d Cir. 1997)............................................................................................ 35

*Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.),*
    323 B.R. 838 (Bankr. S.D.N.Y. 2005)............................................................................ 25

*Houbigant, Inc. v. IMG Fragrance Brands, LLC,*
    No. 09 Civ. 839 (LAP), 2009 WL 5102791 (S.D.N.Y. Dec. 18, 2009) ............................ 3

*Ingram Micro Inc. v. ABC Mgmt. Tech. Solutions,*
    746 F. Supp. 2d 765 (E.D. Va. 2010) ............................................................................. 33

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),*
    240 B.R. 195 (Bankr. S.D.N.Y. 1999)............................................................................ 12

*In re King,*
    305 B.R. 152 (Bankr. S.D.N.Y. 2004)............................................................................ 32

*Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group, LLC),*
    316 B.R. 451 (Bankr. S.D.N.Y. 2004)............................................................................ 32

*Lamie v. U.S. Trustee,*
    540 U.S. 526 (2004)........................................................................................................... 7

*In re Lehman Brothers Holdings Inc.,*
    445 B.R. 143 (Bankr. S.D.N.Y. 2011)............................................................................ 32

*Lehman Brothers Spec. Fin. Inc. v. BNY Corp. Trustee Serv. Ltd. (In re Lehman Brothers
    Holdings Inc.),*
    422 B.R. 407 (Bankr. S.D.N.Y. 2010)............................................................................ 27

*Liquidation Trust v. Daimler AG (In re Old CarCo LLC),*
    435 B.R. 169 (Bankr. S.D.N.Y. 2010)...................................................................... 26, 29

*In re Loranger Mfg. Corp.*,
    324 B.R. 575 (Bankr. W.D. Pa. 2005) ............................................................ 4

*Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*,
    156 F.3d 131 (2d Cir. 1998)............................................................ 18, 20

*N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*,
    129 F.3d 93 (2d Cir. 1997)............................................................ 18

*Nat'l Westminster Bank, U.S.A. v. Ross*,
    130 B.R. 656 (S.D.N.Y. 1991)............................................................ 34

*In re Nemko, Inc.*,
    143 B.R. 980 (E.D.N.Y. Bankr. 1992)............................................................ 34

*In re Norsal Indus., Inc.*,
    147 B.R. 85 (Bankr. E.D.N.Y. 1992)............................................................ 19

*Official Committee of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*,
    269 B.R. 560 (Bankr. D. Del. 2001) ............................................................ 32

*Official Committee of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
    --B.R.--, 2011 WL 357292 (Bankr. S.D.N.Y. July 27, 2011)............................. 15

*Pittsburgh Nat'l Bank v. Lomb (In re Lomb)*,
    74 B.R. 711 (Bankr. W.D. Pa. 1987) ............................................................ 32

*Pryor v. Fisher & Donnelly (In re Dimino)*,
    429 B.R. 408 (Bankr. E.D.N.Y. 2010)............................................................ 25

*Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.)*,
    698 F.2d 42 (1st Cir. 1983)............................................................ 21

*Stern v. Marshall*,
    131 S. Ct. 2594 (2011)............................................................ 36, 37

*Taunton Municipal Lighting Plant v. Enron Corp. (In re Enron Corp.)*,
    354 B.R. 652 (S.D.N.Y. 2006)............................................................ 10

*Togut v. Chemical Bank (In re Hecht)*,
    41 B.R. 701 (Bankr. S.D.N.Y. 1984)............................................................ 23

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010)............................................................ 25

*Tucek v. Hoffman*,
    555 N.Y.S.2d 167 (N.Y. App. Div. 1990) ............................................................ 34

*Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co., Inc.)*,
    929 F.2d 424 (8th Cir. 1991) ................................................... 27, 28

*V.I. Bureau of Internal Revenue v. Chase Manhattan Bank*,
    312 F.3d 131 (3d Cir. 2002) ....................................................... 21

*Waldschmidt v. CBS, Inc.*,
    14 B.R. 309 (W.D. Tenn. 1981) ................................................. 19

*In re Yonkers Hamilton Sanitarium Inc.*,
    22 B.R. 427 (Bankr. S.D.N.Y. 1982) ..................................... 19, 20

## STATUTES

11 U.S.C. § 101(22A) ................................................................. 5, 10, 11

11 U.S.C. § 101(53B) ............................................................ 5, 12, 13, 15

11 U.S.C. §§ 101(53C) .................................................................... 5, 12

11 U.S.C. § 365 .............................................................................. 26

11 U.S.C. § 506 .............................................................................. 23

11 U.S.C. § 553 ......................................................................... *passim*

11 U.S.C. § 561 .............................................................................. 11

11 U.S.C. § 562 ........................................................................... 13, 14

11 U.S.C. § 741 ................................................................................ 9

## OTHER AUTHORITIES

17A Am. Jur. 2d Contracts § 635 ................................................... 34

*Black's Law Dictionary* (9th ed. 2009) ............................................ 7

Fed R. Civ. P. 15(a) ...................................................................... 29

H.R. Rep. No. 109-31 (2005) .......................................................... 5

H.R. Rep. No. 109-648 (2006) ....................................................... 10

N.Y. Banking Law § 9-g(2) (2011) ................................................. 21

Robert D. Aicher, et al., *Credit Enhancement: Letters of Credit, Guaranties, Insurance &
Swaps (The Clash of Cultures)*, 59 Bus. Law. 897 (2004) ............................................. 8

*Webster's Collegiate Dictionary* (11th ed. 2004) .................................................... 7, 12

## PRELIMINARY STATEMENT

Citibank has established that the safe harbors protect its $1 billion setoff and that seventeen counts of the Complaint fail as a matter of law. To counter Citibank's showing, the Trustee's 97-page opposition brief takes substantial liberty with the facts, the law, and the procedures governing this matter.

Throughout, the Trustee appears to be at war with the natural meaning of common English terms (arguing, for example, that a "reimbursement obligation" is not an obligation to reimburse) and with the allegations of his own Complaint. Indeed, the Trustee repeatedly argues that there are unresolved issues of fact when those facts—e.g., fair consideration, contemporaneous exchange for new value—pervade the allegations of the Complaint.

Most disingenuous, however, is the Trustee's lament, repeated throughout his opposition, concerning the current "undeveloped" state of the record, and his suggestion that he could file a very different Complaint—presumably, one that could be sustained—if only he had the chance to conduct discovery. The Trustee asserts that "[t]he limited evidence available pre-discovery raises serious questions about Citibank's conduct," but that "the absence of an opportunity to review documents and examine knowledgeable witnesses, including former LBI employees unavailable to the Trustee, and Citibank and Barclays employees, has thus far delayed the Trustee in developing a full factual record." Opp. 1, 8.[1] The Trustee even contends that Citibank's motion to dismiss is "premature," because it "seek[s] relief before an adequate record has been developed." *Id.*

---

[1] All capitalized terms have the same meaning here as they did in Defendants' Motion to Partially Dismiss the Complaint, dated May 26, 2011 ("Mot."). Citations to the Declarations of Claudia Hammerman and Richard G. Menaker are in the form "Hammerman Decl. Ex. __" and "Menaker Decl. Ex. __." Citations to the Trustee's Memorandum in Opposition to Defendants' Motion to Dismiss and Motion to Lift the Automatic Stay, dated August 5, 2011, are in the form. "Opp.__."

at 3.  Not only is this assertion nonsensical as a matter of federal civil procedure, it is unfounded as a matter of fact.

Consider what the Trustee has represented to this Court about discharging his "specific and important duty to conduct an investigation" of LBI's collapse:

- the Trustee has been granted, and has used, the power to subpoena third parties;

- the Trustee has "received productions amounting to hundreds of thousands of documents" from financial institutions;

- the Trustee has "reviewed hundreds of thousands of pages of internal LBI emails, LBI account records, contractual agreements, and other documents from LBI's records, as well as innumerable quantities of electronic data from LBI's information systems";

- the Trustee has "conducted *over 360 interviews* of former LBI personnel as well as personnel at third parties"; and

- the Trustee "has conducted and continues to conduct various forensic analyses of LBI's books and records."

Trustee's Fifth Interim Report for the Period October 27, 2010 Through April 22, 2011 ¶¶ 70-76 (emphasis added).

With respect to his investigation of Citibank, in particular, the Trustee represented that he was working with his accounting advisors to "determine the accuracy of the sums claimed," that he was interviewing former LBI personnel "[t]o resolve fact issues," and that "Citibank has indicated a willingness to cooperate" with the Trustee's informal requests for information.  Trustee's Third Interim Report for the Period November 12, 2009 Through May 10, 2010 ¶¶ 184-85.  *That was over a year ago*.

In a last-ditch effort to avoid dismissal of his Complaint, the Trustee raises for the first time in his opposition brief what he terms to be "a basic defect at the heart of Citibank's motion to dismiss."  Opp. 82.  He argues that before this Court can determine the application of the safe

harbors to Citibank's $1 billion setoff, Citibank must first establish "both the fact and the amount of 'any obligations of LBI under the CLS Agreement.'" *Id.* at 83 (emphasis removed). The Trustee announces that this "fact issue cannot be finally determined on the present motion." *Id.* This is the first Citibank has heard about any dispute with respect to Citibank's calculation of LBI's $1.26 billion obligation under the CLS Agreement set forth in Citibank's proof of claim. The Trustee has not filed an objection to the amount of Citibank's CLS claim, nor does the Complaint anywhere allege that Citibank's CLS claim was miscalculated. Presumably, if the Trustee and his team of accounting advisors found any material inaccuracies in Citibank's computation, they would have raised them with Citibank long ago and, more to the point, raised them in the Complaint. The Trustee's transparent attempt to manufacture an issue of fact at the last minute should be rejected.

The Trustee has had opportunities to develop the factual basis for his Complaint that vastly exceed—by orders of magnitude—those available to a normal civil litigant. The Trustee has stated his claims for relief in connection with the $1 billion setoff, and they fail as a matter of law. In accordance with well-settled law and procedure, this Court should dismiss the Trustee's claims and put an end to his misguided effort.

## <u>ARGUMENT</u>

The Trustee has not, and cannot, meet his pleading burden with respect to the claims subject to this motion. Once the Complaint is stripped of its manifold conclusory legal allegations, which are not "entitled to the assumption of truth," the factual allegations that remain do not "plausibly suggest an entitlement to relief." *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009).[2] The Court should apply Citibank's safe harbor defense now because the factual allegations of the

---

[2]     Furthermore, the Court need not credit the truth of the Trustee's allegations when they contradict the documents on which he relies. *Houbigant, Inc. v. IMG Fragrance Brands, LLC*, No. 09 Civ. 839 (LAP), 2009 WL 5102791, at *2 (S.D.N.Y. Dec. 18, 2009).

Complaint (together with other material the court may consider on this motion) show that the Bankruptcy Code safe harbors apply. *See*, *e.g.*, *Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 455 n.3 (Bankr. S.D.N.Y. 2006); *In re Loranger Mfg. Corp.*, 324 B.R. 575, 584-86 (Bankr. W.D. Pa. 2005). To allow a searching factual inquiry in every case implicating the safe harbors would result in "uncertainty and unpredictability" for participants in safe harbored transactions, which is completely at odds with their purpose. *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, -- F.3d --, 2011 WL 2536101, at *7 (2d Cir. June 28, 2011).

## I.     The Safe Harbors Bar the Trustee's Claims

In its opening brief, Citibank established, based on the plain language of the Bankruptcy Code, that the CLS Agreement and Letter Agreements are "swap agreements" insulated by the safe harbors. In response, the Trustee resorts to a lengthy exegesis of legislative history in an attempt to argue that Citibank's provision of CLS services to LBI somehow "does not implicate the concerns underlying the amended safe harbor provisions." Opp. 32. When forced to confront the language of the statute, the Trustee ignores the plain meaning of its words and—invoking inapplicable canons of construction and a later amendment to a different provision of the statute—attempts to read in requirements found nowhere in the statutory text. As the Second Circuit recently made clear with respect to another safe harbor provision, attempts to engraft limitations onto the plain language of the safe harbors should be rejected. *Enron Creditors Recovery Corp.*, 2011 WL 2536101, at *1 ("Enron's proposed exclusions from the reach of § 546(e) have no basis in the Bankruptcy Code.").

### A.     The CLS Agreement and Letter Agreements Are Swap Agreements under the Plain Language of the Safe Harbors

Citibank demonstrated in its opening brief that the CLS Agreement and Letter Agreements are protected "swap agreements" under the plain language of the Bankruptcy Code

because each is a "security agreement or arrangement or other credit enhancement related to [LBI's FX transactions], including any guarantee or reimbursement obligation by or to a swap participant or financial participant in connection with [LBI's FX transactions]." 11 U.S.C. § 101(53B)(A)(vi).

Citibank's argument is straightforward: these agreements, which govern the terms under which Citibank would assume responsibility as a principal for the settlement of LBI's FX trades in CLS, provide for a reimbursement obligation (in the case of the CLS Agreement) and rights of setoff (in the case of each of the agreements) to secure LBI's repayment obligation to Citibank. Mot. 21-23. A "reimbursement obligation" is one of the statutory examples of "other credit enhancements." *See* 11 U.S.C. § 101(53B)(A)(vi). A "right of setoff" is the sole example of a "security arrangement" offered in the 2005 House Report. *See* H.R. Rep. No. 109-31, at 129. The reimbursement obligation and setoff rights clearly "relate to" (or are "in connection with") LBI's FX transactions, since they secure LBI's repayment to Citibank for funding those FX transactions in CLS. Citibank is clearly a "financial participant" that has covered contracts "with the debtor or any other entity," exceeding $1 billion in notional amount or $100 million in mark-to-market value. *See* 11 U.S.C. §§ 101(22A)(A). Finally, if the CLS Agreement and Letter Agreements are swap agreements under the Bankruptcy Code, Citibank, by definition, is a "swap participant" within the meaning of the Bankruptcy Code. *See* 11 U.S.C. §§ 101(53C).

By way of response, the Trustee abandons the plain meaning of the statute. The Trustee acknowledges that the CLS Agreement contains a "reimbursement obligation," but argues it is not the *right kind* of reimbursement obligation. The Trustee acknowledges that the CLS Agreement and Letter Agreements contain "rights of setoff" but argues these rights of setoff do not "relate to" LBI's FX transactions in the *right way*. The Trustee appears to acknowledge (and could not credibly dispute) that Citibank has positions in covered contracts totaling over $1 billion in

notional or $100 million in mark-to-market value, but argues that Citibank nonetheless is not a "financial participant" because it does not satisfy these dollar thresholds in the *right context*.  In each case, the Trustee's argument distorts the natural meaning of the statutory language and seeks to impose requirements found nowhere in the statutory text.  The Trustee's arguments should be categorically rejected.

1. <u>The CLS Agreement and Letter Agreements Are "Credit Enhancements" or "Security Arrangements"</u>

The Trustee argues that the CLS Agreement and Letter Agreements do not qualify as either a "security arrangement" or "other credit enhancement," including "a reimbursement obligation," within the meaning of the Bankruptcy Code.  In this connection, the Trustee makes three principal arguments.  *First*, and perhaps most bizarrely, the Trustee argues that LBI's obligation to reimburse Citibank for its payments to CLS Bank on LBI's behalf is not a reimbursement obligation "as that expression is used in the safe harbors."  Rather than looking to the plain meaning of the term, the Trustee urges the Court to interpret "reimbursement obligation" narrowly to encompass only the type of reimbursement obligation arising under a "guaranty."  Opp. 48-49.  The Trustee argues that the "proximity" in the statute of the phrase "reimbursement obligation" and the term "guaranty" requires, "[u]nder the principle of *noscitur a sociis*, [that] words listed together in a statute should be 'given related meaning.'"  *Id.* at 49.  According to the Trustee, a reimbursement obligation—"as th[e] expression is used in the safe harbors"—refers only to "the duty of a principal obligor to pay back (i.e., reimburse) a guarantor or surety who has previously made good on the principal obligor's debt."  *Id.* at 48-49.  The "reimbursement obligation" under the CLS Agreement, then, would not qualify because Citibank was *primarily* liable as principal to pay CLS Bank the amounts due on LBI's FX trades, and not *secondarily* liable as a guarantor or surety would be.  *Id.* at 49-50.

But to state the argument is to refute it. No credible rule of construction requires a court to ignore the plain meaning of unambiguous terms. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotations omitted); *Enron Creditors Recovery Corp.*, 2011 WL 2536101, at *9 (same). The phrase "reimbursement" has a common meaning, as the Trustee acknowledges by equating the terms "reimburse" and "pay back." Opp. 49; *see also Black's Law Dictionary* (9th ed. 2009) (defining "reimbursement" as "repayment"); *Webster's Collegiate Dictionary* (11th ed. 2004) (defining "reimburse" to mean "to pay back to someone" and "to make restoration or payment of an equivalent to"). LBI's obligation to reimburse Citibank is a "reimbursement obligation" under the statute.

*Second*, the Trustee argues that the CLS Agreement does not qualify as a "credit enhancement" under the Bankruptcy Code, because it is not similar to any of the arrangements that have previously been described as "credit enhancements." Opp. 37-38. As the Trustee notes, "credit enhancement" is not defined in the Bankruptcy Code, but the legislative history of the 2005 amendments introducing the term states that a "credit enhancement" encompasses "letters of credit and other similar agreements." *Id.* at 37 (quoting H.R. Rep. No. 109-31, Pt. 1 at 129 (2005)). The Trustee also cites eleven bankruptcy court decisions from across the country (without indicating how he selected these eleven) that each contain the term "credit enhancement," and he lists the instruments or arrangements so described: letters of credit, third party guarantees, reserve accounts, cash collateral deposits, surety bonds, insurance policies, and obligations to put money in an escrow account. *Id.* at 38. However, the Trustee ignores the fact that a "reimbursement obligation" is

another example of a credit enhancement, and one the statute specifically mentions.[3]  As demonstrated above—and  as the Trustee appears to concede—the CLS Agreement contained a "reimbursement obligation" under the plain meaning of the statute (if not under the narrow reading the Trustee advances here).

In all events, the Trustee is simply mistaken when he asserts that Citibank's arrangement with LBI under the CLS Agreement is unlike any of the "credit enhancements" that he identifies.  In performing its role as LBI's Designated Settlement Member in CLS, Citibank provided LBI with the functional equivalent of a letter of credit in favor of CLS Bank.  Like a letter of credit transaction there were three separate commitments:  (i) the underlying FX transaction in which LBI ("applicant") had an obligation to pay currency to its counterparty, which it agreed to fulfill by settling the transaction in CLS Bank ("beneficiary"); (ii) an agreement between LBI and Citibank ("issuer"), setting out LBI's obligation to reimburse Citibank for payments made to CLS Bank; and (iii) the irrevocable commitment ("letter of credit") given by Citibank, once it authorized LBI's trades, to pay LBI's obligations on those trades to CLS Bank.

As in a letter of credit transaction, Citibank was primarily liable to CLS Bank.  *See* Robert D. Aicher, et al., *Credit Enhancement: Letters of Credit, Guaranties, Insurance & Swaps (The Clash of Cultures)*, 59 Bus. Law. 897, 902 (2004) (cited at Opp. 38 n.13) ("a letter of credit creates a *primary obligation* of the issuer to the beneficiary" that the issuer fully expects it will have to pay) (emphasis added).  And like a bank issuing a letter of credit, Citibank structured its reimbursement agreement with LBI to assure repayment by including setoff rights and, eventually, by demanding cash collateral.  Hammerman Decl. Ex. 4 at 3-4; Ex. 5; Ex. 6.  *See* Aicher, *Credit*

---

[3]    Indeed, as the Trustee notes, "[t]here was an identical 2005 amendment to the Federal Deposit Insurance Act, as to which the House Report gives additional examples of credit enhancements, specifically (letters of credit, guarantees, *reimbursement obligations* and other similar agreements.)"  Opp. 37-38 (citing H.R. Rep. No. 109-31 Pt. 1, at 122 (2005)) (emphasis added).

*Enhancement*, 59 Bus. Law at 901 (issuing banks "structure[] their relationship with the applicant to assure repayment," typically requiring "the posting of cash collateral and the ability to offset deposit balances otherwise maintained at the bank by the applicant").

*Finally*, the Trustee relies on the 2006 amendment to the definition of "securities contract" to "further reinforce the point" that the CLS Agreement and Letter Agreements do not constitute "a credit enhancement or a security arrangement as contemplated by the Bankruptcy Code." Opp. 41. The Trustee notes that Congress amended the "securities contract" definition in 2006 to include "any extension of credit for the clearance or settlement of securities transactions," 11 U.S.C. § 741(7)(A)(v), while making no similar amendment to the definition of "swap agreement." According to the Trustee, this must mean that Citibank's role in extending credit to LBI to settle its FX trades is not something Congress intended to protect when it amended the "swap agreement" definition in 2005 to cover "security arrangements" and "other credit enhancements" relating to swap agreements. The Trustee's argument does not withstand scrutiny.

In the first place, nothing in the 2006 amendment to the definition of "securities contract" changes the plain meaning of the "swap agreement" definition under the Bankruptcy Code. Citibank was not simply extending credit in connection with the settlement of LBI's FX trades; Citibank was assuming the obligation as principal for the settlement of those trades in CLS, subject to a reimbursement obligation from LBI and rights of setoff. As such, the agreements constitute "credit enhancements" and/or "security arrangements" under the plain meaning of the statute.[4] In

---

[4] Throughout his brief, the Trustee attempts to minimize the role Citibank played for LBI in CLS, contending that "Citibank acted as a conventional lender, providing overdraft privileges for which the Bankruptcy Code provides no special protection." Opp. 4; *see also, e.g., id.* at 17 (Citibank performs "a conventional banking function"); *id.* at 40 ("the services Citibank provided to LBI were like those it would provide to a checking account customer with overdraft privileges"). The Trustee is simply wrong and, elsewhere in his opposition, actually highlights that Citibank was not a mere lender but acted as principal in connection with the settlement of LBI's FX transactions in CLS. Opp. 49-50.

addition, the Trustee's argument ignores the fact that "enactments of a subsequent Congress are one of the weakest tools for statutory construction because they are an uncertain guide to what the prior Congress actually enacted." *Taunton Municipal Lighting Plant v. Enron Corp. (In re Enron Corp.)*, 354 B.R. 652, 659 (S.D.N.Y. 2006) (citing *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996)). Furthermore, while the Trustee has much to say about what Congress "concluded," "contemplated," and was "pressed to add" when it amended the definition of "securities contract" in 2006, Opp. 41, 42, 46, he fails to mention what Congress actually said about its intent. The legislative history states that the addition to the definition of "securities contract" in Section 741(7) was "intended to *confirm* that the definition encompasses credit extended for the execution, clearance and settlement of securities transactions," H.R. Rep. No. 109-648, at 4 (2006) (emphasis added), suggesting that this already fell within the statutory language common to all safe harbored contracts, including "swap agreements." The Trustee's argument based on the 2006 amendment to the definition of "securities contract" in Section 741(7), is irrelevant as a matter of both law and fact.[5]

2. Citibank Is a "Swap Participant" and a "Financial Participant"

The Trustee quotes the entire definition of "financial participant" in 11 U.S.C. § 101(22A) and then argues that "Citibank satisfies none of those criteria *in connection with* its role

---

[5] The Trustee's lengthy description of (and charts allegedly depicting) equities clearing by the National Securities Clearing Corporation ("NSCC"), is equally irrelevant. It is notable, however, that the Trustee's contrast of CLS with the NSCC simply underscores the systemic importance of Citibank's role in CLS: the three distinct obligations and risks borne by the NSCC that the Trustee highlights are the same ones Citibank and other Designated Settlement Members take on in sponsoring the FX trades of User Members and third parties. First, Citibank's "extension of credit [was] integral" to CLS, as LBI acknowledged by agreeing that Citibank "necessarily assume[d] a credit exposure" to LBI by settling its FX transactions. *See* Opp. 45; Hammerman Decl. Ex. 4 at 3. Second, by becoming the principal obligors of User Member and third party trades, Citibank and other Designated Settlement Members guarantee CLS trades just as NSCC guarantees securities trades in its role as "central counterparty." *See* Opp. 45, 49-50; Hammerman Decl. Ex. 3 §§ 1.1 (defining "Designated Settlement Member") & 2.1.7(b). Finally, once Citibank authorized LBI's trades, it was "locked in": Citibank was irrevocably obligated to fund LBI's trades and seek reimbursement from LBI. Opp. 45; Hammerman Decl. Ex. 3 § 2.1.7(b); Ex. 4 at 3.

as LBI's Designated Settlement Member in CLS."  Opp. 47 (emphasis added); *see also id.* at 46 ("*In the context* of CLS, Citibank was neither a 'financial participant' nor a 'swap participant.'") (emphasis added).  But the statutory definition of "financial participant" sets out an objective test based on an entity's overall presence in protected markets.  A "financial participant" has "one or more" specified "agreements or transactions[6] . . . with the debtor or any other entity" where the transactions have "a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties)" or "gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties)."  11 U.S.C. § 101(22A).  Nothing in the statutory language remotely suggests that the test must be applied separately with reference to an entity's dealings in any specific *context*.  To the contrary, the broad terms of the statute—"one or more agreements" "with the debtor or any other entity" with respect to six different transaction types—make clear that an entity that qualifies as a "financial participant" in one context is a financial participant for all purposes.  Of course, the Trustee does not (and cannot) question that Citibank, among the largest  financial institutions in the world, qualifies as a "financial participant" under the plain meaning of the statute.[7]  And that is all that matters.

The Trustee's argument that Citibank is not a "swap participant" under the Bankruptcy Code also fails as a matter of law.  Because the CLS Agreement and Letter Agreements are "swap agreements" under the Bankruptcy Code, Citibank, by definition is a "swap participant."

---

[6]    The specified "agreements or transactions" are "securities contracts," "commodity contracts," "forward contracts," "repurchase agreements," "swap agreements,"  and "master netting agreements."  11 U.S.C. § 561(a)(1)-(6).

[7]    Indeed, the Court can take judicial notice of Citibank's derivatives proofs of claims in the LBSF and LBHI chapter 11 proceedings (claims numbered 17915 and 29883, respectively), which on their face exceed the dollar thresholds set out in the definition of "financial participant."

*See* 11 U.S.C. § 101(53C) (defining "swap participant" as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor").

> 3. <u>The Credit Enhancements and Security Arrangements in the CLS Agreement and Letter Agreements Are "Related To" Swap Agreements</u>

The Trustee does not dispute that LBI's FX transactions are covered "swap agreements" under § 101(53B)(A)(i) of the Bankruptcy Code.  *See* Opp. 36, 50.  Nor does the Trustee appear to dispute that LBI's reimbursement obligation and Citibank's rights of setoff—which provide for and secure repayment of the amounts Citibank pays to CLS Bank to settle LBI's FX transactions—"relate to" those FX transactions, as that term is normally understood.[8]  Because Citibank has demonstrated that the reimbursement obligation and rights of setoff constitute "credit enhancements" and "security arrangements" under the Bankruptcy Code, then logically, this "credit enhancement" and these "security arrangements" are "related to" the FX transactions, as required under § 101(53B)(A)(vi).

The Trustee, of course, disputes that the CLS Agreement and Letter Agreements qualify as "security arrangements" or "credit enhancements" under the Bankruptcy Code—arguments that we have addressed above.  It appears, however, that, even if they do qualify (as Citibank contends), the Trustee argues that they are not sufficiently "related to" the underlying FX transactions to count as "swap agreements" under the Bankruptcy Code.  According to the Trustee, only "credit enhancements" and "security arrangements" that "are *integral* to underlying swap

---

[8]  *See Webster's Collegiate Dictionary* (11th ed. 2004) (defining "related" as "connected by reason of an established or discoverable relation"; defining "relate" as "to have relationship or connection"); *see also Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("A natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'"); *Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) (holding that prejudgment attachment of assets to satisfy underlying swap obligation is a transfer "in connection with" a swap agreement under the "clear and unambiguous" terms of the statute).

transactions," qualify for swap agreement protection in their own right. Opp. 52 (emphasis added).[9]

The Trustee invokes what he refers to as the "quantitative limitation" in clause (vi) of the "swap agreement" definition to support his argument that a "security agreement or arrangement or other credit enhancement" must be "integrally related to" an underlying swap agreement—rather than merely "related to" a swap agreement, as the statute provides. Opp. 51. The "quantitative limitation" the Trustee refers to has a completely different purpose; it ensures that a credit enhancement or security arrangement is only a safe harbored "swap agreement" to the extent that it relates to underlying transactions that are safe harbored. 11 U.S.C. § 101(53B)(A)(vi) (arrangements are not safe harbored to the extent they "exceed the damages in connection with any [underlying swap agreement], measured in accordance with section 562"). For example, a parent guaranty of a subsidiary's swap agreements and commercial loans would only be safe harbored in connection with the swap agreements, not the commercial loans. The Trustee, however, contends the CLS Agreement and Letter Agreements cannot qualify as "swap agreements" because they cannot "give rise to damages measurable under Section 562." Opp. 51; *see also id.* at 51-52 ("[T]he shortfall resulting from unpaid intraday credits in CLS, cannot even be analyzed in terms of the methodology for calculating damages referred to in Section 562."). This is just not so.

Section 562 concerns only the "timing of damage measurement" in connection with safe-harbored contracts, including swap agreements. Under Section 562, if a financial participant or

---

[9] The Trustee offers only one example of a "credit enhancement" and "security arrangement" that would satisfy his "integrally related to" requirement: "a Credit Support Annex commonly used in connection with ISDA master agreements." Opp. 52; *see also id.* at 41. Of course, the standard ISDA Credit Support Annex cannot be the only thing Congress intended to protect when it amended the swap agreement definition to include, in clause (vi), "any security agreement or arrangements or other credit enhancement," because the Credit Support Annex is part of the ISDA and thus already covered by clause (v) of the swap agreement definition, which covers "a master agreement . . . together with all supplements to any such master agreement." *See* 11 U.S.C. § 101(53B)(A)(v).

swap participant liquidates, terminates, or accelerates a swap agreement, "damages shall be measured as of . . . the date or dates of such liquidation, termination, or acceleration" unless there are no "commercially reasonable determinants of value" on such date, in which case damages are to be measured "as of the earliest subsequent date on which there are commercially reasonable determinants of value." 11 U.S.C. § 562(a)-(b). There is no reason to believe that Citibank could not (or did not) comply with Section 562 in computing damages under the CLS Agreement on the date it terminated the agreement and liquidated the positions.

The Trustee then turns to Collier for the proposition that calculating damages in accordance with Section 562 "typically entails . . . fixing damages by reference to the prevailing market price and values at the time of termination." Opp. 52 (citing 5 *Collier on Bankruptcy* ¶ 562.01 (16th ed. 2011)). The Trustee argues that "[t]he concept of a 'prevailing market price' under Section 562 makes no sense at all with regard to the CLS Agreement and the Letter Agreements." Opp. 52. In fact, it is the Trustee's argument that makes no sense at all. On the termination date, Citibank had short positions in certain currencies (where LBI had failed to repay it) and long positions in other currencies (where Citibank declined to forward payments to LBI in view of LBI's continuing default). *See* Compl. ¶¶ 49, 96. As the Trustee acknowledges, "Citibank netted LBI's short positions against its long positions." Compl. ¶ 48. There is no allegation (nor could there be) that Citibank netted these currency positions at any price other than the prevailing market rates. The Trustee's argument that 11 U.S.C. § 562 somehow disqualifies the CLS Agreement and Letter Agreements from their status as "swap agreements" under the Code is meritless.

The CLS Agreement and Letter Agreements are "swap agreements" under the plain language of the Bankruptcy Code, and the Trustee offers no credible argument to the contrary.[10]

---

[10] Although he attempts to dismiss it, *see* Opp. 40 n.15, the Trustee does not dispute in any meaningful way

### B. Citibank's Actions Reduced Systemic Risk, A Clear Objective of the Safe Harbors

Given the insurmountable difficulties posed by the statutory text, the Trustee's argument begins someplace else. The Trustee starts with a discussion of the "purpose and legislative history" of the safe harbors and an argument that Citibank's provision of CLS services to LBI "does not implicate the concerns underlying the amended safe harbor provisions." Opp. 30, 32. But only two months ago, in a decision the Trustee does not even acknowledge, the Second Circuit squarely rejected a party's attempt to exclude certain transactions from the safe harbors because they allegedly "did not implicate the risks that prompted Congress to enact the safe harbor." *Enron Creditors Recovery Corp.*, 2011 WL 2536101, at *6. If it was not clear before, there is now no question that the Court should not "address . . . arguments regarding legislative history" where the language of the safe harbors is plain. *Enron Creditors Recovery Corp.*, 2011 WL 2536101, at *9; *see also Official Committee of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, --B.R.--, 2011 WL 357292, at *10 (Bankr. S.D.N.Y. July 27, 2011) ("[T]he Second Circuit in *Enron* ruled that courts construing section 546(e) need not examine its legislative history in light of its unambiguous plain language.").[11]

Thus, under clear Second Circuit precedent, Citibank's right to protection under the safe harbors does not depend in the least on whether it was doing anything to reduce systemic risk.

---

Citibank's showing that the CLS Agreement is also a "master agreement," providing for FX transactions between LBI and Citibank. *See* 11 U.S.C. § 101(53B)(A)(v). The Trustee acknowledges that LBI had a principal obligation to deliver foreign currency to Citibank, and Citibank, in turn, had a corresponding obligation to deliver different foreign currency to LBI. *See* Opp. 17-18, 49. Thus, Citibank and LBI regularly engaged in numerous "other foreign exchange" transactions, 11 U.S.C. § 101(53B)(A)(i)(II), under the CLS Agreement, and the CLS Agreement qualifies as a "master agreement"—and therefore a "swap agreement"—under the Bankruptcy Code.

[11]  The Court of Appeals issued its opinion over a vigorous dissent that sought to limit the scope of the safe harbors based on just the kind of legislative history analysis that the Trustee undertakes here. *See Enron Creditors Recovery Corp.*, 2011 WL 2536101, at *13-14 (Koeltl, J., dissenting).

The Court should not accept the Trustee's invitation to take this detour. Nonetheless, Citibank addresses the Trustee's argument here, and he could not be more mistaken. While the Trustee acknowledges that the settlement of FX transactions in CLS reduces systemic risk, the Trustee argues that Citibank's role in assuming principal responsibility for LBI's FX trades so they could settle in CLS—at a time when counterparties were unwilling to take on LBI credit risk—somehow did not serve to reduce systemic risk. Specifically, the Trustee argues that "Citibank wrongly takes credit for its supposed 'vital market-stabilizing role' in providing CLS services to LBI. To the contrary, it was the existence of the CLS process, with its limitation on systemic risk, that performed that function, not Citibank." Opp. 34 n.11 (internal citation omitted); *see also id.* at 30 ("The conduct by Citibank at issue here did not reduce systemic risk—it was the actions of CLS Bank that did so."). The argument makes no sense.

CLS settlement can only reduce systemic risk with respect to trades that are settled in the CLS system. Trades settled bilaterally, under the traditional method of FX settlement, are subject to settlement risk, Compl. ¶ 19, notwithstanding "the existence of the CLS process." Opp. 34 n.11. But a primary feature of the CLS process is that CLS Bank only settles trades submitted or authorized by Settlement Members, a select group of major financial institutions and central banks. The very materials the Trustee submitted on this motion make clear that "[t]he foundation of CLS Bank's overall risk design is the membership criteria set forth in the CLS Bank Rules for Members," which "membership criteria are designed to limit membership to those institutions that have the financial and operational capabilities to satisfy their obligations to CLS Bank in order to minimize the risk of disruptions to the Settlement Service." Menaker Decl. Ex. 1 §§ 3.1.1, 3.2.1. The CLS settlement system relies on the strength of the Settlement Members who must be principally liable for all trades in the system. *See, e.g., id.* Ex. 1 §§ 0.3.2, 0.4.2.

The only way that CLS can reduce systemic risk more broadly in the FX market (*i.e.*, beyond the proprietary trades of Settlement Members) is if Settlement Members agree to take on principal responsibility for the FX trades of User Members or third parties and authorize such trades in the CLS system. Citibank's agreement to act as LBI's Designated Settlement Member and take on principal responsibility with respect to the settlement of LBI's trades in CLS thus clearly reduced systemic risk. Indeed, it is hard to imagine a clearer instance of a Designated Settlement Member's risk-reducing role in the FX market. Because Citibank agreed to act as LBI's Designated Settlement Member and continued to advance funds into the CLS system on LBI's behalf during the week of September 15 to 19, 2008, LBI's FX trades submitted to CLS did in fact settle and LBI's counterparties to those trades did in fact receive their settlement payments. The CLS system did not, however, eliminate LBI counterparty risk but merely shifted that risk to Citibank, which suffered a $1.26 billion shortfall over this five-day period. *See* Menaker Decl. Ex. 1 § 2.2.5 ("A Settlement Member that sponsors a User Member is also exposed to the credit risk of the User Member."); *see also id.* § 3.2.1. If Citibank had refused to act for LBI in CLS and LBI had instead settled these trades under the traditional method, the FX market would have been subject to increased systemic risk and, it can safely be assumed, parties other than Citibank would have borne these (or significantly larger) losses. Indisputably, there would have been turmoil in the market. *See* Trustee's Prelim. Report Ex. C at 12 (settling transactions in CLS "avoid[ed] a major cause of defaults); *id.* at ¶ 56 (counterparties failed to perform on thousands of FX trades outside CLS, further constraining LBI's liquidity).

* * * * *

Because the CLS Agreement and the Letter Agreements are "swap agreements" and Citibank is a "financial participant" or "swap participant" under the Code, Counts I-VI, VIII, IX,

XIII, and XIV should be dismissed, with prejudice.  *See* Mot. 25-27.

## II.     The Doctrine of Equitable Recoupment Bars the Trustee's Claims

The Trustee does not dispute that equitable recoupment, if applicable, is a defense to most of his claims.  Instead, he argues that LBI's deposit of funds with Citibank, Citibank's provision of CLS services in consideration of the deposit, and Citibank's subsequent setoff of the deposit did not constitute a "single integrated transaction."  He further argues that it would be "inequitable" for LBI to have to repay Citibank for the credit Citibank extended on LBI's behalf. Opp. 4.  The Trustee's arguments fail as a matter of law.

According to the Trustee, there was no "single integrated transaction" because Citibank's $1.26 billion CLS claim "consisted of separate parts that accumulated under separate circumstances over the five-day period" between September 15 and 19.  Opp. 56.  But the Complaint and the agreements at issue establish an integrated course of dealing between LBI and Citibank. *Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998) ("In recoupment . . . the claim and counterclaim must arise out of the same transaction or *set of transactions*.") (emphasis added); *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997) ("Recoupment in bankruptcy may occur only within a single contract or transaction or a *single set of transactions*.") (emphasis added).  While the Trustee makes much of the fact that different agreements were signed over this period, at all times Citibank undertook to provide CLS settlement services in accordance with the CLS Agreement.[12]  The number of

---

[12]    On September 15, 2008, Citibank provided CLS settlement services to LBI under the terms of the CLS Agreement.  Opp. 57.  Likewise, in the Letter Agreements, Citibank agreed to settle LBI's FX transactions on September 16 and 17 "in accordance with the CLS Settlement Services Amended and Restated Agreement."  Hammerman Decl. Exs. 5 & 6.  And, similarly, once Citibank received the additional pledge from Barclays, Citibank agreed to continue providing CLS settlement services to LBI "on the basis that the provision of CLS settlement services remains subject to all rights contained in the CLS Agreement and its terms remain in full force and effect."  *Id.* Ex. 9.

agreements the parties signed is irrelevant where the operative terms of their bargain stayed the same. *See In re Norsal Indus., Inc.*, 147 B.R. 85, 89 (Bankr. E.D.N.Y. 1992) (holding that electric company's receipt of three separate security deposits was "one transaction" for purposes of recoupment because "[h]owever many different times a deposit was demanded, the deposit given was still for the same service").

Likewise, the Trustee is wrong that the $480 million CLS shortfall was not subject to recoupment because it arose before the $1 billion deposit was made. The September 15 Letter Agreement states explicitly that "Citibank shall have the right at all times to set off the amount of the referenced deposit account against *any* obligations of Lehman Brothers Inc. . . . under the CLS Agreement." Hammerman Decl. Ex. 5 (emphasis added). The Trustee cites no authority for his position that pre-existing debts are not subject to recoupment. Indeed, they are. *See In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427, 429-30, 432-33 (Bankr. S.D.N.Y. 1982) (recoupment found where creditor made an overpayment to debtor and then, in lieu of cash repayment, deducted a portion of future payments owed to the debtor).[13]

On the equities, the Trustee's arguments are equally misguided. The Trustee asserts that Citibank's demand for the $1 billion deposit, allegedly made "with a gun to LBI's head," "does not satisfy the test for equitable conduct." Opp. 57-58. But courts frequently hold that equitable recoupment applies to creditors who demand security as a condition for providing essential services. *See, e.g.*, *In re Norsal*, 147 B.R. 85 (electricity); *Brooks Shoe Mfg. Co., Inc. v. United Telephone Co.*, 39 B.R. 980 (E.D. Pa. 1984) (telephone). Moreover, the relevant question is whether "it would

---

[13]   The Trustee suggests that *In re Yonkers* is inapposite because it involved government payments for Medicare services ("a typical equitable recoupment scenario"), but does not explain why this distinction makes any difference. Opp. 57 n.18. In fact, the court in *In re Yonkers* relied on a case in which a record company recouped an artist advance (i.e., a pre-existing debt) by withholding future royalty payments from the artist. 22 B.R. at 432 (discussing *Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (W.D. Tenn. 1981)).

be *inequitable* for the debtor to enjoy the benefits of [the CLS transaction] without also meeting its obligations." *In re Malinowski*, 156 F.3d at 133 (emphasis in original). Here it would be inequitable for LBI to benefit from Citibank's provision of CLS services over the week of September 15 to 19, including by receiving hundreds of millions of dollars in currencies for which it did not pay, while avoiding the security LBI posted to induce Citibank to provide these services. Notably, the Trustee has cited *no case* in which recoupment was disallowed where, as here, the debtor consequently would be unjustly enriched.[14]

The Trustee cannot avoid Citibank's recoupment of the $1 billion deposit to satisfy its CLS exposure. Counts I-VI and VIII-XIV should be dismissed.

## III.  The Trustee's Claims to Avoid and Recover the $1 Billion Setoff Fail on Multiple Independent Grounds

### A.  Citibank Did Not Violate the Automatic Stay

The Trustee insists that the timing of Citibank's setoff of the $1 billion deposit "is a clear issue of fact that cannot be resolved on [a] motion [] to dismiss." Opp. 28. Not so. Based on the allegations of the Complaint, Citibank's setoff was undeniably pre-petition. According to the Complaint, Citibank moved the $1 billion deposit out of a Lehman-denominated account and credited the funds to a Citibank-owned account, creating a "contemporaneous record" of the transfer

---

[14]  The Trustee's allegation that Citibank acted "inequitably" by violating the automatic stay or 11 U.S.C. § 553, fails because Citibank recouped against the $1 billion prepetition (*see* pp. 20-22, *infra*) and because Citibank's right to recoupment is not limited by the automatic stay or the Bankruptcy Code restrictions on setoff. *See In re Malinowski*, 156 F.3d at 133 (equitable recoupment is not subject to the automatic stay); *In re Yonkers*, 22 B.R. at 432-33 (equitable recoupment is not limited by 11 U.S.C. § 553(b)).

Similarly, the Trustee's argument that it was "inequitable" for Citibank to allow the build-up of a $1.26 billion shortfall in alleged breach of an obligation that the exposure not exceed $1 billion is factually unfounded and legally irrelevant. There was in fact no breach (*see* pp. 33-36, *infra*) and, even if there had been, there is no basis to find that the build-up of a $1 billion shortfall was inequitable. And $1 billion is all that Citibank recouped.

at 1:13 p.m. on September 19, 2008—*prior* to the filing of the SIPA petition.  Compl. ¶ 50.  These actions effected a setoff as a matter of law.  *See Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.)*, 698 F.2d 42, 47 (1st Cir. 1983) ("[T]he Bank's actions in debiting the [debtor's] accounts and crediting its treasurer's account were sufficient" to accomplish setoff); *see also V.I. Bureau of Internal Revenue v. Chase Manhattan Bank*, 312 F.3d 131, 140 (3d Cir. 2002) (applying New York law, and finding setoff complete upon withdrawal of funds from the debtor's account and transfer to the creditor bank).[15]

Citing *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995), the Trustee argues that Citibank's setoff was ineffective because the $1 billion deposit was moved to a Citibank "administrative hold account."  The Trustee appears to confuse an "administrative hold account" with an "administrative hold."  Compl. ¶50.  *Strumpf* held that no setoff occurred when a bank placed a freeze (*i.e.*, an "administrative hold") on the debtor's checking account and refused to turn the funds over to the debtor.  516 U.S. at 17-18.  The Supreme Court held that placing an administrative hold on a customer's account was "neither a taking of possession of [the customer's] property nor an exercising of control over it."  *Id*. at 21.  Here, however, Citibank did not put an administrative freeze on LBI's account.  Instead, as the Complaint specifically alleges, Citibank actually transferred the $1 billion deposit from the Lehman account into a Citibank-owned and controlled administrative account.  Compl. ¶ 50.  This clearly was the "taking possession of" and "exercising of control over" LBI's property and thus effected a setoff.  That Citibank subsequently transferred the funds from the Citibank administrative hold account to a different Citibank-owned

---

[15]   Contrary to the Trustee's suggestion, Opp. 60, Citibank was not obligated to notify LBI of the setoff in order for the setoff to be complete.  Under New York law, Citibank was simply required to send a notice of the setoff to LBI "on the same business day," which it did.  *See* N.Y. Banking Law § 9-g(2) (2011); Compl. ¶ 53.

account, *id.* ¶ 53, has no legal significance, and the Trustee cites no authority to the contrary. Count I of the Complaint should be dismissed.

### B. Citibank Did Not Receive the Deposit to Obtain Setoff Rights Against Existing Debt

As Citibank demonstrated in its moving brief, the Trustee cannot avoid Citibank's setoff under 11 U.S.C. § 553(a)(3) because Citibank did not receive the deposit for the purpose of setting off against existing debt, but to secure Citibank's future extensions of credit to LBI. In response, the Trustee has not cited a *single* case avoiding a setoff under § 553(a)(3) where the bank extended additional credit after receiving a deposit. Instead, the Trustee argues that, on the current state of the record, there is no basis to believe that Citibank intended to extend additional credit at the time it received the deposit. Opp. 62. He points to the $480 million CLS shortfall accumulated on September 15, 2008 and insists the deposit was received for the purpose of setting off against this pre-existing debt. *Id.* at 61. The Trustee's characterization of the allegations in his Complaint cannot withstand scrutiny.

It is beyond question that the parties expected Citibank to extend additional credit at the time LBI made the deposit. The Complaint alleges that Citibank requested the deposit "as a precondition to providing any CLS settlement services." Compl. ¶ 33. In the September 15 Letter Agreement memorializing the deposit, Citibank *agreed* to settle LBI's trades in CLS on September 16 pursuant to the terms of the CLS Agreement. Hammerman Decl. Ex. 5. The CLS Agreement makes clear that, "[b]y authorizing a transaction in the CLS system . . . Citibank necessarily assumes a credit exposure to CLS Bank on [LBI]'s behalf." *Id.* Ex. 4 at 3. The fact that LBI had a pre-existing debt of $480 million cannot change the fact that Citibank obligated itself to extend future credit in exchange for the deposit. Moreover, the facts alleged in the Complaint establish that after receiving the incremental deposit of $700 million (which was added to $300 million already in LBI's

account), Citibank extended at least $15 billion in additional gross credit, resulting in a net deficit of at least $780 million over the next four days. Compl. ¶¶ 39, 76, 96. Section 553(a)(3) does not invalidate Citibank's setoff, and Count VI should be dismissed.

### C. Citibank Did Not Improve Its Position

The Trustee and Citibank agree on the mechanics of the improvement-in-position test set out in 11 U.S.C. § 553(b). The parties, nonetheless, reach different results because Citibank applies the test to the facts alleged in the Complaint, while the Trustee does not.

The Complaint establishes that "[o]n the evening of September 15," LBI held $300 million or more in its Citibank account. Compl. ¶ 39; *see also* pp. 22-23, *supra*. The Complaint further alleges that, at the end of that day, LBI owed Citibank approximately $480 million. Compl. ¶ 96. Thus, Citibank had an "insufficiency" for purposes of the improvement-in-position test of $180 million on September 15, 2008, before LBI made the incremental $700 million deposit. *See* 11 U.S.C. § 553(b)(2) ("In this subsection, 'insufficiency' means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim."). As the Trustee acknowledges, Citibank's insufficiency was $260 million on September 19, 2008. Compl. ¶ 96. Therefore, Citibank's insufficiency actually increased between September 15 and 19, Citibank did not improve its position, and the Trustee cannot recover any portion of the funds Citibank set off.

The Trustee does not, and cannot, dispute Citibank's math.[16] Instead, he suggests that

---

[16] Although the Trustee spends a great deal of time arguing that Citibank's setoff rights did not give it a "secured" claim under 11 U.S.C. § 506, Opp. 64-66, the debate ultimately does not matter. The test, by its plain terms, determines an insufficiency by comparing the amount owed by the debtor to the amount owed to the debtor. *See* 11 U.S.C. § 553(b)(2). The $300 million LBI deposit, an amount owed by Citibank to LBI before the incremental $700 million was deposited, is plainly a necessary component of the improvement-in-position calculation. Indeed the very cases the Trustee cites makes this clear. *See, e.g., Togut v. Chemical Bank (In re Hecht)*, 41 B.R. 701, 703 n.4 (Bankr. S.D.N.Y. 1984) (in calculating

the $300 million should not be included in the calculation because its "sources and purposes" are allegedly in dispute, it may have included "customer funds," and Citibank allegedly "failed to make payments despite LBI's instructions and instead built up its position for setoff." Opp. 64 (citing Compl. ¶¶ 42, 86-90, 96, 120). But there are no such allegations anywhere in the Complaint, including in the paragraphs specifically cited by the Trustee.[17] Nor has the Trustee submitted a sworn affidavit in opposition to this motion suggesting any such thing, undoubtedly because the "various forensic analyses of LBI's books and records" the Trustee has conducted over the last three years have revealed no customer interest in the funds.[18] *See* Trustee's Fifth Interim Report for the Period October 27, 2010 Through April 22, 2011 ¶ 75. This is no surprise. In each of the Letter Agreements, LBI represented and warranted that it was "duly authorized" to transfer the $300 million and that the funds were "the property only of LBI and not of any other Lehman company." Hammerman Decl. Ex. 5 ¶¶ 3-4; *id.* Ex. 6 ¶¶ 2-3. Because the Trustee does not identify any specific allegations that, if proven, would establish that the $300 million in LBI's account was not a "mutual debt owing to [LBI] by [Citibank]," *see* 11 U.S.C. § 553(b)(2), it is properly included

---

first insufficiency the court includes bank's setoff right against funds then on deposit).

[17] The Trustee makes similar unsupported assertions in connection with his arguments relating to 11 U.S.C. § 553(a)(3). Opp. 62-63. The closest the Complaint comes is an allegation that Citi withheld *CLS payments* that were *due to LBI accounts*. Compl. ¶ 42. This obviously has no bearing on whether payments should have been *made from* the $300 million that was already in LBI's account on September 15.

[18] The Trustee refers specifically to only two counterparty—not customer—claims in his opposition brief, a claim by Nomura Global Financial Products Inc. and another by PT Bank Negara Indonesia (Persero) TBK. Opp. 94 (citing Menaker Decl. Exs. 17 & 18). But the former concerns a Euro account and the latter a pound (GBP) account. *See* Menaker Decl. Ex. 17 ¶ 17; *id* Ex. 18 ¶ 2.

in the calculation of Citibank's insufficiency.[19]  Citibank did not improve its position as a creditor of

LBI, and therefore Counts VIII and IX of the Complaint should be dismissed.

      **D.**      **LBI Received "Fair Consideration" in Exchange for the Letter Agreements**

      As detailed in Citibank's moving brief, the facts alleged in the Complaint establish

that LBI received fair consideration in exchange for entering into the Letter Agreements.  In return

for the Letter Agreements (and $700 million of additional funds deposited thereunder), LBI received

(i) Citibank's forbearance from exercising its right to terminate the CLS Agreement, Hammerman

Decl. Ex. 4 at 6, (ii) access to an "indispensable" service that was "vital" to LBI's ability to maintain

its business operations and preserve value for the benefit of customers and creditors, Compl. ¶¶ 33-

37, and (iii) Citibank's continued extension of credit under the CLS Agreement in a gross amount of

at least $15 billion, creating a net deficit of $1.26 billion.  *Id.*  ¶¶ 47, 96.  Moreover, LBI received

reasonably equivalent value in exchange for the $1 billion as a matter of law, because Citibank's

rights in the collateral could not exceed LBI's debt to Citibank.  *Geron v. Palladin Overseas Fund,*

*Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 841 (Bankr. S.D.N.Y. 2005).

      In response—here, as elsewhere—the Trustee simply runs from the allegations of his

own Complaint.  The Trustee cites cases holding that "fair consideration" is a fact question that

typically cannot be determined on a motion to dismiss.  Opp. 69.[20]  But the Trustee fails to

---

[19]    The Trustee also makes the curious argument that Citibank cannot rely on its "claim" of $480 million for purposes of the improvement-in-position calculation.  But Citibank has made no such "claim."  Rather, the figure comes straight out of the Trustee's Complaint, and the Trustee uses the $480 figure in his own improvement-in-position calculation in Count VIII of the Complaint.  Compl. ¶¶ 96-101.

[20]    The cases cited by the Trustee are inapposite.  *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)* upheld a complaint that alleged specific facts showing lack of fair consideration.  429 B.R. 73, 97 (Bankr. S.D.N.Y. 2010).  *Pryor v. Fisher & Donnelly (In re Dimino)* was decided after a trial on the merits and says nothing about the pleading standard for a constructive fraudulent conveyance claim.  429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010).  *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec.*

meaningfully distinguish this case from the multiple cases cited in Citibank's moving brief dismissing constructive fraud counts where, as here, the substance of the Complaint effectively establishes "fair consideration."[21]

The only allegations the Trustee cites in support of his argument that LBI did not receive "fair consideration" are allegations that Citibank used "leverage" to "force" LBI to make the $1 billion deposit. *Id.* at 67-68 (citing Compl. ¶¶ 31-33, 36-37). But the fact that Citibank wanted the deposit and LBI may not have wanted to make it has no bearing whatsoever on whether Citibank provided LBI with "fair consideration" in exchange. Here, as the Complaint establishes, Citibank clearly did.

The Trustee also argues that Citibank did not, in fact, have the unilateral right to terminate the CLS Agreement on September 15 because such termination allegedly would have violated the ban on *ipso facto* clauses. *Id.* at 70-71. This argument is unfounded. In the first place, the Bankruptcy Code explicitly permits creditors to exercise *ipso facto* rights under contracts, such as the CLS Agreement, to "extend other debt financing or financial accommodations, to or for the benefit of the debtor." 11 U.S.C. § 365(e)(2)(B). In the second place, the *ipso facto* provision is not implicated where, as here, Citibank allegedly terminated the CLS Agreement on the basis of LBHI's

*Corp.*, 351 F. Supp. 2d 79 (S.D.N.Y. 2004) and *Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co., Ltd.*, 375 F. Supp. 2d 257 (S.D.N.Y. 2005) were decided before the Supreme Court's decisions in *Iqbal* and *Twombly*, and so have little relevance to the Trustee's pleading burden under the "plausibility" standard established by those cases.

[21]   For example, the Trustee attempts to distinguish *Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010), on the basis that those "parties had substantial pre-complaint discovery pursuant to Bankruptcy Rule 2004" and the plaintiff "admitted elsewhere in the complaint" that the debtor received significant value from the transaction at issue. Opp. 70. But in this SIPA proceeding the Trustee *has* received "substantial pre-complaint discovery" from numerous parties, including Citi, over the last three years, *see* pp. 1-3, *supra,* and likewise, the Trustee's Complaint admits the significant value LBI received from Citibank in exchange for the Letter Agreements. *See* Mot. 38-39.

bankruptcy filing and not LBI's entry into a SIPA proceeding.[22]  Finally, the consideration LBI

received in exchange for entering into the Letter Agreements and making the deposit was Citibank's

continued extension of credit to clear LBI's trades under the CLS Agreement; Citibank had complete

discretion to stop extending credit to LBI at any time, whether or not Citibank chose to terminate the

agreement.  Hammerman Decl. Ex. 4 at 3; Compl. ¶¶ 28, 47, 96.

The Complaint establishes that LBI received fair consideration in exchange for the

Letter Agreements, and therefore Counts XIII and XIV of the Complaint should be dismissed.

### E.       There Was a Contemporaneous Exchange for New Value

As the Trustee acknowledges in his memorandum of law, Citibank's setoff can only

be challenged as a preference to the extent it was invalid under 11 U.S.C. § 553(a)(3).  Opp. 72.

Because Citibank's setoff was valid, *see* pp. 22-23, *supra*, the Trustee has no basis to attack it as a

preferential transfer.   Assuming, however, that Citibank's setoff was invalid, Citibank has

established a contemporaneous exchange for new value defense as a matter of law.  In response, the

Trustee argues that the defense of contemporaneous exchange for new value raises factual issues that

cannot be decided on a motion to dismiss, citing *Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co.,*

*Inc.)*, 929 F.2d 424, 427 (8th Cir. 1991), for the proposition that "[t]he existence of intent,

contemporaneousness, and new value are questions of fact."  Opp. 74-75.  But these facts are

established by the very allegations of the Complaint.

Here, the CLS Agreement and the parties' course of dealing, as alleged in the

Complaint, provided that LBI would repay intraday credit advances immediately, an obligation LBI

violated on September 15, 2008 and throughout the rest of that week.  Compl. ¶¶ 47, 76; *see also*

---

[22]     Citibank acknowledges the Court's opinion in *Lehman Brothers Spec. Fin. Inc. v. BNY Corp. Trustee*
*Serv. Ltd. (In re Lehman Brothers Holdings Inc.)*, 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010), but
respectfully submits that only the commencement of the *debtor's* case is relevant for purposes of 11
U.S.C. § 365(e)(1).

Opp. 21-22. On September 15, 2008, LBI signed an agreement authorizing Citibank to set off any CLS obligations against a $1 billion deposit held at Citibank. Hammerman Decl. Ex. 5 ¶ 7. From September 15 to 19, LBI accrued CLS obligations of $1.26 billion, and on September 19, Citibank "transferred" the $1 billion deposit to itself to reduce LBI's CLS obligation. Compl. ¶¶ 48-50. These facts, taken solely from the Complaint and the plain language of the agreements put in issue by the Trustee, establish that the parties "intended" a "contemporaneous" exchange of "new value" and that such an exchange took place. *See In re Lewellyn & Co.*, 929 F.2d at 428-29 (relying on the parties' contracts and course of dealing as objective indicia of intent in finding contemporaneous exchange for new value where securities clearing firm accepted collateral from customer, instead of cash repayment, in consideration of credit advanced to customer over prior seven days). Accordingly, Counts IV and V fail as a matter of law and should be dismissed.

## IV.     The Trustee Admits He Has Not Stated a Claim for Actual Fraudulent Conveyance

The Trustee essentially concedes that his claim for actual fraud fails as a matter of law, but he requests leave to replead "after a reasonable opportunity to take discovery." Opp. 83-85. This request should be denied and the claim for actual fraud should be dismissed with prejudice.

In the three years since the LBI liquidation began, the Trustee has conducted broad and searching discovery of all matters concerning LBI's collapse, including LBI's relationship with Citi and the transactions at issue here. *See* pp. 1-3, *supra*. He has interviewed hundreds of former LBI employees and reviewed hundreds of thousands of pages of LBI documents. Trustee's Fifth Interim Report for the Period October 27, 2010 Through April 22, 2011 ¶¶ 72-73, 75-76. Presumably, the Trustee found absolutely no evidence of LBI's fraudulent intent, or he would have

added it to the Complaint.[23]  Because "there was an opportunity afforded to investigate the claims," and still the Trustee "has not presented particularized facts concerning the alleged intentional fraud claim," this claim should be dismissed with prejudice.  *In re Old CarCo LLC*, 435 B.R. at 194-95.

Moreover, it is clear that any amendment would be futile.  The Trustee hopes to salvage his claims of actual fraud by finding evidence that LBI "collu[ded] in Citibank's improper conduct."  Opp. 85.  It is wildly implausible that such evidence could exist when the Complaint itself (as characterized by the Trustee), alleges that Citibank made a "coercive demand for the $1 billion deposit," "on a rushed 'take-it-or-leave-it basis,'" and "with a gun to LBI's head" and that LBI made the $1 billion deposit with Citibank to ensure continued access to CLS, an "indispensable" service that was "vital" to LBI's ability to continue in business for the benefit of its customers and creditors.  Compl. ¶¶ 31-37, 107; Opp. 57, 79, 84.  The Trustee's claim that LBI engaged in these transactions with fraudulent intent is not "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Counts X, XI, and XII should be dismissed with prejudice.

## V.     There Is No Basis to Equitably Subordinate Citibank's Claims

The Trustee offers "four categories" of conduct that purportedly justify the equitable subordination of Citibank's claims.  Opp. 75.  In fact, none of the alleged conduct can plausibly be characterized as inequitable, much less the type of egregious, illegal or fraudulent conduct required to equitably subordinate the claims of a non-insider and non-fiduciary.

*First*, the Trustee points to Citibank's "compulsion under duress of the $1 billion deposit to be used in part against an existing indebtedness."  Opp. 75.  But Citibank's termination of the CLS Agreement and request for $1 billion in security before continuing to extend credit to LBI

---

[23]    The Trustee had the right to amend his Complaint, without leave of Court, within 21 days of receiving Citi's motion to dismiss.  Fed. R. Civ. P. 15(a)(1)(B).  This time limitation is intended to "force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion."  Fed R. Civ. P. 15(a) advisory committee's note.

for CLS settlement was well within Citibank's contractual rights and the only prudent course to take in view of LBI's severe financial distress. It cannot support the equitable subordination of Citibank's claims. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 609-10 (2d Cir. 1983); *see also 80 Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.)*, 169 B.R. 832, 841-42 (Bankr. S.D.N.Y. 1994).

*Second*, the Trustee points to Citibank's alleged breach of the Letter Agreements by "engag[ing] in CLS settlements far in excess of the $1 billion LBI deposit." Opp. 75. As demonstrated below (pp. 33-36), Citibank did not in fact breach any commitment "to cap LBI's exposure in CLS" at the amount of the deposit. Opp. 75. And even if Citibank did breach, its alleged conduct—extending credit *beyond* the $1 billion limit set by the parties—is not the "substantial breach of contract and advantage-taking by [a] creditor" necessary to find that a non-insider's claims should be subordinated. *In re 80 Nassau Assoc.*, 169 B.R. at 840. Citibank could hardly have taken advantage of LBI or other creditors by advancing LBI *more* credit than it was entitled to receive under the Letter Agreements, especially when LBI had requested these advances, was aware of the amount of credit it received, and failed to repay Citibank (thus creating the large shortfall). *See* Menaker Decl. Ex. 7 §§ 2.3, 2.5; Trustee's Prelim. Report ¶ 72; Compl. ¶¶ 47-49; *see also* pp. 33-36, *infra*.

*Third*, the Trustee points to "the build-up of an unprecedented shortfall in connection with Citibank's granting of intraday credits that should have been zeroed out at the end of each business day." Opp. 75. This contention is remarkable. It was *LBI's conduct*, in failing to repay Citibank's credit extensions in CLS, that led to the "unprecedented shortfall"—a fact the Trustee appears to acknowledge in other sections of his brief. *See* Opp. 22 ("LBI's failure to pay Citibank

for the intraday credits resulted in the build-up of a large shortfall in connection with CLS activity.").

      *Finally*, and most prominently, the Trustee points to Citibank's return of the $700 million Barclays had pledged with respect to LBI's CLS obligations. Opp. 75.[24] According to the Trustee, Citibank's decision to pursue recovery from its primary obligor (LBI), rather than first enforcing it rights against a third-party guarantor is conduct "so manifestly unfair" as to be "unconscionable, and it alone warrants equitable subordination of Citibank's claims." Opp. 76. But the Trustee cites no authority that would require a creditor, such as Citibank, to enforce a security agreement with a third-party guarantor (Barclays) before trying to collect its debt from its primary obligor (LBI). This is because no such requirement exists. *See In re Emergency Beacon Corp.*, 48 B.R. 341, 352 (S.D.N.Y. 1985) (citing and quoting *Anderson v. Mass. Mut. Life Ins. Co.*, 421 N.Y.S.2d 539, 540 (N.Y. Sup. Ct. 1979) ("It is a principle of common law that a security interest made for the benefit of the secured party may be released by him at his pleasure. 'It is elementary that a creditor, having in his actual possession one or two sorts of security, is not obliged to resort to either, but may collect through execution on a judgment on the debt itself; and turn about, he is not obliged to resort to his action, but may rely on either of his securities.'")). Moreover, it is hard to see how it is "manifestly unfair" to seek repayment from the party that requested and received the credit extension it failed to repay.[25]

---

[24]   Citibank returned the $700 million in pledged cash in consideration of Barclays' agreement to indemnify Citibank, in an amount up to $700 million, for losses that Citibank might suffer from its provision of CLS services to LBI. Hammerman Decl. Ex. 8.

[25]   The Trustee also argues that, because of its relationship with Barclays, Citibank should be deemed an "insider" and the lesser standard required to equitably subordinate an insider's claims should apply here. Opp. 77-78. The applicable standard is hardly relevant where, as here, there is no inequitable conduct to complain of. If considered, however, the Trustee's argument should be rejected out of hand. Nowhere does the Complaint allege that Barclays was an "insider" or that Citibank "acted in concert" with

The Trustee appears to be making some sort of "marshaling" argument, though he did not plead and could not support any such claim on the facts of this case. Marshaling is an equitable principle that protects a junior creditor by compelling a senior creditor with access to more than one fund of *the debtor* to first satisfy his claims from a fund that is unavailable to the junior creditor. *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group, LLC)*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) (citing *Meyer v. United States,* 375 U.S. 233, 237 (1963)). But here LBI does not have control over the multiple funds at issue,[26] and requiring Citibank to go after Barclays first would not only imperil or delay Citibank's recovery,[27] it would have no impact on the LBI estate because Barclays would be subrogated to Citibank's setoff rights in connection with its reimbursement claim against LBI.[28] The Trustee fails to state a claim for equitable subordination, and Count XVII of the Complaint should be dismissed.

---

Barclays or "did Barclays' bidding, enabling Barclays to acquire LBI's assets at a deep discount without having to honor its pledge." Opp. 78. Nor could these facts plausibly be inferred from the allegations of the Complaint. Moreover, these new allegations about Barclays' insider status plainly conflict with this Court's opinion (on which the Trustee claims to rely) rendered in a litigation lasting over 16 months, including 34 trial days, and in which the Trustee fully participated. *See* Opp. 78; *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143, 158-60 (Bankr. S.D.N.Y. 2011) (concluding that the negotiations between Barclays and Lehman were "arm's-length," that "Barclays acted in good faith," and that the Trustee and his co-movants were unable to demonstrate that Barclays received a windfall from the acquisition).

[26] *See In re King*, 305 B.R. 152, 169-70 (Bankr. S.D.N.Y. 2004) (denying marshaling because the debtor did not control the two funds sought to be marshaled).

[27] *See Official Committee of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 575 (Bankr. D. Del. 2001) (marshaling unavailable where senior creditor would "incur delay and further costs of collection" and bear the "risk of loss while it attempt[ed] to collect"); *see also Chittenden Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works, Inc.)*, 135 B.R. 762, 773 (D. Vt. 1991).

[28] *See Pittsburgh Nat'l Bank v. Lomb (In re Lomb)*, 74 B.R. 711, 711 (Bankr. W.D. Pa. 1987) (denying marshaling where the guarantor would be subrogated to the rights of the original creditor); *Aetna Cas. & Sur. Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772 (2d Cir. 1996) (recognizing insurer's right to be subrogated to setoff claims of co-surety); *Chem. Bank v. Meltzer*, 712 N.E.2d 656, 660 (N.Y. 1999) ("When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship status.")

## VI. There Was No Actionable Breach of Contract

The Trustee has helpfully clarified his breach of contract claim, the parameters of which are not obvious from the Complaint.[29] The Trustee claims Citibank breached Paragraph 5 of the September 16 Letter Agreement, which provides that "Citibank undertakes to effect payments on CLS only for the account of LBI . . . These payments will be made by Citibank only in amounts at any time outstanding of up to the aggregate amount in effect from time to time of the LBI deposit placed with Citibank . . . ." Hammerman Decl. Ex. 6 ¶ 5.[30] According to the Trustee, the "gravamen" of his claim is that Citibank was obligated to ensure that "LBI's exposure to CLS-related activity conducted by Citibank on its behalf would be *limited to the $1 billion sum* on deposit," and that Citibank breached this obligation in permitting "a shortfall that *exceeded* the deposit by a quarter of a billion dollars." Opp. 81 (emphasis in original).

The Trustee's claim that Citibank breached a supposed obligation to protect LBI from itself fails on multiple grounds. First, the contractual provision at issue was clearly intended to benefit Citibank—not LBI—by setting an upper limit on the amount of credit Citibank agreed to extend. *Ingram Micro Inc. v. ABC Mgmt. Tech. Solutions*, LLC, 746 F. Supp. 2d 765, 772 (E.D. Va. 2010) (applying New York law) (credit limit in contract exists "no[t] to protect [the debtor] from overextending itself, but instead . . . places an upper limit on [plaintiff's] obligation to extend [the debtor] credit"); *see also Clark Motor Co., Inc. v. Mfrs. & Traders Trust*, 360 F. App'x 340, 345-46 (3d Cir. Jan. 7, 2010) (holding that contractual limit on amount of loans existed for the benefit of

---

[29] The Complaint alleges that "[i]n return for LBI's $1 billion deposit, Citibank's rights of setoff against LBI's assets, including that deposit, are strictly limited as set forth by the terms of the Letter Agreements," and that "Citibank breached the terms of the Letter Agreements by exceeding the limitations contained therein with respect to the setoffs it purportedly has taken, and claims to be allowed to take, against LBI's assets, including the $1 billion deposit." Compl. ¶¶ 146-147.

[30] The Trustee alleges that Citibank also breached a similar (but not identical) provision in the September 15 Letter Agreement. *See* Opp. 81; Compl. ¶¶ 145-147.

lender and that borrower was not in need of protection since it could control the amount of financing it requested). Based on the allegations in the Complaint—that Citibank drafted the Letter Agreements, presented them to LBI on a "take-it-or-leave it basis," and left LBI "neither power nor time to negotiate" their terms, Compl. ¶¶ 34, 36, 107; Opp. 20—any suggestion that this provision was intended to protect LBI is simply not plausible. Further, LBI had no need for protection under this provision because it was the one that requested—and thereby controlled—the amount and value of CLS instructions settled on its behalf. Compl. ¶¶ 22, 25, 28. Citibank, of course, had the unilateral right to waive a contractual provision inserted for its sole benefit. *See, e.g.*, *In re Nemko, Inc.*, 143 B.R. 980, 987 (E.D.N.Y. Bankr. 1992) (citing John D. Calamari & Joseph M. Perillo, *The Law of Contracts* 494 (3d ed. 1987)); *Tucek v. Hoffman*, 555 N.Y.S.2d 167, 168 (N.Y. App. Div. 1990); 17A Am. Jur. 2d Contracts § 635.

But even if the $1 billion limitation in the Letter Agreements could plausibly be interpreted to protect LBI, LBI clearly waived such limitation by submitting—and not revoking—instructions to settle billions of dollars of FX transactions in CLS after entering into the Letter Agreements. Not only did LBI know the amount and value of instructions it submitted, it also had systems to monitor—and the responsibility to monitor—the short positions it was developing in each currency.[31] "It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) (finding debtor waived breaches of loan agreement by continuing to accept advances from bank); *see Clark Motor*, 360 F. App'x at 345 (rejecting claim

---

[31]  *See, e.g.*, Menaker Decl. Ex. 7 § 2.5 ("[LBI] is responsible for monitoring the CLS positions and make [*sic*] sure that they are consistent with the agreed funding schedules"); *id.* § 2.3 (LBI obligated to notify Citibank if the projected value of its instructions for a given date exceeded the short position limits set by Citibank).

that lender breached financing agreement by providing excess credit because the creditor "requested the increased financing."); *cf. Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F. Supp. 741, 745 (S.D.N.Y. 1991) (dismissing customer's claim that it was not liable for overdrafts on foreign currency exchange account, in part, because customer "was intimately aware on a daily basis of the results of all the trading done for its account").

And, even if the $1 billion limitation in the Letter Agreements was intended to protect LBI, and even if that protection was not waived, the claim fails because LBI's exposure did not increase beyond $1 billion after the parties entered into the Letter Agreements. As the Trustee is fond of pointing out, $480 million of the net $1.26 billion shortfall from CLS settlement accrued on September 15, 2008 *before* the parties entered into the Letter Agreements. Compl. ¶¶ 33, 96. Thus, LBI's incremental exposure from CLS-related activity under the Letter Agreements was at most approximately $780 million—well within the alleged $1 billion cap.

Because there was no breach, the Trustee's contract claim fails as a matter of law. Still, the Trustee's over-reaching claim for "damages" merits a brief response. In his opposition brief, the Trustee makes clear that he is not simply taking issue with the $260 million "overage," he is arguing that Citibank's $1 billion setoff should also fail because Citibank committed a material breach vitiating the entire contract. Opp. 82. This argument is simply makeweight. Under New York law, a breach is material only if it "is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citing *Babylon Assocs. v. Cty. of Suffolk*, 475 N.Y.S.2d 869, 874 (N.Y. App. Div. 1984); *see also Cablevision Sys. Corp. v. Town of East Hampton*, 862 F. Supp. 875, 885 (E.D.N.Y. 1994) ("It is well-settled that, to find that there was a material breach, the departure from the terms of the contract or defects of performance must have pervaded the whole of the contract or have been so essential as

substantially to defeat the object that the parties intended to accomplish.") (internal citation omitted).

As alleged in the Complaint, LBI entered into the Letter Agreements to secure continued access to CLS settlement services. Compl. ¶¶ 34, 36, 37. The Trustee does not assert that Citibank's alleged breach of the $1 billion limit interfered with CLS settlement; in fact, his contract claim is based on the fact that Citibank continued to settle LBI's FX transactions in CLS as LBI requested and notwithstanding the $1 billion limit.

Because the Complaint fails to state a claim for breach of contract, Count XIX should be dismissed.[32]

## VII.   The Buyer Note Claim Should Be Dismissed

The Buyer Note claim should be dismissed in favor of arbitration. The Trustee attempts to avoid the reach of the APA's arbitration clause by arguing that "the sole basis" of his claim "is the Buyer's Note itself, not the Asset Purchase Agreement." Opp. 88. But, as demonstrated in Citi's moving brief, the Buyer Note is part of the APA.[33] The Trustee also invokes an exception to this otherwise-sweeping arbitration clause—"disputes involving third-party claims"—and suggests it is "arguable" that this exception applies here because the Trustee "is

---

[32]   Following the Supreme Court's decision in *Stern v. Marshall*, Citi asked the Trustee to confirm whether he would pursue damages for his breach of contract cause of action in excess of the amounts claimed by Citibank in its proof of claim filed in this proceeding. The Trustee confirmed that he would not. Accordingly, Citibank expects that all of the issues in the contract cause of action will be bound up in the determination of Citibank's claims against the estate, and so *Stern v. Marshall* does not impact this Court's authority to adjudicate Count XIX of the Complaint.

[33]   *See* Mot. 51 n.36. The APA provides that, "[a]ll schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein." Hammerman Decl. Ex. 11 § 16.9 The APA required the Buyer Note to be issued, the Buyer Note itself says it "is issued pursuant to that certain Asset Purchase Agreement" between the parties, and the APA provides that "any dispute" that "may arise between [the parties] under this Agreement" is subject to arbitration. Hammerman Decl. Ex. 12 at 1; Ex. 11 §§ 16.2(c)(i).

mandated under SIPA to give priority to customer (i.e., certain third-party) claims." Opp. 88. The Trustee's half-hearted argument is meritless on its face.

The Trustee's defense of his claim on the merits illustrates why it should not take up any more of the Court's time and resources. The Trustee acknowledges that he must pay *someone* to satisfy the "Demand Conditions" in the Buyer Note, and thereby trigger Citi's reimbursement obligation. But he claims he is not obligated to pay the former executives who earned the vested benefits, and he accuses Citi of reading a requirement into the Buyer Note that is not there. Opp. 87. According to the Trustee, he may simply transfer funds from one of the estate's general accounts into another and deem that transfer to satisfy the payment requirement for purposes of meeting the "Demand Conditions." Opp. 87. This argument is specious. As set forth in Citi's opening brief, the "Demand Conditions" under the Buyer Note and the APA are only satisfied when a "Demand Amount" in respect of "Accrued Liabilities" has been paid, and the "Accrued Liabilities" are "Vested Benefits" that "shall be paid by the Seller [LBI] to the Transferred Business Employees." Mot. 49-50. Thus, the Trustee cannot transfer funds from one pocket to another and claim to have satisfied the condition precedent to Citi's repayment obligation.

Count XVI of the Complaint should be dismissed in favor of arbitration or dismissed on the merits, with prejudice.[34]

---

[34] Under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court lacks constitutional authority to finally adjudicate the Trustee's declaratory judgment claim and Citibank is entitled to an Article III forum. While *Stern* has engendered considerable uncertainty about the scope of Article III power and the jurisdiction of the Bankruptcy Courts, its application to Count XVI is clear. Under *Stern*, Bankruptcy Courts "lack[] the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. That is precisely the circumstance here: the Buyer Note claim is a complete *non sequitur* involving none of the factual or legal issues encompassed by Citi's proofs of claim. Accordingly, Citi respectfully requests that this Court submit proposed findings of fact and conclusions of law to the District Court with respect to the Buyer Note claim.

## CONCLUSION

For the reasons set forth above and in its moving brief, Citi respectfully submits that the Court should dismiss Counts I-VI, VIII-XIV, XVII, and XIX of the Complaint, together with Count XVIII to the extent it is directed to the $1 billion deposit and setoff, with prejudice. Count XVI should be dismissed without prejudice to the Trustee's right to re-file in an appropriate forum, or in the alternative, with prejudice.

Dated: New York, New York
September 2, 2011

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   /s/ Claudia L. Hammerman
      Brad S. Karp
      Stephen J. Shimshak
      Douglas R. Davis
      Claudia L. Hammerman
      1285 Avenue of the Americas
      New York, New York  10019-6064
      Telephone:  (212) 373-3000
      Facsimile:  (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Inc., Citigroup Global Markets, Inc., Citibank Japan Ltd., Citibank Europe plc, Citibank International plc, Citigroup Pty Limited, Banco Nacional de Mexico SA, Citibank del Peru SA, Bank Handlowy W Warszawie SA, ZAO KB Citibank, Citibank AS, and Citibank Maghreb*